7-17-09 Hearing

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF PENNSYLVANIA
 2
      HILDA L. SOLIS,                )
 3                                   )
                      Plaintiff,     )  2:09-CV-00988-CDJ
 4                                   )
                      vs.            )  Philadelphia, PA
 5                                   )  July 17, 2009
      JOHN J. KORESKO, V, et al.     )
 6                                   )
                      Defendant.     )
 7

 8                    TRANSCRIPT OF ERISA HEARING
               BEFORE THE HONORABLE C. DARNELL JONES, II
 9                  UNITED STATES DISTRICT JUDGE

10    APPEARANCES:

11    For the Government:       LINDA M. HENRY, ESQ.
                                JOAN M. ROLLER, ESQ.
12                              JOANNE BILETTA JARQUIN, ESQ.
                                U.S. DEPARTMENT OF LABOR, REGION
III,
13                                 OFFICE OF THE SOLICITOR
                                170 S. Independence Mall West
14                              Suite 630 East
                                Philadelphia, PA 19106
15
      For the Defendant:        JOHN J. KORESKO, ESQ.
16                              KORESKO LAW FIRM
                                200 West 4th Street
17                              Bridgeport, PA 19405

18                              TIMOTHY J. NIEMAN, ESQ.
                                STEPHEN MONIAK, ESQ.
19                              RHOADS & SINON
                                One South Market Square
20                              12th Floor
                                Harrisburg, PA 17108
21

22    ESR Operator:            NELSON MALAVE

23

24

25    Proceedings recorded by electronic sound recording.
```

7-17-09 Hearing

```
 1
 2                        I N D E X
 3   WITNESSES:           Direct    Cross     Redirect    Recross

 4   For the Government:

 5   Robin Murray          12        31

 6   Drake Nicholas        66        81

 7   Jocelyn Sweeting      98

 8

 9   EXHIBITS:                      Marked    Admitted
10   For the Government:
     G-3  E-mail from PennMont to                19
11        Robin Murray
     G-4  E-mail from Robin Murray to
12        Gene Bonnie at PennMont               20
     G-15 E-mail from Gene Bonnie to            21
13        Robin Murray
     G-5  E-mail from Gene Bonnie to            22
14        Robin Murray
     G-7  E-mail from PennMont to               25
15        Robin Murray
     G-8  E-mail from Robin Murray to           26
16        Larry Townsend
     G-9  E-mail from Larry Townsend to         28
17        Robin Murray
     G-16 E-mail from Gene Bonnie to            30
18        Robin Murray
     G-17 Letter from Koresko Law Firm to       67
19        Mr. Nicholas, Rhoades & Sinon

20
     RULINGS:                      Page      Line
21
     Motion to quash subpoena to     9         19
22   Ms. Russell granted

23   Request for a temporary        121        7
     restraining order denied
24

25
```

                                                    - 3 -

                              Colloquy

7-17-09 Hearing

1        THE CLERK:  The Honorable C. Darnell Jones
presiding.

2        THE COURT:  Good morning.  You may be seated.

3        IN UNISON:  Good morning, Your Honor.

4        THE COURT:  Counsel, would you identify yourselves

5   for the record?

6        MS. HENRY:  For the plaintiff, Hilda Solis,
Secretary

7   of Labor, Linda Henry, United States Department of Labor,

8   Regional Solicitor's Office.  Also with me at counsel table

9   are Joan Roller --

10        MS. ROLLER:  Good morning, Your Honor.

11        MS. HENRY:  -- and Joanne Jarquin.

12        MS. JARQUIN:  Good morning.

13        THE COURT:  Good morning.

14        MR. KORESKO:  For the defendants, John Koresko.

15        THE COURT:  Good morning.

16        MR. KORESKO:  Good morning, sir.

17        MR. NIEMAN:  Your Honor, for the defendant,
Community

18   Trust Company -- excuse me, for Farmers & Merchants Trust

19   Company is successor to Community Trust Company.  Tim Nieman

20   with Steve Moniak for Rhoads & Sinon, and I'll get the words

21   out better as we go forward today.

22        THE COURT:  Very well, good morning.

23        MR. MONIAK:  Good morning.

24        THE COURT:  Counsel, let's do this.  Why don't you

25   remain standing?  Let's go forward with the motion to quash

- 4 -

Colloquy

1   that you filed.  And I said remain standing; I'm talking to
Page 3

7-17-09 Hearing

2   counsel, here.  Thank you very much for your courtesy.

3        MR. NIEMAN:  Yes, Your Honor, thank you.  Yesterday

4   we filed a motion to quash in response to a subpoena that was

5   served, and I use that term in quotes, upon Susan Russell who

6   is an employee of F&M Trust.  The subpoena was served at

7   approximately some point after 12:30 yesterday afternoon,

8   which was less than twenty-four hours.  It was not personally

9   served on Ms. Russell.  Instead, there was another bank

10  employee who doesn't even work at that office who happened to

11  be there, and it was handed to him, and that was the service.

12  There was no witness fee tendered, there was no mileage fee

13  tendered, there was no advance notice of the subpoena, as

14  well, even though it asks for the production of documents at

15  the hearing here today.

16        So our first grounds for quashing the subpoena would

17  be that service wasn't effectuated properly and there isn't a

18  proper subpoena in the first place.  Second of all, if you

19  take a look at the subpoena itself, in light of the time

20  constraints we had, less than twenty-four hours, and with the

21  broad nature of the documents requested, there was just no way

22  that we could have complied.  First of all, under Rule 45,

23  there has to be a reasonable time to comply.  If there isn't a

24  reasonable time to comply, the subpoena should be quashed.

25  Here, the subpoena requested the witness, Ms. Russell, to

Page 4

7-17-09 Hearing

- 5 -

Colloquy

1   bring with her all correspondence between any of the

2   following:  Susan Russell, Lowell Gates, F&M Trust,
Department

3   of Labor, and Rhoades & Sinon.  That encompasses thousands
and

4   thousands of pages of documents because it's not limited in

5   any time of -- any way or manner of time, scope, relevancy,

6   even, or subject matter.  It could be, conceivably, almost

7   every piece of paper that's within the possession of F&M
Trust

8   and its predecessor, CTC.  So there wasn't reasonable time to

9   comply.

10          In addition to this, because the subpoena asks for

11   documents that relate to communications with Rhoads & Sinon

12   and also with Mr. Gates who was former counsel of CTC,
there's

13   issues of privilege that would need to be reviewed and looked

14   at, as well, which we were not able to do because of the time

15   constraints and because there was no limit on the subject

16   matter, there were plenty of documents that are responsive to

17   this subpoena that deal with non-REAL VEBA, clients of F&M

18   Trust and its predecessor, CTC, and those would conceivably
be

19   subject to issues of confidentiality and also issues of

20   business information and protected business information.

21          And finally, Rule 45(c)(1) imposes a duty upon the

22   defendants who served the subpoena, which is Mr. Koresko's

23   clients, to take reasonable steps to avoid imposing undue

24   burden or expense.  And it's our contention that by serving

25   this, sort of at the eleventh hour, with this unwieldy, broad

7-17-09 Hearing

- 6 -

Colloquy

1  request for documents, and not even effectuating proper

2  service in the fact that we had to go to the expense and

3  trouble to file and prepare this motion in brief, that we

4  should be entitled to attorneys' fees and costs for that, as

5  well, Your Honor.

6          THE COURT:  Thank you very much.

7          MR. NIEMAN:  You're welcome.

8          THE COURT:  Mr. Koresko?

9          MR. KORESKO:  Let me -- Your Honor, we filed this

10  morning a motion to dismiss on the 12(b)(1) and 12(b)(6), and

11  unfortunately, I got the -- as we talk about eleventh hour

12  issues, I got their motion to quash last night at

13  approximately 7 o'clock, 7:30 at my office while I was
working

14  on the 12(b)(1) and 12(b)(6).  So I think we all are under an

15  eleventh hour in this.  The Department of Labor filed this,
or

16  I got notice Tuesday evening for this preliminary injunction

17  and TRO.  The Department of Labor, yesterday, which was very

18  interesting, filed an amendment in which they changed a lot
of

19  things.  First of all, they said that their statements to the

20  Court were on representations from counsel of F&M and that

21  they were going to produce and F&M employee to testify

22  ostensibly against our interest.  Which means that the
trustee

23  was going to testify against the interests of the

Page 6

7-17-09 Hearing

24    beneficiaries acting through their irrevocable attorney, in

25    fact.  To come to court and say we will gladly produce

- 7 -

Colloquy

1    somebody, but we won't gladly produce the person that can

2    actually show that there was collusion between F&M and the

DOL

3    that would obviate the complaint in its entirety on the basis

4    of unclean hands, and possibly expose why F&M Trust Company

5    should not even be a fiduciary anymore because of its lack of

6    good faith and its lack of fiduciary responsibility to its

7    sesquae (ph.), and, by the way, its litigation partner in

8    numerous litigations.

9        THE COURT:  Let me just ask you at this juncture to

10    address the violations of Rule 45.

11        MR. KORESKO:  Okay, the issue regarding service,

12    Susan Russell is an employee.  Susan Russell is what is the

13    principal person on this account.  It was served at the

office

14    of the individual employee.  There hasn't been any testimony

15    here that the person was not a person in charge --

16        THE COURT:  Doesn't the rule -- and I apologize for

17    interrupting, but as I understand the rule, the rule requires

18    delivering a copy to the named person.

19        MR. KORESKO:  Delivering a copy to the -- there's

20    actually three -- there is three provisions.  The Federal

21    Rules provide not only for serving -- I believe it's Rule 4

--

22    provide for service under the law of the state and also under

7-17-09 Hearing

23    the Federal Rules itself.  In this particular instance, we

24    took the position that serving a person at the office of F&M

25    was tantamount to service on Ms. Russell, particularly - -

- 8 -

Colloquy

1         THE COURT:  But you also took that position
regarding

2    Lowell Gates, is that correct?

3         MR. KORESKO:  Lowell Gates' deposition -- it's not

4    just involved in the deposition of Lowell Gates, although
it's

5    very important for her to confirm what Mr. Gates said.  We

6    didn't serve Mr. Gates properly, and that's a problem.  There

7    was a mistake made by the processor on the subpoena to Lowell

8    Gates.  Consequently, we don't have the people here that are

9    necessary to prove our case.  But at the same time, Your

10   Honor, it's completely inequitable for F&M to claim a

11   violation of Rule 45 as to a favorable witness, but then to

12   offer an unfavorable witness without any objection at all.

13   It's completely contradictory to their obligations under the

14   plan and trust documents.  It goes to the nature of the

15   proceeding.  The reason for this TRO is to allegedly impose a

16   mandatory injunction on us.  To reverse our exercise in

17   discretion.  It is complete inequitable --

18        THE COURT:  Counsel, I don't want to get into the

19   substance of your argument.  I just want to hear, right now,

20   the procedural violations.

21        MR. KORESKO:  It was served at the office of the

Page 8

7-17-09 Hearing

22    individual on a person who allegedly was the person in charge

23    at the time.  There's been no offer of proof contradictory to

24    that.  We don't believe that a -- because of the -- also,

25    because of the privity between the trustee and the
defendants,

- 9 -

Colloquy

1    here, in essence, and also because Ms. Russell, through

2    Community Trust Company, is in essence, an employee, an agent

3    of the defendants in this case.  They're parties.  It's not

4    just a situation where it's a third-party witness.

5              THE COURT:  All right.

6              MR. KORESKO:  These are parties.

7              THE COURT:  Thank you very much.  Counsel, you wish

8    to respond?

9              MR. NIEMAN:  Your Honor, Rule 45 is very clear in

10   terms of how service is to be made.  If Mr. Koresko had

11   attempted to serve a corporate designee of F&M Trust, it
might

12   be a different story.  He specifically attempted to serve

13   Ms. Russell.  He had to have his process service personally

14   hand the document to her, tender the witness check and the

15   mileage check.  That was not done here, and the motion should

16   be quashed on that reason alone -- or, I'm sorry, the
subpoena

17   should be quashed on that reason alone.

18             THE COURT:  The order of the Court is as follows.

19   And now, this 17th day of July, 2009, upon consideration of

7-17-09 Hearing

20    the within the emergency motion to quash subpoena of

defendant

21    Farmers and Merchants Trust Company of Chambersburg,

successor

22    by merger to Community Trust Company, it is hereby ordered

23    that said subpoena directed to Susan Russell if quashed.  The

24    basis for this order is the defendant Koresko's violation of

25    Federal Civil Procedure 45.

- 10 -

Colloquy

1        Now, let's go to the TRO -- excuse me.  Counsel, let

2    me just address one other issue, and that is the request for

3    attorneys' fees.

4        MR. NIEMAN:  Yes, Your Honor.

5        THE COURT:  I'll hold that under advisement --

6        MR. NIEMAN:  Okay.

7        THE COURT:  -- at this point.

8        MR. NIEMAN:  Thank you.

9        THE COURT:  Yes, sir.  All right.  Counsel, you may

10    proceed.

11        MS. HENRY:  Thank you.  Your Honor, we intend to

12    proceed to show why temporary restraining order should be

13    issued against what we call the Koresko defendants in this

14    case.  Before we proceed with our witnesses, procedural

15    matter, I know that many papers have been brought to the

16    Court's attention.  There has, also -- and we would be

willing

17    to give a courtesy copy to the Court if you do not have it

18    yet -- a complaint that had been filed yesterday evening by

19    some of the Koresko defendants against Hilda Solis, several

7-17-09 Hearing

20    attorneys with the U.S. Department of Labor, and several

21    investigators with the Department of Labor.  And we just

22    thought that if the Court didn't have a copy of that, we
would
23    be willing to supply it.

24            THE COURT:  We have it.

25            MS. HENRY:  Thank you.  The Secretary calls Robin

- 11 -

Colloquy

1    Murray.

2            MR. KORESKO:  Your Honor, we would like to

3    preliminarily object to this proceeding.  If the Court does

4    not have subject matter jurisdiction of this matter, the
Court
5    cannot issue a temporary restraining order, and a Court
cannot
6    issue the relief that they have requested because the

7    Department of Labor doesn't have standing to even come in and

8    ask.

9            THE COURT:  The objection's overruled.  You have an

10    exception.

11            MR. KORESKO:  Is Your Honor -- are you making a

12    ruling at this point that the Department of Labor has

13    standing?

14            THE COURT:  counsel, the objection is overruled.

15            MR. KORESKO:  Okay.

16            THE COURT:  You have an exception.

17            MR. KORESKO:  Thank you.

18            THE COURT:  You may step forward.

19            MR. KORESKO:  Your Honor, I object to this
                            Page 11

7-17-09 Hearing

particular

under

20    being called.  This particular witness, first of all, is

21    a fiduciary relationship to the defendants.  This particular

22    witness has absolutely no knowledge and information about the

23    course of conduct relating to this particular matter.  This

24    particular witness was hand-picked, apparently, by an

25    interested trust company in order to overrule the plain

- 12 -

Colloquy

1    language of the documents best in complete discretion in the

2    choice of the fiduciary in PennMont Benefit Services, Inc.

3    Consequently, what she has to offer is predominantly hearsay

4    testimony and also the fact that she has no history with the

5    particular relationship that's credible under these

6    circumstances.

7        THE COURT:  All right, again, the objection's

8    overruled.  The Court will hear her testimony and rule based

9    upon what she says.

10        PLAINTIFF'S WITNESS, ROBIN MURRAY, SWORN

11        THE CLERK:  Please say your full name for the

record,

12    spelling your last name.

13        THE WITNESS:  Robin Murray, M-U-R-R-A-Y.

14        MS. HENRY:  Your Honor, for this proceeding, would

15    you prefer that counsel stand at table to examine or come to

16    the podium?

17        THE COURT:  Whatever's convenient for you, counsel.

18        MS. HENRY:  Thank you.

19                    DIRECT EXAMINATION

Page 12

7-17-09 Hearing

20   BY MS. HENRY:

21   Q.   Please state your name and business address.

22   A.   Robin L. Murray, 20 South Main Street, Chambersburg, PA.

23   Q.   And for whom do you work?

24   A.   Farmers & Merchants Trust Company.

25   Q.   What is your job title with Farmers & Merchants Trust

- 13 -

Robin Murray - Direct

1    Company?

2    A.   Trust operations manager.

3    Q.   What are the duties of the trust operations manager?

4    A.   I oversee the trust operations clerks, and we verify and

5    post the information that our admin assistants input.  We

6    process checks and trades, the tax processing in the

7    department.

8         THE COURT:  I'm sorry, what was the last portion of

9    the sentence?

10        THE WITNESS:  Tax -- we process tax information in

11   our department.

12   Q.   Is F&M Trust the trustee of a trust known as the Single

13   Employer Welfare Benefit Plan Trust and/or the REAL VEBA

14   Trust?

15   A.   Yes.

16   Q.   And at what point in time did F&M become the trustee of

17   that trust?

18   A.   Upon the merger with CTC, November 30, 2008.

19   Q.   At that time, did you obtain any trust agreements
between

7-17-09 Hearing

20    CTC and the plan administrator?

21    A.    Yes.

22    Q.    Did you review those agreements?

23    A.    Yes.

24    Q.    Who was the plan -- is the plan administrator?

25    A.    That is Sue Russell.


                                                        - 14 -

                        Robin Murray - Direct

1    Q.    Okay, that's what you're calling an administrator within

2    your --

3    A.    Yes, yes.

4    Q.    Okay, when I talk about a plan administrator, are the

5    plans -- do they have an administrator who requests payment

6    from the trust for their services or for benefits or for

7    premiums?

8    A.    I'm sorry, can you --

9    Q.    Yes, I'll try to phrase it another way.

10    A.    Okay.

11    Q.    Are you familiar with a company called PennMont --

12    A.    Yes.

13    Q.    -- Benefit Services?

14    A.    Yes, yes.

15    Q.    Who is PennMont Benefit Services?

16    A.    They are the ones that do direct us.  They give us the

17    information every week what to -- they would be the

18    administrator, that's what you're looking for.  Yes.

19    Q.    Did the trust agreement say that CTC and, by merger, F&M

20    Trust was a directed trustee?

                        Page 14

7-17-09 Hearing

21      MR. KORESKO:  Objection, Your Honor.

22      THE COURT:  Basis?

23      MR. KORESKO:  The trust documents speak for

24  themselves.  They've been attached to the motion for

25  preliminary injunction and temporary restraining order.  In

- 15 -

Robin Murray - Direct

1  addition, this particular individual has not been qualified
as

2  able to make legal determinations as to the implications of a

3  particular trust agreement.  Consequently, she's not
competent

4  to testify as to what it says or what the import is.

5      THE COURT:  Overruled.  Do you recall the question?

6      THE WITNESS:  No.

7  A.  Can you repeat please?

8  Q.  Yes.  Did the trust agreement say whether or not CTC,
and

9  thus F&M Trust, was a directed trustee?

10  A.  Yes.

11  Q.  And what did it say?

12  A.  It says that we are the directed trustee.

13  Q.  What do you understand about F&M's trust duties as a

14  directed trustee?

15  A.  We receive direction from PennMont, and as a directed

16  trustee, we also, we have a few fiduciary responsibility on

17  the account to review what they request to make sure that the

18  requests are acceptable distributions.

19      MR. KORESKO:  Your Honor.

20      THE COURT:  Yes?

7-17-09 Hearing

21          MR. KORESKO:  With all due respect, that's a legal

22    conclusion.  The term fiduciary responsibility is a legal

23    conclusion, it's not a fact.

24          THE COURT:  The objection's overruled.

25    BY MS. HENRY:


- 16 -

Robin Murray - Direct

1    Q.    Did you, in the normal course of your duties, receive e-

2    mails from PennMont for payments?

3    A.    Yes.

4    Q.    I'm going to show you an exhibit that is an e-mail dated

5    May 5, 2009, and I have a query for the Court.

6          MS. HENRY:  These have already been numbered as

7    exhibits in an attachment to an affidavit that was submitted

8    with the department's application.  We could keep the same

9    numbering system --

10          THE COURT:  Let's do that, please.

11    Q.    I will show you, then, what has been marked as Exhibit

3.

12          MS. HENRY:  May I approach the witness?

13          THE COURT:  Yes.  Yes, please, thank you.

14    Q.    Do you recognize the document that has been marked as

15    Exhibit 3?

16    A.    Yes.

17    Q.    What is this document?

18    A.    It's an e-mail that I received from Gene Bonnie.

19    Q.    And what was the subject matter of this e-mail from Gene

20    Bonnie?

7-17-09 Hearing

21          THE COURT:  Excuse me, for the record --

22    A.   Oh, from --

23          THE COURT:  -- who is Gene Bonnie?  I'm sorry.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  For the record, who is Gene Bonnie?


                                                      - 17 -

                     Robin Murray - Direct

1           THE WITNESS:  She works for PennMont.

2           THE COURT:  Do you know what capacity?

3           THE WITNESS:  She's an attorney.

4           THE COURT:  You may continue.

5    BY MS. HENRY:

6    Q.   In the course of your duties with F&M trust, when you

7    received e-mails from PennMont requesting payments, from whom

8    do those e-mails typically come?

9    A.   They either come from Larry or Gene, and actually, this

10   one was from Larry.  I'm sorry, I said Gene.

11   Q.   Who is Larry?

12   A.   Larry Townsend also works for PennMont.

13   Q.   Did you respond -- well, let me ask this another way.

14   Did you forward all the payments requested in this e-mail

15   marked as Exhibit 3?  And by you, I mean F&M Trust?

16   A.   No, we did not.

17   Q.   Which payments did you not forward?

18   A.   The legal fees to Koresko Law Firm.

19   Q.   And why didn't you forward those fees?

20   A.   Because due to -- whenever we spoke to our counsel, and

21   through the decision, we made a decision that we would not

pay

                          Page 17

7-17-09 Hearing

22   this because we did not feel it was an allowable expense for

23   the plan.

24   Q.   And why wasn't it felt to be an allowable expense for the

25   plan?


                                                          - 18 -

Robin Murray - Direct

1    A.   Well, let me back up.  We actually sent another e-mail

2    requesting additional information, so we sent an e-mail prior

3    to making that decision.

4         MS. HENRY:  I would move for the admission of

5    Government Exhibit 3 into evidence.

6         THE COURT:  Any objection?

7         MR. KORESKO:  Your Honor, our objection would

8    primarily be on the basis of privilege in that this is a

9    communication between employees of Koresko law firm and the

10   trustee.  And in addition, Your Honor, I would ask you to

11   take --

12        THE COURT:  Excuse me, did you disagree with the

13   witness that this was transmitted from your entity to her?

14   And if that's the case, the privilege is waived.

15        MR. KORESKO:  Well, Your Honor, I would ask you to

16   take a look at the bottom of the e-mail, it says F&M 362.

17   This was production of documents that was made part -- we

18   believe that this was made part of a production of documents

19   voluntarily given to the Department of Labor by F&M Trust

20   Company.  I believe that the present --

21        THE COURT:  But counsel, you're mixing apples and

22   oranges.

    23          MR. KORESKO:  Well, no, it goes to the issue of

    24   whether there's a statutory privilege under the Gramm-Leach-

    25   Bliley Act, the detail was previously asserted on behalf of


                                                          - 19 -

                            Robin Murray - Direct

     1   the defendants in the context of the litigation Child (ph.)
v.

     2   Community Trust.

     3          THE COURT:  If that's the basis for the objection --

     4          MR. KORESKO:  Yes, Your Honor.

     5          THE COURT:  -- the objection is overruled.  The

     6   exhibit is admitted.  Excuse me, thank you.

     7   BY MS. HENRY:

     8   Q.   You mentioned that you had communications with PennMont

     9   after receiving the e-mail marked as Exhibit 3.  I would like

    10   to show you what has been previously marked as Exhibit 4 in

    11   the documents attached to the application.

    12          MS. HENRY:  May I approach?

    13          THE COURT:  Yes.

    14   Q.   Do you recognize the document marked as Exhibit 4?

    15   A.   Yes.

    16   Q.   What is this document?

    17   A.   It's an e-mail that I sent to Gene Bonnie.

    18   Q.   And the date of this e-mail is Monday, May 11th.  Is
that

    19   when you sent it to Gene Bonnie?

    20   A.   Yes.

    21   Q.   Why did you send this e-mail to Gene Bonnie?

    22   A.   We sent this to request additional information regarding

7-17-09 Hearing

23    the legal services fee that was requested for us to pay for
24    85,000 dollars to Koresko.  We wanted some further -- it's
our
25    policy in our department to have those types of information
in

                                                        - 20 -

                         Robin Murray - Direct

 1    our department and due to the policy, we wanted to have the
 2    invoice to support their request.
 3           MS. HENRY:  I would move for the admission of
 4    Government Exhibit 4.
 5           THE COURT:  Any objection?
 6           MR. KORESKO:  No, Your Honor.
 7           THE COURT:  So admitted.
 8           MS. HENRY:  I have an exhibit that was not attached
 9    to the application for a TRO which we will call Government
10    Exhibit 15 because there were fourteen exhibits.
11           THE COURT:  Very well.
12           MS. HENRY:  And may I approach?
13           THE COURT:  Does Mr. Koresko have a copy of that?
14           MS. HENRY:  I'm going to give Mr. Koresko --
15           THE COURT:  All right.  Certainly.
16           MS. HENRY:  -- and Mr. Nieman a copy.
17    BY MS. HENRY:
18    Q.   Looking at Government Exhibit 15, do you recognize this
19    document?
20    A.   Yes.
21    Q.   What is this document?
22    A.   It's an e-mail that I received from Gene Bonnie.
23    Q.   And what was the e-mail from Gene Bonnie in regards to?

7-17-09 Hearing

24    A.    It was her response to my request, and she sent an

25    attachment including the invoice that represented the 85,000

- 21 -

Robin Murray - Direct

 1    dollars.

 2    Q.    When you say a response to your request, was this a

 3    response to your request for --

 4    A.    In the e-mail from Exhibit 4.

 5    Q.    -- from PennMont --

 6    A.    Yes.

 7    Q.    -- for the 85,000, is that correct?

 8    A.    Yes.

 9    Q.    Did you have any communications with Ms. Bonnie orally,

10    or over the phone?

11    A.    No.

12    Q.    After you received Government Exhibit 15 from Ms. Bonnie

13    from PennMont, did you forward the money in response to the

14    request for the 85,000 dollars?

15    A.    No, we did not.

16    Q.    Why not?

17    A.    After reviewing the spreadsheet, we saw that the

expenses

18    were tax issues, and we did not feel that they were allowable

19    payable expenses.

20          MS. HENRY:  I would move for the admission of

21    Government Exhibit 15.

22          THE COURT:  Any objection?

23          MR. KORESKO:  None, Your Honor.

Page 21

7-17-09 Hearing

24      THE COURT:  So admitted.  You may continue.

25      MS. HENRY:  May I approach?

- 22 -

Robin Murray - Direct

1        THE COURT:  Yes.

2   BY MS. HENRY:

3   Q.   I will show you what has been marked as Government

4   Exhibit 5.  Government Exhibit 5 is a document that has, at

5   the top, Robin Murray, forward, FW checks 2009.05.12.419.
Did

6   you receive this e-mail?

7   A.   Yes.

8   Q.   And did you receive this e-mail on the date that this
was

9   sent?

10  A.   Yes.

11  Q.   And what was this e-mail in reference to?

12  A.   This was our weekly request to process checks that we

13  receive from Gene Bonnie's office.

14  Q.   And when you say our weekly, do you refer to F&M Trust?

15  A.   yes, yes, sorry.

16  Q.   And is that, when you say the weekly request, is that a

17  weekly request from PennMont for distribution of monies from

18  the trust?

19  A.   Yes.

20  Q.   Did you review this e-mail?

21  A.   Yes.

22  Q.   Did you forward the monies that were requested, all of

23  the monies that were requested in this e-mail?

24  A.   No, we did not.

Page 22

7-17-09 Hearing
25   Q.   And why not?

- 23 -

Robin Murray - Direct

1   A.   We felt that -- she did include an attachment, but we

2   felt that it was the same situation as previous, that this
was

3   including a tax issue, and it was not allowable expenses.

4   Q.   And when you say a tax issue that wasn't allowable

5   expenses, what do you mean by that?

6   A.   Well, we just feel that that is not an allowable expense

7   for this plan.  That -- I don't know how to word it.

8        MS. HENRY:  I would move for the admission of

9   Government Exhibit 5.

10        THE COURT:  Any objection?

11        MR. KORESKO:  Only subject to the Gramm-Leach-Bliley

12   objection, Your Honor.

13        THE COURT:  Very well, objection's overruled,

14   exception's noted.  The item is admitted.

15        MS. HENRY:  May I approach?

16        THE COURT:  Yes.

17   BY MS. HENRY:

18   Q.   I'm showing you what has been marked as Exhibit 7, an e-

19   mail with Robin Murray wires 2009.05.26.419 at the top.  Do

20   you recognize this document?

21   A.   Yes.

22   Q.   What is this document?

23   A.   Again, it's the weekly request to process checks and

24   wires for the week.

25   Q.   To process checks and wires from the week from whom?

7-17-09 Hearing

- 24 -

Robin Murray - Direct

1    A.    From PennMont from the account.

2    Q.    Did you forward payment with regard to all the requests

3    in this e-mail?

4    A.    No, we did not.

5    Q.    Which did you not forward payment?

6    A.    Koresko Law Firm, legal services fee.

7    Q.    Why did you not forward payment with regard to that

8    request?

9    A.    Upon consultation with our counsel, we decided not to do

10   that, but also, they did not include an invoice backing the

11   request.

12   Q.    What was the issue as to why it was not forwarded upon

13   consultation with the counsel?

14   A.    Because we did not receive proper documentation.

15         MS. HENRY:  I move for the admission of Government

16   Exhibit 7.

17         THE COURT:  Any objection?

18         MR. KORESKO:  Your Honor, to streamline matters, I

19   just have a continuing objection to any of the e-mails that

20   the government --

21         THE COURT:  I have a policy of no continuing

22   objections.

23         MR. KORESKO:  Okay.

24         THE COURT:  You must state your objection for the

25   record.

7-17-09 Hearing

- 25 -

Robin Murray - Direct

1          MR. KORESKO:  All right, it's a Gramm-Leach-Bliley

2   objection, Your Honor.

3          THE COURT:  All right, overruled.  Exceptions noted.

4   It is admitted.  Thank you very much.

5   BY MS. HENRY:

6   Q.   Ms. Murray, I'm showing you what's been marked as

7   Government Exhibit 8.  Do you recognize this document?

8   A.   Yes.

9   Q.   What is this document?

10  A.   This is an e-mail that I sent to Larry Townsend in

11  response to the previous exhibit.

12  Q.   Why did you send this e-mail -- well, first of all,
Larry
13  Townsend, you testified before, is with PennMont?

14  A.   Yes.

15  Q.   And why did you send this e-mail to Larry Townsend?

16  A.   We -- I was just mentioning to him that it's our

17  department's policy to have the documentation on these types

18  of plans on which we serve as trustee and that's what -- I
was
19  sending him an e-mail requesting the information.

20  Q.   Did you receive any information regarding participating

21  employer plan documents as was stated in the e-mail?

22  A.   No.

23  Q.   Why were you requesting employer plan documents?

24  A.   It's our department's policy.

25  Q.   And why is it the policy to have those documents?

Page 25

7-17-09 Hearing

- 26 -

Robin Murray - Direct

1   A.   Because as a fiduciary responsibility, we need to know

2   what payments are being distributed out of our clients'

3   accounts.

4            MS. HENRY:  I move for the admission of Government

5   Exhibit 8.

6            THE COURT:  Any objection?

7            MR. KORESKO:  Only a Gramm-Leach-Bliley objection.

8            THE COURT:  All right, objection overruled.

9   Exception noted.  It is admitted.

10           MS. HENRY:  May I approach, Your Honor?

11           THE COURT:  Yes.

12  BY MS. HENRY:

13  Q.   Ms. Murray, I am showing you Government Exhibit 9 which

14  has at the top Robin Murray, checks and wires,

2009.06.09.419.

15  Do you recognize this document?

16  A.   Yes.

17  Q.   What is this document?

18  A.   It's an e-mail that I received from Larry Townsend from

19  PennMont.

20  Q.   And in these e-mails, did you receive these e-mails,
both

21  in this exhibit and the previous exhibits the same day that

22  they were marked on the e-mail?

23  A.   Yes.

24  Q.   Is this an e-mail that is requesting payments?

25  A.   Yes.

7-17-09 Hearing

- 27 -

Robin Murray - Direct

1    Q.    Did F&M Trust forward all the payments that were
2    requested in this e-mail to PennMont?
3    A.    No, we did not.
4    Q.    which payments did you not forward?
5    A.    Legal fees that were requested to be paid to Caplin
6    Drysdale Attorneys.
7    Q.    Why did you not forward the legal fees requested for
8    Caplin Drysdale Attorneys?
9    A.    We did not receive the required documentation, the
10   supporting documentation.
11          THE COURT:  Excuse me, what is the required and
12   supporting documentation that you speak of?
13          THE WITNESS:  We, like, in our department, our
policy
14   is to have supporting documentation to back up these
requests.
15   We don't like to pay a bill that we don't know what it
16   represents.
17          THE COURT:  Can you give me an example?
18          THE WITNESS:  Well, say, if you wanted me to pay you
19   a hundred dollars out of --
20          THE COURT:  Let's not use me for payment.
21          THE WITNESS:  Okay, sorry.  Okay, so in this case,
we
22   would want a bill from the attorney's office itemizing the
23   fees.  That way, then, we know what the fees represent.
24          THE COURT:  Thank you, you may continue.
25   BY MS. HENRY:

7-17-09 Hearing

- 28 -

Robin Murray - Direct

1  Q.   And I think you had testified earlier, Ms. Murray, that

2  in some cases you received an invoice and still no payment
was

3  forwarded.

4  A.   Yes.

5  Q.   And was not payment forwarded when -- even in those
cases

6  where you did receive an invoice.

7  A.   We did not feel they were allowable expenses for the

8  plan.

9         MS. HENRY:  I move for the admission of Government

10  Exhibit number 9.

11        THE COURT:  Any objection?

12        MR. KORESKO:  Privilege under the Gramm-Leach-Bliley

13  Act, Your Honor.

14        THE COURT:  Overruled, exception is noted.  It is

15  admitted.

16        MS. HENRY:  May I approach, Your Honor?

17        THE COURT:  Yes.

18  BY MS. HENRY:

19  Q.   I'm showing you Government Exhibit 16 which is an e-mail

20  from Gene Bonnie.  What is the date on that e-mail?

21  A.   June 17th.

22  Q.   And is it addressed to yourself?

23  A.   Yes.

24  Q.   Did you receive that e-mail on June 17th?

25  A.   Yes.

Page 28

7-17-09 Hearing

- 29 -

Robin Murray - Direct

1          THE COURT:  The year, please.  I'm sorry.

2          THE WITNESS:  Oh, 2009.

3    Q.    What was the topic of that e-mail?  Why was that e-mail

4    sent to you?

5    A.    She was sending me a plan documentation.  The type of

6    arrangement -- I'm trying to think here, read here -- it was

7    in response to the request that we had sent to her
previously.

8    Q.    Did you review this e-mail when you received it?

9    A.    Yes, I did, and I forwarded it on to our counsel.

10   Q.    After you received this e-mail, was any payment
forwarded

11   in response to the request from PennMont?

12   A.    No.

13   Q.    Why not?

14   A.    We still did not feel that they were allowable expenses.

15   Q.    And why didn't you feel they were allowable expenses?

16   A.    Because they were tax issues.

17         THE COURT:  And again, what do you mean by that?

18         THE WITNESS:  The invoices that we had received from

19   them -- we received two invoices itemizing the bills for
legal

20   fees, and they were for tax issues, and we did not feel that

21   they were allowable expenses for this type of plan.

22         THE COURT:  What's a tax issue, is my question.

23         THE WITNESS:  That's what they have in their -- they

24   were tax cases, I guess they were fighting -- the attorneys

25   were meeting -- I can't -- they were for trial prep and

Page 29

7-17-09 Hearing

- 30 -

Robin Murray - Direct

1  reviewing the records and things for tax cases that Koresko's

2  law firm were fighting for some of the participants of the

3  plan.

4           THE COURT:  Thank you, you may continue.

5           MS. HENRY:  I would move for the admission of

6  Government Exhibit number 15.

7           THE COURT:  Any objection?

8           MR. KORESKO:  Only the Gramm-Leach-Bliley objection.

9           THE COURT:  Overruled, exception is noted.  It is

10  admitted.

11  BY MS. HENRY:

12  Q.   Ms. Murray, did there come a time when you learned that

13  the PennMont had discharged or attempted to remove F&M as the

14  trustee of the SEP or REAL VEBA trust?

15  A.   Yes.

16  Q.   And how did you learn that?

17  A.   Through our counsel.

18  Q.   And what did you learn?

19  A.   That they had removed us from -- that they were removing

20  us from being the trustee on the account.

21  Q.   Did you learn anything about any directions as to where

22  to transfer the money, once F&M Trust was removed?

23  A.   Yes, they were to be transferred to Penn Public Trust.

24  Q.   What, if anything, did you learn about Penn Public
Trust.

25  A.   I know that it's a company that Mr. Koresko owns or is

Page 30

7-17-09 Hearing

- 31 -

Robin Murray - Direct

1    connected to, affiliated with.

2    Q.    How much money currently is in this trust?

3    A.    Around four million dollars.

4    Q.    And has this trust -- has the money in this trust, any
of

5    it, been transferred --

6    A.    No.

7    Q.    -- to Penn Public Trust?

8    A.    No, it has not.

9         MS. HENRY:  Nothing further from this witness.

10        THE COURT:  You may cross-examine.

11        MR. KORESKO:  Your Honor, would you mind if I work

12    from here?

13        THE COURT:  Fine.

14                    CROSS-EXAMINATION

15   BY MR. KORESKO:

16   Q.    Ms. Murray, I'd like to go back, please, to the
beginning

17   of your testimony.  By the way, I'm John Koresko, and I

18   represent the defendants in this case.  Where did you derive

19   your knowledge about this account, the account being -- this

20   account being the REAL VEBA and single employer plan account.

21   Where did you derive your knowledge?

22   A.    We have reviewed the documents in our department.  I

23   reviewed it with the head of our department and the ERISA rep

24   that we have in our department.

25   Q.    When?

7-17-09 Hearing

- 32 -

Robin Murray - Cross-Examination

1    A.    December 2008.

2    Q.    Did you review a file?

3    A.    I'm sorry?

4    Q.    Was there a file?

5    A.    We reviewed the plan documents that we had that Sue

6    Russell had supplied to us.

7    Q.    Who's Susan Russell?

8    A.    She's an employee of F&M Trust Company.

9    Q.    What did she do before that?

10   A.    She was CEO and president of Community Trust Company.

11   Q.    And what was her primary responsibility?

12          MS. HENRY:  Objection, knowledge.  At CTC, at F&M?

13          THE COURT:  More specific, please, counsel.

14   Q.    What was her specific response -- what are her specific

15   responsibilities at F&M Trust Company?

16   A.    She is a trust officer.

17   Q.    And which accounts does she have responsibility for her?

18   A.    The accounts that have been assigned to her.

19   Q.    And isn't the REAL VEBA and single employer plan account

20   assigned to her?

21   A.    Yes.

22   Q.    And hasn't it been her responsibility for about ten

23   years?

24   A.    Yes.

25          MS. HENRY:  Objection.

Page 32

7-17-09 Hearing

Robin Murray - Cross-Examination

1    Q.   You did review the file, right?

2         THE COURT:  Just one second, please.  Let me hear
the

3    basis for the objection.

4         MS. HENRY:  Objection in that knowledge of the

5    witness.  This account has been with F&M Trust for less than
a

6    year.

7         MR. KORESKO:  Your Honor.

8         THE COURT:  Just one second, please.  Let me rule.

9    The objection's overruled.  If you know the answer to the

10   question, you may answer it.  Otherwise, indicate that you

11   don't know.

12   BY MR. KORESKO:

13   A.   Yes, as far as I know, that's how long -- I don't know

14   for sure how long she's been over that account.

15   Q.   And how long have you been involved with the account?

16   A.   Since the merger.

17   Q.   And who -- since the merger.  That's December the 30th,

18   2008?

19   A.   No, it was November 30, 2008.

20   Q.   November 30, 2008.  So you have approximately -- this is

21   July, so you've been involved with this account, so to speak,

22   for eight months?

23   A.   Yes.

24   Q.   And Ms. Russell has been involved for ten years.

25   A.   Yes.

7-17-09 Hearing

- 34 -

Robin Murray - Cross-Examination

1    Q.    Now, can you tell me what was in the file that you

2    reviewed about this account?

3    A.    We had the documents, the plan documents.  It was the

4    agreements.  That's what we reviewed?

5    Q.    Can you tell me which agreements?

6    A.    I can't recall them right now.

7    Q.    Was there a trust document?

8    A.    Yes.

9    Q.    For what trust?

10   A.    For the REAL VEBA and the single employer account.

11   Q.    What does REAL VEBA stand for?

12   A.    Oh, my goodness.  I know it and I can't think right now.

13   I don't know.

14   Q.    What is a VEBA?

15         MS. HENRY:  Objection, relevance.

16         THE COURT:  Overruled.

17   A.    It is an account where we can -- where you have employers

18   in the plan where they can -- or, companies in the plan where

19   they can buy insurance policies and to fund they're life

20   insurance.  And you pay medical benefits.  I --

21   Q.    Are you making reference to documents in front of you,

22   now?

23   A.    No.

24   Q.    So you're saying a VEBA is an account?

25   A.    Yes.

7-17-09 Hearing

- 35 -

Robin Murray - Cross-Examination

1    Q.    And what is the statutory authorization for a VEBA?

2    A.    I don't know.

3    Q.    What do the regulations on the Internal Revenue Code

4    allow a VEBA to do?

5    A.    These are not my job --

6          MR. NIEMAN:  Object.

7          THE COURT:  The objection's sustained.

8    Q.    You're a trust officer, correct?

9    A.    No, I'm trust operations manager.

10   Q.    Is it your position that if the statute of regulations

11   allows something to be paid, that you have the unilateral

12   authority to overrule --

13   A.    Not myself.

14   Q.    -- the regulations or statute?

15         MR. NIEMAN:  Your Honor, I'm -- objection, again.

16   Mr. Koresko said, in his opening remarks, when he objected

17   that she's not an attorney and not here to testify as an

18   attorney, he's asking her, now, to make legal conclusions and

19   legal determinations on the stand.

20         THE COURT:  Based upon the testimony that has been

21   adduced thus far, the witness has testified that she's made

22   some decisions, but they've been made primarily because they

23   were directed by another individual who, I believe, was

24   identified as counsel.  To the extent that the witness can

25   testify that she's made some independent decisions, you're

- 36 -

7-17-09 Hearing

1  allowed to ask her the question as to what decision she made

2  and on what basis she made those decisions.  Beyond that, the

3  objection's sustained.

4          MR. KORESKO:  Your Honor, I just want to understand.

5  Are you suggest -- in footnote 6 of our memorandum that we

6  provided to you, we elucidated the application of the

7  fiduciary exception to the attorney-client privilege in cases

8  of this type.  If -- I want to understand -- if she got her

9  information from her attorneys -- I'm sorry -- is your ruling

10 that she basically doesn't have to tell or testify --

11         THE COURT:  Oh, absolutely, no, no.  It has nothing

12 to do with privilege.

13         MR. KORESKO:  Okay.

14         THE COURT:  It has to do with competence.

15         MR. KORESKO:  Okay.  That's fine.

16 BY MR. KORESKO:

17 Q.   What does regulation Section 1.501(c)(9)-3(e) of the

18 Internal Treasury Regulations provide with respect to the

19 benefits payable by a VEBA trust?

20         MS. HENRY:  Objection.

21         THE COURT:  Sustained.

22 Q.   Have you ever reviewed the regulations?

23 A.   No.

24 Q.   Do you -- don't you think that reviewing applicable

25 government regulations involving a plan is important?

- 37 -

Robin Murray - Cross-Examination
Page 36

7-17-09 Hearing

is

1    A.    As trust operations manager, that is not my job.  That

2    the administrator on the account's position, and the head of

3    our department.

4    Q.    And that's Susan Russell?

5    A.    Yes.

6    Q.    And Susan Russell directed you not to make --

7    A.    She is, no --

8    Q.    -- any payments?

9          THE COURT:  Counsel, let her answer the question.

10    And madam, please let him complete the question.

11    A.    She is the trust officer on the account.  She is not the

12    head of the department.  But, yes.

13    Q.    And who is the head of the department?

14    A.    Tom Peterson.

15    Q.    And Tom Peterson directed you not to make any of the

16    expenditures?

17    A.    No, our counsel did.

18    Q.    So what you're saying is that at the direction of

19    counsel, you may know -- you refuse to take the direction of

20    the plan administrator?

21    A.    With the -- yes.  We consulted with them and we came to

22    that decision.

23    Q.    Didn't counsel have the trust documents and the plan

24    documents?

25    A.    Yes.

- 38 -

Robin Murray - Cross-Examination

1    Q.    So why did they need additional copies of the trust

7-17-09 Hearing

2    documents and the plan documents that are referred to in
these

3    e-mails?

4    A.    Oh, you're -- no, we don't have all those documents that

5    include all of the participants.

6    Q.    What is a participant?

7    A.    It's a member of the -- someone that participates in the

8    plan.

9    Q.    Employers aren't participants, are they?

10   A.    No, but their employees are.

11   Q.    Where, in the trust documents, does it provide that you

12   are entitled to demand any of the information regarding the

13   individual participants?

14   A.    As our fiduciary responsibility, that's what our

15   department policy is.

16           MR. KORESKO:  Move to strike for it's nonresponsive.

17           THE COURT:  Overruled.

18   Q.    Where in the plan documents does it provide that you
have

19   the privilege?

20   A.    It's our department policy.

21   Q.    Where in the plan documents does it provide that you
have
the

22   the privilege to ask for additional information that is in

23   discretion of the plan administrator to provide you?

24   A.    As a fiduciary on this account, it's our responsibility

25   to do it anyway.

- 39 -

7-17-09 Hearing
Robin Murray - Cross-Examination

1   Q.   So may I take your answer to be that you don't know?

2   A.   Take it, I guess, however you need to.  That's our

3   policy.

4   Q.   I'd like your answer, please.

5   A.   That's our policy.

6        MR. KORESKO:  Your Honor, I don't wish to belabor
the

7   point, but I'd ask the Court to either direct the witness to

8   answer or to just say she doesn't know.

9        THE COURT:  She said that's, quote, "that's our

10  policy".

11       MR. KORESKO:  That's our policy.

12  Q.   Do you have a handbook --

13  A.   Not with me.

14  Q.   -- of policies?

15  A.   Not with me, but I do at my desk.

16  Q.   Did you ever send it to -- when F&M took over this

17  relationship -- by the way, is there any contract between

18  PennMont and F&M Trust Company?

19  A.   All of Community Trust Company's accounts merged into
F&M

20  Trust through the merger agreement.

21  Q.   So you're bound by the agreements made by Community
Trust

22  Company?

23  A.   Yes.

24  Q.   So Community Trust Company didn't demand this
information

25  prior to your demands, correct?

- 40 -

7-17-09 Hearing
Robin Murray - Cross-Examination

 1   A.   That's correct.

 2   Q.   Do you have any reason to doubt, based upon the review
of

 3   the file, that the course of conduct over ten years was that

 4   that information you asked for was not relevant or required
in

 5   the context of the operation of the trust?

 6             MS. HENRY:  Objection.

 7             THE COURT:  Sustained.

 8   A.   I can't --

 9             THE COURT:  It's sustained.

10             THE WITNESS:  I'm sorry.

11             THE COURT:  You don't have to answer that.

12             THE WITNESS:  I'm sorry.  Thank you.

13   BY MR. KORESKO:

14   Q.   What was the course of conduct relating to the demand or

15   the request for payments prior to your becoming involved.

16   A.   I do not know what Community Trust Company's procedures

17   were.

18   Q.   Did you review the file to see if there were any

19   rejections?

20   A.   No, I did not.

21   Q.   Would it surprise you that there were never any

22   rejections?

23   A.   No, it would not.

24   Q.   As a matter of fact, don't you know, as a matter of
fact,

25   that there were never any rejections?

                                                    - 41 -

                        Page 40

7-17-09 Hearing
Robin Murray - Cross-Examination

1    A.    Yes.

2    Q.    Don't you know, as a matter of fact, that Susan Russell

3    took absolute direction from PennMont on all matters relating

4    to the plan of trust?

5    A.    Yes.

6    Q.    Don't you know, as a matter of fact, that this
particular

7    new policy that you imposed on this relationship was done at

8    the direction of your lawyers?

9    A.    It was done on the direction of our own policy in our

10   department.  We do this for all of our accounts.

11   Q.    When did PennMont agree to that policy?

12   A.    PennMont -- this account became F&M Trust Company's.

13   Q.    When did PennMont agree to that policy?

14   A.    I don't think they have.

15   Q.    What consideration was given by F&M Trust Company to any

16   participant or PennMont for the obligations of your policy

17   that you imposed?

18   A.    We feel as a fiduciary, it's our responsibility to do

19   what's right for the participants.

20   Q.    What consideration did you give -- that is, what

21   agreement did you give, what promise did you give as a

22   consider --

23   A.    We did not.

24   Q.    You didn't give anything?  So you basically imposed
this?

25   A.    It's our policy.

- 42 -

Page 41

7-17-09 Hearing
Robin Murray - Cross-Examination

1  Q.   You imposed it.  Can you please just answer the
question?

2  A.   I did.

3  Q.   And it's your policy, and you imposed this unilateral

4  requirement, correct?

5  A.   It's our policy, so yes, we began to process things that

6  way.  It's different.

7  Q.   What's different?

8  A.   The way we process things.

9  Q.   Is there anywhere in the plan trust documents that

10  prevent PennMont from firing you?

11  A.   No.

12  Q.   For any reason or for no reason, right?

13  A.   Yes.

14  Q.   And isn't it true that before this relationship even
took

15  place with Community Trust Company, the file reflects that

16  Penn Public Trust was the initial trustee of this --

17  predecessors to these plans, correct?

18  A.   Yes.

19  Q.   Penn Public Trust Company is a nonprofit corporation,

20  correct?

21  A.   Yes.

22  Q.   How do you know that John Koresko owns it?

23  A.   I saw it on the Internet that you were connected with
it.

24  Q.   You saw it on the Internet.

25  A.   Yes.

- 43 -

Page 42

7-17-09 Hearing
Robin Murray - Cross-Examination

1    Q.    From the DOL website?

2    A.    No, from yours.

3    Q.    From our website?  Penn Public Trust?  That's not true,

4    is it?

5    A.    I looked on the Internet to see what the connection was

6    with you.  I know that you're related somehow with that, and
I

7    don't know -- directly, I don't recall it right now.  But I

8    know that you are connected with that company.

9    Q.    What other part of your testimony did you derive from

10   third-party sources and not your own experience?

11   A.    None.

12   Q.    Well, you just said that you went to the Internet to
find

13   out a critical fact.  You were fired in favor of Penn Public

14   Trust, correct?  You were fired.  Correct?

15   A.    Yes.

16   Q.    You were fired before this temporary restraining order

17   was filed, or motion for it was filed, correct?

18   A.    Yes.

19   Q.    And how much are trustee fees, does F&M Trust Company
get

20   each year in connection with this account?

21        MR. NIEMAN:  Objection, Your Honor.  It has no

22   relevance to the proceeding today what the --

23        THE COURT:  Sustained.

24        MR. NIEMAN:  -- fee may be.

25        THE COURT:  Sustained.

- 44 -

Robin Murray - Cross-Examination
Page 43

7-17-09 Hearing

1          MR. KORESKO:  Your Honor, I would ask you to
consider

2    the fact that the pecuniary interest of F&M Trust Company is

3    part of the issue here, today.

4          THE COURT:  I'll reverse that.  I'll allow it.  Go

5    ahead.

6    BY MR. KORESKO:

7    A.   We receive a little over 3000 dollars a month, but we

8    have not received a fee since March.

9    Q.   And does the file reflect any accounting for your fees?

10   A.   I'm sorry, repeat, please?

11   Q.   An accounting for your fees, for the CTC and F&M Trust

12   Company.  Does the file refer to anything there?

13   A.   Yes, it does.  We receive a file every time we request a

14   fee to be charged, we receive a file from Gene Bonnie listing

15   all the participants in the account.

16   Q.   I -- wait a minute.

17   A.   Or all the companies that are in the account.

18   Q.   Maybe I wasn't clear.  You don't provide a set of

19   documents or accounting relating to the services that you do.

20   A.   No.

21   Q.   No, you just charge, right?

22   A.   Yes.

23   Q.   So you've objected to a demand made by the discretionary

24   administrator because they did exactly the same thing that
you

25   did, correct?

- 45 -

Page 44

7-17-09 Hearing

Robin Murray - Cross-Examination

1    A.    I don't agree with that.

2    Q.    What about the Gates law firm.  You paid them, right?

3    A.    Yes.

4    Q.    And there wasn't any accounting in the file of Gates law

5    firm's time, right?

6    A.    Yes.  That's right.

7    Q.    And they've continued to represent F&M Trust, CTC in the

8    third circuit in the present case, right?

9    A.    That's not so.

10   Q.    No, you just fired them.  You just fired them, only,

11   what, two weeks ago?

12   A.    I don't think so.  I don't think that's correct.

13   Q.    If I were to tell you that the records of the United

14   States District Court -- I'm sorry, for the United States

15   Court of Appeals and the United States District Court reflects

16   that the Gates law firm was -- did not withdraw their

17   appearance until last week, would that surprise you?

18   A.    Yes.

19   Q.    Why is that?

20   A.    Because we -- our bank has our own attorneys that we use,

21   and Lowell Gates is not --

22   Q.    So --

23         THE COURT:  I'm sorry, what was the last part of what

24   you said?

25         THE WITNESS:  Lowell Gates is not our bank's

Page 45

7-17-09 Hearing

Robin Murray - Cross-Examination

1    attorneys.

2    Q.   Have you reviewed the dockets of the various cases?

3    A.   No.

4    Q.   No, so you don't know whether Lowell Gates is your

5    attorney at all, do you?

6    A.   I'm pretty sure that I don't -- I know that he's not

7    representing our bank.

8    Q.   He never represented F&M Trust Company?

9    A.   I don't know that information.

10   Q.   Who told you that Mr. Gates never represented F&M Trust

11   Company?

12        MS. HENRY:  Objection, misstating the witness's

13   testimony and relevance.

14        THE COURT:  Sustained.

15   Q.   I'd like to go back to a particular question that I
asked

16   you.  What provision of the trust document allowed you or

17   required you to take information relating to individual

18   participants?

19        MR. NIEMAN:  Your Honor, this has been asked and

20   answered, four, five, six times already today.

21        THE COURT:  Sustained.

22   Q.   Do you have all the amendments that were made to the

23   document?

24   A.   They're in our files back in the office, yes.

25   Q.   So you have the amendment that was done March 7, 2007?

7-17-09 Hearing

1  A.    I haven't -- I don't know the dates on any of the

2  agreements, so I can't tell you.

3  Q.    I'd like to read it to you.

4         MR. KORESKO:  Your Honor, this is already of record

5  in the Court.  It's Exhibit 30 to Ms. Bonnie's affidavit.

6         THE COURT:  Let me hear it offered as proof, please.

7         MR. KORESKO:  Your Honor, there was an amendment to

8  allow legal services payments that was provided March 7, 2007

9  to Lowell Gates and to Susan Russell.  This particular

10  amendment is contradictory --

11         THE COURT:  Let me just say this, counsel.  Assuming

12  that that's accurate, and I have no reason to disbelieve that

13  it is, I assume you would stipulate to that and cite that

14  portion in this record and let me go from there --

15         MR. KORESKO:  Okay.

16         THE COURT:  -- by reading it myself --

17         MR. KORESKO:  Yes, sir.

18         THE COURT:  -- which has nothing to do with this.

19         MR. KORESKO:  I'll be happy to --

20         MR. NIEMAN:  Your Honor, I will not stipulate to
that

21  because we've never seen a signed copy of this amendment.

22  We've seen reference to it in a letter that was sent to my
law

23  firm, but we've never actually seen the amendment, and our

24  review of the files has not shown this amendment --

25         THE COURT:  Then you don't need to stipulate.

- 48 -

7-17-09 Hearing

Robin Murray - Cross-Examination

1          MR. NIEMAN:  -- in any shape or form.  That's shy I'm

2    standing up to object.

3          THE COURT:  I understand.

4          MS. HENRY:  And the Department of Labor has the same

5    objection, Your Honor.  We have seen, as of last night, a

6    letter that was written to a law firm that supposedly cited to

7    this amendment.  In all of our documents, we have not seen

8    this amendment.

9          THE COURT:  All right, then one, because it as issue,

10   the Court certainly will not extract or exact a stipulation.

11   Two, if you choose to do so, Mr. Koresko, in your case in

12   chief, it's conceivable you can introduce that document.  But

13   not through this witness's cross-examination.

14         MR. KORESKO:  I think I've gotten what I wanted, Your

15   Honor, that she's never seen the amendment.  Thank you.

16         THE COURT:  Maybe you didn't hear what I said.

17         MR. KORESKO:  Yes, sir, I did.

18         THE COURT:  The objection's sustained.

19         MR. KORESKO:  Thank you.

20         THE COURT:  All right.  Mr. Koresko, your binder, I

21   believe, is labeled as exhibits for the motion to dismiss.

22         MR. KORESKO:  This is related to Gene Bonnie's

23   affidavit, Your Honor.

24         THE COURT:  Well, I mean, this huge binder that was

25   submitted.

Page 48

7-17-09 Hearing

- 49 -

Robin Murray - Cross-Examination

1          MR. KORESKO:  Yeah, that's what I'm referring to.

2     The affidavit was filed in anticipation of this particular

3     hearing.  Unfortunately, Your Honor, we haven't -- we haven't

4     filed a written response to the motion itself --

5          THE COURT:  I know.

6          MR. KORESKO:  -- formally.

7          THE COURT:  I know.  But nevertheless, you've

8     submitted this binder.

9          MR. KORESKO:  Yeah, that's of record, yes sir.

10         THE COURT:  But it's actually -- contains exhibits

in

11    opposition to this temporary restraining order request?

12         MR. KORESKO:  Well, it certainly does, and we

believe

13    that under the incorporation by reference rules that we're

14    permitted to incorporate, or we would ask Your Honor to

accept

15    that this matter filed of record, that this affidavit filed

of

16    record and the accompanying exhibits be considered as

17    incorporated by reference to the response which Your Honor

18    will hopefully give us the opportunity to provide.  But

19    Ms. Bonnie's here and she will testify directly to what's in

20    here.

21         THE COURT:  All right, you may continue.

22    BY MR. KORESKO:

23    Q.    What legal training have you had, Ms. Murray?

24    A.    None.

25    Q.    None.  All right, you're accountant?

Page 49

7-17-09 Hearing


- 50 -

Robin Murray - Cross-Examination

1    A.    No.

2    Q.    What -- do you have any professional designations at

all?

3    A.    I have worked in the trust business for twenty years,

and

4    I have gone to trust school.

5    Q.    What kind of trust school?

6    A.    Cannon.

7    Q.    Cannon?

8    A.    Yes, it's the name of the school.

9    Q.    And are they a law school?

10    A.    No.

11    Q.    And are they --

12    A.    They teach trust law.

13    Q.    They teach -- they're not a law school?

14    A.    No, as far as I know, no.

15    Q.    And exact -- in the last twenty years, you've been in

the

16    business, right?

17    A.    Yes.

18    Q.    And the last twenty years, how much of your -- how much

19    time did the Cannon course take?

20    A.    I did two weeks of schooling.

21    Q.    Two weeks in twenty years.  And when was that?  When was

22    the last time you were in school?

23    A.    Five years ago.

24    Q.    Have you reviewed any of the Supreme Court precedent

25    since then --

Page 50

7-17-09 Hearing

- 51 -

Robin Murray - Cross-Examination

1    A.    No.

2    Q.    -- on duties of an administrator or trustee?

3    A.    No.

4    Q.    Were you involved in compiling the 3000 documents or
more

5    that were given to the Department of Labor by F&M Trust

6    Company?

7    A.    Yes.

8    Q.    You gave them all over, right?  Everything --

9         MS. HENRY:  Objection, relevance.

10         THE COURT:  Sustained.

11    Q.    Everything that you had in the account, you gave it
over,

12    right?

13         MS. HENRY:  Objection, relevance.

14         THE COURT:  Sustained.

15         MR. KORESKO:  Your Honor, I would ask you to accept

16    that this also goes to the pecuniary interest of Community

17    Trust Company, F&M.

18         THE COURT:  Sustained.

19    BY MR. KORESKO:

20    Q.    What exactly did you give to the Department of Labor?

21    A.    I did not give --

22         MS. HENRY:  Objection.

23         MR. NIEMAN:  Your Honor, same objection.  This is

24    irrelevant.

25         THE COURT:  The objection's sustained.  Counsel,

Page 51

7-17-09 Hearing

- 52 -

Robin Murray - Cross-Examination

1    please move on.

2    BY MR. KORESKO:

3    Q.   Did you receive a subpoena from the Department of Labor?

4    A.   Yes.

5    Q.   When?

6    A.   I was notified about it on Tuesday, Wednesday.

7    Q.   So you received --

8    A.   Wednesday.

9    Q.   -- a subpoena to appear here --

10   A.   Yes.

11   Q.   -- but you never received a subpoena before?

12   A.   No.

13   Q.   Is it the policy of the trust company to just turn over

14   documents to whoever asked?

15            MS. HENRY:  Ob --

16            THE COURT:  Sustained.

17   Q.   Do you know what the policy of the trust company is with

18   respect to surrendering documents?

19            MS. HENRY:  Objection.

20            MR. NIEMAN:  Your Honor, I'm going to object to this

21   whole line of questioning.  There's no --

22            THE COURT:  The Court is sustaining your objection.

23            MR. NIEMAN:  Thank you, Your Honor.

24            THE COURT:  Please move on, Mr. Koresko.  You have

25   very limited time.

7-17-09 Hearing

- 53 -

Robin Murray - Cross-Examination

1  BY MR. KORESKO:

2  Q.   I'd like to go back to -- I don't know -- we got off

3  track regarding the representation of Lowell Gates.  Was

4  Lowell Gates' firm paid out of the trust company accounts?

5  A.   Yes.

6  Q.   And what backup information is there in the file

relating

7  to Lowell Gates' legal services?

8        MS. HENRY:  Objection, asked and answered.

9        THE COURT:  Sustained.

10  Q.   What benefits does this trust allow?

11  A.   Medical benefits, insurance premiums -- is that what

12  you're asking?

13  Q.   Yeah.

14  A.   Okay.  We pay -- is that what you're asking, what we

pay?

15  Q.   No.

16  A.   Can you please restate it?

17  Q.   No, I'm asking you what does the trust permit?

18  A.   I don't understand your question, please.

19  Q.   You know what the trust document said, right?

20  A.   I reviewed it months ago, yes.

21  Q.   What benefits does the trust document permit?

22  A.   From -- I don't know if this is the answer, but this is

23  what I'm thinking.  It's insurance premiums and medical

24  benefits and education expenses.

25  Q.   Medical benefits.  How -- what is -- isn't it true that

- 54 -

Page 53

7-17-09 Hearing
Robin Murray - Cross-Examination

1  you're simply asked to reimburse insurance?  Right?

2  A.  Yes.

3  Q.  You don't evaluate medical claims, right?

4  A.  No.

5  Q.  You don't send checks to doctors, right?

6       MR. NIEMAN:  Your Honor, I'm going to object again.

7  I don't see the relevance of this line of questioning to what

8  we're here --

9       THE COURT:  I'm going to overrule the objection for

10  now.  I'm going to see where counsel's going with this.  You

11  may answer the question.

12  A.  The check requests that we receive each week will tell
us

13  what we need to pay.  And they can be insurance companies or

14  beneficiaries in the account.

15  Q.  Reimbursements.

16  A.  Yes.

17  Q.  But you -- other than what you receive relating to the

18  expenditures, themselves, you don't inquire behind them,

19  correct?

20  A.  I'm sorry, please restate that?

21  Q.  You don't inquire behind the notices that you get to
make

22  payments, correct?

23  A.  No.

24  Q.  I'd like to -- you got -- this was a Government Exhibit

25  16, I'm sure you've seen that, right?

- 55 -

Page 54

7-17-09 Hearing
Robin Murray - Cross-Examination

1   A.   Yes.

2   Q.   Did you review the provisions in this -- I'm sorry.  Did

3   you review the components of this e-mail, the content?

4   A.   I read through them and the head of our department also

5   did, and then we forwarded them to counsel.

6   Q.   Did you match them up with documents that you had on

7   file?

8   A.   No, I did not.

9   Q.   Did your boss?

10  A.   I don't know.

11  Q.   And how do you know that Ms. Bonnie was not giving you

12  accurate information?

13       MR. NIEMAN:  Objection to the question.  I don't

14  believe that --

15       THE COURT:  Sustained.  You may rephrase.

16  Q.   Do you know if these provisions are the provisions of

the

17  trust document?

18  A.   No, I do not.

19  Q.   And what was the source of your quote, unquote,

20  discretion to reject the validity of Ms. Bonnie's assertions

21  that these were, in fact, portions of an applicable trust

22  document.

23       MS. HENRY:  Objection.

24       THE COURT:  Sustained.

25  Q.   What was the basis of -- let me just ask this.  You

- 56 -

Robin Murray - Cross-Examination

Page 55

7-17-09 Hearing

1    didn't comply with Ms. Bonnie's request for any of the

2    disbursement that you denied, correct?

3    A.    Correct.

4    Q.    Let's -- do you have any reason to believe that what

5    Ms. Bonnie says here is not in the trust document?

6    A.    No.

7    Q.    In fact, you reviewed the trust document, right?

8    A.    Yes, I did.

9    Q.    Okay, let's go to 3.1.  At -- it says payment of benefit

10   at the direction of the plan administrator.  Is there
anything

11   unclear about that?

12   A.    No.

13        MS. HENRY:  Objection.

14   Q.    The trustee --

15        THE COURT:  Let me just hear the objection.  Yes,

16   counsel?

17        MS. HENRY:  Objection that, for one, he's reading

18   from an e-mail, not the actually trust agreement.

19        THE COURT:  Sustained.

20   BY MR. KORESKO:

21   Q.    So you do not know -- I'm sorry, you already answered --

22   you didn't actually check this with the actual trust
document,

23   right?

24   A.    No, I did not.

25   Q.    Why not?

- 57 -

Robin Murray - Cross-Examination

Page 56

7-17-09 Hearing

1  A.   We forwarded this on to our counsel by this point.

2  Q.   And what was the basis of your counsel's decision?

3       MR. NIEMAN:  Your Honor, I'm going to object to
this.

4  Now we're starting to get into attorney --

5       THE COURT:  Is counsel going to testify?

6       MS. HENRY:  Yes.

7       MR. KORESKO:  If I -- is counsel going to testify?

8       THE COURT:  No, I'm asking DOL's counsel.

9       MS. HENRY:  At this point, yes, the department has
10  subpoenaed and will call.

11       THE COURT:  The objection's sustained.

12       MR. KORESKO:  Your Honor, I have to --

13       THE COURT:  Take an exception to the Court's ruling?

14       MR. KORESKO:  Yes, take an exception because.

15       THE COURT:  Granted, now move on.

16  BY MR. KORESKO:

17  Q.   Do you have any other -- have you had any experience
with

18  directed arrangements other than the one that's at issue,

19  here?

20  A.   You mean self-directed accounts?  Yes, we do.

21  Q.   Does your procedures manual provide guidance to you

22  regarding self-direction?

23  A.   Yes.

24  Q.   And could you tell us what that procedures manual says?

25  A.   I don't have them memorized.  As our, per policy in our

- 58 -

Robin Murray - Cross-Examination

1  department, we question what they direct us to do.

7-17-09 Hearing

2    Q.    When was the first time that you communicated to

PennMont

3    or members of Koresko Law Firm that you were going to impose

4    this policy?

5    A.    When we received the e-mail requesting 85,000 dollars to

6    be paid to your law firm.

7    Q.    Do you believe that lawyers are required to disclose

8    privileged information to you?

9              THE COURT:  Sustained.

10             MR. NIEMAN:  Objection, Your Honor.

11             THE COURT:  Sustained.

12   BY MR. KORESKO:

13   Q.    Is the policy of your bank, does the policy of the bank

14   contain a provision that requires you to obtain privileged

15   information?

16             MS. HENRY:  Objection.

17             THE COURT:  Sustained, counsel.

18   Q.    Can you quote to any provision of the policies and

19   procedures manual of F&M Trust Company that requires you, in

20   order to satisfy a self-directed request, to require the

21   surrender of privileged information.

22             MS. HENRY:  Objection.

23             THE COURT:  Do you understand that question?

24             THE WITNESS:  Yes.

25             THE COURT:  Answer it, please.


                                                              - 59 -

                    Robin Murray - Cross-Examination

1    A.    Can you ask it again?  I forget.

2    Q.    Are you familiar with any provision of your policies and

7-17-09 Hearing

3   procedures manual that requires you to demand the surrender
of
4   privileged information in connection to a self-directed trust

5   request?

6   A.    No.

7   Q.    So you would agree, then, that if the information that

8   would be communicated to you would be privileged, there was
no
9   requirement, even in your procedures manual, to give it.

10        MS. HENRY:  Objection, relevance.

11        THE COURT:  Overruled.  Is there an answer?

12   A.   I don't -- what -- can you say it again?  This is just
--
13   can you repeat, please?

14   Q.    I'm sure the reporter doesn't have it.

15        MR. KORESKO:  Do you have the ex -- can you please

16   read that back to me?

17        COURT REPORTER:  And you agree any info or

18   communications to you would be privileged.

19   Q.    Would you agree, then, that your policy and procedures

20   manual, that there's no requirement to disclose privileged

21   information in connection with a request in a self-directed

22   situation.

23   A.    Can you restate that?  I'm -- it's --

24   Q.    All right, the policy and procedures manual does not

25   require you in the satisfaction of a self-directed request,
to

- 60 -

Robin Murray - Cross-Examination

1   obtain information containing privileged -- I'm sorry,

7-17-09 Hearing

2    information which is privileged or contains privileged

3    information.  Is that correct?

4    A.   No, I don't know that there -- I don't know how to
answer

5    that question.

6    Q.   Is it your policy to demand privileged information?

7         THE COURT:  Counsel, she says she does not know.

8         MR. KORESKO:  Okay.

9         THE COURT:  Now, you have three minutes to conclude

10   this examination of this witness.

11   BY MR. KORESKO:

12   Q.   Exactly where in the trust document does it provide that

13   expenditures cannot be made in connection with tax matters

14   relating to the trust or its beneficiaries?

15   A.   I don't know where it's at in the trust document.
That's

16   our policy to review that, and we did not feel that it was an

17   allowable expense.

18   Q.   You didn't feel, but you can't cite to a particular

19   provision that prevents it, correct?

20   A.   No, I don't have the policy memorized, I'm sorry.

21   Q.   Well, what about the document, ma'am.  What about the

22   document?  Doesn't the document provide for a specific power

23   of attorney for the Koresko Law Firm or John Koresko,

24   personally, relating to tax and Department of Labor matters?

25   Don't the documents provide for that?

- 61 -

Robin Murray - Cross-Examination

Page 60

7-17-09 Hearing

1    A.    I don't recall that.

2          MR. NIEMAN:  Your Honor, I --

3          THE COURT:  Counsel --

4          MR. NIEMAN:  -- I didn't fully understand the

5    question, but I think it's a mischaracterization of what the

6    documents say, and I think it gets back to this whole issue

we

7    were talking about where we've never seen this alleged

8    amendment.

9          THE COURT:  Sustained on that basis.

10         MR. KORESKO:  Your Honor, I'm not referring to the

11   amendment.  I'm referring to the document that she testified

12   was in her possession.

13         THE COURT:  And she's testified consistently that

she

14   doesn't have it before her and she doesn't know

independently.

15         MR. KORESKO:  She doesn't know in -- all right,

thank

16   you.

17   BY MR. KORESKO:

18   Q.    How many payments relating to income tax matters were

19   made out of trust funds prior to your imposition of this new

20   requirement?

21   A.    Since F&M took over the account, is that what you're

22   asking?

23   Q.    No.

24   A.    No, prior to that?

25   Q.    Even prior to that, yes.

- 62 -

Robin Murray - Cross-Examination

Page 61

7-17-09 Hearing

1   A.   I have no idea.

2   Q.   What about since F&M took over the account?

3   A.   Two?  What are you talking -- all payments or what?  I'm

4   sorry, could you please clarify that?

5   Q.   Oh, which payments did you not deny?

6   A.   We denied four payments.

7   Q.   Right, and how many payments were paid before that?

8   A.   We pay payments every week.

9   Q.   Every week.  And the new policy evolved at the direction

10  of your lawyers?

11  A.   No, it's our policy in our department to review all

12  distributions being paid from accounts.

13  Q.   What's the difference between a distribution, a benefit,

14  and a trust expenditure for fees?

15  A.   When I say distribution, that's just meaning that that's

16  a payment going out of the account.  I --

17  Q.   Aren't they governed by different standards?

18  A.   Yes.

19  Q.   So in the event that the expenditures were actually

20  allowed plan benefits --

21  A.   All three of those, is that what you're saying?

22  Q.   No, the expenditures that were requested were allowed

23  plan benefits, you don't have a policy with respect to plan

24  benefits, correct?

25  A.   I don't know.

- 63 -

Robin Murray - Cross-Examination

Page 62

7-17-09 Hearing

1  Q.  Who does Larry Townsend work for?

2  A.  PennMont.

3  Q.  How do you know that?

4  A.  Because his correspondence that I've received says that

5  in his --

6  Q.  It says PennMont dot com.  Isn't that just an e-mail

7  address?

8  A.  Yes.

9  Q.  But you don't know exactly who he works for, do you?

10  A.  No.

11  Q.  Who does Gene Bonnie work for?

12  A.  Same company.

13        THE COURT:  I'm sorry?

14        THE WITNESS:  Same company.

15  Q.  PennMont?

16  A.  Yes.

17  Q.  Did she ever -- how do you know that?

18  A.  Same reason, her correspondence.

19  Q.  She used a PennMont dot com e-mail address?

20  A.  Yes.

21  Q.  Actually, on Exhibit 3, if you'd like to pull that, she

22  uses a Koresko Law dot com e-mail address.

23  A.  Aren't both companies connected in some way?

24  Q.  I'm afraid that I don't have to answer that question.

25  You made an assumption, didn't you, ma'am?

                                                            - 64 -

Robin Murray - Cross-Examination

1  A.  No.

2  Q.  Gene Bonnie told you I am employed by PennMont Benefit

7-17-09 Hearing

3   Services?

4   A.    I've not spoken with Gene Bonnie.

5   Q.    Then how do you know who she works for?

6          MS. HENRY:  Objection.

7          MR. NIEMAN:  Objection, I don't think there was a

8   question.

9          THE COURT:  Sustained.

10  BY MR. KORESKO:

11  Q.    Just to be clear, why don't you tell me the difference

12  between a plan and a trust?

13         MR. NIEMAN:  Objection, Your Honor, that --

14         THE COURT:  sustained.  Anything further, Mr.

15  Koresko?

16  Q.    Are there any material deviations between the provisions

17  of a REAL VEBA trust and the single employer welfare benefit

18  trust?

19         MR. NIEMAN:  Your Honor, I don't -- relevance.  I

20  don't see the relevance of this line of questioning.

21         THE COURT:  The objection is sustained.

22         MR. KORESKO:  Your Honor, I'm simply trying to point

23  out that there are some rather convenient recollections with

24  respect to documents, and when I asked for specifics, it

seems

25  that we get the I don't know.

                                                    - 65 -

                        Robin Murray - Cross-Examination

1          THE COURT:  The issues before this Court are finite

2   and exact.  There has been direct examination of this

witness;

7-17-09 Hearing

3   there has been cross-examination of this witness.  The
witness

4   examination has concluded.

5           THE WITNESS:  Thank you.

6           THE COURT:  You may step down.

7           THE WITNESS:  Thank you.

8           THE COURT:  You may call your next witness.

9           MS. HENRY:  The Secretary calls Drake Nicholas.

10           GOVERNMENT WITNESS, DRAKE NICHOLAS, SWORN

11           THE CLERK:  Please state your full name, spell your

12   last name for the record?

13           THE WITNESS:  Drake D. Nicholas, N-I-C-H-O-L-A-S.

14           MR. KORESKO:  Your Honor, may I have an offer of

15   proof, please, as to why --

16           THE COURT:  Surely.

17           MR. KORESKO:  -- is being --

18           THE COURT:  Surely.  Go right ahead, please.

19           MS. HENRY:  There has been testimony from Ms. Murray

20   regarding advice from counsel.  Mr. Nicholas is the counsel

21   who provided such advice.  We will ask only about that advice

22   that was provided in response to those questions.  There are

23   also --

24           THE COURT:  You may proceed.

25           MR. KORESKO:  Your Honor, I'll stipulate that he
gave

                                                           - 66 -
                    Robin Murray - Cross-Examination

1   the advice and I'll stipulate that she got it from him.

2           THE COURT:  Do you accept that stipulation?

7-17-09 Hearing

3            MS. HENRY:  We would ask a basis of that advice and

4     whether that was discussed with Ms. Murray.

5            MR. KORESKO:  Mr. Nicholas' --

6            THE COURT:  No, no, just a moment.  Would you accept

7     that stipulation?

8            MS. HENRY:  No, I'm sorry, Your Honor.

9            THE COURT:  You may proceed, then.  Thank you.

10                    DIRECT EXAMINATION

11    BY MS. HENRY:

12    Q.   Mr. Nicholas, by whom are you employed?

13    A.   I'm an attorney with Rhoads & Sinon, Harrisburg Law
Firm.

14    Q.   And is F&M or did there come a time when F&M Trust
became

15    one of your clients?

16    A.   Yes, F&M has been a client of our firm for quite some

17    period of time.

18    Q.   But you have been in the courtroom and heard Ms. Murray

19    report about -- or testify about conversations with counsel

20    with regard to tax issues, is that correct?

21    A.   That's correct.

22    Q.   Are you the counsel from F&M Trust who was asked to look

23    over its documents and determine these tax issues?

24    A.   Yes, I was.

25    Q.   I am also going to show you some documents, and the
first

                                                           - 67 -

              Mr. Drake Nicholas - Direct Examination

1     document we will mark as Government Exhibit 17.

2            MS. HENRY:  May I approach?

7-17-09 Hearing

3          THE COURT:  Yes.

4     Q.   Government Exhibit 17 is a letter addressed to yourself

5     from the letterhead of the Koresko Law Firm, is that correct?

6     A.   That's correct.

7     Q.   Have you seen this document?

8     A.   I have.

9     Q.   Had you seen this document upon its mailing to you?

10    A.   Yes, I did.

11    Q.   What did you do after seeing this document?

12    A.   Upon review of this document, we took into consideration

who

13    the information provided by, I believe this was Ms. Bonnie

14    authored this letter.  This letter was provided as background

15    to information that was requested by our client previously

16    which was asking for substantiation and explanation of these

17    expenses that were being requested.

18    Q.   And by the expenses that are being requested, what are

19    you referring to?

20    A.   There was a request for a disbursement to the Koresko

Law

21    Firm for, I believe, approximately 85,000 dollars.  There was

22    a request for an expenditure -- a second one to Mr. Koresko

23    for about 1500 dollars.  And I think in between that period

of

24    time there was a request for a disbursement to a law firm --

25    the Gilbert Law Firm, I believe their name is, pertaining --

- 68 -

Mr. Drake Nicholas - Direct Examination

Page 67

7-17-09 Hearing

1    all the period pertained to the tax litigation with these --
2    with the VEBA plan.
3    Q.    And when you say the tax litigation with this VEBA plan,
4    what did you learn about the tax litigation with this VEBA
5    plan?
6    A.    We were provided with background information that a
7    number of these employers have been in a long time dispute
8    with the Internal Revenue Service concerning tax
deductibility
9    of these plans.  And that there is a current case, I believe,
10   in District Court of Georgia, which the issue of tax
11   deductibility for contributions to this plan is one of the
12   issues.
13   Q.    And when you say the tax deductibility of the
14   contributions to the plan, what contribution to the plan?
15   A.    That would be the employer's contribution to the plan.
16   Q.    What was your response, if any, to this letter of June
17   17, 2009?
18   A.    We were -- there was an initial letter that was sent, I
19   don't have it in front of me so I don't know all the date
20   sequence.  But the response was made with respect to these
21   after consulting with our client.  I forwarded a letter
22   directly to -- I believe it was Ms. Bonnie at that time,
23   indicating that we had consulted with our clients and advised
24   them that we do not believe these were appropriate expenses
of
25   a plan because they were settler related.  They're related to

7-17-09 Hearing
Mr. Drake Nicholas - Direct Examination

1    expenses being incurred by the employer's sponsors to these

2    plans, and these expenses were not associated with plan

3    participants, beneficiaries or any way related to the

4    administration of the plan and trust of which our client is

5    the trustee of that trust.

6    Q.    In your discussions with the personnel from F&M Trust --

7    and let me ask you, was Ms. Murray with those discussions?

8    A.    Yes.  I've been in many discussions with Ms. Murray.

9    Q.    Did you communicate that with her?

10         MR. KORESKO:  Objection, Your Honor, that is asking

11    for attorney-client privileged communication.

12         THE COURT:  Sustained.

13         MR. KORESKO:  Your Honor, there is no attorney-client

14    privilege in a fiduciary discussion.  Again, I refer you to

15    the research that I gave to the Court.

16         THE COURT:  Let me hear from counsel.

17         MR. NEIMAN:  Your Honor, I don't believe and I wasn't

18    prepared with cases and cites here today.  But I don't believe

19    that the Third Circuit specifically adopted fiduciary

20    exclusion.  If I'm not mistaken the Third Circuit is

21    specifically inclined to adopt fiduciary exclusion.

22         In addition to that, that fiduciary exclusion only

23    applies to communications that relate to fiduciaries of the

24    trust.  Here, this was a communication between Mr. Nicholas

25    and his actual client in terms of what they should do in terms

- 70 -

7-17-09 Hearing

Mr. Drake Nicholas - Direct Examination

1    of their own responsibilities relating to the situation.

2              THE COURT:  Mr. Koresko, that's how I see the issue.

3              MR. KORESKO:  I believe that the predicate to Ms.

4    Murray's testimony and Mr. Nicholas' involvement here related

5    to the administration of the trust.  I don't understand where

6    the exclusion exists.  They claim that they're a trustee.
The

7    fiduciary exception as articulated by the Third Circuit in

8    Wachtel v. Health Net.  And, again, Your Honor, I apologize.

9    I didn't get this issue until last night.

10             THE COURT:  I know.

11             MR. KORESKO:  It's a little bit unfair, of course,
to

12   ask you to rule off the cuff in all this.  And that's perhaps

13   why -- if you make a ruling against use we lost the ability
to

14   cross-examine Mr. Nicholas, or to have Mr. Nicholas give

15   relevant information to the hearing -- to the people that are

16   here including this Court.

17             The fiduciary exception provides that communications

18   between attorneys and clients that are fiduciaries and they

19   claim that --

20             THE COURT:  Counsel, this is what I'm going to do.

21   I'm going to allow it, you have an exception, and it will be

22   subject to being stricken from the record upon review by the

23   Court.  Go ahead.  Thank you.

24   BY MS. HENRY:

25   A.        Can we have the question reasked because my memory

Page 70

7-17-09 Hearing

- 71 -

Mr. Drake Nicholas - Direct Examination

1   is not that good?

2   Q.   As much as my memory will allow.  With regard to the

3   settler function and tax issue, if any, that you had with Ms.

4   Murray?

5   A.   They were generally discussions with our client, with

Ms.

6   Murray, that the extent -- or there were two issues.  One was

7   the documentation to be provided regarding payment of the

8   expense -- requested expense.  And then separate aside from

9   that was what did these fees and expense relate to.  And our

10  discussions were, obviously, they have a fiduciary position

11  and a role to play in this to safeguard the plain assets.

And

12  were these appropriate expense to be paid.

13        THE COURT:  Based upon Ms. Murray's earlier

testimony

14  and the testimony of this witness, the objection is

overruled.

15  You may continue.

16        Now, counsel, we're going to go to about 12:30, so

17  that everyone kind of knows where we are here.  And we'll

18  recess at 12:30.

19        MS. HENRY:  Hope to complete by 12:30.

20  BY MS. HENRY:

21  Q.   And did you advise Ms. Murray, so advise, PennMont about

22  the decision to not pay these requests or payments with

regard

23  to the tax litigation?

Page 71

7-17-09 Hearing

24    A.    Yes, we did.

25    Q.    I show you what is marked as Exhibit 10.

                                                        - 72 -

                Mr. Drake Nicholas - Direct Examination

1         (Pause)

2    Q.    Do you recognize Government Exhibit 10?

3    A.    I do.

4    Q.    And is that your signature on the last page of

Government

5    Exhibit 10?

6    A.    It is.

7    Q.    Did you send this letter on July 6, 2009?

8    A.    Yes, I did.

9    Q.    What was the purpose of sending this letter?

10    A.    The purpose of this letter was to make clear with

respect

11    to prior correspondences that were going back and forth that

12    we had advised our client or advised our client that these

13    expense -- we did not believe these were appropriate expenses

14    to be paid out of a trust and to make a further request for

15    additional plan information so that our client could properly

16    do its job.

17    Q.    Had you --

18            THE COURT:  Excuse me one second.  May I inquire --

19    sir, is it your position as counsel that this trust is

covered

20    by ERISA?

21            THE WITNESS:  It is my opinion, Your Honor, that it

22    is covered by ERISA.

23            THE COURT:  You may continue.

7-17-09 Hearing

24    BY MS. HENRY:

25    Q.    Have you been involved previously in directing or

- 73 -

Mr. Drake Nicholas - Direct Examination

1    advising your client to request documentation from PennMont?

2    A.    We had earlier discussions, yes.

3    Q.    And what was --

4          THE COURT:  Now, I apologize for interrupting, but I

5    am also trying to cut to the chase here, counsel.  And I'm

6    going to ask one more question and I'll be quiet for a second

7    or two.

8          Sir, you've not been sequestered; obviously you've

9    been in the room and heard testimony by reason of inquiry by

10   counsel.  Earlier, during I believe Ms. Murray's testimony,

11   she indicated as a concession to Mr. Koresko's inquiry, that

12   PennMont can fire F&M "for any reason or for no reason."  Is

13   that correct?

14         THE WITNESS:  That was correct, Your Honor, that's

15   the way the document reads.

16         MR. KORESKO:  Your Honor, at this point --

17         THE COURT:  Yes, sir.

18         MR. KORESKO:  -- I would move -- I would move that

19   Mr. Nicholas' admission and Ms. Murray's admission constitute

20   complete bar to the relief that's requested by the Department

21   of Labor.  Because, Your Honor --

22         THE COURT:  We will cross that bridge when we come

to

7-17-09 Hearing
23   it.

24           MR. KORESKO:  Okay.

25           THE COURT:  Thank you very much.


                                                  - 74 -

        Mr. Drake Nicholas - Direct Examination
1            MR. KORESKO:  I would just ask you, maybe at the

2    break, as your clerk to pull Kennedy v. The Administrator of

3    the DuPont supplemental income plan decided in February of

4    2009, as to the specific instructions of the Supreme Court
for
5    the application of the planned documents as read.

6            THE COURT:  Counsel, why do you think I've been

7    asking the questions.

8            MR. KORESKO:  Okay.

9            THE COURT:  Now, I'll get to that bridge when I get

10   to it.  I'll cross that bridge when I come to it.

11           MR. KORESKO:  Okay.

12           THE COURT:  Now -- all right, thank you.  You may

13   continue.

14   BY MS. HENRY:

15   Q.   I believe you had started to say you had communicated

16   certain documents should be provided.  Which documentation

17   were you asking -- or advising that your client request?

18   A.   We were -- the discussions were we were requesting our

19   client personal to the policy which has been over and over

20   again, the correct one, is fiduciary with respect to a number

21   of benefit plans.  It receives request each week to pay out

22   numerous benefits.  Our client was requesting copies of

23   pertinent plan documents adopted by each of these separate

                        Page 74

7-17-09 Hearing

24   employers that were participating in this program.  There are

25   various different types of benefits that are being paid to

- 75 -

Mr. Drake Nicholas - Direct Examination

1   these trust assets, whether they are life insurance benefits.

2   Life insurance premiums being paid on death benefits,

3   education benefits -- the third one offhand I can't remember.

4   But there are various different benefits.  One of the things

5   our client wanted to do to confirm -- similar to the whole

6   concept of before it pays expense to make sure it's a

7   reasonable expense, is when it's wiring monies or cutting a

8   check to pay a certain benefit, wants to be assured that it
is

9   paying insurance premium with respect to a certain employer

10  that that employer is actually providing a death benefit to

11  its employees.  Our client has not way of substantiating the

12  validity of the benefits being paid.  Yes, it's supposed to

13  take direction from the plan administrator, but it is also a

14  fiduciary, nevertheless, and it has a fiduciary role and

15  responsibility to make sure that benefits are being paid

16  properly.

17  Q.   And the documents that you requested were they -- did
you

18  advise your client that they were necessary in order for them

19  to property perform that function you just testified to?

20  A.   I advised them of that, but I didn't need to advise them

21  of that, they already knew that.

22            THE COURT:  Again, I apologize for the interruption.

Page 75

7-17-09 Hearing

23    But at what point in time, if you recall, were you "fired" by

24    Mr. Koresko?

25          THE WITNESS:  Well, there are two e-mails, Your

- 76 -

Mr. Drake Nicholas - Direct Examination

1    Honor, that Mr. Koresko forwarded, and I don't have them in

2    front of me.  They may have been exhibits that were entered

3    already, they may not have.  I don't know.

4          MS. HENRY:  I do not mean to interrupt, Your Honor,

5    but there is an e-mail which has been marked as Exhibit 11,

6    which may refresh Mr. Nicholas.

7          THE COURT:  All right.  You may approach if you
wish.

8    Thank you.

9      (Pause)

10          THE WITNESS:  Counsel, can you repeat what you're

11    asking me?

12          MS. HENRY:  Well, I believe it was the Court's

13    question.

14          THE WITNESS:  Oh, I'm sorry.

15          THE COURT:  Sir, has the document Exhibit 11

16    refreshed your recollection?

17          THE WITNESS:  It has.

18          THE COURT:  Okay.  Will you set that aside now, and

19    do you recall the date when you were "fired" by Mr. Koresko?

20          THE WITNESS:  That would be July 6th, Your Honor.

21          THE COURT:  Of what year?

22          THE WITNESS:  2009.

Page 76

7-17-09 Hearing

23        THE COURT:  Based upon that and as counsel how is it

24   that your entity is still trustee?

25        THE WITNESS:  Well, Your Honor, has our client been

- 77 -

Mr. Drake Nicholas - Direct Examination

1   notified by the plan administrator through Mr. Koresko that

2   they have been removed?  Yes.  There is a provision in the

3   trust document that sets forth that there's a ninety-day

4   notice -- ninety days prior to the notice, prior to the

5   effective removal of the trustee.

6        THE COURT:  Are we in that ninety-day period right

7   now?

8        THE WITNESS:  We are.

9        THE COURT:  All right.  Thank you very much. You may

10   continue.

11   BY MS. HENRY:

12   Q.   Since I have shown you Exhibit 11 do you recognize that

13   document, Mr. Nicholas?  You can bring it back in front of

14   you.

15   A.   Yes, I do.

16   Q.   What is that document?

17   A.   It is an e-mail that was forwarded by Mr. Koresko to me.

18   As I recall within about an hour or so after I sent a letter

19   to Mr. Koresko stating our client's position.

20   Q.   And what did Mr. Koresko communicate in that e-mail?

21   A.   I would have to take a moment to read it.

22   Q.   I don't want all, I just want the basis.  Is it what you

Page 77

7-17-09 Hearing
23   had to testify to to the Court?

24   A.   Yes, your client is removed.

25   Q.   Did he give you any directions as to where the money in

                                                            - 78 -
                    Mr. Drake Nicholas - Direct Examination

1    the trust should be transferred?

2    A.   Yes.  I believe he's indicated the funds should be

3    transferred to Penn Public Trust.  But I'd have to read the
e-

4    mail again to --

5            THE COURT:  I'm going to give you all the time you

6    need to read that because we're going to recess at this point

7    in time.  It's 12:25.  We will reconvene this afternoon at

8    1:45 promptly.  Thank you very much.

9            THE WITNESS:  Thank you.

10           THE COURT:  Now, to the extent that there -- there
is

11   a witness on the witness stand, there are potentially other

12   witnesses, the Court directs an order of sequestration be

13   imposed.  Counsel, do not discussion your testimony with

14   anyone else other than -- and actually you shouldn't be at

15   this point and time even discussing it with counsel.

16           Thank you very much.

17           MR. KORESKO:  Your Honor, may I ask one question?

18           THE COURT:  Yes, sir.

19           MR. KORESKO:  We weren't given a witness list who
was

20   going to testify.

21           THE COURT:  Please give that to counsel.  And

22   reciprocate as well, if you choose to call.

                            Page 78

7-17-09 Hearing
23          MR. KORESKO:  We're going to call two people, Your
24   Honor.
25          THE COURT:  Again, exchange it.  Thank you.  1:45.


                                                     - 79 -
              Mr. Drake Nicholas - Direct Examination
 1      (Recess from 12:27 p.m. until 1:50 p.m.)
 2          THE COURT:  Counsel, may I ask for your indulgence
 3   for just a moment, please?
 4          Sir, would you state your name again for the record.

 5          THE WITNESS:  Drake D. Nicholas.
 6          THE COURT:  Mr. Nicholas, as counsel to F&M, if this
 7   Court does not issue an order today for the duration of the
 8   period prior to the ninetieth day, if there were requests
 9   identical to the ones that had been denied up to this point,
10   would you continue to deny those requests?
11          THE WITNESS:  We would, Your Honor.
12          THE COURT:  Thank you.
13          MS. HENRY:  One question.
14   BY MS. HENRY:
15   Q.   Mr. Nicholas, do you have an area of concentration or
16   specialty in your practice?
17   A.   Yes.  I specialize in several areas, but in particular,
18   ERISA.
19          MS. HENRY:  No further questions.
20          THE COURT:  Mr. Koresko?
21          MS. HENRY:  I'm sorry, I apologize.  We do need to
22   move in Government Exhibits 10, 11 and 17.
23          THE COURT:  Any objection?
                        Page 79

7-17-09 Hearing

24          MR. KORESKO:  My only objection is to Gram H.

25     (indiscernible)?

                                                        - 80 -

                Mr. Drake Nicholas - Direct Examination

1          MS. HENRY:  And I --

2          THE COURT:  Would you say that again?

3          MR. KORESKO:  Gram H. (indiscernible) objection.
And

4     continuing one from -- I'm not allowed to have continuing

5     objections.  So I'll restate it.  To the extent that these

6     documents were turned over to the government as a result of a

7     discovery requests, at which F&M Trust beneficiaries were not

8     made aware, we allege that Rosen Simon had a derivative

9     fiduciary responsibility not to turn over any of them.

10     That they had to ask first before turning over private

11     identifying -- anything that had private identifying

12     information in it, and they didn't do it.  So that objection

13     contains, and that's really restating what I stated --

14          THE COURT:  All right.  Thank you very much.  The

15     objection is overruled, exception is noted.

16          MS. HENRY:  One further item, Your Honor.

17          THE COURT:  Certainly.

18          MS. HENRY:  I believe I may have moved in 15 twice,

19     rather than moved in 16.  So to the extent I have not already

20     moved Government Exhibit 16 into evidence, we do so now.

21          THE COURT:  Thank you very much.

22          I'm sorry, sir, I do have another question.  And
that

23     is if requested by Mr. Koresko, would you turn over the
                              Page 80

7-17-09 Hearing

entire

24    trust before the ninetieth day?

25            THE WITNESS:  Your Honor, that's a difficult

question

- 81 -

Mr. Drake Nicholas - Direct Examination

1    to answer.  But I believe at this point we would advise our

2    client that it has a fiduciary duty in the standard of

conduct

3    of care that, no, we would not.  Based upon concerns about

the

4    plan and it's operation at this point, we would not so advise

5    our client to turn over the assets earlier than ninety days.

6            THE COURT:  Who would be in a position of authority

7    at the trust to not follow your advice and turn over any

8    monies?

9            THE WITNESS:  We advise our clients as counsel.  I

10    mean, obviously, our clients can overrule any or choose to

not

11    accept or ignore any advice we provide.  So whether that

would

12    be the head of the trust department or up higher admin trust,

13    that would be their prerogative to do, since we are counsel

to

14    the bank but not in a position of making a determination to

do

15    that.

16            THE COURT:  Thank you.

17                        CROSS-EXAMINATION

18    BY MR. KORESKO:

19    Q.    Mr. Nicholas, I want to get clear something that's still

7-17-09 Hearing

right?

20  unclear to me.  You advised F&M not to pay any request,

21  A.   We advised F&M not to pay certain expenses that were

22  submitted that we do not believe to be appropriate plan

23  expenses.

24  Q.   And what, particularly, did you advise are inappropriate

25  plan expenses?

- 82 -

Mr. Drake Nicholas - Cross-Examination

I

1  A.   Payment to your law firm, payment to attorneys; Gilbert

2  believe is the name of the law firm.  And I believe the costs

3  from Caplin & Drysdale.

4  Q.   So the payments to Gates' firm are okay?

5  A.   No.

6  Q.   And the payment to Community Trust Company FM, that's

7  fine?

8  A.   They're serving in a fiduciary capacity, yes.

9  Q.   They didn't put forward any documents to justify their

10  payments, did they?

11  A.   Actually, that whole sequence of how F&M and Fire CTC

12  operated in terms of being a trustee was all run by PennMont

and

13  that provided the direction on a monthly basis, I believe,

14  itemized each employer with each itemized fee that F&M should

15  charge to the trust.  So they followed the direction of

16  PennMont with respect to that.

17  Q.   So it's okay to follow PennMont's direction for a

18  professional expense to benefit your client, but not a

Page 82

7-17-09 Hearing

19    professional expense that you are in conflict with in a

20    litigation, that's correct, right?

21    A.    No, I don't agree with your statement.

22    Q.    You're an adversary in litigation of PennMont Benefit

23    Services, correct?

24    A.    Not at this point we're not.

25    Q.    You have in California, and tell me if I'm wrong,

because

- 83 -

Mr. Drake Nicholas - Cross-Examination

1    I just got the pleadings last week.  Mr. Moniak, by the way,

2    has stated that -- on the record that they now contest none

of

3    the plaintiff's allegations in a lawsuit against PennMont and

4    the trusts in the District of California, are you familiar

5    with the Data Link case?

6    A.    Yes.

7         MS. HENRY:  Objection, relevance.

8         MR. KORESKO:  The relevance is -- I'm sorry.

9         THE COURT:  Now you may give me your proffer.

10        MR. KORESKO:  The relevance is to show the

impairment

11    of the fiduciary relationship, the conflicts of interest that

12    are now resonant in the context of the arrangement, and to

13    show that -- look, further to emphasize the probability of

14    success on the merits and the equities that are involved in

15    this case.  Your Honor --

16        THE COURT:  Is the California case a state case?

17        MR. KORESKO:  No, it's federal district.

18        THE COURT:  Federal case.

7-17-09 Hearing

19        MR. KORESKO:  As a matter of fact, it was filed here

20   originally, it's on appeal to the Third Circuit.  And it was

21   refiled in the Central District of California.  We will -- we

22   are in the process of preparing a 12(b)(1) response.  But

23   there's an exclusive venue and jurisdiction clause in the

24   trust document vesting exclusive venue here, in the Eastern

of
25   District, that we believe Data Link will be returned here.


- 84 -

Mr. Drake Nicholas - Cross-Examination

1    course, I can't speak for the judge.

2         THE COURT:  Good thing.  To the extent that you have

3    inquired to this witness a question regarding the California

4    case, how is that relevant to this inquiry?

5         MR. KORESKO:  It's the same trust.  A similar issue

6    to what has been presented as the reason why Community Trust

7    F&M has to be --

8         THE COURT:  Let me ask you this way, counsel.

9         MR. KORESKO:  Of course.

10        THE COURT:  Are you proffering that they have

11   opposing positions on the same issue, or inconsistent issues

12   on the same issue?

13        MR. KORESKO:  Yes.

14        THE COURT:  All right.  Objection overruled.  You
may
15   answer the question.

16   BY MR. KORESKO:

17   A.   Could you restate -- could you provide me with the

7-17-09 Hearing

18  question again, please?

19  Q.   Isn't it true that you've agreed not to contest the

20  plaintiff's claims in the Data Link case in the Central

21  District of California?

22  A.   We are not contesting those claims, that is correct.

And

23  the reason we're not contesting those claims is for two

24  reasons.  One, our client is a directive trustee.  Our client

25  takes no position with respect to whether it was properly

- 85 -

Mr. Drake Nicholas - Cross-Examination

1   moved or not.  Secondly, the very trust that was new drafted

2   provides that the trustee need not get directly involved in

3   litigation, it can allow those matters to be decided by the

4   Court.

5   Q.   What are you doing here?

6   A.   I was subpoenaed.

7        THE COURT:  Excuse me.  That's true.  Counsel --

8        MR. KORESKO:  I'm sorry, I withdraw that comment,

9   Your Honor.  I'm sorry if it -- I'll put it in terms of a

10  question.

11       THE COURT:  Thank you.

12  BY MR. KORESKO:

13  Q.   Mr. Nicholas, what makes the California case different

14  from this case in terms of your desire to be in front of a

15  Judge?

16       MR. NEIMAN:  Your Honor, I'm going to --

17       THE COURT:  Sustained.

18  Q.   Mr. Nicholas, did you have a duty to get involved in the

Page 85

7-17-09 Hearing

19  California case at all?

20  A.    Did we have a duty to get involved?  We were named

21  defendants, so, obviously, we were involved in that case.

22  Q.    And you got yourself released, right?

23  A.    Yes.

24  Q.    You didn't get any of the beneficiaries released or the

25  trust corpus released, correct?

- 86 -

Mr. Drake Nicholas - Cross-Examination

1  A.    It's not a petition to get other parties released.  The

2  issue at hand in the Nestea case is a dispute over whether

F&M

3  as to F&M is being properly terminated or not.  That is not

4  our position to decide one way or another.  F&M is an

5  appointed fiduciary.  And, again, pursuant to the provisions

6  of the trust which you drafted, F&M has no obligation or

7  responsibility to contest those claims.  It can -- if you can

8  provide me with a copy of Section 8.7, I believe of your

9  trust, counsel why don't you read the language that you

wrote.

10          THE COURT:  Excuse me.  The way this works is the

11  train moves and not the station.

12          THE WITNESS:  I understand, Your Honor.

13          THE COURT:  He gets to ask the questions.  Go on.

14  BY MR. KORESKO:

15  Q.    Quite elucidating, Mr. Nicholas.

16          THE COURT:  No comment, counsel.  Just go ahead.

17  Q.    So if I take your testimony you know that my firm were

18  the draftsmen of the trust, correct?

Page 86

7-17-09 Hearing

19   A.   Yes, I believe that you stated that in prior documents.

20   I can't point to which one.

21   Q.   So you believe that statement by Mr. Koresko when he

22   wrote to you, right?

23   A.   If you wrote that to me, yes.

24   Q.   And you didn't believe the other statements as to the

25   authority under which the firm was acting?


- 87 -

Mr. Drake Nicholas - Cross-Examination

1    A.   No.   I put those into two different pots.   I also cite

2    the very language that you have in your trust under standard

3    of conduct which I pointed out to you in my letter of July

4    6th.

5    Q.   Well, a standard of care differs from practitioner to

6    practitioner, doesn't it, Mr. Nicholas?

7         THE COURT:   Excuse me, care or conduct?

8         MR. KORESKO:   Conduct, I'm sorry.

9    Q.   Standard of conduct.   Your standard of conduct is

10   obviously different than CTC's, correct?

11   A.   Yes.

12   Q.   Now, are you telling me that PennMont didn't have the

13   right to rely on the continuation of a prior ten-year

standard

14   of conduct?

15   A.   No, you did not have a right to rely on a standard of

16   conduct by CTC, which is a separate company serving as

17   separate fiduciary capacity.   And then CTC is acquired by a

18   totally different company who has different policies and

19   standards and believes however those policies are, their

Page 87

7-17-09 Hearing

20    administer fiduciary counselors may be different than CTC

21    administers will.

22    Q.    I didn't ask that question.  It was a merger wasn't it,

23    correct?  Isn't that correct, Mr. Nicholas, it was a merger?

24    A.    I didn't handle the corporate transaction but they were
a

25    successor by operation of law, yes.


- 88 -

Mr. Drake Nicholas - Cross-Examination

1    Q.    A successor by operation of law means in a merger

2    setting.  Which, by the way, I would ask Your Honor to take

3    judicial notice of the Pennsylvania corporate documentation

4    and the admissions in the Data Link case that, in fact, CTC

5    doesn't exist anymore by merger.  You don't dispute that Mr.

6    Moniak has said that in his pleadings, do you?

7    A.    CTC, the company, no longer exists because it was merged

8    by operation of law into F&M, which succeeds all the assets

9    and liabilities of CTC.

10    Q.    Exactly.  And it's contractual obligations, right?

11    A.    Yes.

12    Q.    And the course of dealing in context with the
contractual

13    obligation?

14    A.    Yes.

15    Q.    So why did you change the course of dealing?

16    A.    Because we are not CTC.  We didn't represent CTC, we

17    represent F&M.

18    Q.    But did you direct your clients to give notice to

19    PennMont or any party associated with REAL VEBA or SEWBT, of

20    the change of conduct?  The change or the course of conduct?

Page 88

7-17-09 Hearing

21    A.   Yes.  We have correspondence with you, Bonnie, and

22    e-mails with you and our office.

23    Q.   In May of this year, right?

24    A.   So be it.

25    Q.   But ten years and seven months that the course --

- 89 -

Mr. Drake Nicholas - Cross-Examination

1         THE COURT:  Counsel, you're being argumentative.

2    Please, next question.  We're going to stop this hearing

3    pretty shortly.

4         MR. KORESKO:  All right.

5    Q.   Mr. Nicholas, you keep talking about fiduciary duties.

6    In fact, isn't a directive trustee an agent, it's not a

7    fiduciary, is it?

8    A.   No, it is a fiduciary.

9    Q.   Actually, Mr. Nicholas, are you familiar with luring a

10   trustee's handbook, are you familiar with this volume, sir?

11   A.   No, not that volume, I'm not.

12        MR. NEIMAN:  Your Honor?

13        THE COURT:  Yes, sir.

14        MR. NEIMAN:  I don't know if he's questioning him

now

15   as an expert.  We're starting to get into a round that we're

16   not here for today.

17        THE COURT:  It's a moot point.  He said he's not

18   familiar with the volume.  So it doesn't matter.

19        MR. KORESKO:  He gave two expert opinions already

20   that Your Honor already asked about, and I'm afraid that if

21   Your Honor is going to take into --

7-17-09 Hearing

22          THE COURT:  I asked him a question as a witness on

23    the witness stand.  He was not qualified as an expert.  I did

24    not ask him a question as an expert.

25    BY MR. KORESKO:

                                                              - 90 -

                        Mr. Drake Nicholas - Cross-Examination

1     Q.    Are you familiar with the Restatement Second of Agency,.

2     Mr. Nicholas?

3               MR. NIEMAN:  Your Honor.

4               MS. HENRY:  Objection.

5               THE COURT:  Sustained.

6     Q.    Mr. Nicholas, do you know what the standard is of an

7     agent trustee as opposed to a trustee?

8               MR. NIEMAN:  Same objection.

9               THE COURT:  Sustained.

10    Q.    Mr. Nicholas, are you offering any expert opinion here

11    today?

12              MR. NIEMAN:  I would object --

13              THE COURT:  Sustained.

14    Q.    Mr. Nicholas, what due diligence have you done on the

15    structure of REAL VEBA and SEWBT to justify you in making the

16    blanket statement that ERISA applies?

17    A.    Well, based upon the documents we've been able to

review,

18    we believe that there's a sufficient nexus between the trust

19    and the number of adopting employers that maintain the

various

20    welfare benefit plans that are associated with this trust.

21    Q.    But that's not the test, is it?

                        Page 90

7-17-09 Hearing

22  A.   You asked me what did I do to make that determination.

23  Q.   But that's not the test --

24       MR. NIEMAN:  Your Honor, objection again --

25       THE COURT:  Sustained.


- 91 -

Mr. Drake Nicholas - Cross-Examination

1        MR. NIEMAN:  -- he factually testified and now --

2        THE COURT:  Sustained.  Sustained.

3        MR. NIEMAN:  Thank you.

4  BY MR. KORESKO:

5  Q.   What is the relationship among the adopting employers in

6  REAL VEBA?

7  A.   Well, we don't know, because your firm, is failing --

8  Q.   Thank you.

9  A.   -- to provide the documents.

10 Q.   Thank you.  What is the relationship of the beneficiaries

11 in REAL VEBA?

12 A.   Again, we don't have the documents --

13       MR. NIEMAN:  Your Honor, objection.

14       THE COURT:  Just a moment, please.  Yes, sir?

15       MR. NIEMAN:  Objection, Your Honor.  We keep going

16 over this.  I mean, he's here as a fact witness to testify to

17 the facts as to why, what led up to the firing or the

18 termination of F&M Trust.  Now we're going into issues that

19 are irrelevant to the proceedings today.  They're asking for

20 legal opinion that are well beyond the scope of a fact witness

21 in this very limited proceeding that we're here for today.

Page 91

7-17-09 Hearing

22          THE COURT:  Counsel?

23          MR. KORESKO:  Your Honor, one of the elements of
this

24    proceeding is whether or not, under the trust arrangements

25    that exist, PennMont not only had an absolute basis to fire

- 92 -

Mr. Drake Nicholas - Cross-Examination

1    F&M, but did so on the basis of cause.  My questions to Mr.

2    Nicholas, I hope are --

3          THE COURT:  Counsel, I don't think that's an issue
at

4    all.  I think one of the witnesses already testified, if you

5    say they're no longer there, no longer there.  The only issue

6    that we talked about earlier was the ninety-day period of

7    time.

8          MR. KORESKO:  Well, that's the next point that I'd

9    like to --

10          THE COURT:  Let's --

11          MR. KORESKO:  -- and I'm not going to go on much

12    farther.

13          THE COURT:  -- cut to the chase, please.

14          MR. KORESKO:  Okay.

15    BY MR. KORESKO:

16    Q.   Mr. Nicholas, you said that PennMont expenses were a

17    settler function type of expense, right?

18    A.   No, I did not say that.

19    Q.   Who is the settler of REAL VEBA?

20    A.   I did not say that PennMont's expenses -- PennMont never

21    submitted any expenses to our client.

Page 92

7-17-09 Hearing

settler

22    Q.    Oh, the law firm's expenses were in the nature of

23    function expenses.  Who was the settler of the plan?

24    A.    All the employers that are fighting all the tax

25    litigation.


- 93 -

Mr. Drake Nicholas - Cross-Examination

1    Q.    How do you know that?

2    A.    We've been provided with some limited information about

3    the various tax cases.

4    Q.    So you've determined on the basis of limited information

5    that the employers are actually settlers?

6    A.    Yeah, an employer is the settler, yes.

7    Q.    Would it surprise you that the trust was not formed by

8    those employers?

9    A.    I can't answer that, because I don't have all the

10    documents to make that assessment.

11    Q.    So you've made your statements on the basis of

incomplete

12    information, correct?

13    A.    On the basis that PennMont has not turned over all the

14    documents, correct.

15    Q.    Isn't it true that plan surplus is not in anywhere in

16    those documents, committed to the payment of death benefits?

17            MR. NIEMAN:  Your Honor, objection --

18            MR. KORESKO:  I'm sorry.  Let me clarify the

19    documents.

20    Q.    In the plan and trust documents, isn't it true that

21    nowhere is plan surplus committed to the payment of benefits?

Page 93

7-17-09 Hearing

22          MR. NIEMAN:  Objection.  Relevance?

23          MR. KORESKO:  It's the crux of the case.  The case is

24    about the payment out of plan surplus of what are alleged to

25    be improper expenses.  If, Your Honor, the beneficiaries had

- 94 -

Mr. Drake Nicholas - Cross-Examination

1    no reasonable expectation of receiving anything out of plan

2    surplus, no one's been harmed.  That kills jurisdiction of the

3    Department of Labor under 502(a)(5) of ERISA, because under

4    LaRue (ph.) the most recent Supreme Court decision on the

5    topic, and under Hughes Aircraft, and under Lockheed and under

6    Malia v. GE in the Third Circuit, and a hundred other cases,

7    plan surplus is not a benefit and there's no expectation of

8    it.

9          THE COURT:  All right.  The objection is overruled.

10    Go ahead.

11    A.    I disagree with your assessment that this is plan

12    surplus.

13    BY MR. KORESKO:

14    Q.    I want to ask you a question --

15    A.    -- these -- would you let me --

16          THE COURT:  No.  Allow him to answer.

17    A.    These assets are being used to pay insurance benefits and

18    various benefits from these various employer plans.  There is

19    no basis upon which to determine that there is surplus.  As an

7-17-09 Hearing

20   ERISA attorney, what I view surplus to be is assets remaining

21   in the trust after the satisfaction of all expen -- of all

22   benefit liabilities, obligations of the plan and expenses.

23   This plan is far from being -- from doing that.  There are

24   various insurance policies that are held under this plan.  If

25   for example, all of those insurance companies would go under

- 95 -

Mr. Drake Nicholas - Cross-Examination

1   tomorrow, there still needs to be a funded benefit to these

2   various employer plans.  So the actual surplus that you refer

3   to would need to be used to pay benefits --

4           THE COURT:  Excuse me one second.  Excuse me one

5   second, sir.  Is it then your position that that figure, if a

6   surplus existed or did not exist, could only be identified at

7   a point at the end of the existence of the trust?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  All right.

10   BY MR. KORESKO:

11   Q.   Well, actually, Mr. Nicholas, have you read the NEA case

12   that just was issued by the DC Circuit on this particular

13   issue?

14           MR. NIEMAN:  Objection, Your Honor.

15           THE COURT:  Sustained.

16   Q.   Mr. Nicholas, are you aware that there are at least two

17   circuits in the United States that have already held that

18   demutualization proceeds are surplus -- allocated plan

7-17-09 Hearing

rights

19  surplus, and that welfare plan participants do not have

20  to them?  Are you aware of that?

21          MS. HENRY:  Objection.

22          MR. NIEMAN:  Objection.

23          THE COURT:  The objection is sustained.  You might

here

24  want to put that in a brief, perhaps an argument, but not

25  questioning this witness now.


                                                    - 96 -

            Mr. Drake Nicholas - Cross-Examination

1          MR. KORESKO:  Okay, Your Honor.

2          THE COURT:  I want you to cut to the chase here.

I'm

3  going to give you a few more minutes to go with this witness.

4  BY MR. KORESKO:

5  Q.   What particular provision of the plan document, Mr.

6  Nicholas, do you refer to in saying that PennMont does not

7  have the right to make an accounting classification under the

8  plan?

9          MR. NIEMAN:  Objection.  I don't believe he's

10  testified to that fact.

11          MR. KORESKO:  I assumed that he was giving testimony

12  about the plan document itself.  He made representations to

13  that effect.  If I'm wrong, then maybe you'd clarify.

14          THE COURT:  All right.

15          MR. NIEMAN:  It was a characterization of testimony

16  that never took place.  That's the --

17          THE COURT:  Sustained.  You may rephrase.

7-17-09 Hearing

18  BY MR. KORESKO:

19  Q.   Mr. Nicholas, what if I told you that the plan document

20  provided that PennMont had the absolute right to designate

21  what was plan surplus, what was experience gain, and what was

22  not?

23  A.   Is that a question or a statement?

24  Q.   What if I told you, would that change your answer?

25  A.   Is it a question or a statement you're asking.


- 97 -

Mr. Drake Nicholas - Cross-Examination

1           MS. HENRY:  Objection.  Not in evidence.

2           THE COURT:  Sustained.

3  Q.   Did you read in the trust document where PennMont has
the

4  ability to designate anything as surplus or experience gain?

5  A.   No.

6  Q.   Did you read in the trust document that in the event
that

7  there is no life insurance policy intended for the --

8           MR. KORESKO:  I'm sorry.  Let me restate.

9  Q.   Did you read in the plan document that in the event
there

10  is no life insurance policy in place at the time of death,

11  that no benefit is payable?

12  A.   No, I haven't seen such a provision.

13           MR. KORESKO:  That's all I have, Your Honor.

14           THE COURT:  Very well, thank you.

15           MS. HENRY:  The Secretary calls Jocelyn Diaz

16  Sweeting.

17           THE COURT:  Thank you,sir.  You may step down.

Page 97

7-17-09 Hearing

18          MS. HENRY:  Ms. Jarquin will handle the examination

19    of Mr. Sweeting.

20          THE COURT:  Very well.

21          GOVERNMENT'S WITNESS, JOCELYN DIAZ SWEETING, SWORN

22          THE CLERK:  State your full name and spell your last

23    name for the record.

24          THE WITNESS:  Jocelyn Diaz Sweeting,
S-W-E-E-T-I-N-G.

25          THE COURT:  You may proceed.


                                                        - 98 -

                Mr. Drake Nicholas - Cross-Examination

1          MS. JARQUIN:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MS. JARQUIN:

4    Q.    Could you please state by whom you're employed?

5    A.    The U.S. Department of Labor Employee Benefit Security

6    Administration.

7    Q.    And what is your current business address?

8    A.    170 South Independence Mall West, Philadelphia, PA.

9    Q.    Investigator Sweeting, would you please state your

10   current title?

11   A.    I'm a senior investigator.

12   Q.    And how long have you had that position?

13   A.    I've been a senior investigator since 2008.

14   Q.    And how long have you been with the Department of Labor?

15   A.    Since June 2001.

16   Q.    What did you between 2001 and 2008 when you became a

17   senior investigator?

18   A.    I was an investigator in the regular capacity.  I joined
                          Page 98

7-17-09 Hearing

19    the REAL VEBA investigative team in 2007.

20    Q.    Could you describe generally for the Court what the job

21    duties are of an investigator with the Department of Labor?

22    A.    My duties include the enforcement of Title 1 of ERISA.

23    Q.    You indicated that in 2007 you became assigned to the

24    investigation of what we've been referring to here as the
REAL

25    VEBA and SEP?

- 99 -

Ms. Jocelyn Sweeting - Direct Examination

1    A.    Yes.

2    Q.    And that's the investigation that resulted in the filing

3    of the pending lawsuit?

4    A.    Yes, it is.

5    Q.    During the course of that investigation, did the

6    department investigate welfare benefit plans administered by

7    PennMont and the other defendants?

8    A.    Yes, we did.

9    Q.    Investigator Sweeting, were asked to prepare and execute

10    a declaration in the pending TRO matter that we're here for?

11    A.    Yes, I was.

12    Q.    And are you aware that that was submitted as part of the

13    documents in support of this TRO?

14    A.    Yes, I am aware.

15    Q.    I'd like you to describe the general types of
information

16    the department had available to it to review during the
course

Page 99

7-17-09 Hearing
17    of the investigation of -- and for reference, I'll just refer

18    to the investigation of the REAL VEBA -- the investigation
you

19    just mentioned you were assigned to?

20    A.    During the course of the investigation we reviewed over

21    300,000 pages of documents that included bank statements,

22    invoices, correspondence, e-mails, census reports.

23    Q.    And as a result of that investigation, what did the

24    department learn about the type of welfare benefit plans

25    administered by the defendants?


                                                        - 100 -
                 Ms. Jocelyn Sweeting - Direct Examination
1         MR. KORESKO:  Objection.  Calls for a legal

2    conclusion, Your Honor.  If she's going to make a factual

3    statement that's fine, but if she's going to on and start

4    making legal conclusions as a result -- that follow from the

5    facts --

6         THE COURT:  Sustained.

7    BY MS. JARQUIN:

8    Q.    As a result of the department's investigation, what did

9    you learn about the plans administered by the defendants?

10   A.    What we were able to obtain during the investigation
that

11   there were prototype death benefit plans that were being

12   offered to various employers.

13   Q.    And how did employers establish these plans?

14   A.    Employers signed adoption agreements.

15   Q.    And were adoption agreements signed by individual

16   employers?

17   A.    They were signed by individual employers, and the plans
                              Page 100

7-17-09 Hearing

18   were in the name of those employers.

19   Q.   Was there any information in these adoption agreements

20   that set forth the qualifications for the type of employees

21   who could participate in the plan?

22   A.   The employers established the qualifications that their

23   employees needed to meet in order to participate in their

24   plan.

25           MR. KORESKO:  Objection, Your Honor.  May I ask for
a


                                                          - 101 -
              Ms. Jocelyn Sweeting - Direct Examination

 1   clarification, please?

 2           THE COURT:  Yes, sir.

 3           MR. KORESKO:  Ms. Sweeting is testifying on the
basis

 4   of documents that she saw, not on the basis of discussions

 5   with the persons who executed the documents.

 6           THE COURT:  Is that correct, ma'am?

 7           THE WITNESS:  Yes, sir, it is.

 8           THE COURT:  All right.  Fine.  The record shall so

 9   reflect.

10           MR. KORESKO:  And Ms. Sweeting is testifying on the

11   basis of -- if that's the case, I believe that we're entitled

12   to know, at this point, before any more questions are asked,

13   what was the source -- where did these documents come from?

14           THE COURT:  Counsel that's an appropriate objection.

15   Would you lay a foundation, please?

16           MS. JARQUIN:  Yes, Your Honor.

17   BY MS. JARQUIN:

                        Page 101

7-17-09 Hearing

18  Q.    Investigator Sweeting, where did you obtain the adoption

19  agreements that you're referring to in your testimony?

20  A.    During the course of the investigation we issued several

21  subpoenas, some to banks, some to insurance companies, some
to

22  the defendants in the case.  And the documents that I
reviewed

23  were produced from those subpoenas.

24        MR. KORESKO:  And I object to Ms. Sweeting's

25  testimony as being hearsay, Your Honor.  She's testifying on


- 102 -

Ms. Jocelyn Sweeting - Direct Examination

1  the basis of documents produced by third parties who are not

2  here.  Obviously she doesn't have the documents here for us
to

3  cross examine her on.  It's a simple hearsay issue.  They're

4  not in business.  There's no business record exception.

5  There's no official government -- the government didn't

6  produce the expense.  There's absolutely nothing here that we

7  can cross examine her on.  We're just taking her opinion of

8  what she read.  I don't believe that she can give this kind
of

9  testimony and this kind of hearing.

10        THE COURT:  Counsel?

11        MS. JARQUIN:  Your Honor, I would like to follow up

12  with further foundation of Investigator Sweeting as to the

13  source of the adoption agreements, specifically from which

14  party or from -- in response to which subpoena these adoption

15  agreements were submitted to the department.

Page 102

7-17-09 Hearing

16          THE COURT:  Very well.

17    BY MS. JARQUIN:

18    Q.    Investigator Sweeting, do you know from which subpoena

19    these documents, these adoption agreements were received by

20    the Department of Labor?

21    A.    The department received a production for an answer to a

22    subpoena on March 10, 2006 from PennMont.

23    Q.    Thank you.

24          MS. JARQUIN:  May I continue, Your Honor?

25          THE COURT:  Counsel?


                                                        - 103 -

              Ms. Jocelyn Sweeting - Direct Examination

1           MR. KORESKO:  Well, Your Honor, I would only ask the

2     Court to take notice of the date, at this point.

3           THE COURT:  I can't do that.  Talk to me.  What is
it

4     me that you want me to see, counsel?

5           MR. KORESKO:  There's a -- the ERISA guide views

6     jurisdiction -- the statue of limitations as to jurisdiction.

7     She just testified that the documents received by the DOL and

8     giving rise to this were produced on March the 10th, 2006.

9     That's quite some time ago.  And -- let me withdraw.  I'll

10    hold it for closing.

11          THE COURT:  You may continue.

12          MS. JARQUIN:  Thank you, Your Honor.

13    BY MR. JARQUIN:

14    Q.    Ms. Sweeting, did these adoption agreements set forth
the

7-17-09 Hearing

15  type and amount of benefits the individual plans' sponsors

16  were establishing for their particular plans?

17  A.   Yes it did.

18       MR. KORESKO:  Objection, Your Honor.  The word plan

19  sponsor, plan --

20       THE COURT:  Sustained.

21       MR. KORESKO:  -- these are all legal conclusions.

22       THE COURT:  Sustained.

23  BY MS. JARQUIN:

24  Q.   Did these adoption agreements contain any information

25  about the type or amount of benefits being offered?

- 104 -

Ms. Jocelyn Sweeting - Direct Examination

1   A.   Yes, they did.

2   Q.   During the course of the department's investigation, did

3   you learn anything about how persons would become participants

4   in these plans?

5   A.   Participants specifically employees, would sign the

6   participation agreements.

7   Q.   And did they do anything other than signing participation

8   agreements?  Did they do any other kind of filling out of

9   forms?

10  A.   The participation agreement would, in essence, bring them

11  into the plan.  The employer would then establish a life

12  insurance policy in their name.  The employee was responsible

13  for designating a beneficiary to that policy.

14  Q.   During the course of the department's investigation, did

7-17-09 Hearing

15    the department come into any information as to how the

16    benefits were funded?

17    A.    They were funded through life insurance policies.

18    Q.    And do you know what type of life insurance policies

they

19    were?  Whose lives were being insured?

20    A.    The lives of the employees.

21    Q.    The employee participants?

22    A.    Yes.

23    Q.    And, Investigator Sweeting, during the course of the

24    department's investigation, did you come upon any information

25    as to whether there were any procedures in place for

- 105 -

Ms. Jocelyn Sweeting - Direct Examination

1    participants to make claims?

2    A.    We found through reviewing documents that if a claim was

3    made the employee or the employer would make the claim and

4    PennMont would adjudicate those claims.

5    Q.    During the course of the department's investigation, did

6    the department come to establish how many of the arrangements

7    that you've just described were in existence?

8        MR. KORESKO:  Your Honor, I'm happy to stipulate to

9    Ms. Sweeting's affidavit, rather than reading it here in

10    court.  Because all that's happening here right now is she's

11    basically just rehashing what she said in a document that was

12    prepared for her, probably.  But I won't -- I'm going to

7-17-09 Hearing

13  stipulate that Ms. Sweeting will give the testimony that's in

14  her affidavit.  And I don't think that she's --

15          THE COURT:  Counsel, would you accept that offer?

16          MS. JARQUIN:  With the understanding that she'd be

17  released today and she wouldn't be further subject to

18  examination, that would be fine.  I would stipulate to that.

19          MR. KORESKO:  Yeah.  That's fine.

20          THE COURT:  All right.  Have a nice day.

21          THE WITNESS:  Thank you.

22          MS. JARQUIN:  Thank you.

23          MR. KORESKO:  Again, my stipulation is that I agree

24  that she did --

25          THE COURT:  Would you mark the affidavit as an

- 106 -

Colloquy

1  exhibit number and offer it please?

2          MS. JARQUIN:  The one thing I would like to do, Your

3  Honor, I was going to be introducing two documents through

4  Investigator Sweeting; they were the documents that are

5  attached to the declaration.  I can just admit the
declaration

6  into evidence.  The two documents are the two trust
agreements

7  we've been referring to.  I have copies of her declaration; I

8  can just mark it and admit it, if all are in agreement.

9          MR. KORESKO:  Your Honor, I have one objection

10  because one of the documents, I don't believe, is the trust.

11          THE COURT:  Review it and let me know.

7-17-09 Hearing

12          MS. JARQUIN:  I could ask Ms. Sweeting to

13    authenticate the documents, if you'd like.  I will just, for

14    the benefit of the Court, note that the document that is

15    attached as Exhibit A to the declaration is not
Bates-stamped.

16    I have a duplicate of that with a Bates stamp of CTC's Bates

17    stamp that shows how it came to us and what the numbers were.

18    I can substitute that and have Ms. Sweeting authenticate how

19    it came into the possession of the department.

20          MR. KORESKO:  So we're admitting A and B off of her

21    declaration, is that correct?

22          MS. JARQUIN:  We'd like to -- we could admit the

23    declaration as well as A and B, that would be fine.

24          MR. KORESKO:  That's fine.

25          MS. JARQUIN:  Thank you.


                                                          - 107 -
                              Colloquy

1          THE COURT:  Thank you very much.

2          MS. JARQUIN:  I'll mark that Exhibit -- Government

3    Exhibit 18.  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MS. HENRY:  The Secretary rests.

6          THE COURT:  All right.

7          MR. KORESKO:  Move for directed judgment, Your
Honor,

8    on the basis of the fact that they did not introduce the plan

9    document in this case, that they allege as a plan.  They only

10    introduced the trust documents.  The trust documents in this

11    case are the arrangement which the Third Circuit already
                              Page 107

7-17-09 Hearing

12    determined is not an ERISA plan.  Adminiad (ph.) v. -- I'm

13    sorry, Adminiad out of the Seventh Circuit; Donovan v.

14    Dillingham out of the Eleventh Circuit; Taggart out of the --

15    T-A-G-G-A-R-T, out of the Fifth Circuit.

16            THE COURT:  Counsel, are all these in --

17            MR. KORESKO:  They're all in my brief.

18            THE COURT:  Thank you.

19            MR. KORESKO:  The prevailing authority is that the

20    Department of Labor has the burden of showing a plan.  The

21    Department of Labor has certainly showed a trust but they have

22    not showed a plan.

23            THE COURT:  Let me just hear your response to that,

24    please.

25            MS. HENRY:  Yes.  We believe that we have established

- 108 -

Colloquy

1    through the testimony of Investigator Sweeting that in fact

2    there were plan documents and that employers adopted those

3    plan documents.  And you know our legal arguments in support

4    of why it's a plan.  From our pleadings, the Court, I believe,

5    would know that.

6            We do have copies of plan documents if that would

7    assist, which we would introduce as having been produced

8    through a subpoena to PennMont, through the investigator.

9            MR. KORESKO:  It's a little late for that, Your

10    Honor.  And Ms. Sweeting -- they haven't established at all on

7-17-09 Hearing

11  the basis of Ms. Sweeting's declaration --

12      THE COURT:  Let's --

13      MR. KORESKO:  -- what it is that they need to --

14      THE COURT:  Let's set that issue aside momentarily.

15      MR. KORESKO:  Okay.

16      THE COURT:  Counsel, based upon the testimony
adduced

17  at this hearing, if the Court did not grant the temporary

18  restraining order request, yet continued the matter for a

19  preliminary injunction hearing prior to the expiration of the

20  ninetieth day, to which we've been deferring, how would

21  citizens be harmed?

22      MS. HENRY:  Well, Your Honor, as you know, the

23  Department of Labor's position is that there is harm as a

24  result of a violation of the statute --

25      THE COURT:  But if at this juncture, based upon

- 109 -

Colloquy

1  what's been adduced, all that's happened is that Mr. Koresko

2  has requested funds, those requests have been denied.

3      MS. HENRY:  Yes.

4      THE COURT:  That's it.

5      MS. HENRY:  Yes, but if in fact there was no attempt

6  from the Koresko defendants to seek the immediate turnover

7  that they've requested, although it has been denied, through

8  over venues, perhaps such as state court or some other venue,

9  the state would seek to --

10      THE COURT:  And you wouldn't immediately seek to
have
Page 109

7-17-09 Hearing

11    it removed?

12        MS. HENRY:  We would seek to have it removed, yes,

13    Your Honor, but --

14        THE COURT:  But --

15        MS. HENRY:  -- by coming before this Court, we are

16    obviously trying to --

17        THE COURT:  I guess my concern is simply that I've

18    not really heard anything up to this point in time that

would,

19    on the record, demonstrate irreparable immediate harm to,

20    quote/unquote, "the citizens" on whose behalf you bring this

21    action, to justify a temporary restraining order.  That is

not

22    to say that after a full hearing, preliminary injunction

23    hearing, which would occur prior to the expiration of the

24    ninetieth day, that the Court's decision might differ.

25        Now, I also want to make a comment in that regard

- 110 -

Colloquy

1    that while I ask Mr. Nicholas about authority, given that he

2    has, according to the record, given the direction, or

3    directives, regarding the nonexpenditure of these monies

4    requested by Mr. Koresko, that ultimately it is not his

5    decision.  But then again, the Court has not heard from

6    anybody in terms of whose decision it might be.  That burden

7    is on the government, is it not?

8        MS. HENRY:  Your Honor, the burden to show

9    irreparable harm is indeed on the government, but the -- we

do

10    not know what F&M Trust will do in response to these

Page 110

7-17-09 Hearing

11  directions.

12       THE COURT:  And I can't speculate as to what they

13  will do.

14       MS. HENRY:  They've received the directions and they

15  may in the future decide to comply with them, and it is the

16  defendants who are getting the directions that violate ERISA

17  and who are seeking to have the assets turned over to

18  themselves in violation of Section 406 of the Act.

19       THE COURT:  If the evidence in this record is that

an

20  agreement exists and by that agreement Mr. Koresko, and I say

21  him just because simplicity's sake, if Mr. Koresko said look,

22  in this agreement we have the right, the absolute right, to

23  terminate it, that's not a violation of ERISA because that's

24  the agreement.

25       MS. HENRY:  Two points, Your Honor.  One is that an

- 111 -

Colloquy

1  agreement cannot, by the statute itself, an agreement, a

trust

2  agreement, a plan document, may not violate Sections 404 of

3  ERISA.

4       THE COURT:  Well, let me ask you directly, does the

5  right to terminate violate the ERISA statute?

6       MS. HENRY:  The right to terminate, in and of

itself,

7  does not violate ERISA, no.  It would be issuing a decision

--

8  or, excuse me, a directive on the right to terminate on the

9  basis that the defendants were being asked to comply with
Page 111

7-17-09 Hearing

10    ERISA and, importantly here, that they've asked to transfer

11    the trust assets to an entity controlled by themselves.  It
is

12    the entirety of those directions that the Department brings

13    before the Court as violating ERISA and causing immediate
harm

14    should that trust asset be transferred to the defendants.

15              THE COURT:  Has F&M responded in writing to the

16    demand to turn over the trust?

17              MS. HENRY:  Other than -- no, not to the -- as far
as

18    I know, not to the demand to turn over the trust.  If

19    Mr. Nieman has a different --

20              MR. NIEMAN:  Your Honor, I don't believe that there

21    has been a response to that, but our position has been that
we

22    will not turn it over.  And shortly after that happened, this

23    proceeding was initiated and here we are today.

24              THE COURT:  Seems to me that if anyone -- if I deny

25    this, that the only entity that would come running to court


                                                          - 112 -

                              Colloquy

1    would be Mr. Koresko asking to force them to turn it over --

2              MS. HENRY:  And perhaps --

3              THE COURT:  -- which he can't do in this hearing.

4              MS. HENRY:  This is true, Your Honor, and that is an

5    option that the Department of Labor was seeking to eliminate.

6              THE COURT:  I understand that, but how --

7              MS. HENRY:  In that --

                              Page 112

7-17-09 Hearing

8        THE COURT:  -- could this Court do that?

9        MS. HENRY:  Well, the harm to the public is that

10   there would be continuing violations of ERISA.  And should

11   these trust assets be turned over to defendants, who the --

12        THE COURT:  Well, ultimately -- let me ask it this

13   way.  I understand the complaint, but the allegation is

14   continuing violation of ERISA; that's yet to be proved.

15        MS. HENRY:  We believe that we had proved that

16   through the requests for payment to Koresko Law Firm, which,

17   in and of itself, violates Section 406(b)(1) of ERISA.  They

18   are a party-in -- they are fiduciary, excuse me.  And a

19   fiduciary may not deal with plan assets on their on behalf.

20        THE COURT:  If --

21        MS. HENRY:  That request --

22        THE COURT:  If hypothetically -- this is not to

23   denigrate you in any way, Mr. Koresko -- Mr. Koresko

24   innocently was mistaken in the law or reasonably believed his

25   interpretation was correct, and other entities similarly

- 113 -

Colloquy

1   situated around the country did the same thing he did, would

2   DOL go to court seeking injunctions across the board against

3   every entity that made that innocent mistake or reasonable

4   conclusion, particularly as an attorney if an attorney makes

5   that decision?

6        MS. HENRY:  Obviously, the department needs to

7   evaluate each case as it comes before it.  In this instance,

8   Your Honor, a fiduciary is held to the standard of what

7-17-09 Hearing

9   someone who has expertise in the field would know.  They

10  cannot have, as it is said in one case, an empty head and a

11  pure heart.  So even an innocent mistake, if it does not

12  comport with the fiduciary standards, would still violate

that

13  section.

14           THE COURT:  All right.

15           MR. KORESKO:  May I respond, Your Honor?

16           THE COURT:  In a second.  I don't mind telling you

17  what I'm thinking at this point in time.  I think I may I

have

18  already done that already, I suppose.

19           But first and foremost, I'm not inclined to grant

20  this request for temporary restraining order.  Part and

parcel

21  of why I'm not so inclined, however, is the fact that I

truly

22  believe, based on the evidence introduced at this hearing,

23  that any requests by Mr. Koresko are going to be turned down.

24  And as long as there is time remaining in this, quote,

25  unquote, "ninety-day window", the Court could schedule a

- 114 -

Colloquy

1   preliminary injunction hearing, allow for any discovery

that's

2   absolutely necessary -- not of harassment nature, because the

3   filings here are already voluminous -- and to hold that

4   hearing, perhaps on the expiration of the ninetieth day, to

5   give everyone a full opportunity to present the evidence to

6   the Court for the Court to make a decision.  And I don't

think

Page 114

7-17-09 Hearing
7    that anyone's going to be prejudiced or harmed irreparably,

8    given the testimony that nothing's going to be turned over.

9         And if in fact Mr. Koresko chooses, as he certainly

10   has a right to do, to file an action to demand or enforce it,

11   again, I would only assume that there's going to be an

12   immediate request to remove.  Now, I don't have any control

13   over that, obviously.

14        But again, I don't think that the Court's decision

15   here on the TRO request can be based upon this somewhat

16   endless speculation that's outside of the record in this
case.

17   And while I certainly understand the Department of Labor's

18   position here, I don't think I've had sufficient evidence to

19   this point that would demonstrate the justification for such

20   an extraordinary ruling as a temporary restraining order.

21        MS. HENRY:  With the understanding, Your Honor,

22   there's a representation from counsel for F&M that in fact

23   requests for payment that are in violation of ERISA, as
you've

24   heard described here, are not honored, and trust assets are

25   not turned over to an entity that is controlled by
defendants,


                                                    - 115 -
                              Colloquy
1    we understand the Court's position.  I don't -- Mr. Nieman is

2    standing; I don't know if he wants to address the Court.

3         THE COURT:  I'll hear from Mr. Nieman.

4         MR. NIEMAN:  Your Honor, I mean, we are kind of
stuck

5    in the middle of this whole thing, as you obviously can see.
                              Page 115

7-17-09 Hearing

6    And one of the concerns that we have going forward from here

-

7    - and you're free, obviously, to make a decision and I

8    understand where you're coming from -- how do we operate

going

9    forward, because we are stuck between a rock and a hard

place.

10        Obviously, the Department of Labor has made

his

11    allegations against F&M in its complaint.  Mr. Koresko and

12    entities have made allegations against us here.  We do need

13    certain documentations and things like that to be able to do

14    our job.  We need deposits to be made into the account, which

15    we've been allowing PennMont to do so that we can continue to

that.

16    make the payments for insurance premiums and things like

that.

17    And there's another issue --

that,

18        THE COURT:  And let me just -- as you're saying

19    I wanted to also make that a part of this record, that there

20    is nothing in the record adduced thus far -- and certainly

21    we've closed the record -- that would indicate that any

entity

22    has been harmed for lack of payments to be made.  Is that

23    correct?

in

24        MR. NIEMAN:  I think that's correct for this point

25    time.  I think the record's still open.

- 116 -

Colloquy

1        THE COURT:  I'm not talking about your entity, Mr.

2    Koresko.

Page 116

7-17-09 Hearing

3          MR. NIEMAN:  Mr. Koresko --

4          MR. KORESKO:  No, I'm not talking about my entity

5     either.  Ms. Bonnie -- I would proffer Ms. Bonnie's testimony

6     that in fact there are a dozen policies that are in danger of

7     lapse right now because of the blanket -- the blanket order

8     not to pay anything that is requested by PennMont in

9     connection with --

10         THE COURT:  Well again, you have a right to pursue

11    that as the movant.

12         MR. KORESKO:  Yes, that's --

13         THE COURT:  That's not -- I have no control over that

14    here.

15         MR. KORESKO:  I understand that, Your Honor.  I mean,

16    you do and you don't.  And I would suggest to you the

17    following.  As a chancellor in equity related to an ERISA

18    trust, Your Honor has full authority under the All Writs Act

19    to make any and all order which is equitable under the

20    circumstances concerning --

21         THE COURT:  If I did that it would be of more harm to

22    you than anybody else.  Are you sure you want me to do that?

23         MR. KORESKO:  The notion ultimately -- you could --

24    you could possibly -- you could order against me.  What I'm

25    saying to Your Honor is that we have 120 cases that are

- 117 -

Colloquy

1     docketed for tax court.  The trial is supposed to happen in

Page 117

7-17-09 Hearing

2    October.  The tax court of the United States is not going to

3    stop while people fight over whether or not the trial can get

4    paid for.  The United States has a pecuniary interest in

5    making sure that those participants are harmed to the extent

6    of the tax liability related to the trust corpus which has

not

7    been distributed.  We pointed that out in our brief.  But the

8    United States is not here purely as a disinterested party.

It

9    is here as a litigant.  It has a pecuniary interest in the

10   outcome.  To interfere with the ability of the tax payers to

11   defend and not have to pay tax, is absolutely essential to

the

12   government's ability to force those tax fees to go away.  In

13   other words --

14        THE COURT:  I don't know what the other words are,

15   but I have absolutely no jurisdiction over that whatsoever.

16        MR. KORESKO:  Well, Your Honor has -- well, I would

17   ask Your Honor to consider the following as part of the

18   overall order, the applicable order in this case.  The

19   insurance companies that are registered in Pennsylvania are

20   all subject to the jurisdiction of this Court by operation of

21   statute.  And also, Your Honor has jurisdiction over them if

22   in fact you accept, for purposes of this hearing only, that

23   there may be an ERISA case.

24        To that extent, Your Honor can issue an order

25   preventing any insurance company from lapsing any policies

- 118 -

Colloquy

7-17-09 Hearing

1  that are in the trust right now because they can't be paid

2  for.  Your Honor can do that because the beneficiaries, the

3  sesquaeca (ph.) trust, as it's called, are the direct

4  beneficiaries to whom both F&M and the Department of Labor

5  have responsibilities to.

6        The Department of Labor cannot come in here and then

7  ask Your Honor to do X with the expectation that the persons

8  they're supposed to help are in fact going to get harmed.  It

9  just flies in the face of all equity.  Equity follows the law

10  in this circumstance.

11        The second thing that I would ask this Court to order

12  is that -- accepting as we will your decision to postpone an

13  injunction ruling until sometime within this ninety-day

14  period -- that F&M be ordered to do no harm.  That is

15  certainly within the realm of equity, and they are here.  It's

16  not that there's no due process and they don't know.

17        THE COURT:  What does "do no harm" mean, give you

18  what you're asking for?

19        MR. KORESKO:  It means they pay the premiums when

20  asked.  They don't have -- if you're going to interfere with

21  the trust -- if you're going to interfere with professional

22  fees, that's certainly one thing.  But if you're going to

23  interfere with the actual execution of the documents that

24  they're called to execute --

25        THE COURT:  But counsel, that certainly is within the

- 119 -

7-17-09 Hearing
                    Colloquy

1   discretion of -- I would assume -- the attorney who
testified,

2   Mr. Nicholas.

3              MR. KORESKO:  Okay.

4              THE COURT:  That's his call.

5              MR. KORESKO:  Well, I understand that --

6              THE COURT:  Because, again, of the fiduciary

7   relationship and also the potential liability.  I think they

8   know what they're doing.

9              MR. KORESKO:  Yes, I do, and I know what you're

10  saying.  But of course -- let's look at the irreparable harm

11  of uninsurable beneficiaries.  If the policies --

12             THE COURT:  Well, now wait a minute.  Irreparable

13  harm -- they're the movants.

14             MR. KORESKO:  Well, we're going to balance --
they're

15  the movants.

16             THE COURT:  But you're trying to switch to the point

17  where you're claiming irreparable harm when you're not even

18  the movant on this temporary restraining order request.

19             MR. KORESKO:  Your Honor, the standard is not the

20  reasonable standard.  This is a mandatory injunction

21  proceeding.  This is not a status quo injunction.  In a

22  mandatory injunction proceeding, the movant's burden is to

23  show probability of success on the merits.  I don't know if

24  that's been shown today; I don't think it has.  But more

25  importantly, Your Honor, is in fashioning an appropriate
order

7-17-09 Hearing
Colloquy

1    for appropriate equitable relief under ERISA, pursuant to

2    Great West v. Knudson and Varity v. Howe, et al., that Your

3    Honor has the authority and Your Honor has to know in making

4    and fashioning an order, that in fact beneficiaries aren't

5    going to be harmed because third parties allegedly

6    representing the beneficiaries' interests do the wrong thing.

7    The Department of Labor has taken the position that they're

8    not to pay anything.  The Department of Labor thus is going

to

9    cause beneficiaries who are uninsurable --

10          THE COURT:  Counsel, I respectfully disagree with

11   you.  The Department of Labor has no control whatsoever over

12   what Mr. Nicholas directs his counsel --

13          MR. KORESKO:  Well, if they act --

14          THE COURT:  -- then to do.

15          MR. KORESKO:  If they act contrary to the directions

16   of DOL.

17          THE COURT:  That's his prerogative too, I suppose,

18   his insurance.

19          MR. KORESKO:  Well, is it reasonable to assume that

20   the United States government -- that a trust --

21          THE COURT:  I'm not going there.  I will not let

this

22   hearing go there, counsel.

23          MR. KORESKO:  All right, sir.  I would just ask Your

24   Honor to consider the fact that they can't meet their burden

25   of proving not only a probability of success on the merit,

but

Page 121

7-17-09 Hearing

- 121 -

Colloquy

1    they can't prove balancing of the equities that lays in favor

2    of the government's position here.

3            THE COURT:  Again, I began my allowed opining with

4    this is what I was inclined to do, which was simply to deny

5    the request for a temporary restraining order without more.

6            MR. KORESKO:  I accept that, Your Honor.

7            THE COURT:  All right then, and that is the order of

8    the Court.  Now, to the extent that there will be a

9    preliminary injunction hearing where you'll have a full

10   opportunity to present what you need to present -- once we

11   look at our calendar and once I get, frankly, a stipulation

12   here right now in terms of the equity of this Court as to

what

13   day the expiration will occur -- I will fashion a date

14   consistent with your calendars to hold a hearing inside of

the

15   ninety-day period.  And I think if I do it that way,

16   everyone's interests will be protected.

17           MR. NIEMAN:  Your Honor, if I may, just voice a

18   concern --

19           THE COURT:  Yes, sir.

20           MR. NIEMAN:  -- on behalf of F&M.  I understand

where

21   you're coming from, for the next sixty or ninety days,

22   whatever it is, we do need certain documents and certain

23   information so that we can perform our duties.  For example,

24   we've requested a list of --

25           THE COURT:  Well, no, that's something that I have

Page 122

7-17-09 Hearing

- 122 -

Colloquy

1    absolutely no control over.  That's between you and

2    Mr. Koresko.  And I've certainly heard testimony about what's

think

3    forthcoming and what's not been forthcoming, but I don't

4    that the Court, under the circumstances, is in a position to

5    order anything, because quite honestly, I don't know enough.

6    I don't have enough information about that.  You do.  It's as

7    simple as that.

8              MR. NIEMAN:  Okay, Your Honor.  Again, I appreciate

9    that, it's just we do find ourselves in a very --

10             THE COURT:  You might want to go out in the hallway

11   and talk about it, but there's nothing that I can do about

it.

12             MR. NIEMAN:  We may need to do that, Your Honor,

job

13   because it's almost impossible for us to adequately do our

14   with both the requirements of the DOL --

15             THE COURT:  I will say this.  It certainly seems to

16   me that when we look at the beneficiaries of the policy, that

17   the actions of everyone involved can at least identify those

financial

18   areas that will not hurt those people and hurt their

19   interests.  I think we've seen enough of that happen in this

20   country to date.  And as counsel, it seems to me you can

21   identify the legitimate issues that are brought to the Court,

22   and I will address those.  But to the extent that there are

23   other issues that really, really are affected by this, it's

anything

24   more personality, to speak quite honestly, than it is

Page 123

7-17-09 Hearing
25   else.  And I urge you as strongly as I can, work those things

- 123 -

Colloquy

1    out.  Try to settle those things, even if it's for just
within

2    the next ninety-day period of time, so that the people who

3    have these investments are not hurt.  I urge you to do that.

4              MR. NIEMAN:  Thank you.

5              THE COURT:  Thank you.  This matter is adjourned for

6    the day.  Thank you.

7              Counsel, I do want an agreement in writing as to
when

8    the ninety-day period expires.  Thank you.

9              MS. HENRY:  Thank you, Your Honor.

10             THE COURT:  I'm like a court forcing an agreement
but

11   I want it.

12             MR. NIEMAN:  Thank you very much.

13             MR. KORESKO:  Your Honor, one thing.

14             THE COURT:  Yes, sir?

15             MR. KORESKO:  When is our response to the
preliminary

16   injunction motion due?

17             THE COURT:  Now.

18             MR. KORESKO:  Can we have thirty days?

19             THE COURT:  No.  No.  That should've already been

20   filed.

21             MR. KORESKO:  The preliminary injunction response?

22             THE COURT:  Yes.  Can you not do that within the
next

23   few days?

Page 124

7-17-09 Hearing

24          MR. KORESKO:  Okay.

25          THE COURT:  You have -- ninety-nine percent of it is

- 124 -

Colloquy

1    here anyway.

2          MR. KORESKO:  Yes, Your Honor, I'm aware of that.

3    Thank you so much.

4                (Court is adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 125

7-17-09 Hearing

25

- 125 -

1                   C E R T I F I C A T I O N

2

3           I, Dena Page, the court approved transcriber, do

4   hereby certify the foregoing is a true and correct transcript

5   from the official electronic sound recording of the

6   proceedings in the above-entitled matter.

7

8

9

10  _____        _July 27, 2009____

11  DENA PAGE                                DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7-17-09 Hearing