In the United States District Court
For the Eastern District of Pennsylvania

| | |
|---|---|
| Hilda L. Solis, Secretary of Labor, United States Department of Labor, <br><br> Plaintiff, <br><br> v. <br><br> JOHN J. KORESKO, V, et al., <br><br> Defendants | Civil Action No. 09-0988 |

## Affidavit of Jeanne Bonney
### In Rebuttal to DOL's Witness Testimony and Proffered Testimony of Jocelyn Diaz-Sweeting with DOL Stipulation to Documents
### and
### In Support of Defendants' Offer of Proof of Reasonable Value of Trust Services, Appropriateness of Legal Services and Reasonable Value of Legal Services

I, JEANNE BONNEY, swear and affirm that the following is true and correct to the best of my knowledge, information and belief.

1. I am an attorney employed by Koresko Law Firm ("KLF") and serve as Counsel to PennMont Benefit Services, Inc. ("PennMont").

2. I am a named Defendant in the above action and attended the Hearing for Preliminary Injunction held on September 2, and 3, 2009, at the conclusion of which the Court urged the Parties to stipulate to documents intended for admission rather than use witness testimony.

3. Having intended to introduce documents in rebuttal of DOL's witness testimony, the proffered testimony of Jocelyn Diaz-Sweeting and in support of proof of the reasonable value of trust services, the appropriateness of legal services and the reasonable value of legal services, Defendants' offer this Affidavit and have submitted the documents attached hereto for DOL review and proposed admission by stipulation.

4. The owner/ employer witnesses for Mida, Inc., Harry H. Monokian, D.M.D. PA, John Sharratt Associates. and Cetylite Inc. ("clients") uniformly testified to execution of an Adoption Agreement in which, *inter alia,* they named John J Koresko, V as Secretary of a Plan Committee upon whose signature alone the Committee and Trustee are authorized to act in matters pertaining to the Trust and the Plan; consented to be a

party to a Trust Agreement incorporated by reference as though set forth at length, and certified their intention and understanding that the Plan is not one involving retirement. The clients verified that PennMont and the Trustee where entitled to rely on the representations made by executing the Adoption Agreement.

       5.      No one testified that they relied upon or even knew John Koresko.

       6a.     The client witnesses testified that there is one Trust, not separate Trusts, that they joined the REAL VEBA Trust rather than setup their own trust, and that they in fact exercise no control over the Trust or Trust assets.

       6.      By signing the Adoption Agreement, clients certified their intention and understanding of Article 6 of the Plan Document states the services provided by PennMont.[1] There has been no testimony that PennMont did not provide these services. All client witnesses testified that they paid their fees in full since inception, without objection.

       7.      Subsequent to adoption each client was further apprised of PennMont's services by letter entitled "Acknowledgment of Participation and Summary Plan Description", attached hereto as Exh. 1..

---

[1] Plan 6.03    Rights and Duties - Unless an Administrator has been named in the Adoption Agreement, the Committee shall enforce this Plan in accordance with its terms and shall be charged with its general administration. The Committee shall exercise all of its discretion in a uniform, nondiscriminatory manner and shall have all necessary power to accomplish those purposes, including but not limited to the power:

  (a)    To determine all questions relating to the Eligibility of Employee to participate.

  (b)    To compute and certify to the Trustee the amount and kind of Benefit payable to Participants and their Beneficiaries.

  (c)    To maintain all the necessary records for the administration of the Plan other than those maintained by the Trustee.

  (d)    To prepare and file or distribute all reports and notices required by law.

  (e)    To authorize all the disbursements by the Trustee from the Trust.

  (f)    To direct the investments to be made by the Trustee (if the Trust is directive) in a manner consistent with the objectives of the Plan and authorized by the Trust.

  (g)    To make and publish such rules for the regulations of the Plan as are not inconsistent with the terms hereof.

  (h)    To make any amendments to the Plan (except with respect to contribution rates) where necessary to meet the requirements of law or to protect the interests of the Participants.

  (i)    To determine the application of Benefits upon dissolution and termination as provided under Section 10.02.

If an Administrator has been named in the Adoption Agreement, it shall assume and perform all and each and every, duty and responsibility to the Committee; except that if the Trust is a directive Trust as stated in the Adoption Agreement, then the sole and exclusive duty of the Committee shall be issuance of investment directions (other than those relating to Insurance Contracts) and matters incident thereto.

The term "Committee" as used herein shall include the "Administrator," unless the context of the instrument indicates a contrary intent.

8. Clients were asked a series of questions about "being told" or "did you receive" trust financial information to which they are not entitled and in which they have no legal interest or control, such as Trust funds in a money market account or Trust policy values.

9. There is no disclosure required in the DOL regulations for this type of arrangement. There is no statutory disclosure requirement. No clients complained to the year end letters put into evidence by DOL as a form of benefit statement. Under the plain language of the documents, there was no other information reportable to participants.

10. Nor is disclosure of plan amendment required. The documents do not require permission or prior notice.

11. The owner of the policies is the Trustee. The beneficiaries of the various VEBAs had no ownership interests in those policies or proceeds, and therefore, have no rights to any disclosures. To the extent clients got Trust asset value from their insurance agents, the agents may have violated statutory and common law duties to the Trustee.

12 Trust investment of funds not needed on hand in a money market account is an ordinary, necessary and standard practice. Contributions awaiting application for premium payment are the property of the Trustee, not the property of any employer or employee. [We would be getting sued for fiduciary breach if the amounts were not so deposited.]

13. All amounts including any demutualization proceeds were accounted as surplus until designated as benefits, pursuant to PennMont's and the Trustee's multiple powers of classification.

14. Any interest and any demutualization proceeds ever received were or would have been classified as surplus. No action of Defendants ever caused any rightfully earned and calculated benefit not to be paid.

15. No payment to Defendants or third parties for services rendered ever impaired the ability of the Trusts to satisfy the rightful demand of any claimant. Other than the claim in *REAL VEBA v. Castellano*, 03-cv-6903 (EDPA) there is no unpaid claim that is due.

16. All plans that are top hat and unfunded ("unfunded" meaning fully insured) do not require fiduciary oversight. All of the arrangements were in reality two plans. A term insurance plan and a whole life insurance plan.

17. Term policies were billed and paid as bills were received. The year end letters exhibited by DOL show that whole life contributions were accelerated because they were motivated by a looming tax year end. Over 95% of all employer contributions

went to the cash value life insurance, as demonstrated in client Sharratt's case ($400,000/$500 = 99.9% to owner/employee).

18. The Mida client Cindy Monokian testified that any funds attributable to contributions had already been placed into an annuity for ten year distribution to her – after she transferred her sole employee to her husband's corporation on 12.31.06 in order to prevent sharing in distribution. It was thereafter deduced that as her husband's office manager Ms. Monokian then terminated all her husband's employees, including her former employee, on 12.31.06, on the same date that Dr. Monokian adopted a medical benefit of no greater than $50,000/annum, in which only he would participate since all other employees were gone. It was Mr. Koresko who pointed out, rather than DOL, that this shenanigans in order to avoid sharing benefits or termination distribution was potentially an ERISA violation.[2]

19. Mida and Monokian both stated that they had legal representation in Larry Michaels, Esquire, and that he read the documents and knew about the plan that they were adopting and participating in, throughout their participation.

20. The Monokians unequivocably received legal service benefits. The Monokians' emails requesting assistance, executed Form 2848 (authorizing Koresko Law Firm as taxpayer representative); Waiver of Disclosure and Agreement to Representation; and Koresko Law Firm's submissions to IRS are attached hereto as Exh.2.

21. I certify that the attached IRS interviews, conducted at the request of IRS, are a true and correct record of the questions of the United States and the testimony of the Monokians. Exh 3.

22. The Monokians did not disclose to the Koresko Law Firm that they were in contact with DOL against our interests while availing themselves of our legal services.

23. John Sharratt was advised of the hold on termination distribution and given a full explanation in writing. He nevertheless threatened suit against his insurance agent, Ron Miles, and the Defendants, *see* Exh.4.

24a  The meeting Mr. Sharratt attended in Stoneham Massachusetts on January 26, 2001, was far from a "sales presentation". It was a seminar certified by the National Association of State Boards of Accountancy for which those licensed professionals present received three credits toward their insurance or CPA continuing education requirements, *see* NASBA renewal application showing over one hundred such seminars, including this one, at which Mr. Koresko was the instructor,.Exh 5.

24b. As was evident by his testimony, Mr. Sharratt terminated the plan without ensuring that term coverage for his terminally ill employee would continue unabated, and

---

[2] It must be noted that a termination distribution is NOT a benefit but merely one option available to the Plan Administrator at the time of plan termination. In the case of Mr. Sharratt, the policies will remain in force for the time being, rather than be surrendered.

was rendered speechless when reminded that any termination distribution would be pro rata with this employee, clearly not contemplated by Sharratt. His testimony would lead one to conclude that there was no intention to give any employee any money.

25. The death benefit proceeds of Cetylite's deceased employee are not Plan assets. There are no "plan assets." The trust is not a plan. Proceeds were deposited into law firm escrow accounts, pursuant to the custodial agreement with CTC. *See* Exh 6. The documents allowed this, as the Master Plan provisions allowed payments into Trusts for an insured.

26. Since there are no "plan assets" there cannot be a breach of fiduciary duty.

27. It is not a violation of law for a law firm to have escrow accounts. *See* Rule Prof Conduct 1.15

28. After payment of the benefits pursuant to settlement and release, the remainder were still not "plan assets." Nothing "reverts" to a plan. The funds are separately held by the firm an intermediary between the owner and beneficiary of the policy [the trustee CTC] and an unsecured claimant. There are no ERISA fiduciary duty rules with respect to such amounts. The firm was acting as a custodian in its own right, on behalf of the owner.

29. All benefits have been paid other than Castellano. The amounts paid were calculated according to the governing documents. The present value of the entire benefit payable is an accommodation not required by the documents if the claimant did not want periodic payment over ten years.

30a. The medical insurance reimbursement for Cetylite was not intended as an indemnity benefit. There was an existing medical plan. PennMont simply agreed by way of settling their dispute and desire to terminate the plan to save Cetylite from an existing obligation to pay medical insurance premium. This payment was negotiated in order to inure to the benefit of owners, because otherwise profits would have been reduced by Cetylite's obligations to pay for medical insurance.

30b. Cetylite has not made a contribution for years. Payment commencing in July of 2005 of $1.2 million in medical reimbursements out of Trust assets not "belonging" to Cetylite or its owner/employees is an accommodation to resolve a problem. See Affidavit of Larry Townsend.

31 The testimony of TD Bank, N.A. as to the name of the account was opinion and not fact, and this Court ruled as such. The account title is Koresko & Associates, P.C., escrow agent for the benefit of Penn Public Trust. It is a law firm account.

32. No evidence was introduced to refute the deposition testimony attached as Exh C to Defendants Motion in Limine that the subject TD Bank account ending "8561" is exclusively for the private law firm client "NXXXXXX." *See* Exh 7.

33. Ms. Jarvis may have testified as to lobbying expenses. No evidence was introduced to refute the decision of PennMont and CTC that it was in the best interest of participants not to allow IRS to destroy the plans, and to engage lobbyist counsel to delay if not defeat IRS' intentions to reverse the tax advantaged nature of the arrangement. Jefferson Government was paid funds. Proactive intervention using surplus trust funds allowed participant clients to contribute $100 million of additional money and save over $40 million in tax because Internal Revenue Code 419A(f)(6) was not eliminated. The $270,000 seems a small price for such a large benefit.

34. Ms. Jarvis may have testified as to her "spreadsheet" of seven employers purportedly having nonowner employees. Three of these eleven employers terminated with RELEASES, of which two never made it into SEWPT, Trust assets which insured the lives of these employers' employees remained in REAL VEBA until the time of plan termination.

35. Ms. Jarvis may have testified as to her "classification" of payments out of the Trust to PennMont as fees. Ms. Monokian's testimony squarely supports what I stated in prior affidavits – employers made out checks incorrectly that required PennMont fees had to be "backed out" of the Trust account, and vice versa.

36. Ms. Jarvis may have testified as her "classification" of payments out of the Trust to the Law Firm as fees. A significant portion of these payments were reimbursement to the law firm for payment to Anderson Kill and Olick, LLP, for representation in the DOL matter.

37. I would further testify as to the reasonable legal, trust and other service fees paid out of surplus in accordance with the plan and trust documents, at reasonable rates and without endangering the payment of benefits.

38. PennMont tried to find an alternative trustee prior to the plan amendment adopted July 29, 2009. The eligible candidates were not interested in taking on a trustee engagement where there were existing IRS and DOL issues. We could not find any trustee that wanted to be a "material advisor" to an arrangement that IRS classifies as a "listed transaction."
Material advisors are subject to onerous potential penalties for minor noncompliance that are presently not waivable by IRS.

39. DOL has polluted the waters of potential successor trustees by its false and misleading press release, and the newspaper stories that ensued [as demonstrated by the testimony of DOL witnesses] leaving PPT as the only known entity desirous of being trustee.

40. No trustee is necessary under ERISA §403(a), and the appointment of same is subject to the complete discretion of PennMont under the trust documents.

41. As Trustee, Penn Public Trust would charge reasonable fees.

42. CTC was paid $250/year per active employer but, as all prior Trustees, performed virtually no function other than to move money in and out of the money market account and cut checks and wires for payment of premiums and fees as directed by PennMont. Checks and wire confirmations come to PennMont for subaccounting and distribution. In essence, PennMont performed trustee functions as to accounting and premium payment allocation. CTC received $514,000 for its services since 2002. Total fees paid to titular Trustees such as CTC (i.e., First Union and Commerce) since 1994 are $1,056,000.

43. The total inflow of funds from 8/25/94 through 7/14/09 is $195 million. The present cash balance is approximately $3 million. In other words, the total outflow has been $192 million.

44. Under the Loring analysis, it would have been reasonable to take a percentage of .7444 of each amount of outflow, rather than a flat rate. *See* Exh 8.

45. We learned through our litigation that Benistar was charging an annual administrative fee of 5% of contributions, exit fees of 10% for rollovers, and 20% for cash distributions.

46. The 5% and 20% numbers are higher than the standards for standard trusts, but 419 arrangements are novel and not standard because of the unique legal and governmental problems associated. See, testimony of Molly Carpenter regarding the demised of Benistar at Exh 9; the closing of Niche Marketing at Exh 10.

47. Under the Benistar market approach PennMont (as the functional trustee) would have been entitled to $9,750,000 for 2000 to 2009, aside from an asset fee.

48. This renders pale any accusation that PennMont overbilled.

49. The Legal Services Amendment and the most recent NOE amendments were appropriately adopted by PennMont. The legal services amendment was approved by CTC.

50. Koresko Law Firm possesses engagement letters and IRS powers of attorney for over 130 owner/ employee participants who elected to have the Trust provide a legal service benefit in connection with their Tax Court litigation. See, Monokian engagement letter and IRS Form 2848, at Exh 2.

51. DOL has complained of the absence of "new" engagement letters between the law firm and its clients, Penn Public Trust, and PennMont. Under the Rules of

Professional Conduct a new fee letter is not required for old clients. Since Penn Public Trust and PennMont are related to the law firm by ownership, it is doubtful the RPC requires anything other than "a reasonable fee."

52. Four law firm staff work exclusively on Trust business: an attorney, two paralegals and an information management specialist. Ms. Bonney has worked in the ERISA arena for fifteen years; Ms. Bonner and Ms. Gaughan are both accomplished attorneys who function as paralegals; Mr. Townsend constructed and maintains a unique database system devoted exclusively to Trust accounting and Plan Auditing functions. They are salaried personnel. When providing Trust services billable to the Trust (which at present is solely for litigation or IRS tax court matters) Ms. Bonney bills at $250/hr; Ms. Bonner, Ms. Gaughan and Mr. Townsend at $100/hr. Bankruptcy Courts have approved our rates in the past.

53. During the period 2000 to 2009, the firm would have been entitled to the law firm only billed and was paid a small fraction of that, as reflected on Ms. Jarvis "chart".

54. Jeanne Bonney, Nancy Bonner, Joan Gaughan and Larry Townsend would not be employed by the Law Firm if not for the firm's representation of the Trust and PennMont's administrative services.

55. John Koresko does not take a full-time salary from PennMont or the law firm, and has not during the time I have been associated with the firm.

56. During the time I have been associated with the firm, I know that John Koresko spends at least half his time, or 1000 hours per year, on trust-related matters. Mr. Koresko's hourly rate is $450 to $500 per hour, depending on the engagement.

57. The rates charged by the firm in connection with IRS matters are much less than those charged by outside counsel (see Caplin bill and Sumerfield bill). Additional factors make the Law Firm's rates for handling IRS matters more than economical. Having an overwhelming number of clients seeking services, and the uniqueness of the ever evolving situation with IRS, law staff have little time to work on other matters. The work is novel and constant research and client contact is required. The cost is de minimis, as the economies of scale are at play. We have made unique inroads in negotiations with IRS and learned from other counsel that "they are waiting to see how far we can get" as we are recognized as one of the lead firms in this area of law.

58. Since 1994 when Koresko Law Firm had its first 419 tax client –IT HAS NEVER LOST A CASE! Not one client has yet had to pay a dime to IRS for a 419 matter.

FURTHER AFFIANT SAYETH NOT.

_____
JEANNE BONNEY

SWORN TO AND SUBCRIBED
BEFORE ME THIS ___ DAY
OF _____, 2009

_____
NOTARY PUBLIC

My commission expires: _____

NOTARIAL SEAL
JOHN A. TURLEY, JR., Notary Public
Borough of Bridgeport, Montgomery Co., PA
My Commission Expires July 9, 2011

# CERTIFICATE OF SERVICE

I hereby certify that at my direction a true and correct copy of the Affidavit of Jeanne Bonney was served this date, via ECF, upon the following:

JOAN ROLLER, ESQ.
LINDA HENRY, ESQ.
JOANNE JARQUIN, ESQ.
The Curtis Center, Suite 630 East
170 S. Independence Mall West
Philadelphia, PA 19106-3317

TIMOTHY J. NIEMAN, ESQ.
STEPHEN MONIAK, ESQ.
Rhoads & Sinon LLP
One South Market Square, 12th Floor
Harrisburg, PA 17101

_____
John J. Koresko, V, Esq.

September 8, 2009