Hilda v. Solis, Secretary of Labor, DOL       Civil Action No. 2:09-cv-00988
Plaintiff,

v.

John Koresko, V et al.
Defendants.

## Koresko Defendants' Proposed Findings of Fact and Conclusions of Law in Opposition to the Department of Labor's Application for Preliminary Injunction Preventing PennMont from removing F&M as Trustee of REAL VEBA and SEWPT and Appointing Penn Public Trust

## I.  Background

The Department of Labor (DOL) moved for Preliminary Injunction to prevent Koresko Defendants from removing F&M Trust (F&M) as Trustee of the Regional Employer' Assurance Leagues Voluntary Employees' Beneficiary Association (REAL VEBA) Trust and Single Employer Welfare Benefit Trust (SEWBT) (the Trusts) and appointing Penn Public Trust (PPT).

The Court ordered further evidentiary hearing to commence October 6, 2009, placed a stay on the discharge of F&M as Trustee to maintain *status quo*, and required the Parties to file Proposed Findings of Fact and Conclusions of Law, to include issues enumerated by the Court as A through S.

The Koresko Defendants were granted an extension to noon on October 7, 2009, to file, and rebuttal to DOL and F&M granted until noon on Friday, October 9, 2009.  The Koresko Defendants add issue (T) regarding equities to be considered by this Court.  For ease of reference the issues are divided into categories, e.g: "Burden of Proof" "Amendments A-F", "Coverage: G-K", "Trust Assets and Plan Benefits: L-P" and "Fiduciary Duties: Q-T."

## II. Conclusion of Law: The DOL Has Failed to Meet Its Burden of Proof and Introduction

### A. The Administrative Procedure Act Applies To The Secretary's Actions And The Petition For Injunctive Relief. Under The Act The Secretary Has The Burden Of Proof And The Burden of Production.

1.     In order to get an injunction, the DOL must show (1) there is a likelihood of success on the merits; (2) somebody will suffer irreparable harm if relief is not granted; (3) greater harm will not be imposed on defendants if relief is granted; (4) the public interest will not be adversely affected. See *Kos Pharmeceuticals, Inc. v Andrx Corp.,* 369 F3d 700 (3rd Cir 2004).

2.     If the relief sought involves a mandatory injunction, as distinguished from prohibitory relief, the plaintiff must show not merely a likelihood of success, but a high likelihood of success on his claims. *See Beal v. Stern,* 184 F.3d 117, 122 (2d Cir. 1999).

3.     An order to compel somebody to act in a certain way is a mandatory injunction, and it is not favored at all in the law.

4.     The request in this case, to strip PennMont or others of their authority, and to prevent payment of services being rendered in over 100 Tax Court cases, has the hallmarks of a mandatory injunction for which a heightened standard is appropriate.

5.     DOL has the burden of production and persuasion in order to prevail in its Application for Preliminary Injunction.

6.     The DOL witnesses included individuals whose companies terminated their arrangements (Monokian and Sharratt), eliminated benefits for non-owner

employees (which prevented distribution to non-owner employees ["NOEs"] (Monokian, or eliminated death benefits so as to absolve the corporate subscriber to the trust from paying a pre-existing benefit expenditure (Cetylite).

7.    The DOL introduced no evidence that any NOEs have executed participation agreements that are still operative.

8.    As a matter of law DOL has not satisfied its burden of proving that: 1) This Court has authority to disregard the Plan and Trust documents so as to find that PennMont lacks authority to fire F&M and designate Penn Public Trust (PPT) as successor; 2) ERISA applies to the assets of the REAL VEBA and SEWBP Trusts; and 3) prospectively, Trust assets involve ERISA plans.

9.    A court's review of a federal rule or agency action is governed by the Administrative Procedure Act, 5 U.S.C. § 706 (2001) (the "Act" or "APA"). The APA allows a court to "hold unlawful or set aside agency action, findings, and conclusions" that are found to be, inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . [or] unsupported by substantial evidence." § 706(2).  The arbitrary and capricious standard asks whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

10.    When reviewing a particular agency action challenged under §706(2) of the APA, "[t]he court is first required to decide whether the [agency] acted within the scope of [its] authority." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). The first step in this analysis is an examination of any statutes providing

authority for the agency to act. If "the intent of Congress is clear" as to "the precise question at issue, that is the end of the matter. As the Supreme Court explained in *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995)(citations omitted). But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency has responded within a permissible construction of the statute." *Id.* This analytical approach applies not only when a regulation is directly challenged, but also when a particular agency action is challenged, as in *NationsBank.*

11.     The ultra vires acts of any executive agency may be challenged, and equitable relief granted, under the Administrative Procedure Act *See Zellous v. Broadhead Associates*, 906 F.2d 94 (3d Cir. 1990). Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702 (1988), provides a waiver of sovereign immunity for the entire action. *Cf. Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 2740 & n. 48, 101 L.Ed.2d 749 (1988) (district court's jurisdiction under § 702's waiver of sovereign immunity is not barred by possibility that monetary judgment may be entered).

12.     Under the APA, rules and actions may be either "legislative" or "interpretive." A legislative rule must be promulgated according to the notice and comment procedures of 5 U.S.C. § 553. *See, e.g., Beazer E., Inc. v. United States Envtl. Protection Agency*, 963 F.2d 603, 606 (3d Cir. 1992). Actions or rules that create rights, assign duties or impose obligations are "legislative" and presumptively unenforceable in the absence of a specific Congressional delegation of authority. *See Dia Navigation Co. v. Pomeroy,* 34 F.3d 1255 (3d Cir. 1994). Furthermore, a legislative rule which is not promulgated in accordance with the requirements of the APA does not have the force of law. *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03, 99 S. Ct. 1705, 1718, 60 L. Ed. 2d 208 (1979). "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive." *Bailey v. Sullivan*, 885 F.2d 52, 62 (3d Cir. 1989) 885 F.2d at 62. Interpretive

rules, however, are not binding on either an agency or the court. *Armstead v. United States Dep't of Housing & Urban Dev.*, 815 F.2d 278, 282 (3d Cir. 1987); *see also, American Ambulance Serv., Inc. v. Sullivan,* 911 F.2d 901, 908 (3d Cir. 1990)("[i]nterpretive rules are entitled to no more weight on judicial review than their inherent persuasiveness commands (citation omitted)." An agency's "interpretive" acts pursuant to interpretive rules cannot, therefore, be "rubber stamped." They must, when challenged, be thoroughly reviewed by the court. The challenging party must be given the ability to (1) demand that an agency establish a complete factual predicate for the statutory or regulatory authority under which it acts; and (2) obtain discovery of relevant evidence for purposes of its defense.

13.     No statute or judicial authority exempts the DOL's rules or actions from scrutiny under the APA. For example, in *Huffer v. Herman*, 168 F.Supp.2d 815 (S.D. Ohio 2001), the trustees of two retirement plans governed by ERISA sought review of penalties levied against them by the Department of Labor. The court could not overturn the DOL's refusal to waive the penalties because the statute committed waiver to the sole discretion of the DOL. Id. at 821-22, citing 5 U.S.C. § 701(a)(2). On the other hand, the court reviewed the imposition of the penalty under the APA and found that the Secretary exceeded his authority. Id. at 821-23.

14.     The Third Circuit Court has held that the APA applies to actions involving the Department of Labor's procedures for Black Lung benefits claims. *Greenwich Collieries v. Director*, OWCP, 990 F.2d 730 (3d Cir. 1993), aff'd 512 U.S. 267, 114 S. Ct. 2251, 129 L. Ed. 2d 221 (1994); *Maher Terminals v. Director, Office of Workers' Compensation Programs*, 992 F.2d 1277 (3d Cir. 1993).

15.     In the present case, the rules in question are the Secretary's own regulations concerning ERISA's remedies, the existence of a prohibited transactions and the statutory exceptions thereto in ERISA sec. 408 and the Labor Regulations.

16.     The rules are also the DOL's own admissions over nearly 20 years of having no regulatory authority over multiple employer trusts, like REAL VEBA and SEWBPT because such entrepreneurial arrangements are not plans, stated repeatedly in advisory opinions and legal proceedings accepted by five Circuit Courts of Appeal.

17.     The agency actions in question are DOL's attempt to remove Defendants as fiduciaries of the Trusts and cause this court to accept arbitrary and capricious re-construction of DOL policy positions for purposes of litigation.

18.     To the Secretary's extent her positions conflict with any statute, they are *prima facie* unreasonable.

19.     Congress placed limits on what the Secretary could had jurisdiction of and what remedies are available under ERISA sec. 502.

20.     In ERISA Congress gave the Secretary only authority to enforce ERISA, and limited the remedies to one particular statutory remedy, obtaining benefits that were not paid, and then "appropriate equitable relief."

21.     Injunction is a serious remedy, is disfavored, and cannot be presumed to be "appropriate."

22.     There is no authority for the Secretary to obtain relief that would not be otherwise available in equity, if ERISA applies.

23.     There is no authority for the Secretary to supersede the interpretations of the Plan Administrator with respect to governing documents, if ERISA applies, and the court has no authority to overturn the interpretations of a fiduciary with respect to document interpretation unless such interpretations are "arbitrary and capricious." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

24.     In an ERISA case, even though the plain language of governing documents normally prevails, the court must give deference to the interpretations of an

appropriately empowered administrator. In this case, the documents in no less than 10 places vest the Defendants with broad authority. Furthermore, the trustee, CTC ceded even more authority back to the administrator in connection with certain Custodial Agreements.

25. It is well established that a court will not permit modification of the trust simply because its terms are objectionable to certain parties or the beneficiaries believe that their welfare would be served by some such modification. *See, e.g., Crocker Citizens National Bank v. Younger,* 4 Cal. 3d 202, 481 P.2d 222, 93 Cal. Rptr. 214 (1971); *Sigmund Sternberger Foundation, Inc. v. Tannenbaum,* 273 N.C. 658, 667-75, 161 S.E. 2d 116, 128 (1968); *Stanton v. Wells Fargo Bank,* 150 Cal. App. 2d 763, 770-76, 310 P.2d 1010, 1016-19 (1957).

26. The Labor Regulations contain no provisions defining what is a reasonable fee for services or other amounts permitted to be paid to the Defendants pursuant to ERISA sec. 408.

27. The Secretary introduced evidence only that amounts for legal services were paid, not that they were unreasonable or paid pursuant to a Legal Services Benefit.

28. The Secretary introduced no evidence that the payment of a benefit is a transaction contemplated by ERISA sec. 404 or 406.

29. The Secretary introduced no evidence that contradicted the claims of reasonableness put forth by the Defendants.

30. Neither the Labor Regulations nor ERISA define the particular contents of a welfare benefit plan.

31. There are no Labor Regulations specifically directed to address the types of Multiple Employer Trusts at issue in this case.

32.    As a matter of law, this court is bound to follow the plan documents and the interpretations of them that are not arbitrary and capricious as advanced by the Defendants, and reject the assertions of the Department of Labor.

B.    **The Secretary Did Not Satisfy Her Burden of Production or Persuasion**

1.    Section 7(c) of the Administrative Procedure Act (APA), states that "except as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). *Dir. v. Greenwich Collieries*, 512 U.S. 267, 269, 114 S. Ct. 2251, 2253, 129 L. Ed. 2d 221, 226 ( 1994).

2.    "A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d).

3.    Assignment of the burden of proof is a rule of substantive law. *Id.*, citing *American Dredging Co. v. Miller*, 510 U.S. 443, 454, 127 L. Ed. 2d 285, 114 S. Ct. 981 (1994).

4.    The Supreme Court will not presume exemptions to the APA. *Id.*, citing *Brownell v. Tom We Shung*, 352 U.S. 180, 185, 1 L. Ed. 2d 225, 77 S. Ct. 252 (1956), and neither will this court.

5.    In *Greenwich Collieries*, the Court considered a rule of evidence applicable to cases involving Black Lung benefits. In rejecting the argument of the Solicitor of the Department of Labor, the Court examined the history of the APA and concluded that the term "burden of proof" included both the burden of production and the burden of persuasion. 267 U.S. at 276.

6.    No reported case could be found by Defendants or this court (i) allowing the DOL to change the burden of proof in other matters involving Title 29, U.S.C.,

or (ii) exempting an application for injunction from the APA's allocation to the Secretary the burdens of production and persuasion.[1]

### C. This was a mandatory injunction proceeding which required the Secretary to establish a heightened burden of proof an persuasion

1. A mandatory injunction seeks to enjoin a party from taking an action it is otherwise permitted to do.

2. This is not a status quo injunction, as the status quo assumes that no parties' rights are affected by a freeze on actions.

3. As a matter of law, PennMont had the power to amend the trust so as to eliminate benefits payable to non-owner employees.

4. As a matter of law, PennMont had the power to amend the trust so as to fire F&M Trust Co.

5. There was evidence that F&M Trust Company produced documents that were subject to substantial prior litigation conducted by Community Trust Company and the Defendants, and that F&M turned such documents over to the Secretary without the consent or permission of the Defendants.

6. As a matter of law, the court cannot find that the actions of the Defendants to terminate F&M Trust Company were arbitrary or capricious, as such powers were delegated exclusively to PennMont.

---

[1] The old cases, especially tax cases like *U.S. v. Powell*, 379 U.S. 48, 57, 13 L. Ed. 2d 112, 85 S. Ct. 248 (1964), have been applied in other circumstances without particular highlight of the peculiarities of tax matters. Neither *Powell*, nor its progeny purport to interpret the APA. If an agency is not authorized to take an action because of noncompliance with the APA, applicable statutes, its own regulations, or common law, the agency action can be neither authorized nor relevant to its legal function. *C.f. Dole v. Trinity Industries, Inc.*, 904 F.2d 867, 870 (3d Cir.), cert. denied, 498 U.S. 998 (1990).*U.S. v. Westinghouse Electric Corp.*, 638 F.2d 570, 574 (3d Cir. 1980) (citing *U.S. v. Morton Salt*, 338 U.S. 632, 652(1950). Furthermore, it appears that the courts applying *Powell* have not been asked to make a distinction between actions by the Internal Revenue Service, which arguably has jurisdiction over every taxpayer, as opposed to other agencies whose regulatory authority is limited by statute to certain people. The Secretary cannot credibly argue that she has authority to subpoena anything from anyone. On the other hand, the Secretary has admitted that she violated the good faith prong of *Powell* by using the subpoena proceeding as a shill for this and other litigation. *See LaSalle Bank v. U.S.*, 437 U.S. 298 (1978).

7.     The action of the Secretary, seeking an order compelling this court and the Defendants from following the plain language of the operative documents is a mandatory injunction.

8.     Aside from proving an equitable balance in its favor, and a lack of harm to the Defendants, the Secretary had to prove by a strong probability of success that the court had the authority to order the Defendants not to take an action permitted by the plain language of the documents.

9.     As a matter of law, the Court finds that the sole power to amend the subject trusts is within the absolute discretion of defendant PennMont.

10.    As a matter of law, the Court finds that the "Plan Documents" of REAL VEBA and SEWBPT are incorporated by reference into the provisions of the trust documents.

11.    As a matter of law, the Court finds that the trust documents prevail as a matter of interpretation.

12.    As a matter of law, the Court finds that an references in the Plan Documents, which may have indicated the necessity for a signature on any amendment, are overruled by the provisions of the trust document requiring merely notice of amendments to the trustee. As a matter of law, the Third Circuit in *Malia v. General Electric Co.,* 23 F3d 828 (3rd Cir. 1994) found that any ERISA requirement of a written amendment was an administrative, not substantive, requirement; and this court concludes that the course of dealing between the Defendants in the testimony proffered has established the effectiveness of the amendments and the primacy of notice over the signatures of the same persons who produced them.

III.    **The History of the Benefit Arrangement**

10

1.  The Regional Employer's Assurance Leagues Voluntary Employees' Beneficiary Association Trust (REAL VEBA) is a trust created under the laws of Pennsylvania in 1996. [*REAL VEBA v. Sidney Charles Markets*, 2006 U.S. Dist. LEXIS 50725 (E.D. Pa. 2006) (hereinafter "*SCM*")]

2.  The Single Employer Welfare Benefit Plan Trust (SEWBPT) is a trust created under the laws of Pennsylvania in 2002. [*SCM*]

3.  REAL VEBA evolved from various VEBAs of the Delaware Valley Leagues ("the Leagues"). [*SCM*]

4.  The Leagues entered into a trust agreement with Penn Public Trust on December 15, 1992. Lawrence Koresko signed as vice president for operations of the League and John Koresko signed as general counsel for Penn Public Trust. *Id.* Thereafter Commerce Bank, N.A. (in 1995), Corestates Bank, N.A. (in 1996), and Community Trust Company (CTC) (in 2002) succeeded Penn Public Trust as Trustee of the REAL VEBA arrangement. CTC also became Trustee of the SEWBPT when it arose in 2002. [Bonney Aff2 Tab 13; Tr. 10/06/09 p. 16:19-23].

5.  In 1994, John Koresko applied to the IRS and received determination letters that the VEBAs were organizations described in § 501(c)(9) of the Internal Revenue Code[2]. [Tr.9/09/09 pp. 70:20-25; 71:1-16].

6.  Code § 501(c)(9) and Internal Revenue Treasury Regulation §1.501(c)(9)-3(e), incorporate by reference §501(c) (20 )(legal services agreement). [Tr. 9/09/09 pp. 69:22-25; 70:1-24; 71:1-16].

---

[2] All references to "Section" or "Sections" [abbreviated § and §§, respectively] are to sections of the Internal Revenue Code of 1986, as amended, unless otherwise indicated. ("the Code"). Citations to Regulations refer to Treasury Regulations issued under the Code, unless otherwise indicated.

6a.     Neither IRC § 501(c)(9), the regulations thereunder, the Labor Management relations act incorporated into Treas. Reg. 1.501(c)(9)-3(e), nor ERISA sec. 3(1) define the exclusive types of legal services benefits that a trust may provide.

7.     PennMont, a Pennsylvania corporation owned by John Koresko and Larry Koresko, is the named Plan Administrator for REAL VEBA and SEWBP (collectively, "the Plans"). [Complaint at ¶ 9; 11; Dep PennMont at pp 62:19-23].

8.     PennMont is settlor of the Trusts and has the right to amend the REAL VEBA Trust or SEWBP Trust (collectively, "the Trusts") [Bonney Aff2 at Tab 14 Trust Doc 10.1.]

9.     John Koresko formed the Plans and the Trusts, Penn Public Trust and the Plan Administrator. John Koresko is the incorporator and president of Penn-Mont Benefit Services Inc. John Koresko is the incorporating vice president, secretary and treasurer of Penn Public Trust, Trustee. [Dep of John Koresko, at pp. 31:13-19; 44:24; 45:1-19]

10.     A person may serve in more than one fiduciary capacity without violating ERISA. [SCM].

IV.     **The Employer and Employee Vests Absolute Discretion and Irrevocable Power of Attorney in PennMont and John Koresko by the Employer and Employee**

11.     The operative documents for REAL VEBA and Single Employer Welfare Benefit Plan are identical except for the names of the organizations and the basis of the deduction taken. [Tr. 09/09/09 pp. 60:24-25; 61:1-16; 132:3-25; 134:17-20].

12.     The principal operative documents for the Plans and Trusts consist of a Master Trust agreement, a Master Plan document, Adoption Agreements, Participation Agreements, and insurance policies on the lives of participants. [Tr. 9/09/09 pp. 63:6-25; 64:1-10].

13.     PennMont has the sole power of amendment to the Master Trust and Plan documents. [Bonney Aff2 Tab 13 Plan Doc. 9.03(b)].

14. Modification of the Trust is a modification of the Plan, which merges into the Trust. [Bonney Aff2 at Tab 14 Trust Doc 10.1.] The provisions of the Plan documents are all incorporated by reference into the Master Trust document. [Bonney Aff2 Tab 13; Plan Doc 10.22]

15. At no time did any employer have a trust agreement or plan document for itself. [Tr. 9/02/09 p. 153:16; Gov Exh. 11 bates 120920; 120921; 199:3-25, 201:1-23; Gov Exh. 14].

16. Each Participation Agreement includes an irrevocable power of attorney to Mr. Koresko to deal with insurance policies and other assets on behalf of each participant, and specifically states that the plan may be modified or participation terminated at any time. Without an executed Participation Agreement a participant may not obtain a benefit. [Def Exh. 5].

17. The Trustee's role is that of directed trustee, being subject to the direction of PennMont in all material respects. [Bonney Aff2 Tab 14 Trust Doc; Tr. 7/19/09 p. 15, 84; F&M Ex 1, Article III; F&M Ex 2, Article III]

18. CTC executed a Custodial Agreement with Koresko & Associates, P.C. in which it delegated to KAPC and its designees possession of all insurance policies and other powers of the trustee. Furthermore, the Custodial Agreement gave KAPC the right to ignore any directions or requests of CTC in the discretion of KAPC. [Def Exh. 11 at para 10; 12.]

19. The trusts gave the Plan Administrator the power to "determine all questions arising in connection with the administration, interpretation and application of the Plan, including questions of eligibility, and status and rights of Participating Employees and Beneficiaries and any other person hereunder and the payment and/or provision [of] benefits hereunder." [Bonney Aff2 Tab 14 Trust Doc. 2.02, 5.02, 2.05, 5.04, 10.11, 9.02(c)].

20.     The Plan Administrator also determines the amount each employer contributes to the Trust. [Bonney Aff2 Tab 13 Plan Doc. Article 3]

21.     A participating employer must "make such contributions to the Trust Fund as may be required by the Administrator to provide benefits under the Plan . . . including amounts necessary to pay premiums for insurance contracts." [Bonney Aff2 Tab 13 Plan Doc. 4.01]

22.     In the event the Trust is terminated, "[a]ny remaining funds shall be used and applied by the Trustee in accordance with the plan. After application of funds to expenses and other permitted expenditures, the administrator is directed to provide additional benefits of the kind and type described in Section 3.01 above [employee welfare benefits] to the Participating Employees then participating . . ."

23.     Several hundred owner/employees adopted the Plans to provide themselves with a tax-advantaged death benefit in the form of a "Top Hat" arrangement, whereby a primary motivation for the transaction was the benefits to owner/employees. [Bonney Aff2 ¶ 7; Tr. 9/09/09 pp. 60:11-25; 61:1-25; 62:1-9].

24.     Cash value life insurance which, once sufficiently paid up, would last until death was the primary vehicle for coverage of owner/employees. Term insurance was purchased on rank and file as less expensive and more manageable, given the transiency of rank and file employment. A pattern arose where employers paid in their large cash contributions at year end to maximize their deduction, and contributed term insurance premium when due. [Tr. 09/09/09 pp. 57:22-265; 58:1-17].

25.     The arrangement provides a non vested death benefit, as opposed to a vested distribution of cash in the form of a pension benefit. [Bonney Aff2 Tab 13 Plan Doc. 9.03].

26.     Each participating employer was required to execute an Adoption Agreement to which he consents to be a Party to the Trust Agreement, names John Koresko as Secretary

of the Plan Committee with authority to execute all documents, and certifies knowledge that the Plan is not one of retirement. [Gov 11; 32; 34]

27. Each participating employee, whether an owner or not, was required to executed a Participation Agreement giving PennMont and John Koresko limited and irrevocable Power of Attorney to execute all documents in connection with the Plans, failure to execute the documents results in a participants' inability to receive the unsecured promise of a death benefit. [Bonney Aff2 Tab 13 Plan Doc 3.07; Def. Exh. 5].

28. Employees do not contribute to the Trusts. [Tr. 10/06/09 p.54:23-25; 55:1-17].

29. There are only two Trusts, each a multiple employer account over which PennMont exercises absolute discretion in assigning payout determinations. [Tr. 10/06/09 p.54:23-25; 55:1-17].

30. The Adoption Agreement limits the life insurance to "current protection" with "no economic value" (such as paid-up or cash surrender value). [Bonney Aff2 Tab 13 Plan Doc 5.02].

31. The participants "have no rights in the [insurance] Contract other than death benefit protection." *Id.*

32. Each employer's Adoption Agreement with the VEBAs provides at Section 7, section 3.1:

> (A) Except as provided in paragraph (B), the Life Benefit shall consist only of current protection, containing no economic value (such as paid-up or cash surrender value) extending beyond one Plan Year, irrespective of whether the provision of such benefit is funded by the Trustee with ordinary variable, universal, or other life Contracts. The

participant shall have no rights in the Contract other than death benefit protection.

33.     The Trustee is the sole owner and beneficiary of all insurance contracts purchased to reinsure the Plans promise to pay a death benefit. [Bonney Aff2 ¶7 Tab 12].

34.     Article 7 gives the trustee complete authority over insurance contracts and proceeds. The Trustee or Administrator determines the ultimate death claim beneficiary pursuant to the documents or power of attorney [7.05(a)], and they may distribute a contract or cash, in their discretion if a benefit becomes payable [7.05(f)]. But if a benefit is intended to be funded by a contract, no benefit is payable unless the amount payable under the policy is received by the Trustee [7.05 (g)]. Still any benefit must be calculated and paid under Article 5 sections 5.02, 5.04 [an annuity over 10 years or mutually agreeable discretionary payment]. It is assumed that all benefits are to be funded from insurance policies unless the Employer gives a contrary notice. [7.05(g)][3].

---

[3] 7.05 Policies -
(a) General Description - **The Trustee may purchase Policies on each Participant to fund any of the Benefits described in Article 5. The policy shall be a contract between the Trustee and the Insurer and shall reserve to the Trustee all rights, options and Benefits provided by the Policy and permitted by the Insurer, except that the right to name and change the Beneficiary shall be exercised by the Trustee or by the Plan Administrator or such other fiduciary other than a participant authorized to do so in writing pursuant to a power of attorney or other document.**.
(f) Ownership - **All policies and Contracts shall be owned by the Trustee. All cash value contained in such policies and Contracts shall be owned by the Trustee. The Trustee shall be under no obligation to distribute a policy or Contract to any participant or beneficiary as part of any benefit or termination payment, but may, instead, distribute the cash surrender value of same.**
(g) Incorporation into plan - Notwithstanding anything in this Plan and the Trust to the contrary, in the event any benefit provided hereunder is funded or intended to be funded by a policy or Contract, the terms and conditions of such policy or Contract (whether issued or pending via application) shall be construed as terms and conditions for the payment of the such benefit. *Without limiting the generality of the foregoing, no benefit which is funded or intended to be funded by a policy or Contract shall be payable to any Participant or Beneficiary unless or until the amount payable under such policy or Contract is received by the Trust. For purposes of this Plan and the Trust, all benefits shall be deemed intended to be funded by a policy or Contract unless the Employer shall notify the Administrator and Trustee in writing of its election to the contrary.*

35. Plan beneficiaries have only potential expectancy interests subject to the discretion of the Trustee, Administrator, or attorney in fact.

36. Benefits come only out of insurance policy proceeds [payable at death], if the plan is still associated with the Trusts, if the employer is still a member of the Plan, if no disqualifying events have occurred, and only when the fiduciaries responsible for payment determine who gets the benefits.

37. Trust provisions show complete reliance on the Plan Administrator and that the Plan Administrator controls eligibility and the claims process[4]:

38. Trust provisions show that the Plan Administrator controls Employer contributions, Trust cash reserves; payment of Plan and Trust expenses, legal actions and all other administrative matters.[5]

---

[4] Preamble: WHEREAS, the Employer has appointed Penn-Mont Benefit Services, Inc. ("Plan Administrator") as contractor for plan administration services and each Adopting Employer has appointed an Advisory Committee, as defined herein; * * *3.3 Reliance on Plan Administrator. Any directions pursuant to Section 3.1 may, but need not, specify the application to be made of monies so ordered. Each direction to the Trustee under Section 3.1 shall constitute a representation and warranty by the Adopting Employer, the Advisory Committee., and the Plan Administrator that such direction is in accordance with applicable law, the Plan and this Trust Agreement. The Trustee shall have no duty to make any independent inquiry or investigation before acting upon such direction, or to see to the application of any monies so paid over.

5.04 - Powers of the Administrator - Without limiting the general of the foregoing, the Administrator shall have the following powers:

b. To determine from time to time the benefits to be provided to Participating Employees under the Plan provided that such benefits are of the kind and type described in Section 2.3;

c. To establish from time to time conditions and requirements of eligibility for participation of Participating Employees under the Plan Adopting Employer;

d. To establish from time to time administrative procedures, specifications and conditions applicable to the payment and/or provision of benefits to Participating Employees under the Plan;

e. To determine from time to time the method and manner for funding payment of, and/or otherwise providing benefits to Participating Employees, their Dependents and, in the case of Death Benefits, their Beneficiaries, under the Plan, including, without limitation, insurance, direct cash payment or reimbursement from the Trust Fund and/or hospitalization, medical or dental services provided by medical groups, dental groups, hospitals, clinics or other persons; to underwrite any such insurance or to provide any such hospitalization, medical and/or dental services, as the case may be;

f. To direct and arrange for the payment and/or provision of, and otherwise arrange for and cause to be paid and/or provide, all services to which Participating Employees are entitled to under the Plan;

g. To verify and investigate claims of Participating Employees, their Dependents, medical groups, dental groups, hospitals, clinics and other persons which provide benefits or services to Participating Employees or their Dependents under the Plan;

39. In consideration for these powers over the Trustee, the Administrator
indemnifies the Trustee[6] and may with absolute discretion amend the Trust Agreement

---

[5] h. To determine from time to time the amount and frequency of contributions hereto at which each Participating Employer shall make in order to defray the cost of providing benefits to its Participating Employees in accordance with the Plan;

   i. To determine and establish the level of cash reserves of the Trust as may be necessary, appropriate and/or desirable for the proper execution, administration and accomplishment of the purposes and objectives of the Plan and Trust;

   j. To direct and authorize the payment of the Trust Fund in accordance with the terms, conditions and purposes, but subject to the restrictions and prohibitions, of the Plan and Trust Agreement;

   k. To adopt such rating Plans for insurance purchased hereunder as may be necessary or desirable;

   l. To offset any portion of all experience rating refunds on insurance benefits purchased in accordance with the Plan against the obligations of Participating Employer to make contributions becoming due hereunder.

   m. To determine all questions arising in connection with the administration, interpretation and application of the Plan, including questions of eligibility, and status and rights of Participating Employees and Beneficiaries and any other person hereunder and the payment and/or provision benefits hereunder;

   n. To decide any dispute or question arising under the Plan;

   o. To designate from time to time any person, firm or corporation to serve as agent for the service of legal process under the Plan;

   p. To do all other acts and things, and in connection therewith to execute all such instruments and documents, as may be necessary, appropriate, desirable or convenient for the exercise of the powers granted hereunder or for the accomplishment of the purposes and objectives of this Trust.

   8.2     Plan Expenses. With respect to expenses incurred by Persons other than the Trustee, the Plan Administrator may direct the Trustee to pay from the Trust any other administration expenses of the Plan. Each direction to the Trustee under this Section shall constitute a representation and warranty by the Adopting Employer, Advisory Committee., and Plan Administrator that such direction is in accordance with applicable law, the terms of the Plan, and the terms of this Trust Agreement, and the Trustee shall have no duty to make any independent inquiry or investigation as to any of the foregoing before acting upon such direction or to see to the application of any monies paid over.

[6] 8.5     Indemnification of Trustee. In consideration of the Trustee agreeing to enter into this Agreement, the Plan Administrator and Adopting Employer hereby agree to indemnify and hold harmless the Trustee, individually and as Trustee, and the Trustee's parent and affiliates and each of their directors, officers, employees, subsidiaries and agents ("Indemnified Parties") from and against all amounts, including without limitation taxes, expenses (including reasonable counsel fees), liabilities, claims, damages, actions, suits, or other charges, incurred by or assessed against each Indemnified Party ("Claims"), in advance, unless it is alleged and until it is conclusively determined that such Claims arise from the Trustee's own negligence or willful breach of its obligations specifically undertaken pursuant to this Agreement.

   9.1     Resignation or Removal. The Trustee may be removed by PM at any time upon ninety (90) days notice in writing to the Trustee. The Trustee may resign at any time upon ninety (90) days notice in writing to the PM.

9.2     Designation of a Successor. Upon the removal or resignation of the Trustee, the termination of the Trust or a termination of the Trust Agreement as described in Section 9.2, or any event other than a complete termination of the Plan, the Plan Administrator shall appoint a successor trustee for the Plan which shall have the same powers and duties as those conferred upon the Trustee hereunder and upon acceptance of such appointment by the successor trustee, the Trustee shall assign, transfer and pay over the Trust or part thereof, as the case may be, to such successor trustee. Resignation shall not be effectuated unless and until a successor trustee has been appointed by the Plan Administrator. Any expenses incurred by the Trustee in connection therewith shall be charged to and paid from the Trust as an expense of administration.

simply by notifying the Trustee in writing, including removing the Trustee[7], reviewable only for abuse of discretion.

40.    The Administrator may delegate its duties to others to perform, such as the Koresko Law Firm.[8]

41.    An employer has no rights upon Plan termination and an employee who fails to execute a Participation Agreement giving irrevocable Limited Power of Attorney in PennMont and John Koresko at to Plan matters is ineligible for benefits.[9] [Def. Exh. 5].

---

[7] 10.1    Amendment. Subject to the restrictions set forth in section 3.5, PM may at anytime and from time to time amend, in whole or in part, any or all of the provisions of this Trust Agreement by notice thereof in writing delivered to the Trustee; provided, however:
   (a) No amendment shall be effective which shall attempt to cause any of the assets of the Trust to be used for or diverted to purposes other than for the exclusive benefit of those covered under the Plan and no funds contributed to the Trust or any assets for the Trust shall ever revert to or be used or enjoyed by the Adopting Employer except as permitted under the Plan and applicable laws and regulations;
   (b) No amendment shall have any retroactive effect so as to deprive any Person of any benefits already accrued;
   (c) No amendment (including, for the purpose of this Section 9.1, any provision of the Plan, incorporated by reference in this Trust Agreement) which affects the rights, duties or responsibilities of the Trustee may be made without its prior written consent.
   10.2    Termination. Subject to the restrictions set forth in Section 3.5 the Employer may terminate this Trust Agreement by notice in writing thereof delivered to the Trustee, or in the event of disqualification under Section 10.2.
   10.3    Trustee's Authority to Survive Termination. Until the final distribution of the Trust, the Trustee shall continue to have and may exercise all of the powers conferred upon it by this Trust Agreement.
   12.3    Plan Administrator. Unless otherwise specifically stated in this Trust Agreement, the Trustee may take directions from the Plan Administrator in all matters relating to the Plan and shall be further fully protected in acting upon any notice or direction received from the Plan Administrator. Unless otherwise specifically stated in the notice or direction, notice or direction from the Plan Administrator shall be deemed to be notice or direction from the Employer.
   12.7    Fiduciary Discretion. Unless otherwise provided, any Plan Administrator acting hereunder shall be deemed to act pursuant to its absolute discretion, and any such action may be reviewed only for abuse of discretion.

[8] 2.05    Delegation of Duties - The Plan Administrator shall have sole discretion to delegate any and all Fiduciary responsibilities under the Trust (other than those of the Trustee) to designated persons. Any such delegation shall be communicated in writing to the Employer, the Plan Administrator, the Trustee, the Insurer and each Participant and Beneficiary. The Trustee may appoint an investment manager who shall be a Fiduciary with the power to manage, acquire or dispose of any asset of the Trust, and who shall be a registered investment advisor, bank, individual or insurance company who has acknowledged in writing that he is a Fiduciary with respect to the Trust. Such an appointment shall be communicated in writing to the Employer, the Plan Administrator, the Trustee, the Insurer and each Participant and Beneficiary. The Plan Administrator and the Trustee may additionally delegate the performance of specific ministerial responsibilities. Any reference in the Plan and Trust to "Trustee" shall also mean "Plan Administrator" when a duty, privilege or immunity has been delegated.

42.     Since the Administrator acts as the Plan Committee so long as it is appointed, it has tremendous control over benefits: the source of benefits, to whom payable, the mechanics of payment; and execution of the claim procedure.[10]

---

[9] 3.01(e)Termination of Plan Participation - An Employee who otherwise meets the requirements for eligibility and participation contained herein shall be a participant in this plan only during the period the Employer participates in the plan. *Upon termination of the Employer's participation, whether voluntary or involuntary, the Employee shall have no further right to the benefits hereunder, including without limitation, those benefits for which claims have been made but not yet paid on the date participation terminates.*
     3.07     Voluntary Participation - The participation by an Employee shall be voluntary, if Participant contributions are required under the Adoption Agreement. Any Employee who, when first eligible, does not elect to participate within the time provided may participate as of any subsequent Anniversary Date by meeting the requirements of Eligibility under the Adoption Agreement and by making the required contributions as of such subsequent Date. *Each eligible Employee shall complete an Employee Participation Agreement on such forms as may be provided by the Plan Administrator, in order to participate.*

[10] 5.02  Limitations - The Plan may provide only life and other benefits permitted pursuant to §419 of the Internal Revenue Code, or any successor provision:
          (a)     Life Benefit - The Term "Life Benefit" means a Benefit including a burial Benefit or a wreath payable by reason of the death of a Participant. A "Life Benefit" may be provided directly by the Plan through self-funding or through any form of insurance permitted under section 419. It generally must consist of current protection, but also may include a right to convert to individual coverage on termination of Eligibility for coverage through the Plan. A "Life Benefit" also includes the Benefit provided under any life insurance contract purchased directly from the Plan by a Participant if the Plan is Employer-funded, or provided to a Participant if the Plan is Employer-funded.
     The "Life Benefit" may be paid in a form of survivor income Benefit to a named Beneficiary or if no Beneficiary is named then to the estate of the deceased Participant. *Such Benefit may be payable upon the death of the Participant in a series of monthly payments not to exceed 120 or as otherwise provided in an annuity purchased by the plan or as agreed by the Beneficiary and the Administrator, in the Administrator's sole and absolute discretion.*
     5.04     Source of Benefits - The amount of Benefit shall to the extent thereof, be paid out of Contracts and out of other funds held by the Trustee for the payment of benefits under the Plan, *in the discretion of the Trustee.*
     5.05     Mechanics of Payment - The Committee shall, with respect to any Benefits, direct the Trustee to pay such benefits directly from the Trust fund.
     5.06     Claim Procedure - Upon a Participant's death, Disability or other termination of participation in the Plan:
          (a)     *The Committee shall determine a Beneficiary to whom payment shall be made.*
          (b)     The Committee shall have the right to any time, to designate from the persons indicated below, the Beneficiary to whom payment of the Benefit shall be made. The Committee may designate one or more of the following:
               (1)     Spouse;
               (2)     Parents;
               (3)     Children or lineal descendants of any of the children;
               (4)     A Trust created by or for the Benefit of a Participant;
     5.08     Excess Claims - *An Excess Claim shall not become a liability or claim under this plan or against the assets of the Trust or an accrued Benefit of any Employer, Beneficiary, or Participant claimant until thirty (30) days after presentment of written notice of and Excess Claim to the Committee, Plan Administrator and Trustee.* For purposes of the Plan and Trust, the term "Excess Claim" is a claim

43.     In the event of an amendment to the Plan (even if by virtue of Trust amendment by which the Plan is amended by incorporation) there is no vesting unless a triggering event has already occurred: i.e., there has been a DEATH, there has been a claim, and it has been resolved before an employers "termination" out of the plan.[11]

---

for Benefits the amount of which exceeds the value of assets contributed to the trust by the Employer, including proceeds thereof and contracts adjusted for gains, losses, income and expenses attributed to (i) such assets, proceeds and contracts, (ii) the operation of this Plan and (iii) Employees' claims (other than the subject Excess Claims) under the Plan prior to presentation of the Excess Claim.

　　　5.10     General Limitation on Benefit Payment - Notwithstanding any provisions of this Plan and Trust, a Participant who has less than ten (10) years of participation shall forfeit any benefit payable hereunder if it is determined by the Plan Administrator that he has engaged in a disqualifying act with respect to the Employer, Employees, Plan or Trust. A Participant shall be deemed to have engaged in a disqualifying act if he is determined by the Plan Administrator to have: (1) been guilty of committing theft, fraud or embezzlement with respect to the Employer; or (2) committed any criminal act or malicious act [not rising to the level of a crime] which damages the person or property of the Employer, Employees, Plan or Trust. *The judgment of the Plan Administrator as to whether a Participant has committed a disqualifying act shall be final, unless made without evidence to support such judgment.*

　　　6.03     Rights and Duties - Unless an Administrator has been named in the Adoption Agreement, the Committee shall enforce this Plan in accordance with its terms and shall be charged with its general administration. The Committee shall exercise all of its discretion in a uniform, nondiscriminatory manner and shall have all necessary power to accomplish those purposes, including but not limited to the power:

　　　　　(a)     To determine all questions relating to the Eligibility of Employee to participate.
　　　　　(b)     To compute and certify to the Trustee the amount and kind of Benefit payable to Participants and their Beneficiaries.
　　　　　(c)     To maintain all the necessary records for the administration of the Plan other than those maintained by the Trustee.
　　　　　(d)     To prepare and file or distribute all reports and notices required by law.
　　　　　(e)     To authorize all the disbursements by the Trustee from the Trust.
　　　　　(f)     To direct the investments to be made by the Trustee (if the Trust is directive) in a manner consistent with the objectives of the Plan and authorized by the Trust.
　　　　　(g)     To make and publish such rules for the regulations of the Plan as are not inconsistent with the terms hereof.
　　　　　(h)     To make any amendments to the Plan (except with respect to contribution rates) where necessary to meet the requirements of law or to protect the interests of the Participants.
　　　　　(i)     To determine the application of Benefits upon dissolution and termination as provided under Section 10.02.

　　　　　*If an Administrator has been named in the Adoption Agreement, it shall assume and perform all and each and every, duty and responsibility to the Committee*; except that if the Trust is a directive Trust as stated in the Adoption Agreement, then the sole and exclusive duty of the Committee shall be issuance of investment directions (other than those relating to Insurance Contracts) and matters incident thereto.

　　　　　The term "Committee" as used herein shall include the "Administrator," unless the context of the instrument indicates a contrary intent.

[11] Plan .9.03     Amendments
　　　　　(a)     The Employer shall have the right to amend the **Benefit structures** in this Plan from time to time, and to amend or cancel any such amendments.
　　　　　(b)     *The Administrator shall have the right to amend this Plan, in its sole discretion, from time to time and to amend or cancel any such amendments. Without limiting the scope*

44. The Employer indemnifies the Administrator unless the acts taken were dishonest or in willful violation of the law or regulation under which such liability, loss, cost or expenses arose, and costs may be taken from Trust assets.[12]

45. Employer irrevocably appoints the Administrator or his delegate, which may be the Koresko Law Firm, the attorney in fact in matters related to the IRS of DOL.[13]

46. The Trust document controls the Plan document and they are construed together.[14]

47. The Administrator has wide discretion provided by the Plan Document, including interpretation of documents, death benefit payout options, delegation of duties, source of benefits, releases required for payment, determination of distribution if due, amend,

---

*of the foregoing, such amendments may include modification of the status of this plan for federal income tax purposes if future developments in the law indicate the utility of such change.*

   (c) Such amendments shall be set forth in an instrument in writing executed by the amending party. An amendment may be current, retroactive or prospective, in each case as provided therein. Provided, however, that no amendment shall:

     (1) Cause any of the assets of the Trust to be used for or diverted to purposes other than for the exclusive Benefit of Participants and their Beneficiaries.

     (2) Have any retroactive effect so as to deprive any Participant or his Beneficiary of any accrued Benefit, except that such changes may be made as are required by the Internal Revenue Service in order for the Plan to be initially approved and qualified under the Internal Revenue Code and its regulations as a Health and Welfare Benefit Plan.

     (3) Create or effect any discrimination in favor of Participants who are highly compensated, who are officers or the Employer, or who are stockholders of the Employer. In no event shall this provision be construed as vesting any right to any benefit to any individual prior to the time all events have occurred which fixes the nature, timing and amount of such benefit and absolute entitlement thereto.

[12] 10.10 Indemnification of the Administrator by the Employer - The Employer hereby agrees to indemnify the Administrator for and to hold it harmless against any and all liabilities, losses, cost or expenses (including legal fees and expenses) of whatsoever kind and nature which may be imposed on, incurred by or asserted against the Administrator at any time by reason of the Administrator's Service under this Agreement if the Administrator did not act dishonestly or in willful violation of the law or regulation under which such liability, loss, cost or expenses arose. Such amounts may be charged as expenses of the Plan and Trust against assets contributed by the Employer which would otherwise be employed or distributable hereunder.

[13] Master Plan Article 10

[14] 10.21 Trust Agreements Control. - The Plan and the Trust are both parts of a single integrated welfare benefit program and shall be construed together. In the event of any conflict between the provisions of this Plan document and the Trust document adopted in connection herewith, the terms of the Trust document shall control; and the terms of the Trust shall be considered incorporated by reference into this Plan.

involuntarily terminate an employer, provide statement of account, limitations on death

benefit payout, methodology and valuation of trust fund.[15]

---

[15] 2.02 Interpretation - Wherever in the Trust discretionary powers are given to any party, or wherever any interpretation may be necessary, such powers may be exercised or the interpretation shall be made in a nondiscriminatory manner.

5.02    Life benefit: . . . Such Benefit may be payable upon the death of the Participant in a series of monthly payments not to exceed 120 or as otherwise provided in an annuity purchased by the plan or as agreed by the Beneficiary and the Administrator, in the Administrator's sole and absolute discretion.

2.05    Delegation of Duties - The Plan Administrator shall have sole discretion to delegate any and all Fiduciary responsibilities under the Trust (other than those of the Trustee) to designated persons

5.04    Source of Benefits - The amount of Benefit shall to the extent thereof, be paid out of Contracts and out of other funds held by the Trustee for the payment of benefits under the Plan, in the discretion of the Trustee

10.11    Receipt and Release for Payment. Any payment to a Participating Employee, his legal Representative, beneficiary or other permitted party, shall to the extent thereof, be in full satisfaction of claims hereunder against the Plan, the Trustee, Plan Administrator, and Employer, any of whom may require such Participating Employee, his legal representative, beneficiary, or other payee to execute a receipt and release in such form as shall be required by the Trustee or Plan Administrator, in its sole and absolute discretion. In the event of termination of participation in the Plan, the Trustee or Plan Administrator may require such a receipt and release from the Employer.

9.02(c)  Nothing herein shall be interpreted to require distribution under section 9.02(b) of forfeitures or other amounts classified by the Trustee or Plan Administrator as unallocated experience gains or losses for the benefit of the entire Trust; and the determination of amounts distributable hereunder by the Trustee or Plan Administrator shall be final unless determined by to be arbitrary and capricious by a court of competent jurisdiction.

9.03 (b) The Administrator shall have the right to amend this Plan, in its sole discretion, from time to time and to amend or cancel any such amendments. Without limiting the scope of the foregoing, such amendments may include modification of the status of this plan for federal income tax purposes if future developments in the law indicate the utility of such change.

9.04    Termination - The Employer shall have the right to terminate its participation in this Plan by delivering written notice of termination to the Trustee, at least thirty (30) days prior to the proposed date of termination. The Trustee shall have the right to involuntarily terminate the Employer's participation in this Plan for any reason which would cause the Plan and Trust not to qualify under Section 419, or for any other action attributable to the Employer or its Employees which the Trustee, in its sole and absolute discretion, determines to be conduct detrimental to this Plan or Trust, including but not limited to, false certification in the Adoption Agreement or other misrepresentation.

8.04    Statement of Account - As soon as practicable after the end of each Plan Year, but not later than 120 days, the Plan Administrator shall present to each Participating Employer a statement of the account showing the credit to his account at the beginning of such Year, any changes during the Year, the accrued Benefit at the end of the Year, and such other information as the Employer may determine. *However, neither the maintenance of accounts, the allocation of credits to accounts, nor the statement of account shall operate to vest in any Participating Employee of a Participating Employer any right to interest in or to any asset of the Trust except as the Trust specifically provides. The Plan Administrator's determination of the account balances shall be final unless deemed arbitrary and capricious by a court of competent jurisdiction.*

5.10    General Limitation on Benefit Payment - Notwithstanding any provisions of this Plan and Trust, a Participant who has less than ten (10) years of participation shall forfeit any benefit payable hereunder if it is determined by the Plan Administrator that he has engaged in a disqualifying act with respect to the Employer, Employees, Plan or Trust. A Participant shall be deemed to have engaged in a disqualifying act if he is determined by the Plan Administrator to have: (1) been guilty of committing theft, fraud or embezzlement with respect to the Employer; or (2) committed any criminal act or malicious act [not rising to the level of a crime] which damages the person or property of the Employer, Employees, Plan

23

48. The Administrator has wide discretion provided by the Trust Document, including entering into agreement with insurers, calculations and payment or other dispositions from the Trust Fund, and other trust related activities reviewable only for abuse of discretion.[16]

---

or Trust. The judgment of the Plan Administrator as to whether a Participant has committed a disqualifying act shall be final, unless made without evidence to support such judgment.

The Administrator has the complete discretion to determine the value of any amounts distributable from the trust and to classify any amounts as surplus which need not be distributed as benefits:

8.03    Method of Valuation - In determining the fair market value of assets other than securities for which trading or bid prices can be obtained, the Trustee or Plan Administrator may appraise such assets itself, or in its discretion, employ one or more appraisers for that purpose and rely on the values established by such appraiser or appraisers.

8.02    Valuation of the Trust Fund - The Administrator shall direct the Trustee, as of each Anniversary Date, and at such other date or dates deemed necessary by the Administrator, herein called "valuation date", to determine the net worth of the assets comprising the Trust Fund as it exists on the "Valuation date" prior to taking into consideration any contribution for the Plan Year. In determining such net worth, the Trustee shall value the assets comprising the Trust Fund at their fair market value as the "valuation date" and shall deduct all expenses for which the Trustee has not yet obtained reimbursement from the Employer or the Trust Fund. *All policies and Contracts may be valued at $1.00 or other nominal value, and neither the Administrator nor Trustee shall be required to report changes in cash values.*

[16] 5.12 - Agreement With Insurer - The Administrator may enter into any agreement with a legal reserve insurance company or with providers of services which it, in its absolute discretion, deems to be in the best interest of the Trust, including but not limited to the following: . . .

(c)    Agreements with respect to the calculations and payment, or other dispositions, of any experience rating refunds, dividends or other credits to be paid to the Trust Fund by any insurer or provider of services. In the absence of any such agreement, any experience rating refunds, dividends or other credits paid to the Trust Fund by an insurer or provider of services shall be used for the general purpose of the Trust as the Administrator in its discretion shall determine.

6.1    Powers of the Trustee. In furtherance of the powers otherwise specified herein or conferred upon the Trustee by law, the Trustee shall be vested with the following powers and discretion with respect to the assets of the Trust: . . . (j) to do all other acts (exclusive of acts otherwise committed to the discretion of the Adopting Employer, Advisory Committee., Plan Administrator) which in the judgment of the Trustee are necessary or desirable to carry out the duties expressly conferred upon it by this Trust Agreement for the proper administration of the Trust even though the power to do such acts is not specifically set forth herein.

Approval of Appropriate Agencies. The Trustee may, in its absolute discretion, condition delivery, transfer, or distribution of any assets upon the Trustee's receiving assurances satisfactory to it that any notice or other action which may be required to be given under ERISA or the Code to any Person, the Department of Labor or the Internal Revenue Service has been given or taken, as the case may be, and that any filing which is required to be made to determine that a termination has not affected the qualification of the Plan has been made. The Trustee shall not be responsible under the Plan to give any such notice, make any such filings, maintain any records required under ERISA or the Code or take any other action, all of which, for purposes of this Trust Agreement, shall be the responsibility of the Plan Administrator.

Fiduciary Discretion. Unless otherwise provided, any Plan Administrator acting hereunder shall be deemed to act pursuant to its absolute discretion, and any such action may be reviewed only for abuse of discretion.

**V.    No Employer or Employee, as Owner or Otherwise, has any legal or equitable interest in Trust Insurance Policies, the Trust Fund, or Trust Surplus whether during the Life of the Plan or Upon Plan Termination.**

49.    The SEWBP is not a pension plan.[17]

50.    The policies are owned by the Trustee and all cash value therein belongs solely to the Trustee. Participants and employers have no legal or beneficial right to any policy cash value.[18]

51.    Most importantly, there is NO VESTING or legal or equitable title of any employee or employer in Trust assets in the Trust Fund or otherwise.[19] [Bonney Aff2 ¶7 Tab 12].

---

[17] 10.19 Single Employer Plan - It is intended that this plan qualify as a single employer health and welfare benefit plan described in Section 419 of the Code, as these provisions apply to health and welfare benefit plans, without giving effect to references therein unique to pension, profit sharing, or other plans of deferred compensation. This is not a plan of deferred compensation. *The execution of an Adoption Agreement by a Participating Employer shall give rise to the creation of a new Plan with a separate benefit structure under the Plan.*

[18] 7.05    Policies -
(a)    General Description - The Trustee may purchase Policies on each Participant to fund any of the Benefits described in Article 5. The policy shall be a contract between the Trustee and the Insurer *and shall reserve to the Trustee all rights, options and Benefits provided by the Policy and permitted by the Insurer, except that the right to name and change the Beneficiary shall be exercised by the Trustee or by the Plan Administrator or such other fiduciary* other than a participant authorized to do so in writing pursuant to a power of attorney or other document..
(f)    Ownership - *All policies and Contracts shall be owned by the Trustee. All cash value contained in such policies and Contracts shall be owned by the Trustee.* The Trustee shall be under no obligation to distribute a policy or Contract to any participant or beneficiary as part of any benefit or termination payment, but may, instead, distribute the cash surrender value of same.

[19] 8.02    Valuation of the Trust Fund - The Administrator shall direct the Trustee, as of each Anniversary Date, and at such other date or dates deemed necessary by the Administrator, herein called "valuation date", to determine the net worth of the assets comprising the Trust Fund as it exists on the "Valuation date" prior to taking into consideration any contribution for the Plan Year. In determining such net worth, the Trustee shall value the assets comprising the Trust Fund at their fair market value as the "valuation date" and shall deduct all expenses for which the Trustee has not yet obtained reimbursement from the Employer or the Trust Fund. All policies and Contracts may be valued at $1.00 or other nominal value, and neither the Administrator nor Trustee shall be required to report changes in cash values.
8.04    Statement of Account - As soon as practicable after the end of each Plan Year, but not later than 120 days, the Plan Administrator shall present to each Participating Employer a statement of the account showing the credit to his account at the beginning of such Year, any changes during the Year, the accrued Benefit at the end of the Year, and such other information as the Employer may determine. However, neither the maintenance of accounts, the allocation of credits to accounts, nor the statement of account shall operate to vest in any Participating Employee of a Participating Employer any right to interest in or to any asset of the Trust except as the Trust specifically provides. *The Plan Administrator's*

52.     In the Employee Retirement Income Security Act of 1974 ("ERISA"),
Congress did legislate expressly on the subject of "vesting" requirements in pension
funds. In sharp contrast to the language of § 302(c)(5), ERISA contains lengthy, detailed
provisions governing the circumstances under which an employee whose work has
generated contributions to a pension fund can be denied benefits from that fund. 29
U.S.C. §§ 1051-1061. When Congress acted in ERISA, it concluded that the vesting
standards of ERISA should not apply to health benefit funds like those at issue in this
case. *See* H.R. Rep. No. 93-533, 93d Cong., 2d Sess., at 1-14 (1974).

53.     Jeanne Bonney testified that she did an analysis of amounts remaining at
F&M prior to the hearing of October 6. [Tr. 10/06/09 p. 66 13:16]

---

*determination of the account balances shall be final unless deemed arbitrary and capricious by a court of competent jurisdiction.*
        9.02     Fund Recovery - It shall be impossible for any part of the contributions under this Plan to be used for, or diverted to, purposes other than the exclusive Benefit of the Participants or their Beneficiaries.
                (a)     Upon dissolution of the Plan and/or termination by virtue of an Employer's voluntary or involuntary termination of membership in the Plan, any assets remaining in the Plan after satisfaction of all liabilities to existing Beneficiaries shall be applied in one or a combination of the following, as selected by the Trustee or Plan Administrator in its discretion.
                        (1)     **Such remaining assets shall be used to provide (either directly or through the purchase of insurance), life, sick, accident or other benefits** within the meaning of Regulation Section 419, pursuant to criteria that do not provide for disproportionate benefits to officers, shareholders or highly compensated employees of the Employer; or
                        (2)     Such remaining assets shall be distributed to members pro-rata based on the total benefits payable to which such Member and his beneficiaries would be entitled to pursuant to ARTICLE 5 compared to the total benefits payable to which all Members and their beneficiaries would be entitled pursuant to ARTICLE 5; or

                        (3)     Distributions shall be based on objective and reasonable standards which do not result in either unequal payment to similarly situated Participants or in disproportionate payments to officers, shareholders or highly compensated employees of the Employer.

                (b)     In the event an Employer terminates participation in the Plan, either voluntarily or involuntarily, any distribution to Employees of such Employer pursuant to section 9.02(a) shall be made only from the aggregate assets of the Trust constituting the Participant Account(s) attributable to such Employer's Employees.  Without limiting the generality of the foregoing, distributions to a particular Participant may be based upon a formula, the numerator of which is all compensation of the Employee during years of participation in this Plan, and the denominator of which is all such compensation for all Employees of the Employer earned during their years of participation.

54.    Only approximately $37,000 of the $2.4 million presently at F&M represented amounts contributed by employers who at one time had NOE participants. [Tr. 10/06/09 p. 74:2-4]

55.    That balance represents contributions tracked to particular employers, less expenditures tracked to particular employers.  [Tr. 10./06/09 p. 56:19-25; 59: 2-17]:

56.    Ms. Bonney concluded that although not completely sure, because of the pattern of contributions, it was highly likely the excess was attributable to contributions earmarked for owner employee benefits.[Tr. 10/06/09 p. 60:2-25].

57.    Ms Bonney stated that no NOE had any interest in those funds as the trust was not paying term insurance and the documents did not vest in any NOE an interest in any money. [Tr. 10/06/09 p. 66: 21-25;

58.    Lowell Gates, when asked of the interest of NOEs in any trust money, stated without equivocation "NONE." [Tr. 10/06/09 60:3-5].

59.    There was no evidence that any term insurance premium relating to NOEs was due.

60.     There was no evidence that any term insurance premium relating to NOEs was unpaid.

61.    Distribution of Trust assets is not required and the standard of review for the Administrator's determination on this issue is arbitrary and capricious. [20]

## VI.    Trust Amendments

---

[20]     (c)    Nothing herein shall be interpreted to require distribution under section 9.02(b) of forfeitures or other *amounts classified by the Trustee or Plan Administrator as unallocated experience gains or losses for the benefit of the entire Trust; and the determination of amounts distributable hereunder by the Trustee or Plan Administrator shall be final unless determined by to be arbitrary and capricious by a court of competent jurisdiction.*

**A.     The March 1, 2007, REAL VEBA Plan and Trust Amendment ("Legal Services Amendment")**

Findings of Fact

1.     Amendment of the Trust was valid without formal approval or any approval of CTC, as the Trust Document provides that unless the issue modifies the rights and duties of the Trustee PennMont may unilaterally amend the Trust at any time by simply providing notice in writing to the Trustee. [Bonney Aff2[21] Tab 14; Trust Doc 10.1[22]].

2.     The Trust Agreement controls.  The Plan and the Trust Documents are both parts of a single integrated welfare benefit program and are construed together.  In the event of any conflict between their provisions the terms of the Trust document control and the terms of the Trust incorporated by reference into the Plan.  [Bonney Aff2 Tab 13; Plan Doc 10.22[23]].

3.     Whereas the Plan document at 9.03 requires a writing for an amendment (i.e., where the employer amends the Plan, [9.01]) an amendment to the Trust by PennMont is sufficient to amend the Plan.

4.     Nevertheless, the amendment was in fact ratified by CTC.

a)     On or before March 1, 2007, John Koresko acting on behalf of PennMont provided to CTC a written clarification or amendment of the legal services benefit. [Bonney Aff2 Tab 30, incorporated by reference at Tr. 7/17/09 p. 49:12-21].

---

[21] Second Affidavit of Jeanne Bonney in Support of Defendants' Motion to Dismiss in re Trust Expenditures and Information Provided to F&M, dated July 16, 2009 (the "big white binder").

[22] 10.1  Amendment.  Subject to the restrictions set forth in section 3.5, PM may at anytime and from time to time amend, in whole or in part, any or all of the provisions of this Trust Agreement by notice thereof in writing delivered to the Trustee...

[23] 10.22 Trust Agreements Control. - The Plan and the Trust are both parts of a single integrated welfare benefit program and shall be construed together.  In the event of any conflict between the provisions of this Plan document and the Trust document adopted in connection herewith, the terms of the Trust document shall control; and the terms of the Trust shall be considered incorporated by reference into this Plan. Except to the extent expressly inconsistent with any amendment or restatement to the Trust, the terms and conditions of that certain Trust document submitted in connection with the application for exemption under Code section 501(c)(9) filed by the Delaware Valley Leagues shall continue in full force and effect as part hereof.

b) March 27, 2008 correspondence from Lowell Gates, Chairman of the Board of CTC, to Susan Russell, CEO of CTC, and the Koresko Law Firm stated that CTC's Board was aware of and reviewing the March 1, 2007 document. PennMont never believed that the Amendment was not in place. [Tr. 9/09/09 p. 91:1-15].

c) Testimony was provided on October 6, 2009, that the CTC Board conducted an independent legal review of the March 1, 2007, document and determined that is was not necessary because the existing Plan and Trust documents already provided for legal services. [Tr. 10/06/09 p. 27L1-25].

d) In reliance on the Amendment, as well as the underlying Plan and Trust Documents, PennMont forwarded legal bills to CTC. Legal services fees were paid to the Gates Halbruner and Hatch Law Firm as related to DOL proceedings, and to the Koresko Law Firm and other law firms as to DOL proceedings as well as IRS matters. [Tr.9/08/09 p. 72:17-19; Gov Exh. 23; Tr. 10.06.09 p.28:1-12].

e) This practice was honored over a period of two and a half years until DOL brought suit in March 2009; soon thereafter and without notice F&M caused legal services payments to cease. [Tr. 9/09/09 pp. 91:16-25; 92:1-23].

f) DOL's witnesses Cindy Monokian and Harry Monokian, and their respective firms MIDA and HARRY H. MONOKIAN DMD, PC applied for and received this benefit when Koresko Law Firm represented them before IRS, as paid for by the Trust, from April 2007 until early 2009. [Tr. 9/09/09 pp. 114-117; Def Exh.13]. Jeanne Bonney testified that, as with all other IRS clients, when the Monokians advanced from the audit stage to an adjustment, and their Protest Letters became due, the Monokians' paid out of pocket to Koresko Law Firm an additional $5,000 each, after two years of receiving the Trust sponsored legal services benefit. [Tr. 9/09/09 pp. 188:21-25; 189:1-14; 189:13-25; 190:1-21].

g)      DOL's witness John Sharratt discussed with Jeanne Bonney but declined the IRS related legal services benefit [Tr. 9/09/09 p. 112:1-12]. Taxpayer Participants who were audited agreed with IRS to attempt obtain Trust assets to pay their IRS bill. [Bonney Aff2 para. 42].

Conclusions of Law

1.      The March 1, 2007, REAL VEBA Plan and Trust Amendment ("Legal Services Amendment") is valid.

2.      The amendment is valid even if not executed because there is no requirement of a signed document as an element of any sort of an arrangement. *Malia v. General Electric Co.,* 23 F3d 828 (3rd Cir. 1994).

3.      The only thing that ERISA requires, if ERISA even applies, is a writing. No particular form is required. Amendments can be made by oral agreement or in the form of a course of dealing and later reduced to writing. See *Orth v Wisconsin State Employees Union,* 546 F3d 868 (7th Cir. 2007).

4.      There was a writing, it was served on the Trustee, and the Trustee recognized the benefit without further action required.

5.      The administrator interpreted within the realm of its authority that the ability of an employer to amend its "benefit structure" related only matters within its discretion, but could not supercede the authority of PennMont to possess the sole authority with respect to amendments affecting the entire trust.

6.      Ms. Bonney stated that "experience rating" as defined by the Internal Revenue Service, included "termination distributions;" making such types of distributions prohibited regardless of other language. [Bonney Aff2 ¶7 Tab 12]

7.      As a matter of law, the interpretation of PennMont was not arbitrary and capricious.

**B.** **Was the legal services amendment necessary to include a legal services benefit in the REAL VEBA Plan?**

Findings of Fact

1.     A legal services benefit underlies the original arrangement by operation of Internal Revenue Code[24] § 501(c) 9 and Internal Revenue Treasury Regulation §1.501(c)(9)- 3(e), which incorporates by reference §501(c) 20 (legal services agreement). [Tr. 9/09/09 pp. 69:22-25; 70:1-24; 71:1-16].

2.     The benefit already existed under the terms of the Plan and Trust documents[25]. [Tr. 09/09/09 pp. 76:16-17; 183:19-25].

    a.     The Plan Document specifically provides for expenses related to IRS challenges.[26]

    b.     The Plan Document specifically provides for legal fees.[27]

    c.     The Trust Document expressly authorizes the employment of attorneys.[28]

---

[24] All references to "Section" or "Sections" [abbreviated § and §§, respectively] are to sections of the Internal Revenue Code of 1986, as amended, unless otherwise indicated. ("the Code"). Citations to Regulations refer to Treasury Regulations issued under the Code, unless otherwise indicated.

[25] Plan 10.21 Limited Power of Attorney - By Adopting this Plan, the Employer hereby appoints the Administrator, Trustee, or their delegate its attorney in fact with respect to all questions, controversies, and issues relating to the Plan before the Internal Revenue Service and Department of Labor. This power of attorney is irrevocable.

[26] Plan 9.05 Approval by Internal Revenue Service - Notwithstanding anything herein to the contrary, if, pursuant to an application filed by or on behalf of the Plan, the Commissioner of Internal Revenue Service or his delegate should determine that the Plan does not initially qualify as a Plan and Trust under Section 419 of the Code, and such determination is not contested, or if contested, if finally upheld, then the Plan shall be void ab initio and all amounts contributed to the Plan by the Employer, less expenses paid, shall be returned within one year of the final unappealable, judicial or administrative determination and the Plan shall terminate, and the Trustee shall be discharged from all further obligations.

[27] Plan 10.10 Indemnification of the Administrator by the Employer - The Employer hereby agrees to indemnify the Administrator for and to hold it harmless against any and all liabilities, losses, cost or expenses (including legal fees and expenses) of whatsoever kind and nature which may be imposed on, incurred by or asserted against the Administrator at any time by reason of the Administrator's Service under this Agreement if the Administrator did not act dishonestly or in willful violation of the law or regulation under which such liability, loss, cost or expenses arose. Such amounts may be charged as expenses of the Plan and Trust against assets contributed by the Employer which would otherwise be employed or distributable hereunder.

[28] Trust 5.09 - Delegation of Authority - The Administrator shall have the authority (a) to allocate it responsibilities under the Plan, and (b) to employ any one or more persons, firms or corporations (including actuaries, attorneys, accountants, investment managers and consultants) including a broker of record and/or

d.    The Trust Documents specifically authorizes legal services.[29]

e.    The Trust Document authorizes payment to third parties at the direction of the Plan Administrator.[30]

f.    The Trustee is permitted to engage in legal action to protect the property of the Trust where there are sufficient assets to do so:[31]

g.    In particular, the Trust Document provides that attorneys are entitled to payment from the Trust.[32]

---

an employee benefit consultant to advise it with respect to any of its responsibilities and duties under the Plan, or to perform any of its responsibilities under the Plan, and is authorized to charge the Plan for the reasonable fees thereof. Notwithstanding the foregoing provisions of this Section, neither the Administrator nor any other fiduciary hereunder may allocate or delegate the responsibilities so such allocation or delegation within a reasonable period of time in the event the Administrator determines that such allocation or delegation is no longer in the interest of the Plan and its Participating Employees. Anyone may serve in more than one fiduciary capacity with respect to this Plan. The Administrator or Employer is the named fiduciary.

[29] Trust 8.1 <u>Trustee's Compensation and Expenses.</u> Compensation to the Trustee shall be as set forth in writing by agreement between the Trustee and Plan Administrator. Any expenses incurred by the Trustee in connection with its administration of the Trust including, but not limited to, fees for legal services rendered to the Trustee (whether or not rendered in connection with a judicial or administrative proceeding) such compensation as set forth in the fee schedule agreed in writing by the Trustee and the Employer and communicated to Plan Administrator and all other proper charges and disbursements of the Trustee shall be paid from the Trust unless first paid by the Adopting Employer. Administrative Trustee Fees shall begin following acceptance of this Trust, and shall be billed annually on the anniversary of this Agreement. Trustee fees shall be billing annually by the Plan Administrator, and the fees shall not be charged to the Trust Fund until the Plan Administrator has completed efforts to collect same directly from the Adopting Employer. Asset Allocation Fees shall be billed annually with monthly adjustments and shall be based on the average assets valuation per annum. Anything in the preceding sentence to the contrary notwithstanding, the Adopting Employer shall reimburse the Trustee for any such fees and expenses if for any other reason such expenses are not paid out of the Trust. Fees and reimbursement will not be affected by removal or by termination of the Trust, however, in such event, fees will be prorated, and any unearned portion shall be returned.

[30] Trust 8.2 <u>Plan Expenses.</u> With respect to expenses incurred by Persons other than the Trustee, the Plan Administrator may direct the Trustee to pay from the Trust any other administration expenses of the Plan. Each direction to the Trustee under this Section shall constitute a representation and warranty by the Adopting Employer, Advisory Committee., and Plan Administrator that such direction is in accordance with applicable law, the terms of the Plan, and the terms of this Trust Agreement, and the Trustee shall have no duty to make any independent inquiry or investigation as to any of the foregoing before acting upon such direction or to see to the application of any monies paid over

[31] Trust 8.4 <u>Legal Actions.</u> To the extent not otherwise required by ERISA, the Trustee shall not be required to institute any legal action or to appear or participate in any legal action to protect or preserve the property of the Trust, or its title thereto, unless the Trustee is in possession of assets in the Trust sufficient for the payment of, or shall have first been indemnified to its satisfaction from all loss, cost and liability related thereto, provided, however, that this provision shall not be construed so as to require anyone to indemnify the Trustee from expenses or liabilities as to any suits or proceedings against the Trustee if not required to do so in accordance with Section 7.5 hereof.

[32] Trust 13.3 <u>Reliance on Experts.</u> The Trustee may consult with experts (who may be experts employed by the Plan, Plan Administrator, or an Adopting Employer), including legal counsel, appraisers, pricing services, accountants or actuaries, selected by it with due care, with respect to the meaning and construction

        h.      The powers of the Trustee include litigation and litigation expenses where the Trust Fund is at issue.[33]

    3.      Jeanne Bonney testified that, in fact, beginning in 1994, participants were notified of the legal services benefit related to IRS audit. The benefit was relatively unused from 1994 until 2006, when IRS began widespread examination of Plan participants. [Tr. 10.6.09 p. 15:20-25; 16:1-12; Def. Exh.14].

    4.      Lowell Gates, Esquire, LLM (tax), former Chairman of CTC, testified that he has served as legal counsel to thousands of corporations, of which nine hundred (900) or more were fiduciary trusts, in which he had been involved in a dozen or more ERISA fee cases in litigation. [Tr.9/08/09 pp. 66:10-25; 67:8-25; 68:20-25; 69:1-8]. He stated that in the context of setting up the relationship with PennMont [in 2002] that CTC reviewed the REAL VEBA trust document and in his opinion on its face it provides for fees for fiduciaries and allows for legal fees to be charged. [Tr. 9/08/09 pp. 70:19-25; 71:1-25; 72: 6-18; Tr. 10.6.09 p. 27:1-25].

Conclusions of Law

    1.      A legal services amendment was not necessary to include a legal services benefit in the REAL VEBA Plan.

---

of this Trust Agreement or any provision hereof, or concerning its powers and duties hereunder, and shall be protected for any action taken or omitted by it in good faith pursuant to or on the basis of the opinion of any such expert.

[33] Trust 6.1 Powers of the Trustee. In furtherance of the powers otherwise specified herein or conferred upon the Trustee by law, the Trustee shall be vested with the following powers and discretion with respect to the assets of the Trust: (h) to bring, join in, or oppose any suits or legal proceedings involving the Trust Fund where the Trustee may be adversely affected by the outcome, individually or as trustee, or where it is advised by counsel that such action is required on its part by ERISA or other applicable law; (i) to employ suitable agents, advisors, and counsel and to pay their reasonable expenses and compensation as expenses of the Trust Fund; and (j) to do all other acts (exclusive of acts otherwise committed to the discretion of the Adopting Employer, Advisory Committee., Plan Administrator) which in the judgment of the Trustee are necessary or desirable to carry out the duties expressly conferred upon it by this Trust Agreement for the proper administration of the Trust even though the power to do such acts is not specifically set forth herein.

2.     Internal Revenue Code[34] § 501(c) 9 provides that voluntary employees' beneficiary organizations providing for the payment of life, sick accident or other benefits to their members, their dependents or designated beneficiaries are exempt organizations. Internal Revenue Treasury Regulation §1.501(c)(9)- 3(e), which incorporates by reference §501(c) 20 (legal services agreement) provides that a voluntary employees' beneficiary organization shall not be prevented from qualifying as an exempt organization merely because it provides legal services or indemnification against the cost of legal services.

3.     §1.501(c)(9)- 3(e) permits "other benefits" to qualify under §501 exempt organizations if the benefit is similar to life, sick or accident benefits and the benefit is intended to safeguard or improve the health of a member or his dependent or protects against a contingency that interrupts earning power.

4.     Legal service benefits by operation of IRC §501(c) 20 are qualifying benefits.

**C.    Was there a Single Employer Welfare Benefit Plan ("SEWBP") and/or the associated Trust ("SEWBP Trust") the legal services benefit?**

<u>Findings of Fact</u>

1. In Fall 2006 when it was recognized by John Koresko and PennMont that a tremendous volume of legal assistance was being sought by plan participants subject to IRS audit (in excess of 200 inquiries), a legal services clarification was prepared and submitted to CTC on or before March 1, 2007. [Tr. 09/09/09 p. 90:3-25; Def Exh. 12].

2. Lowell Gates testified that the relevant dates were 2006 and 2007 – at that time only the SEWBP was actively providing benefits and therefore the amendment was relevant to it. [Tr. 10.6.09 pp. 16:10-25; 17:1-18].

---

[34] All references to "Section" or "Sections" [abbreviated § and §§, respectively] are to sections of the Internal Revenue Code of 1986, as amended, unless otherwise indicated. ("the Code"). Citations to Regulations refer to Treasury Regulations issued under the Code, unless otherwise indicated.

Conclusions of Law

1. The Single Employer Welfare Benefit Plan ("SEWBP") and/or the associated Trust ("SEWBP Trust") were amended to clarify the legal services benefit.

2. As discussed above, there was no legal requirement to formally amend. The Amendment put in writing for CTC, Trustee, for the sole purpose of making clear the nature and scope of the benefit as it was anticipated that a large number of owner/employees would be under IRS examination and require such services.

**D. Status of and relationship between the REAL VEBA Trust and the SEWPT.**

Findings of Fact

1. REAL VEBA and SEWBT were created by PennMont or other Koresko Defendants. [*SCM, supra;* Complaint para 9 and 11.

2. Any employer wanting to receive funding from the trusts for benefits could subscribe, and there was no evidence of any commonality or relationship among subscribing employers.

3. DOL's and the Defendants' witnesses testified consistently that there were strong tax-motivations connected with the subscription to the trusts. [BonneyAff2 para 5; Tr. 9/02/09 pp. 210:21-25; 211:1-15; Tr. 9/03/09 pp. 31-36]

4. The witnesses testified that more than 97% of all money contributed to the arrangements was intended to fund the permanent life insurance policies written on the lives of owner employees. [Tr. 9/03/09 pp. 122:24-25; 123:1-9; Tr. 10/06/09 p. 66: 1-7].

5. Jeanne Bonney testified that term insurance was billed to the employers and promptly paid when received. [Tr. 10/06/09 p.39: 14-21].

6. Ms Bonney also testified that employers often contributed amounts for the owner employees in advance of the time due to insurance carriers, or the amounts

were held in trust to prevent the policies from becoming modified endowment contracts. Tr. 09/09/09 p.159:1-3; Bonney Aff2 ¶ 14].

7.      Ms. Bonney testified that the interest earned by the fund, and other amounts in the possession of F&M trust, were primarily if not exclusively attributable to contributions for owner employees' benefits. [Tr. 09/09/09 p. 161:4-25].

8.      REAL VEBA and SEWBT are, according to the Internal Revenue Service, either plans of deferred compensation or not plans at all.  Bonney Aff2 ¶ 46; Tab 28.

9.      REAL VEBA and SEWB are not individual account plans, but rather define a particular benefit that a participant might be entitled to upon the occurrence of a future, triggering event.  Each is funded by one Trust Fund account over which participants have no legal or beneficial interest. Bonney Aff2 ¶ 46; Tab 28].

10.      They are separate Trusts. [F&M Exh. 1 and 2].

11.      Each Trust and Trustee serves as fiduciary for the beneficiaries named by the Plan and Trust documents pursuant to terms of the Trust Agreements. *Id.*

12.      The only significant difference between the Trusts is the underlying recognition of which deduction is being taken by contributing owner/employers, whether based on Code §419A(f)(6) or §419(e), respectively.  Bonney Aff2 ¶ 7 Tab 12.

13.      There was no "conversion" or "commingling" as each participant's benefits are funded by a multiple employer trust where all assets are available for all claims and there is no asset segregation or subaccounting at the trust wide level. [Tr. 09/09/09 pp. 60:24-25; 61:1-16; 132:3-25; 134:17-20].

[Page break for Figure 1]