# Koresko Law Firm

A PROFESSIONAL CORPORATION

Attorneys

John J. Koresko, V +*
Jeanne D. Bonney **

200 West Fourth Street
Bridgeport, Pennsylvania 19405
(610) 992-2200
Fax (610) 992-1091

Of Counsel:
Sean P. Flynn **

+ Certified Public Accountant
\* Also Admitted in Florida
\*\* Also Admitted in New Jersey

October 8, 2009

Hon. C. Darnell Jones, II                                                VIA OVERNIGHT MAIL
United States District Court - Eastern District of PA
James A. Byrne Federal Courthouse
601 Market Street
Chambers-Rooms 5918
Philadelphia, PA 19106-1797

           Re:     *Solis v. Koresko et al*, No. 09-cv-988
                     <u>Request for Consideration of Newly Discovered Authority</u>

Dear Judge Jones:

       We filed our opposition to the Motion of the Secretary of Labor for Preliminary Injunction on August 3, 2009, which appears at docket 79 in the above-captioned matter. Since the filing of this response, it has come to the attention of the defendants that the United States has published internally a memorandum which we think is dispositive on the issue of whether the fiduciary responsibility and prohibited transactions provisions of ERISA ever applied to the Defendants, and thus, whether an injunction can issue in this case.

       The Defendants have placed into their Proposed Findings of Fact a panoply of evidence supporting the Conclusions of Law that REAL VEBA and SEWBPT are regarded by the government as primarily forms of deferred compensation. The witnesses reiterated that the benefits were directed primarily at a select group of managerial employees, primarily owners.

       A "top hat" plan is a plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees...." 29 U.S.C.A. § 1101(a)(1) (West 2009). Top hat plans are subject to ERISA only as far as its enforcement provisions, and administrators of top hat plans are exempted from ERISA's fiduciary responsibility requirements. *See In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir.1996). There is no cause of action under ERISA for breach of fiduciary duty in top hat plans, even though the plan administrators may be said to fall under ERISA's definition of "fiduciary." *See Goldstein v. Johnson & Johnson*, 252 F.3d 433 (3d Cir.2001). (top hat plan administrators are not fiduciaries under ERISA); *In re New Valley Corp.*, 89 F.3d at 153 (no cause of action for breach of fiduciary duty in a top hat plan).

The terms "deferred compensation" and "unfunded plan" are not defined by ERISA. Many years ago, the Department of Labor abdicated responsibility over such determinations to the Internal Revenue Service. In Advisory Opinion 93-13, the DOL confirmed its "view that any determination of the "unfunded" status of [a] . . . plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law. Addressing the issue as to whether such plans would fail to be "unfunded" solely because certain "rabbi trusts" are maintained in connection therewith, the Department has indicated that, in the absence of pertinent legislative history defining "unfunded" for purposes of Title I of ERISA, the positions adopted by the Service regarding the tax consequences to trust beneficiaries should be accorded significant weight under Title I of ERISA." See also Letter from Elliot I Daniel, Assistant Administrator for Regulations & Interpretations, DOL, to Richard H. Manfreda, Chief, Individual Income Tax Branch, IRS (Dec 13, 1985), reprinted in 16th Annual Employee Benefits Inst 121-24 (1986) ("a 'top hat' plan or excess benefit plan would not fail to be 'unfunded' solely because there is maintained in connection with such plan a 'rabbi trust.'").

Taken literally, the official DOL position is that its application of ERISA will be guided by tax law interpretations of the IRS. The courts have gone further. The seminal case is *Miller v Heller*, 915 F Supp 651 (SD NY 1996), which involved a so-called "split dollar" insurance purchase to recover the employer's cost of paying nonqualified deferred compensation. The court stated that the test for determining whether a plan is funded or unfunded for ERISA purposes is whether the beneficiary can establish, through the applicable plan documents, a legal right greater than that of an unsecured creditor to a specific set of funds from which the employer is obligated to pay the deferred compensation. *Id.* at 660; approved by *Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000). The *Demery* court found no merit that a plan was "funded" through the purchase of life insurance contracts on the participants. *Id.* The panel reviewed beneficiary rights in the plan documents for, and found that they did not have a status greater than unsecured creditors with respect to "specific funds." *Id.*

In DOL Adv Op 81-11A, the Department of Labor (DOL) ruled on an employer's plan that provided death benefits to its employees would *not* be funded if the employer purchased life insurance policies to cover all or part of its liabilities. Based on the facts regarding the employer's proposed plan, the insurance policies were found not to be assets of the plan. No participant or beneficiary had any preferred claim against the policies or any beneficial ownership interest in the policies. The policies were not designated as security for the payment of benefits. The assets were treated as not sufficiently those of the employees.

Defendants included in their Conclusions of Law citations to many cases and authorities indicating the subject arrangements, while providing welfare type benefits, are also regarded as unfunded arrangements that provide a type of deferred compensation. As the Third Circuit said in *In re IT Group, Inc.*, 448 F.3d 661 (3d Cir.2006):

> a deferred compensation plan is an agreement by the employer to pay compensation to employees at a future date. The main purpose of the plan is to defer the payment of taxes. The idea is to defer the receipt of compensation

    until retirement or termination of employment, when the employee is in a lower
    tax bracket, thus reducing the overall amount of taxes paid.

*Id. at 664-65* (internal citation omitted).

  Very recently, the Internal Revenue Service published and distributed Chief Counsel Advice ("CCA") memorandum No. *200931049* (dated July 31, 2009), dealing with both these issues. See www.irs.gov/pub/irs-wd/0931049.pdf (visited Oct. 8, 2009).The CCA is attached hereto and appears in the redacted form in which it is in the public domain. Apparently, IRS Chief Counsel issued this advice in connection with existing litigation involving section 419 plans, like the type of litigation referred to repeatedly before Your Honor as involving the employers, owner-employees and the Koresko Defendants.

  A few admissions of the government are of particular note. On Page 2, IRS writes: "Unfunded plans can be insured or self-insured, or a combination.. . . Other unfunded plans provide benefits through health insurance, life insurance, and/or disability insurance. With these types of plans, the employer pays. . . the insurance premium . . . for policies that cover the employee participants. On page 6, the IRS takes the position that any fund is to be ignored if cash surrender value policies are used because IRS says that the courts should ignore the trust [without explaining why] and treat the policies as owned by the employer as in a typical unfunded arrangement. Beginning on page 7, the IRS states its litigation position, that such arrangements are really not benefits at all, or they are deferred compensation (see p. 10, 19). The IRS admits that in the case of deferred compensation treatment, the taxation to the employees is deferred. 26 U.S.C. § 404.

  The CCA points out the inability of the government in the case at bar to meet its burden of proving by a strong probability of success that the subject trusts are ERISA welfare plans, and even if they are, that they are subject to the fiduciary duty rules of Title I, part IV (ERISA §§ 404-408). In hundreds of cases presently under audit or in Tax Court, the government tells the courts to ignore the trusts, and to treat the trusts as extensions of the employers. Given the reasonable assumption that the employers are themselves entrepreneurial, such a position accords with the rules of *Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 787 (3d Cir. 1998) that the trusts are entrepreneurial.

  If the trusts are not to be accorded separate legal significance of a beneficial nature, because the "contributions" are not really contributions [but rather *de facto* capital contributions to a related entity], there cannot legally be a fund for purposes of ERISA. Accordingly, the life insurance owned by such arrangements is really owned by an "agent" of the employers, leaving the arrangements within the classic definition of unfunded deferred compensation plans.

  Again, as the predominant benefits were for owner employees, they are unfunded top hat plans. And if they are unfunded top hat plans, there are no grounds for any action under ERISA because the Defendants are not subject to the fiduciary duty or prohibited transactions rules of Title I, part IV. Of equal importance, if a plan is unfunded [top hat or not] there are no "plan assets" that can be the subject of a fiduciary breach or a prohibited transaction. The government

should be bound to its positions on grounds of judicial estoppel, but at an equitable level, given the confusing and contradictory state of the legal landscape [created by the government], the Defendants should not be held to the standard of knowing what the government cannot apparently get straight. The foregoing analysis becomes somewhat unnecessary if the court applies the documents and amendments as written, since the entirety of ERISA cannot apply in this case because no owner employees are permitted to receive benefits and have no present interests in trust assets. *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon* 541 U.S. 1, 13-14, 124 S.Ct. 1330, 158 L.Ed.2d 40 (2004). The CCA emphasizes that the assets must be those of the employer, not the employee. ERISA is not concerned at all with the rights of employers or owners.

Thank you for your kind consideration.

Respectfully,

John J. Koresko, V.

JJK/
cc:
Department Of Labor -Office of the Solicitor
Joan Roller, Esq.
Linda M. Henry, Esquire
The Curtis Center, Suite 630 East
170 S. Independence Mall West
Philadelphia, PA 19106-3317
Fax 215-861-5162

Timothy J. Nieman, Esquire
Rhoads & Sinon LLP
One South Market Square
P.O. Box 1146
Harrisburg, PA 17108
Tele: (717) 231-6614
Fax: (717) 231-6626

ID: CCA_2009012211174141         Number: **200931049**

Office:                          Release Date: 7/31/2009

UILC: 419.14-00, 419.12-02, 419.00-00,

419.03-00

---

**From:**
**Sent:** Thursday, January 22, 2009 11:17:43 AM
**To:**
**Cc:**
**Subject:** FW: Revised Background document

I'm forwarding the revised version         sent to        on 1/15. I don't know it this is
what the agents will get –                  may still be working on this, but I wanted you
to have this.


## ATTACHMENT 1: REDACTED

## ATTACHMENT 2

### Background

I.  **Welfare Benefit Plans and Funds**

Sections 419 and 419A of the Internal Revenue Code govern the deduction of contributions to a welfare benefit *fund* (defined in § 419(e)).

Not all employer welfare benefit *plans* are funded. A "plan" is an arrangement, usually pursuant to a written document, under which an employer provides welfare benefits to employees. Some employers prefer to pay the cost of providing employee benefits under a welfare benefit plan out of the general assets of the business. This type of arrangement is often referred to as an "unfunded plan."

This document is concerned solely with arrangements which claim to be funded welfare benefit plans ("funded plans"), in other words, to include a welfare benefit fund within the meaning of § 419(e).

Sections 419 and 419A are discussed in detail below under "II. General Rules for the Employer's Deductions for its Contributions to a Welfare Benefit Fund."

### A. Welfare Benefit Arrangements

#### 1. Self-Insured and Fully Insured Plans

##### a. Unfunded Plans

Unfunded plans can be insured or self-insured, or a combination. When an unfunded plan is self-insured, the employer pays the benefit amount, typically out of the general assets of the company. Using health benefits as an example, the employer would reimburse the provider (e.g., the doctor or pharmacy) or the participant, in whole or in part, for the cost of a doctor's visit or a drug prescription. Typically, a third-party administrator would determine and pay claims on the employer's behalf.

Other unfunded plans are fully insured. They provide benefits through health insurance, life insurance, and/or disability insurance. With these types of plans the employer pays (again, typically out of its general assets), the insurance premiums, in whole or in part, for policies that cover the employee participants. The insurance company then pays the benefits to the participants. Some plans may be self-insured with respect to some benefits and fully insured with respect to others.

##### b. Funded Plans

An employer may establish a welfare benefit fund, as defined in § 419(e), in order to set aside assets to pay benefits under a welfare benefit plan. A welfare benefit fund is usually a trust, typically either a taxable trust or a Voluntary Employees' Beneficiary Association (VEBA) within the meaning of § 501(c)(9). In the case of self-insured plans, the employer will contribute to the fund amounts that will be used to pay benefits directly to the provider (again, typically the doctor or pharmacy) or the participant. For fully insured plans, the employer will contribute amounts to the fund that will be used by the fund to pay for insurance premiums.

#### 2. "Single Employer Plans"

While the Code does not contain the term "single employer plan," the term is often used to refer to a plan under which there is only one participating employer and the employer's contributions are used only for benefits for its own employees (and related administrative costs). Assuming that the fund associated with the single employer welfare benefit plan is a welfare benefit fund within the meaning of § 419(e), an employer's deductions for contributions to the fund will be governed by the limits of §§ 419 and 419A.

The deduction limitations of §§ 419 and 419A apply to welfare benefit funds, generally. As discussed below, certain welfare benefit funds may qualify for an exception to these limits, thus allowing employers to take larger deductions for their contributions to these funds.

#### 3. 10 or more Employer Plans ("§ 419A(f)(6) plans" or "(f)(6) plans")

In certain circumstances, several employers might participate together in one plan to provide welfare benefits to their employees. Employers belonging to trade associations, for example, may establish a welfare benefit fund which is part of a "10 or more employer plan" within the meaning of § 419A(f)(6). In such a plan, the relationship of the employer to the welfare benefit fund is more similar to the relationship of an insured to an insurer, than an employer to a single employer fund. See H.R. Rep. No. 98-961, 98th Cong., 2d Sess., 1159 (1984-3 C.B. (Vol. 2) 1, 413).

Employers that participate in a welfare benefit fund which meets the requirements of § 419A(f)(6) and the regulations thereunder may be able to deduct the amount of their contribution to a welfare benefit fund under the plan without reference to the general deduction limits of §§ 419 and 419A. (However, other Code provisions might limit or bar the deduction.) The § 419A(f)(6) exception to the deduction limits of §§ 419 and 419A applies only to contributions to a welfare benefit fund which is part of a 10 or more employer plan to which more than one employer contributes and to which no employer normally contributes more than 10 percent of the total contributions contributed to the plan by all employers. Furthermore, the exception applies only if the plan does not maintain experience-rating arrangements with respect to individual employers.

### 4. Collectively Bargained Funds ("§ 419A(f)(5)(A) plans" or "(f)(5) plans")
### (Welfare Benefit Funds Which Are Part of a Collectively Bargained Plan)

Section 419A(f)(5)(A) provides an exception to the deduction limits of §§ 419 and 419A for contributions to a separate welfare benefit fund under a collective bargaining agreement (i.e., a welfare benefit fund which is part of a plan determined by a collective bargaining agreement). The § 419A(f)(5)(A) exception is based in part on the premises that (1) the contribution amounts agreed to in a collective bargaining setting will not be excessive because of the arms' length negotiations between employee representatives and one or more employers that is inherent in a true collective bargaining process; and (2) if the contributions amounts are not excessive, then the employer's claimed deductions for the contributions will not be excessive. See S. Rep. No. 313, 99th Cong., 2nd Sess. 1010 (1986), 1986-3 C.B. (Vol. 3) 1, 1010. Part III. C.1., below, provides more information on the requirements of § 419A(f)(5)(A) and § 1.419A-2T.

A collectively bargained fund may involve only one employer (i.e. a variant of a welfare benefit fund maintained as part of a single employer plan for which contributions are deducted under §§ 419 and 419A) or, as suggested above, multiple employers; in this document the term "collectively bargained fund" will refer to a fund maintained pursuant to a collective bargaining agreement, which meets the requirements of § 419A(f)(5)(A), and with respect to which the contributing employer or employers claim a deduction for contributions under § 419A(f)(5)(A).

### B. Welfare Benefit Funds

#### 1. May be Exempt or Non-Exempt

A welfare benefit fund may be "any trust, corporation, or other organization not exempt from the tax imposed by [Chapter 1 of the Code]" which meets the requirements of § 419(e). See § 419(e)(3)(B). Non-exempt trusts are sometimes used to fund benefit arrangements.

A welfare benefit fund also may be a Voluntary Employees' Beneficiary Association (VEBA), described in § 501(c)(9), or, less commonly, a § 501(c)(7) or 501(c)(17) organization. See § 419(e)(3)(A). VEBAs are commonly used to fund benefit arrangements. However, the fact that a trust used to provide benefits under an arrangement may have received a determination letter stating that the trust is exempt under § 501(c)(9) of the Code has no relevance to whether the plan funded by the trust is truly a welfare benefit plan, to whether the benefits paid to participants are taxable, or to whether the employer may take a deduction for contributions to the trust under §§ 419 and 419A. Furthermore, the earnings of a VEBA are not necessarily exempt from income tax, because VEBAs are subject to Unrelated Business Income Tax (UBIT) under § 512(a)(3).

### 2. Accounts with an Insurance Company

If you encounter a situation in which a taxpayer claims that an account or an arrangement with an insurance company constitutes a welfare benefit fund within the meaning of § 419(e)(3)(C), please contact a technical advisor or your local field counsel.

## II. General Rules for an Employer's Deductions for its Contributions to a Welfare Benefit Fund under §§ 419 and 419A

The deduction limits imposed by §§ 419 and 419A apply to contributions paid or accrued with respect to a welfare benefit fund after December 31, 1985. Prior to that date, the amount of a deduction for contributions paid to a welfare benefit fund was controlled solely by § 162.[1]

### A. Section 162

An employer which does not maintain a funded welfare benefit plan but rather pays for benefits directly from its general assets (whether through benefit payments, premium payments or both) typically will claim a deduction for its contribution payments under § 162. Section 162(a) allows a deduction for all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. A taxpayer must meet five requirements in order to deduct an expense under this section. The taxpayer must prove that the item claimed as a deductible business expense: (1) was paid or incurred during the taxable year; (2) was for carrying on a

---

1 The enactment of § 419 placed new statutory limits on the amount of the deduction allowable to an employer in a given taxable year for contributions to a welfare benefit fund and, further, changed the timing of the deduction for accrual basis taxpayers from the general rules of § 461.

trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense. Commissioner v. Lincoln Savings & Loan Assoc., 403 U.S. 345, 352 (1971); T.J. Enterprises, Inc. v. Commissioner, 101 T.C. 581, 587 (1993).

Prior to the effective date of §§ 419 and 419A, an employer which maintained a funded welfare benefit arrangement typically would claim a deduction for the amount of its contribution to the fund under § 162, whether or not the entire amount was determined actuarially to be necessary or, in fact, was used, to provide employee benefits in the taxable year the contribution was made.

Sections 419 and 419A were enacted as part of the Deficit Reduction Act of 1984 (DEFRA). Sections 419 and 419A imposed strict limits on the deduction of contributions in excess of the current year's costs. Congress's purpose in enacting §§ 419 and 419A, generally, was to restrict an employer's deduction for contributions to a welfare benefit fund to amounts reasonably and actuarially necessary to satisfy expenses incurred in the year the deduction is taken. The exceptions which Congress provided to this rule are very narrow and strictly defined for the funding of certain nondiscriminatory postretirement benefits.

Contributions must be "otherwise deductible" in order to be deductible under § 404 or 419. Therefore, meeting the requirements of § 162, among other Code sections, is still a precondition for deductions claimed under § 419. It is also a precondition for deductions claimed under § 404 which governs deductions for deferred compensation payments.

### B. Sections 419 and 419A

#### 1. Overview

Under **§ 419**, the employer's deduction for contributions to a welfare benefit fund for a taxable year is limited to:

1) an amount necessary to provide benefits for that year (**qualified direct cost**), *plus*
2) an addition to a **qualified asset account**, up to an **account limit** determined under **§ 419A**
*minus*
3) the fund's after-tax income.

#### 2. Qualified Direct Cost

Section 419(c)(3) provides that a fund's Qualified Direct Cost is the aggregate amount that would have been allowable as a deduction to the employer for the taxable year for plan benefits includible in the employees' incomes for the year (or which would have been includible but for an exclusion) if (a) the employer had been a cash basis taxpayer and (b) the employer had provided the benefits directly.

As stated above, a welfare benefit fund's qualified direct cost does not include amounts that an employer would not be able to deduct if it had provided the benefit directly (instead of through the fund). This is an important point when dealing with arrangements which have paid premiums on cash value life insurance policies.

Rev. Rul. 2007-65, 2007-45 I.R.B. 949, provides that for purposes of determining the limitations on an employer's deduction for contributions to a welfare benefit fund under §§ 419 and 419A, premiums paid on cash value life insurance policies by the fund are not included in the fund's qualified direct cost whenever the fund (or the employer) is directly or indirectly a beneficiary under the policy within the meaning of § 264(a). This is because a fund's qualified direct cost does not include amounts that would not have been deductible if the employer had provided the benefit directly. In situations involving premiums paid by a fund for cash value life insurance policies, if the employer had provided the benefit directly (that is, if the employer had not set up a trust to obtain and hold the cash value life insurance policies, but instead had held the policies itself and paid the premiums itself) § 264(a) would have precluded the deduction for the premium payments. Thus, those premium payments are not included in the fund's qualified direct cost.

### 3. Qualified Asset Account Additions

A fund's **qualified asset account** consists of any **assets set aside** to provide for the payment of (1) disability benefits, (2) medical benefits, (3) supplemental unemployment compensation benefits or severance pay benefits, or (4) life insurance benefits.

Pursuant to § 419A(c)(1), the **account limit** for any qualified asset account for any taxable year is (subject to special rules for certain types of benefits) the amount reasonably and actuarially necessary to fund claims incurred but unpaid (as of the close of the taxable year), and administrative costs with respect to those claims. Note that the inclusion of amounts for claims "incurred but unpaid" when calculating the account limit would only apply in the case of self-insured plans. In cases where the plan is fully insured, the deduction could not exceed the current year's cost of providing insurance coverage to the participants (plus, if applicable, actuarially determined amounts contributed to a postretirement medical and/or life insurance reserve which meets the requirements of § 419A(c)(2), discussed below). Also, please note that, as discussed below, other Code sections may limit or bar the deduction of certain insurance premium payments.

Section 419A(c)(2) provides that the account limit for any taxable year may also include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis as necessary for post-retirement medical benefits to be provided to covered employees or post-retirement life insurance benefits to be provided to covered employees. Section 419A(e)(2) provides that life insurance benefits shall not be taken into account under § 419A(c)(2) to the extent the life insurance coverage for an employee exceeds $50,000. Section 419A(c)(2) provides that contributions to a post-retirement medical reserve is to be determined on the basis of current medical costs. Section 419A(d) requires separate accounts for key

employees with respect to the post-retirement benefits, and § 419A(e)(1) requires that the post-retirement reserve be nondiscriminatory.

### III. Certain Arrangements Claiming to Include Welfare Benefit Funds: Issues Which May Arise under §§ 419 and 419A

The following is not meant to be a complete list of the issues that can come up when dealing with arrangements claiming to be welfare benefit plans; the issues will vary depending on the facts of the particular arrangement. Below are some of the most common issues involving the rules under §§ 419 and 419A, particularly with respect to professional corporations and other small businesses.

Legal issues involving the rules of other Code sections are not addressed in detail here but are discussed under "IV. Service's Position." For example, if an arrangement claiming to be a welfare benefit fund is determined to be, in fact, a plan of deferred compensation, the rules of § 404(a)(5) (and, potentially, § 409A) would govern the deduction of contributions to the arrangement. The Service's position with respect to the timing of deductions to such a plan is explained under part IV.

The three issues in Sections A, B and C below generally involve the following questions:

1) Is the sole purpose of the arrangement to provide welfare benefits to employees?

   a) If the answer is no, then §§ 419 and 419A won't govern the extent and timing of any deductions for contributions to the arrangement. Which Code sections will control the extent and timing of any deduction depends, of course, on what the arrangement is, in fact. (See A., below, and IV.)

   b) If the answer is yes, then the question is whether the deductions for contributions
      are allowed by the rules under §§ 419 and 419A.

      i) Were the employer's contributions to the fund used to pay cash value life
         insurance premiums? If yes, please see B., below.

      ii) Were the employer's contributions to the fund used to pay premiums under a
         life insurance contract that is part of a split-dollar life insurance arrangement as defined in Treas. Reg. § 1.61-22? (Generally, a split-dollar life insurance arrangement is an arrangement between an owner (e.g., an employer or trust), and a non-owner (e.g., an employee or shareholder), to split the benefits of a life insurance contract.) If yes, please see IV.

      iii) If the employer claims that it can deduct more than what §§ 419 and

419A allow because the arrangement it contributed to qualifies for an exception under § 419A(f)(5)(A) or § 419A(f)(6), see question 2 and Section C, below.

2) If the arrangement is determined to include a welfare benefit fund, and claims to be a collectively bargained plan under § 419A(f)(5)(A) or a 10 or more employer plan under § 419A(f)(6), does it truly qualify for the exception under which the contributing employers are claiming a deduction? (See Section C below.)

### A. Certain Arrangements Claiming to Include a Welfare Benefit Fund under § 419(e) are Dividend or Deferred Compensation Arrangements

Certain arrangements claim to be a welfare benefit fund as defined in § 419(e) and to be subject to the rules of §§ 419 and 419A, when, in fact, they are primarily or in whole (1) disguised dividend arrangements, or (2) deferred compensation arrangements. The deduction, if any, for contributions to such arrangements is governed by Code sections other than §§ 419 and 419A. The Service's position on such arrangements is addressed in more detail under "IV. Service's Position." Please note that not only self-described single employer plans, but also purported 10 or more employer plans and purported collectively bargained plans may be, in fact, disguised dividend or deferred compensation arrangements.

#### 1. Dividend Arrangements

##### a. Arrangements Involving the Use of Cash Value Life Insurance

In <u>Neonatology Associates et al., v. Commissioner</u>, 115 T.C. 43 (2000), <u>aff'd.</u> 299 F.3d 221 (3d Cir. 2002), a trust claimed to be a § 419(e) welfare benefit fund that provided current life insurance benefits (that is, a promise to pay an employee's beneficiary a death benefit should the employee die during the year, while employed with the employer). The Tax Court held, however, that most of the amounts contributed to the trust were disguised constructive dividends to the owner-employees. In <u>Neonatology</u>, the owner-employees of the business and the promoter of the arrangement expected and understood that most of the contributions would benefit the owner-employees. In affirming, the Third Circuit said that the artificially inflated premiums paid by the employers in that case were a creative bookkeeping ploy invented by insurance specialists to exploit what they thought were loopholes in the tax laws. The Third Circuit further stated that the payments were so far in excess of the cost of the annual insurance protection that they could not plausibly qualify as ordinary and necessary business expenses under § 162(a).

Similarly, in <u>V.R. DeAngelis, MDPC & R.T. Domingo, MDPC v. Commissioner</u>, T.C. Memo 2007-360, the Tax Court ruled that an arrangement that was marketed as, and designed to appear as, a welfare benefit plan providing death and severance benefits, through which the employer's owner-employees obtained "cash-laden" life insurance policies was nothing more than a subterfuge to pay surplus cash to the owner-employees. The Tax Court stated that while employers are not generally prohibited

from funding term life insurance for their employees and deducting the premiums on that insurance as a business expense under § 162(a), employees are not allowed to disguise their investments in life insurance as deductible benefit plan expenses when those investments accumulate cash value for the benefit of the employees personally.

## Questions

1) Did the employer pay artificially high insurance premiums, in excess of the cost of current life insurance protection, under the arrangement?

2) Do the owner-employees and other key employees report only small amount of income with respect to the life insurance coverage and contributions for it, which are out of proportion to the substantial amounts of money contributed by the employer on their behalf?

3) Can a covered employee have a cash value policy covering the employee's life transferred to him or her – i.e. can an employee get at the cash value in that policy? Or, can a covered employee convert or exchange a policy without cash value, either for a policy with cash value, or for a policy without cash value but for which the premiums are not based on the employee's age at the date of the conversion or exchange?

If the answers to one or more of the above questions are yes, then it is likely that the arrangement is not an employee welfare benefit fund, but is an arrangement used to disguise investments in life insurance as deductible benefit-plan expenses when those investments accumulate cash value for owner-employees personally.

If the employer does not establish that the payments to the arrangement are anything other than a nondeductible distribution of cash for the benefit of the owner-employee(s) (and, if applicable, other key employees), then the plan may be simply a disguised dividend arrangement, i.e. a means of distributing corporate earning and profits to the owner-employee in the guise of providing "employee benefits." It is a subterfuge to accumulate surplus corporate cash in the life insurance policy for the owner-employee's ultimate use and benefit. If the payments are deemed to be distributions of earnings and profits to covered owner-employee(s), then they are not deductible to the employer. See <u>Neonatology Associates et al., v. Commissioner</u>, 115 T.C. 43 (2000), aff'd. 299 F.3d 221 (3d Cir. 2002); <u>V.R. DeAngelis, MDPC & R.T. Domingo, MDPC v. Commissioner</u>, T.C. Memo 2007-360.

### b. Other Disguised Dividend Arrangements

The above is not an exclusive description of disguised dividend arrangements and is not meant to suggest that such arrangements are limited to purported benefit plans involving cash value life insurance. A determination of whether an arrangement is, in fact, a method to collect and distribute corporate earning and profits under the pretext of funding and providing welfare benefits is made based on the facts of the particular case.

For example, Notice 2007-84, 2007-45 I.R.B. 963, informs taxpayers of the Service's intent to challenge certain promoted trust arrangements claiming to provide nondiscriminatory post-retirement medical benefits and post-retirement life insurance benefits which, in operation, benefit primarily the owners or other key employees of the business. These purported welfare benefit arrangements typically are sold to small businesses and other closely held businesses as a way to for the owners to provide post-retirement medical benefits, post-retirement life insurance, and cash and other property to themselves and, perhaps, other key employees of the business, on a tax-favored basis through the use of a trust.

The amount of the employer's deduction for contributions to one of these arrangements is often based on a calculation of a post-retirement reserve associated with each of the plan participants – i.e. each of the employer's employees. However, while the calculation of the employer's contributions and deductions may be based on the actuarial assumption that all the business' employees will eventually receive post-retirement benefits under the arrangement, it is unlikely, in many situations, that the rank and file employees of the small business will remain in the business's employ until retirement or will retire from that business. The calculation also may be based on other actuarial assumptions that either are not reasonable or are not permitted to be reflected in the reserve calculations for purposes of §§ 419 and 419A.

While in such arrangements the trust frequently uses the employer's contributions to purchase cash value life insurance policies on the lives of employees who are owners of the business and, sometimes, on the lives of other key employees, this is not always the case. Other methods for funneling corporate earning and profits to the owners may include: (1) amending the plan to provide benefits other than the plan's original post-retirement medical or life insurance benefits at a time when the owners and perhaps other key employees will be the primary beneficiaries; (2) terminating the plan prior to the payment of the post-retirement benefits at a time and using a method of asset allocation that provides the owners and key employees, directly or indirectly, all or a substantial portion of the assets held by the trust.

## 2. Deferred Compensation Arrangements

If it is found that payments to a purported welfare benefit plan or arrangement are part of a compensatory arrangement, rather than a distribution of earnings and profits (above), and the sole purpose is not the provision of welfare benefits, then the arrangement is a non-qualified plan of deferred compensation.

Section 419 generally controls the timing and amount of an employer's deductions for contributions made to a welfare benefit fund. Section 404(a) provides the deduction rules for employers' contributions to stock bonus, pension, profit-sharing, or annuity plans, as well as the deduction rules for compensation paid to any employee under a plan deferring the receipt of that compensation.

Unfunded deferred benefits are treated the same as deferred compensation, under § 404(b)(2). If the deferred benefits are provided through a *funded* welfare benefit plan, however, then § 419 generally controls the deduction. (See §§ 402(b)(2)(B) and 419(e)(2)(B) of the Code.) In determining whether § 419 or § 404 applies, the primary question is whether the arrangement has any features of a deferred compensation plan, or whether it is solely a welfare benefit fund. See <u>Wellons v. Commissioner</u>, 31 F. 3d 569, 571 (7th Cir. 1994), aff'g T.C. Memo 1992-704 (taxable years before effective date of § 402(b)(2)(B)).

The facts of an arrangement may raise the question of whether it is a funded welfare benefit plan or a deferred compensation plan, i.e. whether § 419 or § 404 applies to the employer's deductions. The Code does not define a "plan deferring the receipt of compensation." However, the regulations provide that an arrangement defers the receipt of compensation or benefits to the extent that, under it, an employee receives compensation or benefits more than a brief period of time after the end of the employer's taxable year in which the services creating the right to such compensation or benefits are performed. Treas. Reg. § 1.404(b)–1T Q&A 2 (a). Deferred compensation arrangements can take many forms and can even have characteristics similar to welfare benefit funds.

## **Questions**

1) Does the arrangement mainly provide cash or other benefits to a covered employee more than a brief period of time after the end of the employer's taxable year in which the employee performed the services that created the employee's right to that compensation or those benefits, *regardless* of whether there was an unforeseen event (contingency) of the type that would normally trigger such payments from a welfare benefit fund?

2) Has the employer contributed amounts to the arrangement that far exceed the cost of providing the current year's benefits for the covered employees?

If the answer to one or both questions is yes, then the arrangement may be a deferred compensation plan. If the arrangement is a deferred compensation plan, then § 404(a)(5) governs the employer's deduction and the employer must show that it has met the requirements that section. Under § 404(a)(5), an employer can deduct its contribution to a non-qualified deferred compensation plan only in the year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan. However, if the plan does not maintain a separate account for each employee, then no deduction is allowed at all. Further, amounts are deductible under § 404(a)(5) only if they would otherwise be deductible.

If the employer has not established (1) that the payments to the plan are includible in the Employee's gross income in the year at issue;[2] (2) that separate accounts were

---

[2] The inclusion of amounts in the Shareholder-Employee's gross income with respect to the arrangement is governed by § 402(b).

maintained for each employee[3]; or (3) that amounts contributed are otherwise deductible, then the employer's payments to the plan are not deductible under § 404(a)(5).

### B. Arrangements Claiming to be Funded Welfare Benefit Plans under § 419(e) which hold Cash Value Life Insurance Policies

Even in cases where an arrangement is determined to be a welfare benefit fund within the meaning of § 419(e), the rules of §§ 419 and 419A may bar the deduction of contribution amounts.

As stated above, Rev. Rul. 2007-65, 2007-45 I.R.B. 949, provides that the premiums paid on cash value life insurance policies are not included in the fund's qualified direct cost under § 419(c)(3) if the fund is **directly or indirectly a beneficiary under the policy** within the meaning of § 264(a). Examples include, but are not limited to, plans under which the fund is the owner of the policy, and, plans under which the covered participant owns the policy but has assigned the proceeds of the cash value policy to the fund, in whole or in part.

This is because a fund's qualified direct cost does not include amounts that would not have been deductible if the employer had provided the benefit directly. In situations involving premiums paid by a fund for cash value life insurance policies which benefit, directly or indirectly, the fund, if the employer had held the policies and paid the premiums itself, § 264(a) would have precluded the deduction for the premium payments. Thus, those premium payments are not included in the fund's qualified direct cost under § 419(c)(3), and, accordingly, are not deductible under § 419.

### C. Issues with Certain Arrangements Claiming to Meet the Requirements of the § 419A(f)(5)(A) or § 419A(f)(6) Exception to the General Deduction Limits of §§ 419 and 419A

Further to the issues described above, certain arrangements claim to be collectively bargained plans or 10 or more employer plans which meet the requirements of the exception to the deduction limits of §§ 419 and 419A provided by, respectively, § 419A(f)(5)(A) or § 419A(f)(6). These arrangements and their participating employers claim that deductions for contributions are governed solely by the rules of § 162.

#### 1. Certain Arrangements Which Claim to be "maintained pursuant to a collective bargaining agreement" Within the Meaning of § 419A(f)(5)(A)

---

3 See § 404(a)(5); Treas. Reg. § 1.404(a)–12(b)(3). Such accounts must be sufficiently separate and independent to qualify as separate shares under § 663(c). The general test for separate and independent shares under § 663(c) is "whether distributions of the trust are to be made in substantially the same manner as if separate trusts had been created." Treas. Reg. § 1.663(c)–3(a). In addition to meeting the "separate share" rule, the trust must meet the "separate account" rule of § 404(a)(5). "Separate accounts," as used in § 404(a)(5), requires separate accounts maintained on the books and records of the trust. Wigutow v. Commissioner, T. C. Memo. 1983-620.

As explained above, § 419A(f)(5)(A) provides an exception to the deduction limits of §§ 419 and 419A for contributions to a separate welfare benefit fund under a collective bargaining agreement. The § 419A(f)(5)(A) exception is based in part on the premise that deductions for contribution amounts agreed to in a collective bargaining setting will not be excessive because of the arms' length negotiations between adversary parties inherent in the collective bargaining process. See S. Rep. No. 313, 99th Cong., 2nd Sess. 1010 (1986), 1986-3 C.B. (Vol. 3) 1, 1010.

Section 1.419A-2T, Q&A-2, of the Regulations sets out several requirements that a fund must meet in order to qualify as a welfare benefit fund under a collective bargaining agreement for purposes of § 419A(f)(5)(A) of the Code. One requirement is that the benefits provided through the fund were the subject of arms-length negotiations between employee representatives and one or more employers. Another requirement is that the circumstances surrounding a collective bargaining agreement must evidence good faith bargaining between adverse parties over the welfare benefits to be provided through the fund.

The Service has encountered arrangements which purport to be collectively bargained plans but do not meet the requirements of § 419A(f)(5)(A). In determining whether there was a valid collective bargaining agreement, the examiner should review whether there were bona fide arm's length negotiations between adverse parties. There must also be a valid employee representative negotiating with the employer.

All facts and circumstances must be examined to determine if there is a valid collective bargaining agreement. Below are some indicators which, if present in a particular arrangement, suggest that an arrangement is <u>not</u> maintained pursuant to a bona fide collective bargaining agreement.

- The owner(s) of the employer picks the union.
- The employer decides who is in the bargaining unit covered by the collective bargaining agreement.
- The bargaining unit includes officers and the owner's family members, while other employees are excluded from the bargaining unit.
- The union makes no effort to organize the remaining employees.
- There is no evidence that the non-owner-employees had any say over who would be their employee representative.
- The owner initiated contact with the union.
- There is no union presence at the workplace.
- The union makes no effort to enforce the provisions of the collective bargaining agreement.
- The initial contact with the union is through an insurance agent.
- The employee representative allows the shareholder-employee(s) to receive substantially bigger benefits than the rank and file employees.
- The Employer provided other benefits than those provided in the contract. For example, the Employer provides benefits to its employees, such as

- health insurance and retirement benefits, even though the contract does not provide for these benefits.
- There is no evidence of negotiations between the Employer and the union.

See Notice 2003-24 for further information.

## 2. Certain Arrangements Which Claim to be "10 or more" Plans Within the Meaning of § 419A(f)(6)

As explained above, the § 419A(f)(6) exception to the deduction limits of §§ 419 and 419A applies only to contributions to a welfare benefit fund which is part of a 10 or more employer plan (1) to which more than one employer contributes and (2) to which no employer normally contributes more than 10 percent of the total contributions contributed to the plan by all employers. Furthermore, the exception applies only if the plan does not maintain experience-rating arrangements with respect to individual employers.

The legislative history of the Deficit Reduction Act of 1984, which enacted §§ 419 and 419A, states that the exception provided by § 419A(f)(6) was provided because "the relationship of a participating employer to [such a] plan often is similar to the relationship of an insured to an insurer." Even if the 10 percent contribution limit is satisfied, the exemption does not apply to a plan that is experience-rated with respect to individual employers, because the "employer's interest with respect to such a plan is more similar to the relationship of an employer to a fund than an insured to an insurer." H.R. Rep. No. 98-961, 98th Cong., 2d Sess., 1159 (1984-3 D.B. (Vol. 2) 1, 413). A plan does not meet the requirements of § 419A(f)(6) unless 10 or more employers contribute to a single pool of funds, and that single pool of funds is for the use of the group of employers as a whole (e.g. to pay the claims of all employees covered under the plan). Booth et al v. Commissioner, 108 T.C. 524 (1997).

The Service has uncovered arrangements which claim to be valid 10 or more plans but which, in fact, do not meet the requirements of § 419A(f)(6). Typically, such arrangements provide separate accounting with respect to the contributions and earnings of the individual employers, and/or provide experience-rating with respect to the claims of the individual employers' employees. Benefits are sometimes related to the amounts allocated to the employees of a participant's employer. Whether by formal agreement or informal practices, in these arrangements, a particular employer's contributions or its employees' benefits are determined and tracked in a way that insulates the individual employers to a significant degree from the claims experience of other participating employers. Thus, in such arrangements, the relationship of the employer to the arrangement is more like an employer to its own fund, than an insured party to an insurer. See § 1.419A(f)(6)-1 for further information.

Arrangements that are the same as or substantially similar to the claimed 10 or more employer plans were originally identified as listed transactions in Notice 2000-15, 2000-1 C.B. 826. Taxpayers participating in listed transactions are required to disclose that participation in accordance with § 1.6011-4 (or, depending on when the transaction was