IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HILDA L. SOLIS, SECRETARY        :     CIVIL ACTION
OF LABOR, UNITED STATES          :
DEPARTMENT OF LABOR              :
                                 :
           v.                    :
                                 :
JOHN J. KORESKO, V, et al.       :     NO. 09-988

TABLE OF CONTENTS

I.    Summary Judgment Standard. . . . . . . . . . . . . . . . .3

II.   Factual Background.. . . . . . . . . . . . . . . . . . . .5

      A.   The REAL VEBA Employee Benefit Arrangement. . . . . .5

      B.   The Parties.. . . . . . . . . . . . . . . . . . . . .8

      C.   The Decor Plan, the Cetylite Plan, and the Castellano
           Plan. . . . . . . . . . . . . . . . . . . . . . . . .9

      D.   The Alleged Fiduciary Violations. . . . . . . . . . 12

III.  Threshold Questions. . . . . . . . . . . . . . . . . . . 19

      A.   ERISA Coverage. . . . . . . . . . . . . . . . . . . 21

      B.   Coverage of Fiduciary Responsibility Provisions: The
           "Top Hat" Exception.. . . . . . . . . . . . . . . . 37

      C.   Fiduciary Status. . . . . . . . . . . . . . . . . . 43

IV.   ERISA Fiduciary Duties.. . . . . . . . . . . . . . . . . 61

      A.   ERISA Section 403, 29 U.S.C. § 1103.. . . . . . . . 63

      B.   ERISA Section 404, 29 U.S.C. § 1104.. . . . . . . . 66

      C.   ERISA Section 406(a)(1)(D), 29 U.S.C.
           § 1106(a)(1)(D).. . . . . . . . . . . . . . . . . . 70

      D.   ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1).. . 73

V.    Relief.. . . . . . . . . . . . . . . . . . . . . . . . . 75

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HILDA L. SOLIS, SECRETARY   :   CIVIL ACTION
OF LABOR, UNITED STATES     :
DEPARTMENT OF LABOR         :
                      :
        v.         :
                      :
JOHN J. KORESKO, V, et al.   :   NO. 09-988

<u>MEMORANDUM</u>

McLaughlin, J.                             August 3, 2012

      This action arises out of alleged violations of fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in connection with a multiple-employer employee death benefit arrangement.  The Secretary of Labor (the "Secretary" or "DOL") moves for partial summary judgment as to three purported ERISA plans (collectively, the "Plans"): the Cetylite Industries Inc. Health and Welfare Benefit Plan (the "Cetylite Plan"), the Decor Coordinates Health and Welfare Benefit Plan (the "Decor Plan"), and the Domenic Castellano D.D.S., P.A. Health and Welfare Benefit Plan (the "Castellano Plan").  The Secretary brings her motion against only some of the defendants, namely: John J. Koresko, V ("Koresko"), Jeanne Bonney, PennMont Benefit Services, Inc. ("PennMont"), Koresko & Associates, P.C. ("KAPC"), and Koresko Law Firm, P.C. ("KLF").  The Court will refer to these defendants collectively as the "Koresko Defendants."  The Secretary did not move for

1

summary judgment against defendant Farmers & Merchants Trust Company of Chambersburg ("F&M Trust"), successor by merger to Community Trust Company ("CTC").[1]

The Secretary argues that the Plans are employee welfare benefit plans as defined by ERISA; that the Plans have plan assets in the form of employer contributions, insurance policy proceeds, and earnings therefrom; that the Koresko Defendants are ERISA fiduciaries with respect to those plan assets; and that the Koresko Defendants breached several of their fiduciary duties by failing to maintain plan assets in trust and transferring assets into non-trust accounts that they themselves controlled.  The Court will grant the Secretary's motion as to defendants Koresko, Bonney, and PennMont for violations of ERISA Sections 403, 29 U.S.C. § 1103; 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) for all three Plans.  The Court will grant the motion as to defendants Koresko, Bonney, and PennMont for violations of ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) as to the Cetylite Plan, and deny without prejudice as to the Decor and Castellano Plans.  The Court will deny the motion without prejudice as to KAPC and KLF, and as to violations of ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1).

---

[1] Nevertheless, F&M Trust submitted an opposition to the Secretary's motion.  ECF Nos. 281, 282.

I.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of the basis for its motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once a properly supported motion is made, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

A fact is "material" if it might affect the outcome of the suit under the governing law. <u>Id</u>. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id</u>. The court must view the facts in the light most favorable to the nonmoving party. <u>See Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 251 n.12 (3d Cir. 2010).

The Koresko Defendants' response to the Secretary's statement of undisputed facts purports to "dispute" the majority of the Secretary's factual recitations. However, their response is replete with legal arguments, lacks citations to the record, and generally does not comply with Federal Rule of Civil Procedure 56(c)(1) or this Court's procedures. <u>See generally</u> Koresko Stmt. Resp. (ECF No. 284). The Court considered properly

3

supported facts genuinely disputed only where the Koresko
Defendants provided citations to the record.

Defendant F&M Trust denied many of the Secretary's
facts under Federal Rule of Civil Procedure 56(d), which states:

> If a nonmovant shows by affidavit or declaration that, for
> specified reasons, it cannot present facts essential to
> justify its opposition, the court may: (1) defer considering
> the motion or deny it; (2) allow time to obtain affidavits
> or declarations or to take discovery; or (3) issue any other
> appropriate order.

The Court of Appeals for the Third Circuit has interpreted this
provision to require a party seeking further discovery in
response to a summary judgment motion to submit an affidavit
specifying what particular information is sought; how, if
uncovered, it would preclude summary judgment; and why it has not
previously been obtained.  Pa. Dep't of Public Welfare v.
Sebelius, 674 F.3d 139, 157 (3d Cir. 2012) (citing Dowling v.
City of Phila., 855 F.2d 136, 139 (3d Cir. 1988)).  The Secretary
has not moved for summary judgment against F&M Trust.  The
affidavit submitted by attorney Timothy J. Nieman on behalf of
F&M Trust referred to documents in the DOL's possession, but does
not explain how the documents would preclude summary judgment on
the legal issues relevant to F&M Trust, or why the documents were
not previously obtained.[2]  Decl. of Timothy J. Nieman (ECF No.

---

[2] Mr. Nieman's affidavit does not dispute the plaintiff's
assertion that F&M Trust has not sent any discovery requests to
the Department of Labor.  See Decl. of Linda M. Henry ¶ 2 (ECF
No. 297-1).

283).

Thus, except where the defendants countered the Secretary's factual recitation with citations to the record, the Court considered any properly supported facts undisputed for the purposes of the motion pursuant to its discretion under Federal Rule of Civil Procedure 56(e)(2).  The Court now sets forth those facts.

II.  Factual Background[3]

A.  The REAL VEBA Employee Benefit Arrangement

Defendant John J. Koresko ("Koresko") and his brother, Lawrence Koresko, run a loose, unincorporated association of unrelated employers called the Regional Employers Assurance Leagues ("REAL").  The REAL offers a program of employee welfare benefits, including death benefits, to employers through the Regional Employers Assurance Leagues Voluntary Employees' Beneficiary Association ("REAL VEBA") Trust, a multiple employer trust.  Koresko and his brother sign documents and take actions on behalf of the REAL, which is neither an actual business entity nor a corporation.  Koresko also wrote the plan and trust documents for the death benefit arrangement and the REAL VEBA Trust.  Koresko Dep. 85-86 (Aug. 25, 2009) (GX 10); Koresko Aff.

_____

[3] For ease of reference, the Court will cite the DOL's exhibits as "GX" and the Koresko Defendants' exhibits as "DX."

5

¶¶ 3, 4, 5 (May 4, 2004) (GX 4); Master Trust Agreement, Whereas Cl. (GX 11).

Employers execute an adoption agreement in order to join the REAL. In doing so, they indicate their agreement to adopt the REAL VEBA "Plan" and subscribe to the REAL VEBA Trust. The adoption agreement allows employers to select the type and amount of benefits offered, and to set eligibility requirements. Eligible employees of adopting employers may then sign participation agreements to participate in the benefit arrangement. See, e.g., Castellano Adoption Agreement (GX 44); Castellano Participation Agreements (GX 46).

The REAL VEBA Plan Document ("Plan Document"), which governs the benefit arrangement, states that each adopting employer "shall in a timely manner contribute to the Trustee all amounts . . . necessary to provide all Benefits." Plan Document § 4.01(a)(1) (GX 14). Employer contributions are received into the REAL VEBA Trust to be held for the benefit of all employees covered in the arrangement. The Plan Document also permits the trustee to use employer contributions to purchase insurance policies on the lives of participating employees to fund the benefits. Master Trust Agreement Whereas Cl., § 4.2 (GX 11); Plan Document § 7.05(a) (GX 14). The benefits are paid according to the terms of each employer's Adoption Agreement and the Plan Document, and out of proceeds from these insurance contracts as

6

well as other funds held by the trustee for the payment of
benefits.  Bonney Aff. ¶¶ 11, 24 (July 16, 2009) (GX 17); Plan
Document §§ 5.04, 7.05(a) (GX 14).

      The REAL VEBA Master Trust Agreement ("Master Trust
Agreement") provides that the plan administrator shall perform
separate accounting of the balances in the entire REAL VEBA Trust
allocable to employees of each adopting employer.  But the
agreement also states that separate accounting "shall not operate
to prevent any portion of the Trust Fund from being available for
the payment of any claim arising under the Plan."  Master Trust
Agreement § 4.4 (GX 11).  See also Cetylite Summary Plan
Description 5 (GX 35) ("Under the terms of the Plan, all assets
of the Trust are available to pay all claims that are presented
to the Trustee.  This means that money contributed to the Plan by
the Employer could be used to pay benefits of employees other
than those of the Employer.").  At the same time, under the Plan
Document, benefits shall not be payable to any participant or
beneficiary until the amount payable under the insurance policy
that funds the benefit is received by the REAL VEBA Trust.  Plan
Document § 7.05(g) (GX 14).

      The Plan Document provides that each adopting employer
shall appoint a "Committee," which determines the beneficiaries
to whom benefit payments are made, computes the amount of the
benefits, and directs the trustee to pay benefits from the trust

fund, among other responsibilities.  However, the Plan Document
also specifies that if an employer names a plan administrator in
its adoption agreement, the administrator "shall assume and
perform all and each and every [] duty and responsibility to the
Committee," and that the term "Committee" in the Plan Document
shall include the administrator.  Plan Document §§ 5.05, 5.06,
6.01, 6.03 (GX 14).

     B.   <u>The Parties</u>

     PennMont is a Pennsylvania corporation that performs
plan administrative services for the REAL VEBA Trust, but has no
employees or physical assets of its own.  Its work was and is
performed by employees of the Koresko law firms, Koresko &
Associates, P.C. ("KAPC"), and Koresko Law Firm, P.C. ("KLF").
PennMont maintains corporate offices at the same address as KAPC
and KLF, functions like a division thereof, and operates on the
premises thereof.  9/9/09 Tr. of Prelim. Injunction Hr'g 39-42
(GX 7); Bonney Dep. 95-96 (Aug. 19, 2009) (GX 8); Koresko Aff. ¶¶
13-16 (May 4, 2004) (GX 4); DOL Stmt. ¶ 5; Koresko Stmt. Resp. ¶
5.

     John Koresko, a lawyer and certified public accountant,
is the president of PennMont.  He is also the sole shareholder of
his law firms, KAPC and KLF.  Jeanne Bonney was an employee of

both KAPC and KLF and served as counsel to PennMont.[4]  See Pa.
Dep't of State Filing (GX 1); Koresko Aff. ¶¶ 1, 13 (May 4, 2004)
(GX 4); 9/9/09 Tr. of Prelim. Injunction Hr'g 39-40 (GX 7);
Bonney Aff. ¶ 1 (July 16, 2009) (GX 17).

        In March 2002, Community Trust Company ("CTC") became
trustee of the REAL VEBA Trust.  Subsequently, Farmers &
Merchants Trust Co. of Chambersburg ("F&M Trust") became the
trustee after merging with CTC on November 30, 2008.  F&M Trust
remained the trustee until January 15, 2011, when Judge Jones
signed an order in this case discharging F&M Trust, and
permitting Penn Public Trust ("PPT") to become the trustee.
Master Trust Agreement § 1.6 (GX 11); 7/17/09 TRO Hr'g Tr. 12-13
(GX 12); ECF No. 195 ¶¶ 3-4.

         John Koresko is the director, secretary treasurer,
president, and counsel of the current REAL VEBA trustee, PPT.  He
manages PPT and directs all of its operations.  PPT has no
employees of its own; employees of the Koresko law firms perform
PPT's operations.  See Koresko Dep. 40-42, 45-48 (Aug. 25, 2009)
(GX 10).


        C.   The Decor Plan, the Cetylite Plan, and the Castellano
             Plan

        Decor Coordinates, Inc. ("Decor"), Cetylite Industries,

_____

        [4] Ms. Bonney is now ill and unable to participate
meaningfully in the case.  ECF No. 270.

Inc. ("Cetylite"), and Domenic M. Castellano, D.D.S., P.A. (the "Castellano Dental Practice") are among the many employers that adopted the benefit arrangement offered by the REAL VEBA Trust, or its predecessors.[5]  Representatives from Decor, Cetylite, and the Castellano Dental Practice executed REAL VEBA adoption agreements in November 1994, December 1994, and July 1998, respectively.  Decor Adoption Agreement (GX 9); Cetylite Adoption Agreement (GX 33); Castellano Adoption Agreement (GX 44).

        The Adoption Agreements stated that the plan names would be the Decor Coordinates Inc. Health and Welfare Benefit Plan, the Cetylite Industries Inc. Health and Welfare Benefit Plan, and the Domenic M. Castellano, D.D.S. P.A. Health and Welfare Benefit Plan.  Each agreement named PennMont as the plan administrator, provided death benefits to eligible employees, and did not require participant contributions.  Each Adoption Agreement also defined the death benefit as calculated based on a set multiple of the participating employee's salary.  Decor

---

        [5] The parties appear to agree that the Delaware Valley League of Merchants VEBA was the predecessor to the REAL VEBA. See 9/2/09 Tr. of Prelim. Injunction Hr'g 28; 9/8/09 Tr. of Prelim. Injunction Hr'g 14; see also 9/9/09 Tr. of Prelim. Injunction Hr'g 41.
        Decor initially signed an agreement to join the Southeast League of Merchants VEBA, and Cetylite to join the Delaware Valley League of Manufacturers VEBA.  Decor and Cetylite then each later signed agreements to become party to the REAL VEBA Trust.  Decor Waiver & Consent (GX 15); Cetylite Amendment (GX 34).  The Delaware Valley League of Manufacturers VEBA no longer functions.  Koresko Aff. ¶ 25 (GX 4).

Adoption Agreement §§ 2(a), 2(c), 4(a), 5(c) (GX 9); Cetylite Adoption Agreement §§ 2(a), 2(c), 4(a), 5(c) (GX 33); Castellano Adoption Agreement §§ 2(a), 2(c), 4, 5(c) (GX 44).

Each employer then subsequently made contributions into the REAL VEBA Trust on behalf of its participating employees. In 1995, 2000, and 2001, Decor wrote checks in the amounts of $100,000, $80,000, and $50,000 to the then REAL VEBA Trustee "f/b/o Decor Coordinates Inc. W.B.P." At least two Decor employees that did not own any portion of the company were listed in an inventory of insurance coverage sent from PennMont to Decor's president, Angelo Ferraro. See Decor Checks (GX 16); Ltr. from Jeanne Bonney to Angelo Ferraro (Nov. 15, 2001) (GX 18).

Cetylite sent multiple checks from 2000 through 2003 for payment into the master trust. Approximately 30 employees participated in Cetylite's arrangement with the REAL VEBA Trust. Cetylite Checks (GX 37); 9/3/09 Tr. of Prelim. Injunction Hr'g 5-6 (GX 36).

PennMont acknowledged receipt of at least one contribution check from the Castellano Dental Practice and indicated that future remittances should remain payable to the then trustee of the REAL VEBA Trust, "f/b/o Domenic M. Castellano, D.D.S., P.A. Welfare Benefit Plan." Castellano Dental Practice employees Mary Lee Harper and Alison Acco each

11

signed employee agreements to participate in the REAL VEBA Trust. Records obtained from PennMont reflect insurance policies from CNA Life for these two employees.  Ltr. from Jeanne Bonney to Dr. Castellano (July 16, 1998) (GX 45); GX 46 at 1, 2, 10.

D.   The Alleged Fiduciary Violations

The alleged fiduciary violations by the Koresko Defendants follow the same general pattern for each of the Plans. Life insurance policies were taken out on the lives of participating employees from Decor, Cetylite, and the Castellano Dental Practice.  Following the deaths of these employees, proceeds from the insurance policies were paid to the REAL VEBA trustee, who transferred them into a business high performance money market account held by John Koresko and Jeanne Bonney. CTC, the then-trustee of the REAL VEBA Trust, was not the account holder on these accounts.  PennMont paid a certain amount of benefits to the intended beneficiary in its discretion as plan administrator.  Most of the remaining policy proceeds were then transferred to the "Koresko Law Firm Death Benefit Escrow Account."  The Court outlines these actions in more detail below.

1.   Insurance Proceeds Paid on the Life of Decor
     Employee Angelo T. Ferraro

In 1995, the United of Omaha Life Insurance Company issued a $2,500,000 life insurance policy on the life of Decor

employee Angelo T. Ferraro.  The insurance policy named "Commerce Bank, N.A., Trustee for Decor Coordinates, Inc. W.B.P." as the beneficiary and "Commerce Bank, N.A., Trustee" as the owner, with a listed address of "c/o Penn-Mont Benefit Svc."  In 1997, policy ownership was assigned to "Corestates Bank, N.A., Trustee f/b/o Decor Coordinates W.B.P.," which also became the new beneficiary.[6] United of Omaha Pol'y (GX 20).

In 2001, Mr. Ferraro signed a beneficiary nomination form naming "The Trustee of the Ferraro Family Trust Dated April 26, 2001" as the beneficiary of any death benefits payable as a result of his participation in the Decor Plan.  In January 2002, Mr. Ferraro died.  After Mr. Ferraro's death, the Ferraro Family Trust submitted a REAL VEBA death benefit claim form to PennMont. Ferraro Beneficiary Nomination Form (GX 19); Ferraro Death Benefit Claim Form (GX 21).

On or about May 8, 2002, United of Omaha issued a check payable to "Community Trust Comp., Trustee" in the amount of $2,515,890.41, representing the proceeds from the policy that insured Mr. Ferraro.  Later that month, PennMont deposited this check into a Commerce Bank account named the "Commerce Bank FBO

---

[6] It is the Court's understanding that Commerce Bank, N.A. and Corestates Bank, N.A. were trustees of the REAL VEBA Trust prior to CTC.  See Decor Waiver & Consent (GX 15) (mentioning Corestates Bank, N.A. as trustee); Cetylite Amendment (GX 34) (mentioning Commerce Bank, N.A. as trustee); Castellano Adoption Agreement § 11 (GX 44) (mentioning Corestates Bank, N.A. as trustee).

REAL VEBA Trust, Community Trust Company Trustee," with Account
No. Xxxxxx1638 ("CTC Trust Account").  DOL Stmt. ¶¶ 20, 21;
Koresko Stmt. Resp. ¶¶ 20, 21; United of Omaha Check (GX 22);
PennMont Record and Deposit Ticket (GX 23).

　　　　In November 2002, Koresko and Bonney opened a new
business high performing money market account, No. Xxxxxxxxx5890,
with First Union National Bank ("Ferraro FUNB Account").[7]  The
account application listed Koresko and Bonney as trustees and
authorized signatories.  The account holders for the Ferraro FUNB
Account were "Ferraro Death Benefit Trust," "John J. Koresko
Trustee" and "Jeanne D. Bonney Trustee."  Account Application (GX
24); FUNB Account Statement (GX 25).

　　　　The Ferraro FUNB Account bank statement reflects that
on or about November 14, 2002, CTC transferred $2,513,194.58 from
Commerce Bank to the Ferraro FUNB Account.  The bank statement
recording this transfer referenced "EMPL DECOR COOR."  FUNB
Account Statement (GX 25).  On or about November 18, 2002,
shortly after opening the Ferraro FUNB Account, Jeanne Bonney
issued a check in the amount of $2,027,723.94 from the Ferraro
FUNB Account to the "Ferraro Family Trust dated 4/26/01."  Bonney
mailed the check to counsel for Mr. Ferraro's family.  Ferraro
Death Benefit Claim Form (GX 21); Ltr. and Check from Jeanne

---

[7] First Union National Bank became Wachovia Bank.  <u>See</u>
Account Application (GX 24).

Bonney to Phillip Forbes (GX 26).  On December 31, 2004, Koresko signed a check from the Ferraro FUNB Account for $494,166.53, payable to "Koresko Law Firm - Death Benefit Escrow Account." The cancelled check bears the endorsement "For Deposit Only xxxxx6507 Koresko Law Firm."  GX 28.

Two more checks issued from the Ferraro FUNB Account: (1) a check for $1,213.35 to the U.S. Treasury dated April 14, 2004, and (2) a check for $3,041.48 to "Commerce Bank" dated March 10, 2006, which endorsement stated "xxxxx8992."  At the time, Koresko and Bonney held a bank account in the name of "Angermeier Death Benefit Trust" with the account number xxxxx8992 (hereinafter the "Angermeier Account").  A Ferraro FUNB Account statement covering the period April 29, 2006 through May 31, 2006 showed a balance of zero dollars.  GX 29; GX 30; GX 31; Account Statement (GX 32).

2. Insurance Proceeds Paid on the Life of Cetylite Employee Dale A. Kelling

In 1995, the First Colony Life Insurance Company issued a $1,020,000 life insurance policy on the life of Cetylite employee Dale A. Kelling.  The policy named "Trustee of the DE Valley League of Manufacturers Trust Under Trust Agreement dated 9/1/92" as the owner and beneficiary of the policy.  In 1997, policy ownership was changed to "Corestates Bank, N.A., Trustee c/o Penn-Mont Benefit Services," which also became the new

15

beneficiary.  First Colony Pol'y (GX 38).

In 1995, Mr. Kelling executed a beneficiary nomination form naming his wife, Linda Kelling, as the beneficiary of any death benefits payable from his participation in the Cetylite Plan.  Mr. Kelling died in June 2003.  After Mr. Kelling's death, his wife submitted a REAL VEBA death benefit claim form to PennMont.  Kelling Beneficiary Nomination Form (GX 39); Kelling Death Benefit Claim Form (GX 40).

In August 2003, First Colony Life Insurance Company wrote a check for $1,027,374.00, payable to the "Regional Employers Assurnce League Trst [sic] DTD 3/20/95 RESTATED 3/18/02."  Shortly afterwards, PennMont employee Maggie Carroll submitted a premium payment request to the then REAL VEBA trustee: "Please cause the REAL VEBA Trustee to prepare payment as follows: . . . Kelling Family Death Benefit Trust $1,027,374.00."  The payment request directed payment to be sent to PennMont's offices.  GX 41; REAL VEBA Premium Payment Request (GX 42 at 6); GX 43.

A business high performance money market account with account number xxxxxxxx1675 was opened at Wachovia Bank, N.A., in the name of the "Kellig Gamily [sic] Death Benefit Trust" (hereinafter the "Wachovia Kelling Account").  Koresko and Bonney were listed as account holders and trustees.  GX 42 at 8.  On September 8, 2003, CTC, the REAL VEBA Trust trustee, issued a

check in the amount of $1,027,374.00 payable to "Kelling Family Death Benefit Trust."  The check was deposited into the Wachovia Kelling Account held by Koresko and Bonney.  See GX 42 at 4, 8.

On October 24, 2003, Jeanne Bonney sent a letter to Linda Kelling, attaching a check from the Wachovia Kelling Account for $812,681.70, payable to Linda Kelling.  GX 42 at 9-10.  On December 31, 2004, Koresko signed a check drawn on the Wachovia Kelling Account for $216,115.61 payable to "Koresko Law Firm - Death Benefit Escrow Account."  The cancelled check bears the endorsement: "For Deposit Only xxxxxx6507 Koresko Law Firm." GX 42 at 13.

Two more checks issued from the Wachovia Kelling Account: (1) a check for $236.18 to the U.S. Treasury, and (2) a check for $2,786.87 to "Commerce Bank," which endorsement indicated deposit to account number "xxxxx8992."  The -8992 account number corresponded to that of the aforementioned Angermeier Account held by Koresko and Bonney.  A Wachovia Kelling Account bank statement covering the period March 1, 2006 through March 31, 2006 showed a balance of zero dollars by the end of the period.  GX 31; GX 42 at 16, 19, 20.

> 3.   Insurance Proceeds Paid on the Life of Castellano
>       Dental Practice Employee Domenic M. Castellano

In 1995, Dr. Domenic M. Castellano, an employee of the Castellano Dental Practice, applied for a $750,000 life insurance

policy from Chubb Life Insurance Company.  The application named
"Corestates Bank, N.A., Trustee f/b/o Dominic Castellano, D.D.S.,
W.B.P." as owner and beneficiary of the policy, with "Pennmont
Benefit Svcs." listed under owner address.  The insurance company
- subsequently renamed Jefferson Pilot Financial Insurance
Company - issued the applied-for policy on Dr. Castellano's life
in 1997.  Castellano Application (GX 47); Jefferson Pilot Pol'y
(GX 48).

Dr. Castellano executed a beneficiary nomination form
naming his spouse, Gretchen Hutto Castellano, as the beneficiary
of any death benefits payable from his participation in the
Castellano Plan.  Following the death of Dr. Castellano, a
dispute developed between PennMont and Mrs. Gretchen Castellano
regarding the payment of her benefit claim, which ultimately
resulted in a lawsuit pending in this Court.  Castellano
Beneficiary Nomination (GX 49); <u>REAL VEBA et al. v. Castellano</u>,
Case No. 2:03-cv-06903-MAM.

Koresko and Bonney opened a new business high
performance money market account at Wachovia Bank in the name of
"Castellano Death Benefit Trust" and with the account number
xxxxxxxxx9604 (the "Wachovia Castellano Account").  The deposit
account application lists Koresko and Bonney as trustees and
authorized signatories.  GX 50.

On July 9, 2003, the Jefferson Pilot Financial

Insurance Company issued a check for $751,266.18 to the order of "REAL VEBA TRUST DTD 3/20/95, Jeanne Bonney as Trustee."  The check indicated that it related to "Insured: Domenic M. Castellano."  The endorsement on the cancelled check indicates that the check was deposited into the Wachovia Castellano Account.  GX 51.

On July 21, 2003, $751,266.18 was transferred from the Wachovia Castellano Account to the CTC Trust Account.  The same amount was then redeposited back to the Wachovia Castellano Account the following day by CTC.  GX 52; GX 53.

Subsequently, Koresko signed a check from the Wachovia Castellano Account for $759,112.98, payable to "Koresko Law Firm - Death Benefit Escrow Account."  That check was negotiated and the endorsement on the check states "For Deposit Only xxxxx6507 Koresko Law Firm."  GX 54.  Two more checks issued from the Wachovia Castellano Account: (1) a check for $189.02 to the U.S. Treasury, and (2) a check for $3,318.72 to "Commerce Bank," which endorsement indicated deposit to account number "xxxxx8992."  The -8992 account number corresponded to that of the aforementioned Angermeier Account held by Koresko and Bonney.  GX 31; GX 55.

## III. Threshold Questions

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee

benefit plans." <u>Edwards v. A.H. Cornell & Son, Inc.</u>, 610 F.3d
217, 220 (3d Cir. 2010) (citing <u>Shaw v. Delta Air Lines, Inc.</u>,
463 U.S. 85, 90 (1983)).  Title I of ERISA covers "employee
benefit plan[s]," of which there are two types: employee pension
benefit plans or employee welfare benefit plans (hereinafter
"EWBPs").  ERISA Section 3(3), 29 U.S.C. § 1002(3); ERISA Section
4(a), 29 U.S.C. § 1003(a).

      ERISA imposes strict participation, vesting, and
funding requirements for pension plans, but exempts welfare plans
from those regulations.  ERISA Section 201, 29 U.S.C. § 1051
(excepting welfare plans from provisions dealing with
participation and vesting); ERISA Section 301, 29 U.S.C. § 1081
(excepting welfare plans from provisions dealing with funding).
However, both pension and welfare plans are generally subject to
ERISA's uniform rules concerning reporting, disclosure, and
fiduciary responsibility.  <u>Edwards</u>, 610 F.3d at 220; <u>Deibler v.
Local Union 23</u>, 973 F.2d 206, 209 (3d Cir. 1992).

      The Secretary's motion presents two threshold
questions: (1) First, whether and to what extent ERISA covers the
REAL VEBA or the Plans at issue; and (2) Second, whether ERISA's
fiduciary responsibility provisions apply and, if so, what
fiduciary duties the Koresko Defendants had with respect to the
Plans.  The Court considers each question below.[8]

_____

      [8] Defendant F&M Trust raised a statute of limitations
argument in opposition to summary judgment.  However, because the

A.   <u>ERISA Coverage</u>

The Court finds that the master REAL VEBA Trust is not an employee welfare benefit plan ("EWBP") as defined in ERISA, but that the Cetylite, Decor, and Castellano Plans are.

ERISA defines an EWBP as: (1) any "plan, fund, or program" (2) "established or maintained" (3) by an "employer or by an employee organization, or by both" (4) for the purpose of providing various benefits, including death benefits (5) for its participants or their beneficiaries.[9]  ERISA Section 3(1), 29 U.S.C. § 1002(1).  The Court understands the parties' dispute to center around the first two elements - that is, whether Cetylite, Decor, and the Castellano Dental Practice "established or maintained" a "plan, fund, or program."

ERISA does not define "plan, fund, or program." Whether a plan exists within the meaning of ERISA is "a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." <u>Deibler v. Local Union 23</u>, 973 F.2d 206, 209 (3d Cir. 1992) (citing <u>Wickman v. Nw. Nat'l. Ins. Co.</u>, 908 F.2d 1077, 1082 (1st

---

Secretary did not move for summary judgment against F&M Trust, and the Koresko Defendants did not raise the argument, the Court does not consider it for the purposes of this motion.

[9] ERISA also exempts from coverage five enumerated categories of employee benefit plans under ERISA Section 4(b), 29 U.S.C. § 1003(b).  However, the defendants do not contend that any of these exemptions apply.

Cir. 1990)).  The prevailing standard for determining the existence of a plan was set forth by the Eleventh Circuit in Donovan v. Dillingham, 688 F.2d 1367 (11th Cir. 1982).  The Donovan standard, since applied by the Third Circuit, provides that an ERISA plan exists if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."  Gruber v. Hubbard Bert Karle Weber, Inc., 159 F.3d 780, 789 (3d Cir. 1998) (emphasis added) (citing Deibler v. Local Union 23, 973 F.2d 206, 209 (3d Cir. 1992)).

The "established or maintained" element seeks to ascertain whether the plan is part of an employment relationship by looking at the degree of participation by the employer in the establishment or maintenance of the plan.  See Peckham v. Gem State Mut., 964 F.2d 1043, 1049 (10th Cir. 1992).  "[N]o single act in itself necessarily constitutes the establishment of the plan, fund or program."  Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982).  The decision to extend benefits, for example, is not itself the establishment of a plan or program. See id. at 1373.

Nevertheless, "[a]n employer . . . can establish an ERISA plan rather easily."  Gruber, 159 F.3d at 789 (citation omitted).  An employer's payment of insurance premiums is substantial evidence of the existence of an ERISA-covered plan.

See id. (citing Robinson v. Linomaz, 58 F.3d 365, 368 (8th Cir. 1995)).  The Third Circuit has also stated that the crucial factor in determining whether a plan has been established or maintained is whether the employer expressed an intention to provide benefits on a regular and long-term basis, and that it does not matter whether the employer did so by purchasing insurance or by subscribing to a multiple employer trust. Deibler, 973 F.2d at 209; Gruber, 159 F.3d at 789.

### 1.   The REAL VEBA Trust

It is undisputed that the REAL VEBA Trust - that is, the master multiple employer trust into which all the employer contributions are deposited - is not itself an employee welfare benefit plan as defined in ERISA.  The Third Circuit has held that there are two broad requirements for a multiple employer plan to constitute an EWBP.  Gruber, 159 F.3d at 787.  First, the group of employers that establishes and maintains the plan must be a "bona fide" association of employers tied by a common economic or representation interest, unrelated to the provision of benefits.  Second, the employer-members of the organization that sponsors the plan must exercise control, either directly or indirectly, both in form and in substance, over the plan.  Id.

At the very least, the employer members of the REAL lack commonality of interest apart from the provision of benefits

to their employees.  Thus, under Third Circuit case law, the REAL
VEBA Trust is not an ERISA-covered EWBP.[10]


    2.  Single-Employer EWBPs

        Nevertheless, the Secretary has established that the
Cetylite, Decor, and Castellano Plans are single-employer EWBPs
covered by ERISA.  In Gruber, the Court of Appeals for the Third
Circuit recognized that individual employer members of a program
sponsored by an association that is not itself an "employer" or
"employee organization" may yet establish a single employer
welfare benefit plan covered by ERISA.  See 159 F.3d at 786, 787,
789-90.  This view is consistent with prior Department of Labor
advisory opinions.  See, e.g., DOL Advisory Op. No. 96-25A, 1996
WL 634362, at *3 (Oct. 31, 1996); DOL Advisory Op. No. 82-57A,
1982 WL 21240, at *2 (Nov. 2, 1982).

        The Cetylite, Decor, and Castellano Plans qualify as
"plans, funds, or programs" under the Donovan criteria.  First, a
reasonable person would determine that the intended benefits are
death benefits, and that the class of beneficiaries includes each

_____

        [10] It is unclear to the Court whether a "REAL VEBA Plan"
exists.  The adoption agreements that employers sign to join the
REAL VEBA state that the employer "adopts the Voluntary
Employees' Beneficiary Association Health and Welfare Plan and
its companion Trust sponsored by the [REAL]."  See, e.g., Decor
Adoption Agreement (GX 9).  To the extent there is a REAL VEBA
Plan at the multiple-employer level, it is not an EWBP under
ERISA for the same reasons that the REAL VEBA Trust is not an
EWBP.

eligible employees of the employers that sign participation agreements.  Second, a reasonable person would determine that the financing for the Plans comes from the REAL VEBA Trust, as reinsured through the purchase of life insurance policies on the lives of participating employees.  Lastly, a reasonable person would determine that to receive benefits, beneficiaries must apply to the plan administrator, PennMont, upon the death of the insured.[11]

That the Plans are ERISA EWBPs finds further support in Gruber's instruction that an employer's payment of insurance premiums is substantial evidence of the existence of an ERISA-covered plan.  See Gruber, 159 F.3d at 789; see also Sipma v. Mass. Cas. Ins. Co., 256 F.3d 1006, 1012 (10th Cir. 2001) (payment of premiums is substantial evidence that a plan has been established).  The facts set forth above show that Decor, Cetylite, and the Castellano Dental Practice each made monetary contributions on behalf of their employees to the REAL VEBA Trust, and that some or all of those contributions were used to purchase life insurance policies on the lives of participating employees that then funded the death benefits.  This fact is substantial evidence that these three employers established or maintained EWBPs covered by ERISA.

---

[11]   The fact that a program allows for the exercise of discretion does not disqualify it as a plan within the scope of ERISA.  Deibler, 973 F.2d at 210 n.6.

It is important to note that the Gruber court rejected the argument that the employers were not paying insurance premiums because they were not paying money directly to an insurer.  In Gruber, individual employers made contributions to a trustee account, and a trustee then disbursed the pooled contributions to pay eligible medical expenses pursuant to the trust documents.  159 F.3d at 789.  In this case, the organizational structure contains one additional level of complexity.  Instead of paying benefits directly from contributions pooled from multiple employers, the REAL VEBA trustee reinsures the trust's obligations by using employer contributions to purchase life insurance policies on the lives of participating employees that name the REAL VEBA trustee as the beneficiary.  When the employee dies, the insurance company pays the REAL VEBA trustee, and death benefits may then be paid out to the participants' beneficiaries in accordance with the Plan Document.  The additional layer of complexity in the REAL VEBA benefit arrangement does not strike the Court as changing the crucial factor in the Gruber analysis - that is, whether the employers expressed an intention to provide benefits on a regular and long-term basis.  Cf. Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc., 805 F.2d 732 (7th Cir. 1986).  It merely alters the risk profile for the funding trust.

Finally, the Court notes that its conclusion - at

least with respect to the Cetylite Plan - is consistent with and supported by the Summary Plan Description that was made available to the employee participants.  The Cetylite Summary Plan Description flatly states that the Cetylite Plan "is covered by the Employee Retirement Income Security Act of 1974 ('ERISA') which was designed to protect employees' rights under benefit plans."  Cetylite Summary Plan Description § 13 (GX 35).  The document then explains that ERISA imposes duties upon people who are responsible for operations of the plan, and that these fiduciaries have a duty to act in the best interest of participants and their beneficiaries.  Id.  Although statements in summary documents do not constitute the terms of an ERISA plan,[12] here they provide evidence of the plan's existence and its coverage under ERISA.  See Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir. 1990) (distribution of a handbook containing a listing of ERISA rights and summary plan description is "strong evidence that the employer has adopted an ERISA regulated plan").

The Koresko Defendants contend that fact issues regarding whether employers engaged in administrative activities preclude summary judgment.  See Koresko Opp. 22-24.  They rely

---

[12] See CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011).

mainly on two cases in support of their argument.[13]  Neither
controls the outcome here.

The Koresko Defendants cite a Fifth Circuit case that
states that ERISA does not regulate "bare purchases of . . .
insurance where . . . the purchasing employer neither directly
nor indirectly owns, controls, administers or assumes
responsibility for the policy or its benefits."  <u>Taggart Corp. v.
Life & Health Benefits Admin., Inc.</u>, 617 F.2d 1208 (5th Cir
1980).  First, the Eleventh Circuit in <u>Donovan</u> expressly rejected
the implication from <u>Taggart</u> that an employer that only purchases
insurance or subscribes to a multiple employer trust cannot be
said to have established an EWBP.  <u>See Donovan</u>, 688 F.2d at 1375.
The Third Circuit applies the <u>Donovan</u> standard of what
constitutes a "plan."[14]  <u>See Deibler</u>, 973 F.2d at 209; <u>Gruber</u>, 159
F.3d at 789.  Second, although the Fifth Circuit did not itself
reject the holding of <u>Taggart</u> outright, it later agreed with
<u>Donovan</u> that while the purchase of insurance does not
conclusively establish a plan under ERISA, it is substantial

---

[13] The Koresko Defendants also cite <u>Donovan</u> for the
proposition that there must be evidence that the employer
purchased benefits for a substantial percentage of a class of
employees or members.  Koresko Opp. 21.  <u>Donovan</u> instituted no
such requirement.  <u>See</u> 688 F.2d at 1374-75.  Rather, the cited
passage from <u>Donovan</u> merely discussed an example of circumstances
that qualify as establishment of an ERISA plan.

[14] The Eleventh Circuit was bound by <u>Taggart</u> unless an en
banc or Supreme Court decision subsequently considered the issue.
<u>See Donovan</u>, 688 F.2d at 1370 n.3.

evidence of the establishment of one.  See Mem. Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 242-43 (5th Cir. 1990).

The Koresko Defendants also rely on Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987), for the proposition that ERISA is not implicated when an employer's obligation to pay a benefit is predicated on the occurrence of a single contingency that may never materialize.  The issue in Fort Halifax was whether ERISA preempted a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing.  The Supreme Court held that the Maine statute was not preempted because it did not establish or require employers to establish an employee benefit plan.  The Fort Halifax Court reasoned that there was no employee benefit plan because the employer:

> assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize . . . . The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

Id. at 12.

First, Fort Halifax itself recognizes that arrangements to provide death benefits can qualify as ERISA plans because "[w]hile death benefits may represent a one-time payment from the perspective of the beneficiaries, the employer clearly foresees

29

the need to make regular payments to survivors on an ongoing basis." Id. at 14.

Second, Koresko interprets Fort Halifax too broadly. This Court does not read Fort Halifax to stand for the proposition that the employer itself must be the one responsible for the ongoing administrative program in order to establish an employee benefit plan.  The lack of employer involvement in ongoing administration does not establish the absence of an ERISA plan.  See, e.g., Randol v. Mid-West Nat'l Life Ins. Co., 987 F.2d 1547, 1550 n.5 (11th Cir. 1993) (stating that there is no requirement that the employer play any role in administering the plan in order for it to be an ERISA EWBP); Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 417-18 (4th Cir. 1993) (finding an ERISA plan where company obtained group insurance policy, determined the benefits to be provided, negotiated policy terms, and paid for half of the costs, but was not otherwise involved in plan administration); Brundage-Peterson v. Compcare Health Servs. Ins. Corp., 877 F.2d 509, 509-10 (7th Cir. 1989) (finding that a "barebones plan" was an ERISA plan where employer contracted with two insurance companies to insure the employer's employees and paid the employees' share of insurance premiums).  This reading of Fort Halifax accords with the statutory definition of an EWBP, which uses the disjunctive "established or maintained" and does not include any requirement that the employer administer or

30

control the plan, fund, or program.  ERISA Section 3(1), 29

U.S.C. § 1002(1) (emphasis added).  Thus, <u>Fort Halifax</u> does not

exclude from ERISA coverage an arrangement where, as here,

employers face periodic demands on their assets in the form of

employer contributions, but designate responsibilities and pay

fees to an administrator, PennMont, to handle the processing of

claims and payment of death benefits.

Defendant F&M Trust raises one last argument: that

section 10.19 of the Plan Document raises a genuine issue of

material fact as to whether Cetylite, Decor, and the Castellano

Dental Practice created their own individual plans.  F&M Opp. 18-

19.  That provision states:

> The execution of an Adoption Agreement by a Participating
> Employer *shall not give rise to the creation of a new Plan*,
> but shall be construed as merely the adoption of a separate
> benefit structure under the League's Plan . . . .

Plan Document § 10.19 (GX 14) (emphasis added).  However, that

provision does not appear to be referring to a "plan" for the

purposes of ERISA.  Rather, the context of the provision suggests

that the language refers to the Internal Revenue Code and

accompanying regulations.  Because whether a plan is a single

plan for tax purposes has no bearing on whether the employers

formed an EWBP for the purposes of ERISA, the provision does not

suffice to raise a genuine issue of material fact about whether

the Plans are EWBPs under ERISA.

In sum, the Court finds that Cetylite, Decor, and the

31

Castellano Dental Practice each established or maintained a plan, fund, or program under the prevailing <u>Donovan</u> criteria.[15]

### 3. <u>Non-Owner Employees</u>

Federal regulations contain one additional requirement for a plan to be an "employee benefit plan" covered by Title I of ERISA.  Under 29 C.F.R. § 2510.3-3(b), the term "employee benefit plan" does not include any plan, fund or program, under which no employees are participants.  The regulation states that "[a]n individual and his or her spouse shall not be deemed to be employees with respect to a trade or business . . . which is wholly owned by the individual or by the individual and his or

---

[15] Although the Court does not decide the question of ERISA coverage on the basis of judicial estoppel, the Court notes that John Koresko successfully argued in <u>REAL VEBA Trust v. Sidney Charles Mkts., Inc.</u> that ERISA's arbitrary and capricious standard of review governed a similar or identical employee benefit arrangement.  <u>See</u> Pls.' Mem. Supp. Summ. J. 27 (Docket No. 55-2 in Case No. 01-cv-4693); <u>REAL VEBA Trust v. Sidney Charles Mkts., Inc.</u>, No. 01-4693, 2006 WL 2086761, at *2 (E.D. Pa. Sept. 26, 2005).  Koresko convinced Judge Sanchez that "[t]his Plan is a welfare benefits plan governed by ERISA" and to apply ERISA's arbitrary and capricious standard of review to PennMont's decision to deny death benefits to the beneficiary in that case.  <u>Id</u>.  The VEBA in <u>Sidney Charles</u> was the Delaware Valley League of Merchants VEBA, a predecessor to the REAL VEBA.  <u>See</u> <u>supra</u> note 5.  According to Judge Sanchez, the plan documents for both VEBAs are identical except for the names of the organizations.  <u>Sidney Charles</u>, 2006 WL 2086761, at *1 n.2.
Koresko argued to this Court that the <u>Sidney Charles</u> case was distinguishable because it involved a different trust arrangement and presented a different legal issue.  Tr. of Oral Argument 37-40.  The Court does not see how the issue of ERISA coverage differs between the two cases.

her spouse."  29 C.F.R. § 2510.3-3(c).  In other words, to be an EWBP covered by Title I of ERISA, the Plans must have at least one participant in the plan other than the owner or her spouse - that is, at least one "non-owner employee" ("NOE").  Yates v. Hendon, 541 U.S. 1, 21 (2004).

There is undisputed record evidence that each of the Plans at issue originally involved at least one participating non-owner employee.  Among the participants in the Decor Plan were Joseph Ferraro and Bruce Hall, who had life insurance policies for $520,000 and $604,500, respectively.  The Cetylite Plan covered approximately thirty employees.  Employees Mary Harper and Alison Acco signed participation agreements for the Castellano Plan in 1998 and 2001, respectively.  See 11/15/01 Ltr. from Jeanne Bonney to Angelo Ferraro, attachments (GX 18); Tr. of Prelim. Injunction Hr'g 5 (Sep't 3, 2009) (GX 36); Employee Participation Agreements (GX 46).

The Koresko Defendants argue that a purported July 29, 2009 Amendment executed by PennMont excluded any NOEs from the Plans.  That amendment states:

> No benefits shall be paid to or on account of any claimant, person, participant, or former participant . . . classified as a non-owner-employee, or to any beneficiary of any such NOE.

July 2009 Amendment, Part III (DX 1).  According to the Koresko Defendants, because the Plans no longer have any NOEs, they cannot be ERISA plans by operation of 29 C.F.R. § 2510.3-3(b),

33

even if they were previously ERISA plans.  Koresko Opp. 17.  The
Court agrees with the Secretary that the purported July 29, 2009
Amendment was not valid under the terms of the REAL VEBA Plan
Document, for two reasons.

  __First__, it appears that PennMont did not have authority
to amend the plan.  ERISA Section 402(b)(3), 29 U.S.C. §
1102(b)(3), states that every employee benefit plan shall
"provide a procedure for amending such plan, and for identifying
the persons who have authority to amend the plan."  Section 9.03
of the REAL VEBA Plan Document governs the procedure for
amendments to the Plan, and sets forth the actors with authority
to amend the plan.  It provides that _employers_ have the right to
"amend the Benefit structures in this Plan" and that "_[t]he
League_ shall have the right to amend this Plan, in its sole
discretion, from time to time . . . . Such amendments shall be
set forth in an instrument in writing executed by the amending
party.  An amendment may be current, retroactive or
prospective."[16]  Plan Document §§ 9.03(b), (c) (GX 14) (emphasis
added).  "The League" is not a defined term in the Plan Document,
but it is used elsewhere in the Plan Document to refer to the
REAL (the unincorporated association of employers run by John

---

[16] The Master Trust Agreement does not differ from the Plan
Document with respect to the authority for amendment.  That
agreement also states that "the League" may amend by notice in
writing to the trustee.  Master Trust Agreement § 9.1 (GX 11).

Koresko and his brother).

The purported July 29, 2009 Amendment was not signed by the REAL, but rather by PennMont, the plan administrator, through Koresko's brother.[17]  The signature page states that PennMont executed the amendment, and the signature line reads "Larry Koresko, Vice President."  July 2009 Amendment (DX 1).  John Koresko himself also signed the amendment:

> AS ATTORNEY IN FACT FOR ALL PARTICIPATING EMPLOYERS
> BY: John Koresko, V, President, PennMont Benefit Services, Inc.

Id.  There is a signature line for trustee F&M Trust (the successor to CTC) for "acknowledgment," but it is unsigned.  Id.

The Koresko Defendants have not pointed the Court to anything in the Plan Document giving the plan administrator authority to amend the plan, or defining the "League" as the "Administrator."  Nor do they assert that John Koresko signed the amendment under the employers' authority to amend the benefit structures of the Plans.

Section 6.03 of the Plan Document does permit the "Committee" to "make any amendments to the Plan (except with respect to contribution rates) *where necessary to meet the requirements of law or to protect the interests of the*

---

[17] The Court notes that the whereas clause of the July amendment quotes from Section 9.03 of the Plan Document as authority for the amendment, but replaces the word "League" with the "Administrator."  July 2009 Amendment (DX 1).

*Participants*."  Plan Document § 6.03(h) (GX 14) (emphasis added).
As a reminder, the Plan Document basically equates the
"Committee" with the plan administrator when, as here, a plan
administrator has been named.  <u>Id</u>. § 6.03.  However, the Koresko
Defendants have not argued that authority for PennMont to amend
stemmed from this provision.  Nor have they contended that the
July amendment was necessary to meet the requirements of law or
to protect the interests of the participants.

In any case, the amendment is invalid for a <u>second</u>
reason: the Plan Document limits the amendments that can be made
by specifying that "no amendment shall . . . [c]reate or effect
any discrimination in favor of Participants who are highly
compensated, who are officers or [sic] the Employer, or who are
stockholders of the Employer."  <u>Id</u>. § 9.03(c)(3); <u>cf</u>. <u>id</u>. §
3.01(b)(1) ("This Plan does not permit any condition for
Eligibility which would limit eligibility or benefits to
officers, shareholders, or highly compensated Employees.").
Eliminating non-owner employees from the arrangement all together
violates that prohibition.

In other words, even if John Koresko or PennMont had
authority to amend the Plan Document, the Plan Document
specifically prohibits amendments that create discrimination in
favor of highly compensated employees, or officers or
stockholders.  Therefore, the provision eliminating NOEs from

36

plan coverage flatly violates the Plan Document and is invalid.

Lastly, as a policy matter, it would be wholly contrary to the purposes of ERISA if ERISA-covered employee benefit plans could avoid subsequent enforcement of ERISA provisions that once applied by simply eliminating ERISA coverage by amendment.[18] Thus, the Court concludes that the employer-level Cetylite, Decor, and Castellano Plans are ERISA EWBPs because the July 29, 2009 purported amendment eliminating coverage for non-owner employees was invalid.

B.   Coverage of Fiduciary Responsibility Provisions: The "Top Hat" Exception

ERISA's provisions regulating fiduciary responsibility are located in Part 4 of Subtitle B of Title I.  ERISA Section 401, 29 U.S.C. § 1101, provides that these fiduciary responsibility provisions apply to any employee pension or welfare benefit plan, but with two exceptions.  The Koresko Defendants argue that one of these exceptions, the so-called "top hat" exception, applies and exempts the Plans from ERISA fiduciary responsibility provisions all together.

Top hat plans are (1) "unfunded" and (2) "maintained by

---

[18] John Koresko admitted at oral argument that one purpose of the July amendment, which he authored, was to avoid application of ERISA.  Tr. of Oral Argument 16-18; see also id. at 18 ("[O]bviously we were in Court on a bunch of legal issues, so why not amend the plan to get rid of the ERISA issues.").

an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."[19]   ERISA Section 401, 29 U.S.C. § 1101(a)(1).   Top hat plans are subject to ERISA's administrative and enforcement provisions, but not to substantive provisions that impose fiduciary duties.[20]   In re IT Grp., Inc., 448 F.3d 661, 664 (3d Cir. 2006); Kemmerer v. ICI Ams. Inc., 70 F.2d 281, 286 ("Top hat plans . . . which benefit only highly compensated executives, and largely exist as devices to defer taxes, do not require such scrutiny and are exempted from much of ERISA's regulatory scheme.").   As a result, there is no cause of action under ERISA for breach of fiduciary duty involving a top hat plan.   Goldstein v. Johnson & Johnson, 251 F.3d 433, 443 (3d Cir. 2001).

Although the Third Circuit has not itself addressed the

_____

[19] A deferred compensation plan is an agreement by the employer to pay compensation to employees at a future date.   The idea is to defer payment of taxes until retirement or termination of employment, when the employee is in a lower tax bracket.   In re IT Grp., Inc., 448 F.3d 661, 664 (3d Cir. 2006).

[20] By way of explanation, the Department of Labor has previously commented that Congress exempted these top hat plans from ERISA's substantive protections because it believed that unlike rank and file employees, management and highly compensated employees have sufficient bargaining power to negotiate favorable plans and are capable of taking the risks of such plans into account.   DOL Advisory Op. 90-14A, 1990 WL 123933, at *1-2 (May 8, 1990).   Participants in top hat plans can bring civil actions to recover benefits due or enforce the terms of their plans.   Kemmerer v. ICI Ams. Inc., 70 F.3d 281, 286-87 (3d Cir. 1995).

issue, most other courts have held that the burden of establishing the existence of a top hat plan rests on the party asserting that it is a top hat plan.  See, e.g., MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019, 1023 (D. Minn. 2010); In re New Century Holdings, Inc., 387 B.R. 95, 110 (Bankr. D. Del. 2008); Alexander v. Brigham & Women's Physicians Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006), aff'd, 513 F.3d 37 (1st Cir. 2008); In re IT Grp., Inc., 305 B.R. 402, 407 (Bankr. D. Del. 2004), order aff'd by In re IT Grp., Inc., 448 F.3d 661 (3d Cir. 2006).

The Court need not decide whether the Plans were maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees because the Court finds that the Plans were funded.[21]

The Court of Appeals for the Third Circuit recently set forth the two key factors in determining whether a plan is

---

[21] The Court notes that the Koresko Defendants' opposition briefing did not actually appear to argue affirmatively that the Plans constituted deferred compensation plans.  Rather, they appeared to be making an estoppel argument: that because the Internal Revenue Service has taken the position in its tax court litigation against REAL VEBA employers and employees that the REAL VEBA arrangement is a form of deferred compensation, the Court should hold the Secretary of Labor to that same position. Koresko Opp. 35-36.  However, since it is the party asserting the exception that bears the burden of establishing the existence of a top hat plan, the Court is not inclined to exempt the Plans from application of ERISA's fiduciary provisions solely on such grounds.

"funded" or "unfunded" under ERISA:

> (1) whether beneficiaries of the plan can look to a res
> separate from the general assets of the corporation to
> satisfy their claims;

> (2) whether beneficiaries of the plan have a legal right
> greater than that of general, unsecured creditors to the
> assets of the corporation or to some specific subset of
> corporate assets.

In re IT Grp., Inc., 448 F.3d 661, 669 (3d Cir. 2006).[22]  The two
factors essentially examine "two sides of the same coin."  Id. at
667.

In IT Group, the employer agreed to establish a
separate trust in connection with a deferred compensation plan,
and to transfer over to the trust such assets for the plan as it
determined in its discretion to be appropriate.  In actuality, no
funds were deposited into the trust.  Id. at 665-66, 669.  The
plan and trust documents explicitly stated that the "Plan
constitutes an unfunded plan" and that the establishment of the
separate trust would not affect the status of the plan as
unfunded.  In particular, the trust document explained that
assets contributed to the trust were held subject to the claims

---

[22] The Third Circuit also instructs that courts may consider
the plan's intended and actual tax treatment.  In re IT Grp.,
Inc., 448 F.3d 661, 669 (3d Cir. 2006).  The Koresko Defendants
spend a considerable portion of their opposition brief explaining
the tax motivation behind the REAL VEBA Trust.  However, the
Court does not now consider the Plans' tax treatment because the
tax treatment of the plans was - and remains, as far as the Court
is aware - the subject of litigation with the Internal Revenue
Service.  See 7/17/09 Tr. of TRO Hr'g 67.

of the employer's creditors in the event of insolvency.  Id. at 665-66.  The Third Circuit held that even if funds had actually been deposited into the segregated trust, the plan was unfunded.  The separate trust set up by the employer in IT Group was essentially a "rabbi trust," an irrevocable trust in which funds are held out of reach of the employer and separate from the employer's other assets, but subject to the claims of employer's creditors in the event of insolvency.  Id. at 665.

Here, the REAL VEBA Trust assets are separate and set aside from the general assets of the adopting employers.  But unlike in IT Group, there is no indication that the REAL VEBA Trust is a rabbi trust.  The Koresko Defendants have not pointed to any plan or trust provision rendering REAL VEBA Trust assets vulnerable to the claims of the creditors of adopting employers in the event of employer insolvency.

The Koresko Defendants counter that the death benefits promised to the beneficiaries are uncertain and unvested, and that the beneficiaries therefore have no legal right greater than that of general unsecured creditors to the assets of the REAL VEBA Trust.  In support, they cite plan provisions that confer absolute discretion on the plan administrator to designate the beneficiary to whom payment shall be made, the amount of payment, and that permit the trustee to pay benefits out of either insurance contracts or other funds held by the trustee.  Plan

41

Document §§ 5.04, 5.06(b), 6.03 (GX 14).

But whether the benefits are vested is not the relevant inquiry under In re IT Group.  Again, the inquiry is whether there are funds separate from the general assets of the corporation - that is, the employer - for the payment of plan benefits, and whether the beneficiaries have a legal right greater than that of the employer's general unsecured creditors to those assets.  448 F.3d at 667, 669.  Here, the corpus of the REAL VEBA Trust is the res separate from the general assets of the employer that beneficiaries look toward to satisfy their claims.  The provisions cited by the Koresko Defendants have no bearing on whether creditors of adopting employers can reach the assets of the REAL VEBA Trust in the event of the employers' insolvency.  The fact that the plan administrator has discretion to designate the beneficiary and determine the amount and source of benefit payments is irrelevant to the funding inquiry.

The Court's conclusion that the Plans are funded is bolstered by various provisions in the governing documents.  For example, the Plan Document states:

> [N]o benefit which is funded or intended to be funded by a policy or Contract shall be payable to any Participant or Beneficiary unless or until amount the [sic] payable under such policy or Contract is received by the Trust.  For purposes of this Plan and the Trust, *all benefits shall be deemed intended to be funded by a policy or Contract unless the Employer shall notify the Administrator or Trustee in writing of its election to the contrary.*

Plan Document § 7.05(g) (GX 14) (emphasis added).  Furthermore,

section 6.09 of the Plan Document states:

> Funding Policy and Procedures - The Employer and named
> Fiduciaries shall formulate policies, practices and
> procedures *to carry out the funding of the Plan* . . . .
> [They] shall from time to time accomplish the following:
> . . . .
> (c) Determine and project Benefit liabilities;
>
> (d) Make plans to satisfy the liquidity needs of the
> Plan
>
> (e) Consult with the Plan Actuary . . . or such other
> advisors as may be necessary, *to maintain minimum
> funding standards and assure the payment of Plan
> Benefits*.

Plan Document § 6.09 (GX 14) (emphasis added).  The insurance

policies that finance the benefits are owned by the REAL VEBA

trustee, and thus are not merely general assets of the employer.

Id. §§ 7.05(a), (f).

Thus, the Court concludes that the Plans were not

"unfunded" top hat plans exempt from ERISA's fiduciary

responsibility provisions.  Because the fiduciary responsibility

provisions apply to these Plans, the Court proceeds to analyze

whether the Koresko Defendants are fiduciaries with respect to

the Plans.

C.   Fiduciary Status

1.   ERISA Fiduciaries

ERISA defines "fiduciary" not in terms of formal

trusteeship, but in functional terms of control and authority

over the plan.  Srein v. Frankford Trust Co., 323 F.3d 214, 220

43

(3d Cir. 2003).  Under ERISA, even if a person[23] is not named as a fiduciary in plan documents, he or she may still be a fiduciary with respect to a plan to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises *any authority or control respecting management or disposition of its assets*,
> . . .
> (iii) he has *any discretionary authority or discretionary responsibility in the administration of such plan*.

ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) (emphasis added). The statutory definition thus requires that a fiduciary "must be someone acting in the capacity of manager, administrator, or financial advisor to a plan." Pegram v. Herdrich, 530 U.S. 211, 222 (2000) (internal quotations omitted); Bd. Of Trustees of Bricklayers and Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc., 237 F.3d 270, 272 (3d Cir. 2001).

Discretion is a prerequisite to fiduciary status for a person generally managing an ERISA plan under the first clause of subsection (i) or administrating a plan under subsection (iii). However, under the second clause of subsection (i), any control over the disposition of "plan assets" makes the person who has such control a fiduciary.  In other words, for those who manage plan assets, control over such assets - even without discretion -

---

[23] ERISA defines "person" as an "individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."  ERISA Section 3(9), 29 U.S.C. § 1002(9).

is sufficient to confer fiduciary status.  <u>Bricklayers</u>, 237 F.3d at 273.  The statute recognizes the high standard that trust law imposes on those who handle money or assets on behalf of another. <u>Id</u>.

The Secretary relies primarily on this second clause of subsection (i) to argue that the Koresko Defendants are fiduciaries subject to ERISA's fiduciary responsibilities.[24]  DOL Br. 19-21.  Thus, the Court must first determine whether the monies held in the master REAL VEBA Trust and handled by some of the Koresko Defendants are "plan assets."

### 2.  Plan Assets

ERISA employee welfare benefit plans need not have plan assets.[25]  Nevertheless, the Court finds that under the prevailing

---

[24] The Secretary also maintains, and the Court agrees, that PennMont is a fiduciary under sub-section (iii) since it exercises discretionary authority and responsibility as the plan administrator.  Thus, even if there were no plan assets, PennMont would still be a fiduciary as to these Plans.

[25] Title I of ERISA does not impose funding requirements on employee welfare benefit plans.  Thus, the DOL has expressed in an advisory opinion that

> an employer sponsor of a welfare plan may maintain such a plan *without identifiable plan assets* by paying plan benefits exclusively from the general assets of the employer.  This could be the case even if an employer sets aside some of its general assets in a separate employer account for the purpose of ensuring that assets are available to provide benefits under the plan.

DOL Advisory Op. 99-08A (May 20, 1999) (emphasis added).

meaning of "plan assets," the Cetylite, Decor, and Castellano Plans each have plan assets to which ERISA fiduciary responsibilities can attach.

Neither ERISA nor the Department of Labor regulations clearly define the term "plan assets."  The statute provides, in relevant part, that plan assets are "plan assets as defined by such regulations as the Secretary may prescribe."  ERISA Section 3(42), 29 U.S.C. § 1002(42).  The regulations address the scope of "plan assets" in two specific contexts: (1) where an employee benefit plan invests in another entity, 29 C.F.R. § 2510.3-101, and (2) where contributions to a plan are withheld by an employer from employees' wages, 29 U.S.C. § 2510.3-102.  <u>Secretary of Labor v. Doyle</u>, 675 F.3d 187, 203 (3d Cir. 2012).

The Secretary makes two arguments as to why the Plans have plan assets: (1) that under ordinary notions of property law, a plan obtains a beneficial interest if the property is held in trust for the benefit of the plan or its participants and beneficiaries; and (2) that 29 C.F.R. § 2510.3-101(h)(2) applies and controls.  The Court addresses each argument below.

> a.    Beneficial Ownership Interest in the Multiple
>        <u>Employer Trust Context</u>

The parties do not appear to dispute that the governing standard for defining "plan assets" is the one recently articulated by the Court of Appeals for the Third Circuit in

Secretary of Labor v. Doyle, 675 F.3d 187 (3d Cir. 2012).[26]  In
Doyle, the Third Circuit explained that the term "plan assets"
should be given its ordinary meaning, and therefore should be
construed to refer to property owned by an ERISA plan.  Id. at
203.  In doing so, the Third Circuit cited with approval an
advisory opinion issued by the Department of Labor stating that
"the assets of a plan generally are to be identified on the basis
of *ordinary notions of property rights under non-ERISA law*.  In
general, the assets of a welfare plan would include any property,
tangible or intangible, in which the plan has a *beneficial
ownership interest.*"  Id. (citing DOL Advisory Op. No. 93-14A,
1993 WL 188473, at *4 (May 5, 1993)) (emphasis added).  Doyle did
not define "beneficial ownership interest," but the Eighth
Circuit has stated that whether a plan has acquired a beneficial
interest depends on whether the plan sponsor expressed an intent
to grant such a beneficial interest or has acted or made
representations sufficient to lead participants and beneficiaries
of the plan to reasonably believe that such fund separately
secures the promised benefits or are otherwise plan assets.
Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647
(8th Cir. 2007) (citing DOL Advisory Op. 94-31A at 7 (Sept. 9,
1994)).

---

[26] The Koresko Defendants do not cite Doyle, but the
standard they rely on in their briefing is the same as that
articulated in Doyle.

The Third Circuit has instructed that the first step in identifying the property of an ERISA plan is to consult the documents establishing and governing the plan.  A court should then, in light of these documents, consult contracts to which the plan is a party or other documents establishing the rights of the plan.[27]  _Doyle_, 675 F.3d at 402.

Per _Doyle_, the Court begins with the documents establishing and governing the Plans: the Plan Document, the Trust Agreement, and the Adoption Agreement.  These documents make clear that the REAL VEBA trustee, not any individual employer, employee, beneficiary, or single-employer plan, has legal ownership over the insurance policies on the participating employees' lives, as well as the employers' contributions.  For example, the Master Trust Agreement governing the REAL VEBA Trust states that:

> _Title to the Trust Fund shall be vested in and remain exclusively in the Trustee_ and neither the Adopting Employer, Advisory Committee, Plan Administrator, nor any employee, or his or her decedents or beneficiaries shall have any right, title or interest therein or thereto. _Participation in the Plan and this Trust shall not give_ any

---

[27] The _Doyle_ court declined to rule on the argument that representations made to a business that purchased benefits should also be considered, and noted that representations are relevant only to the extent that they affect property rights under ordinary property law principles.  675 F.3d at 402.  The Secretary does not appear to have argued in this motion that the defendants made representations to employers that affected the property rights of the Plans under ordinary property law principles.  The Court therefore does not consider any such argument.

employee, beneficiary or any other Person, *any right or interest in the Plan or this Trust other than as herein provided.*

Master Trust Agreement § 4.6 (emphasis added) (GX 11).  <u>See also</u> Plan Document §§ 7.05(a), (f) (GX 14) (noting that insurance policies are contracts between the trustee and the insurer, and that policies are owned by the trustee).  This provision vests legal title to all property received by the trustee - including employer contributions and income therefrom - solely and entirely in the trustee.[28]  <u>See also</u> Decor Adoption Agreement § 7(a)(3) (GX 9); Cetylite Adoption Agreement § 7(a)(3) (GX 33); Castellano Adoption Agreement § 8(b)(1) (GX 44) (stating that participants shall have no rights in insurance contracts other than death benefit protection).

But the inquiry does not end there.  Although the documents do not confer legal title to the REAL VEBA trust assets on the Plans, they manifest an intent to confer a beneficial interest on participating plans.  A trust is generally defined as a fiduciary relationship in which one person holds a property interest subject to an equitable obligation to keep or use that interest for the benefit of another.  George T. Bogert & George G. Bogert, The Law of Trusts & Trustees § 1 (Westlaw 2011).

---

[28] "Trust Fund" is defined as "all property received by the Trustee hereunder, together with income thereon, but shall exclude any property properly disbursed by the Trustee."  Master Trust Agreement § 1.15 (GX 11).

Thus, in most cases, the trustee has legal title to the trust property, and the beneficiary has an equitable interest in the trust property.  _Id_.  In other words, the trustee's interest is a bare legal interest, and does not entitle him to any benefit or profit from the trust property.  _Id_. § 146.  _See also_ Restatement (Third) of Trusts § 42 cmt. a (2003) (noting that interest taken by the trustee is generally nonbeneficial); _id_. cmt. c ("[A] trustee, _as_ trustee, ordinarily takes only . . . 'bare' legal title to the trust property."); _In re Columbia Gas Sys. Inc._, 997 F.2d 1039, 1059 (3d Cir. 1993) ("[T]he classic definition of a trust [is that] the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee.").

A welfare plan will have a beneficial interest in assets if the employer establishes a trust on behalf of a plan, or specifically indicates in the plan documents or instruments that separately maintained funds belong to the plan.  _See, e.g._, DOL Advisory Op. 94-31A, 1994 WL 501646, at *2 (Sept. 9, 1994).  _See also, e.g._, DOL Advisory Op. 99-08A, 1999 WL 343509, at *3 (May 20, 1999); DOL Advisory Op. 92-24A, 1992 WL 337539, at *2 (Nov. 6, 1992) (same).  In this case, several provisions of the governing documents confirm that the assets in the REAL VEBA Trust are held in trust for the exclusive benefit of the participating employees and beneficiaries of employers that adopt

the REAL VEBA benefit arrangement.[29]  For example, the introductory clauses in the Master Trust Agreement state that the trustee will hold the funds contributed to it by employer members of the League "in a fiduciary capacity for the benefit of all Employees covered under the Plan . . . [and] hold all money and property received or purchased by it hereunder, IN TRUST." Master Trust Agreement (GX 11).  Elsewhere, section 2.1 of the Master Trust Agreement states:

> *This trust is established* . . . for the purpose of receiving contributions of the Adopting Employers and their employees *to provide for life . . . benefits and distributing benefits to the employees and beneficiaries hereunder* or payment of Insurance premiums or making such other similar payments pursuant to the terms of the Plan.  *All contributions, and all assets and earnings of the Trust are solely the net earnings of the Trust and shall not in any manner whatsoever inure to the benefit of any person other than a Person designated as an employee or beneficiary of an Adopting Employer under the terms of the Plan.*

Master Trust Agreement § 2.1 (GX 11) (emphasis added).  The Plan Document contains similar provisions providing that the trust corpus and income shall be used for the exclusive benefit of participating employees and their beneficiaries.  See Plan Document §§ 2.01, 2.03, 2.04, 9.02 (GX 14).  Section 4.6 of the Master Trust Agreement, cited above by the Koresko Defendants,

---

[29] This conclusion is consistent with the general structure of ERISA.  ERISA requires that "all assets of an employee benefit plan shall be held in trust by one or more trustees."  ERISA Section 403(a), 29 U.S.C. § 1103(a).  It would make little sense if plan assets somehow lost their character as plan assets by virtue of being held in trust (as required by statute), which separates legal and equitable title.

does not destroy that beneficial interest because it is qualified by the clause "other than as herein provided."

This case does raise the question of whether the Decor, Cetylite, and Castellano Plans must have an *individual* beneficial ownership interest for the assets in the REAL VEBA Trust to qualify as assets of these Plans.  In other words, in the context of a multiple employer trust, must there be a demonstration of intent to create a beneficial interest *specifically* as to that individual employer's plan, as opposed to other plans whose assets are also in the multiple employer trust?

There is little case law dealing with similar multiple employer trust arrangements, but under ordinary non-ERISA law, persons can hold property jointly in undivided interests.  <u>See,</u> <u>e.g.,</u> Restatement (Third) of Property (Servitudes) § 2.3 cmt. a (2000) ("An estate in land owned by more than one person is held in undivided interests.").  Thus, following the principle articulated in <u>Doyle</u> that plan assets are to be identified on the basis of ordinary notions of property rights under non-ERISA law, the Court concludes that in the context of a multiple employer trust, funds as to one employer's plan need not be segregated from those of another employer's plan (as opposed to segregated from the employers' general corporate assets) to qualify as plan assets.  ERISA plans can have assets by virtue of holding an undivided beneficial interest in commingled trust funds, even if

other plans also own an undivided beneficial interest therein.

        The RLJCS case cited by F&M Trust does not mandate a finding to the contrary.  RLJCS Enterprises, Inc. v. Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust ("RLJCS"), 487 F.3d 494 (7th Cir. 2007).  In that case, as here, the Professional Benefit Trust offered life and other benefits to small corporations - partly for tax reasons and also to spread risk.  To fund the benefits, the Trust took out insurance on the lives of the participating employees.  As here, the trust was named as the owner of the policy.  The issue in RLJCS was whether former participants in the Trust were entitled to distributions of demutualized stock of insurers that had issued the policies on their lives.  Judge Easterbrook held that because "only the Trust has any property interest in any particular policy . . . [it] follows that distributions of cash or stock attributable to any policy also belong to the Trust."  487 F.3d at 497.  He explained that the Trust does not buy insurance policies on behalf of beneficiaries; rather "it does so for its own security."  Id. at 496.  The participating employers contract and buy a promise of a death benefit to be paid by the Trust, and the Trust chooses where and how to reinsure that obligation.  Because the Trust pays the policy premiums, the Trust owns the policies, and any demutualization proceeds therefrom.  Id. at 498-99.

        Although RLJCS presents similar facts to this case,

that court examined a different legal issue than the one at bar. RLJCS addressed whether the *individual insured or his employer* had a property interest in the proceeds of the insurance policy taken on his life.  By contrast, this case deals with whether the adopting employers' *Plans* had a beneficial ownership interest in the same.  The difference is crucial.  In this case, even though the Court finds that the Plans have an undivided beneficial interest in the employer contributions, the insurance policy proceeds, and income thereon, the benefits to which any individual beneficiary is entitled would still be determined by the plan administrator pursuant to the Plan Document and the Adoption Agreement.[30]  Thus, RLJCS is distinguishable in addition to not being binding on this Court.[31]

---

[30] Defendant F&M Trust also argued that the Secretary was prohibited from bringing a claim under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), since Mrs. Castellano is bringing a claim under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), in REAL VEBA v. Castellano, Case No. 03-cv-6903.  However, again, the Secretary is not seeking to have funds restored to individual beneficiaries such as Mrs. Castellano, but rather to the *Plans*.

[31] At oral argument, John Koresko represented to this Court that the Third Circuit has held that where an insurance policy is owned by the trustee and purchased for the protection of the trustee and indemnification of the trustee's liability, the policy is not a plan asset.  See Tr. of Oral Argument 73 (citing Bill Gray Enterprises, Inc. Employee Health & Welfare Plan v. Gourley, 248 F.3d 206 (3d Cir. 2001)).  In fact, Bill Gray did not make any such holding.  The legal issue in that case was whether a self-funded employee welfare benefit plan that purchased a stop-loss insurance policy was an insurance carrier subject to state insurance regulation for ERISA preemption purposes.  248 F.3d at 214.  The Bill Gray court made no finding regarding whether the stop-loss policy or any proceeds therefrom

A common refrain throughout the Koresko Defendants' briefing is that the beneficiaries have a mere expectancy, not a vested beneficial interest.  Koresko Opp. 29.  They argue that any potential beneficiaries' receipt of death benefits remains uncertain until the plan administrator exercises discretion in their favor to pay them benefits.  The Koresko Defendants make a related argument that in a discretionary trust, the beneficiary has a mere expectancy until the trustee elects to make a payment.  Koresko Op. 29 n.20.  But once again, the relevant inquiry regarding whether there are plan assets requires examining whether the *plan*, not any individual beneficiary, has a beneficial ownership interest.  Doyle, 675 F.3d at 203-04.

Moreover, the record does not support the Koresko Defendants' mere assertion that the REAL VEBA Trust is a discretionary trust.  A discretionary trust is one in which the settlor gives the trustee authority to use discretion in the timing and amount of income payments to the beneficiary.  George T. Bogert & George G. Bogert, The Law of Trusts & Trustees § 228 (Westlaw 2011).  The trustee in a discretionary trust may have sole, absolute, and uncontrolled discretion whether to pay or apply trust income or principal to or for the benefit of the beneficiary.  Notwithstanding language in the Plan Document conferring sole and absolute discretion upon the plan

_____

constituted assets of the employee welfare benefit plan.

55

administrator to interpret plan provisions, PennMont's discretion to pay benefits in this REAL VEBA arrangement is *not* unbridled: the administrator must pay benefits in accordance with the terms of Plan Document and the employer's Adoption Agreement.  The Koresko Defendants have not cited any cases holding that an ERISA fiduciary's discretion to pay benefits according to a plan document somehow transforms assets from which the fiduciary pays claims to non-plan-assets.  Nor would it make sense to find that any time a plan administrator has discretion to interpret plan documents while paying benefit claims, there are no plan assets under ERISA, since many ERISA plans confer such discretion on the plan administrator.

To summarize, the Court concludes that the Decor, Cetylite, and Castellano Plans have an undivided beneficial interest in the corpus of the REAL VEBA Trust (including employer contributions, insurance policy proceeds, and income therefrom) under the governing plan documents and are, therefore, plan assets to which fiduciary duties attach.  The nature of any particular beneficiary's interest in the assets of the REAL VEBA Trust is irrelevant to the inquiry of whether the Plans have assets.

b.  29 C.F.R. § 2510.3-101(h)(2)

Although the Court does not rely on this regulation,

the Court's conclusion that the Plans have plan assets finds

support in 29 C.F.R. § 2510.3-101.  Section 2510.3-101(h)(2)

states:

> When a plan acquires or holds an interest in any entity
> (other than an insurance company licensed to do business in
> a State) which is established or maintained for the purpose
> of offering or providing any benefit described in section
> 3(1) or section 3(2) of the Act to participants or
> beneficiaries of the investing plan, *its assets will include
> its investment and an undivided interest in the underlying
> assets of that entity*.

29 C.F.R. § 2510.3-101(h)(2) (emphasis added).  The comments

accompanying this regulation in the Federal Register suggest that

the intention of this provision was "to apply primarily to so-

called 'multiple employer trusts.'" Final Regulation Relating to

the Definition of Plan Assets, 51 Fed. Reg. 41262-01, 41263 (Nov.

13, 1986).  Significantly, section 2510.3-101(j) sets forth the

following example regarding how (h)(2) operates:

> A medical benefit *plan*, P, *acquires a beneficial interest* in
> a *trust*, Z, that is not an insurance company licensed to do
> business in a State.  Under this arrangement, Z will provide
> the benefits to the participants and beneficiaries of P that
> are promised under the terms of the plan.  Under paragraph
> (h)(2), *P's assets include its beneficial interest in Z and
> an undivided interest in each of its underlying assets*.
> Thus, persons with discretionary authority or control over
> the assets of Z would be fiduciaries of P.

29 C.F.R. § 2510.3-101(j)(12) (emphasis added).  To the extent

this regulation applies to the REAL VEBA Trust, it supports the

Court's conclusion above that (1) the Plans had an undivided

beneficial interest in the assets of the REAL VEBA Trust, and (2)

the Plans had plan assets, and (3) hence, anyone with authority

or control respecting the management or disposition of such assets was an ERISA fiduciary subject to ERISA's fiduciary responsibility provisions.

Below, the Court turns to the question of whether each individual Koresko Defendant was a fiduciary.

### 3.   Koresko Defendants as Fiduciaries

The Court finds that the undisputed facts establish that PennMont, Koresko, and Bonney are fiduciaries subject to ERISA's fiduciary responsibility provisions.  However, the record as it stands does not support a similar finding as to Koresko & Associates, P.C. ("KAPC") or Koresko Law Firm ("KLF").

It is undisputed that PennMont is the plan administrator of the Plans.  As such, PennMont is necessarily a fiduciary because it exercises "discretionary authority or discretionary responsibility in the administration" of the Plans under ERISA Section 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii).[32] See 29 C.F.R. § 2509.75-8 D-3 ("[A] plan administrator . . . of a plan must, [by] the very nature of his position . . . . be [a fiduciary].").  Indeed, the Koresko Defendants frequently assert - in this litigation and in other litigation surrounding this multiple-employer employee benefits arrangement - that PennMont

---

[32] Indeed, PennMont would be a fiduciary of the Plans even if the Court did not find that there were plan assets.

has sole and absolute discretion under the Plan Document to determine the benefits due and the beneficiaries to which claims are paid.

As to the remaining Koresko Defendants - Koresko, Bonney, KAPC, and KLF - the relevant ERISA provision is section 3(21)(A)(i), which, to recap, states that a person is an ERISA fiduciary to the extent he exercises "any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." ERISA Section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). The Third Circuit has held that any control over the disposition of plan assets renders a person who has control a fiduciary. Bd. of Trustees of Bricklayers & Allied Craftsmen Local 6 v. Wettlin Assocs., Inc., 237 F.3d 270, 273 (3d Cir. 2001).

As set forth in the facts section above, the record shows that: (1) Koresko and Bonney were listed as trustees and authorized signatories on the Ferraro FUNB Account, the Wachovia Kelling Account, and the Wachovia Castellano Account, into which CTC transferred monies from the CTC Trust Account; (2) Koresko and Bonney each signed at least one check from the Ferraro FUNB Account, the Wachovia Kelling Account, and the Wachovia Castellano Account. See supra. The Koresko Defendants do not genuinely dispute any of these facts with supporting factual

59

citations.  Indeed, in their opposition, they maintain that they had authority to perform these actions.  Koresko Opp. 37-39.  As such, the undisputed facts demonstrate that Koresko and Bonney exercised authority or control over the disposition of the Plans' assets, which were deposited into the Ferraro FUNB Account, the Wachovia Kelling Account, and the Wachovia Castellano Account.

The record is not so clear, however, with respect to KAPC or KLF.  The facts indicate that certain amounts from the Ferraro FUNB Account, the Wachovia Kelling Account, and the Wachovia Castellano Account were paid into the "Koresko Law Firm - Death Benefit Escrow Account."  However, there is nothing in the record to demonstrate who had authority or control over that account.

The Secretary argues that the law firms are fiduciaries because they performed all the work for PennMont and had full responsibility for plan administration, including handling and managing benefit claims.  She suggests that since Bonney and Koresko worked as employees and agents of the law firms, the firms exercised authority and control over plan assets by extension.  DOL Br. 21.  But it is not clear to the Court based on the briefing submitted at this stage why this is the case. Cf. In re Bank of Am. Corp. Securities, 756 F. Supp. 2d 330, 346-47 (S.D.N.Y. 2010) (discussing a split in authority regarding whether the doctrine of respondeat superior provides an

independently viable theory of recovery in the ERISA context).
Discovery may well show that KAPC and KLF exercised authority or
control over plan assets, but the record at this stage does not
support summary judgment in the Secretary's favor as to these
defendants.

Thus, for the purposes of this motion, the Court
considers only whether PennMont, Koresko, and Bonney (the
"Koresko fiduciaries") violated their fiduciary duties to the
Plans.


IV.  ERISA Fiduciary Duties

The Supreme Court has found that Congress intended to
incorporate the fiduciary standards of trust law into ERISA, and
that fiduciaries owe strict duties to beneficiaries in the
administration and payment of trust benefits.  Mass. Mut. Life
Ins. Co. v. Russell, 473 U.S. 134, 152-53 (1985); Jordan v. Fed.
Exp. Corp., 116 F.3d 1005, 1015 (3d Cir. 1997).  See also Donovan
v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1981) (describing
ERISA fiduciary duties as "the highest known to the law").  The
Secretary contends that the Koresko Defendants breached their
fiduciary duties as follows: (1) violation of ERISA Section 403,
29 U.S.C. § 1103(a), for failure to hold plan assets in trust;
(2) violation of ERISA Section 404, 29 U.S.C. § 1104, for failing
to discharge duties solely in the interests of the participants

61

and beneficiaries, and with the care of a prudent man in like capacity; (3) violation of ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), for transferring plan assets to parties in interest, and (4) violation of ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), for dealing with plan assets for their own interest.

The Secretary essentially relies on the same factual predicate for most of the alleged fiduciary violations: (1) Insurance proceeds on the lives of participating employees in the Plans were paid by the insurance company to CTC, the then trustee of the REAL VEBA Trust; (2) CTC transferred some or all of those proceeds to the Ferraro FUNB Account, the Wachovia Kelling Account, or the Wachovia Castellano Account;[33] (4) Koresko and Bonney were signatories and account holders on those three accounts, but CTC was not; (5) Some or none of the money in those three accounts was paid as benefits to plan beneficiaries; (6) The unpaid remainder was either used to pay the U.S. Treasury, transferred into the "Angermeier Account," or deposited into the "Koresko Law Firm Death Benefit Escrow Account."  See supra. Because the Koresko Defendants' response to the Secretary's statement of facts fails to genuinely dispute these material facts, the only remaining question is whether these facts

---

[33] The record reflects that PennMont directed the insurance proceeds on Dale Kelling's life to be transferred out of the CTC Trust Account.  GX 42 at 5-6.

establish the alleged fiduciary violations as a matter of law.


    A.    <u>ERISA Section 403, 29 U.S.C. § 1103</u>

    Section 403 of ERISA requires that:

*all assets of an employee benefit plan shall be held in trust by one or more trustees.* Such trustee or trustees shall be either *named in the trust instrument or in the plan instrument* . . . or appointed by a person who is a named fiduciary, and upon acceptance of being named or appointed, the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan . . . .

ERISA Section 403(a), 29 U.S.C. § 1103(a) (emphasis added). The record in this case shows that CTC was the trustee of the REAL VEBA Trust at the relevant time periods, but that John Koresko and Jeanne Bonney - and not CTC – were account holders and signatories on the Ferraro FUNB Account, the Wachovia Kelling Account, or the Wachovia Castellano Account into which assets of the Plans were transferred.

    The Koresko Defendants' argument that the accounts were "trust accounts" is inapposite because Koresko and Bonney were not trustees named in the trust or plan instrument as required by ERISA. Nor were they appointed by a named fiduciary. Similarly, the Koresko Defendants' argument that section 4.4 of the Master Trust Agreement permits the plan administrator to divide trust assets among separate accounts is inapposite because that provision does not abrogate the statutory requirement that plan assets be held in trust *by a trustee*. Likewise, the limited

power of attorney forms executed by participating employees, which permit PennMont and Koresko to execute documents considered by the plan administrator to be "incident to administration or operation of the plan," do not abrogate the requirement that plan assets be held in trust.  Employee Participation Agreements (GX 46 at 1-2).  Fiduciaries cannot absolve themselves of statutory fiduciary responsibilities by operation of plan documents.  This is especially the case here, where John Koresko wrote all of the plan and trust documents, runs the REAL, is president of the plan administrator and sole shareholder to the law firms that perform its work, and is the director of the current REAL VEBA trustee.

The Koresko Defendants also cite section 2.05 of the Plan Document and a Custodial Agreement between CTC and Koresko & Associates, P.C., dated March 21, 2002, for the proposition that CTC was permitted to and did in fact authorize Koresko and Bonney to serve as trustees on the Ferraro FUNB Account, the Wachovia Kelling Account, and the Wachovia Castellano Account.  Koresko Opp. 39 (citing 9/9/09 Tr. of Prelim. Injunction Hr'g 168, where Jeanne Bonney discusses the Custodial Agreement).  In the Custodial Agreement, CTC and Koresko & Associates, P.C. purported to agree that the latter would act as agent for the custody of certain insurance policies owned by the trustee.  Custodial Agreement (GX 65).

However, although ERISA permits plans to allocate

fiduciary responsibilities among named fiduciaries, or delegate responsibilities to persons other than named fiduciaries when the plan instrument expressly so provides, the statute specifies that trustee responsibilities cannot be so allocated or delegated.[34] ERISA Section 405(c), 29 U.S.C. § 1105(c).  Indeed, although the Plan Document in this case expressly provides for delegation of fiduciary responsibilities, it also tracks the language of ERISA and prohibits the delegation of trustee responsibilities. Section 2.05 states, in relevant part:

> <u>Delegation of Duties</u> - The Plan Administrator shall have sole discretion to delegate any and all Fiduciary responsibilities under the Trust (*other than those of the Trustee*) to designated persons . . . . The Trustee may appoint an investment manager who shall be a Fiduciary with the power to manage, acquire or dispose of any asset of the Trust, and who shall be a registered investment advisor, bank, individual or insurance company who has acknowledge in writing that he is a Fiduciary with respect to the Trust.

Plan Document § 2.05 (GX 14) (emphasis added).  There is no indication that CTC appointed Koresko or Bonney as investment managers, or that Koresko and Bonney acknowledged in writing that they were fiduciaries with respect to the trust.  Thus, the purported delegation of authority to KAPC does not abrogate the

---

[34] ERISA defines "trustee responsibility" as "any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan," other than a power to appoint an investment manager.  ERISA Section 405(c)(3), 29 U.S.C. § 1105(c)(3).  The Plans' trust instrument in this case provides that any property received by the trustee, together with income thereon, shall be held by the trustee in trust.  Master Trust Agreement § 2.2 (GX 11).

statutory requirement in ERISA Section 403(a) that assets be held in trust by a trustee.[35]  The Court finds that defendants PennMont, Koresko, and Bonney violated their fiduciary duty under ERISA Section 403(a), 29 U.S.C. § 1103(a).[36]

B.    ERISA Section 404, 29 U.S.C. § 1104

        Section 404(a)(1)(A) of ERISA requires fiduciaries to discharge duties with respect to a plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their

---

[35] ERISA Section 403(b) excepts "any assets of a plan which consist of insurance contracts or policies issued by an insurance company qualified to do business in a State" from Section 403(a)'s requirement that plan assets be held in trust by the trustee.  ERISA Section 403(b)(1), 29 U.S.C. § 1103(b)(1).  It appears that Section 403(b)(1) applies to contracts or policies held by insurance companies.  Cf. Wachtel v. Health Net, Inc., 482 F.3d 225, 234 (describing Section 403(b)(1) as an exception "for insurance companies providing insurance contracts"); H.R. Rep. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5079, 1974 WL 11542 ("To the extent that plan assets are held by an insurance company they need not be held in trust.") (emphasis added).  Nevertheless, the Court does not now decide the applicability of Section 403(b) because the Koresko Defendants have not argued that they are exempt from the requirement to hold plan assets in trust under that provision.

[36] ERISA imposes liability on co-fiduciaries.  ERISA Section 405(a), 29 U.S.C. § 1105(a).  Koresko and Bonney each wrote checks out of the accounts for which they, and not CTC, were signatories and account holders.  PennMont had knowledge of these actions through its president, John Koresko himself, as well as through its counsel, Jeanne Bonney.  At the very least, PennMont permitted these actions to go forward.  With respect to the Cetylite Plan, there is evidence that PennMont directed these actions.  See supra n.33.

66

beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  Relatedly, Section 404(a)(1)(B) of ERISA imposes on fiduciaries the duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA Section 404(a)(1), 29 U.S.C. § 1104 (a)(1).

The Secretary argues that by directing or permitting that plan assets be diverted into accounts subject to their sole control, the Koresko fiduciaries violated their duty of loyalty under (a)(1)(A) and duty of care, prudence, and diligence under (a)(1)(B).  The Court agrees.

Trust law imposes a duty on trustees to avoid placing themselves in a position that may prevent their functioning with the complete loyalty demanded of them as trustees.  In Donovan v. Bierwirth, an employer that offered a corporate pension plan was the target of a corporate takeover bid.  The trustee-fiduciaries of the pension plan were officers of the employer company; the plan also owned shares therein.  The fiduciaries not only took actions to defeat the takeover bid but caused the plan to purchase additional common stock in the employer company to thwart the takeover bid.  680 F.2d 263, 264, 266-269 (2d Cir. 1982).  The Second Circuit held that although ERISA permitted the

67

plan to invest assets in securities issued by the employer company, the fiduciaries were obligated to avoid placing themselves in a position where their acts as officers of the corporation would prevent their functioning with complete loyalty to participants and beneficiaries.  Id. at 271, 272; see also id. at 276 (noting that fiduciaries should have realized that their judgment could scarcely be unbiased and that they should have taken every feasible precaution to carefully consider the options).  The court faulted the fiduciaries for failing to adequately investigate and calculate the risks and benefits of the actions they took and found that they violated their fiduciary duties under ERISA Sections 404(a)(1)(A) and (B).  Id. at 272, 274-276.  The Seventh Circuit came to a similar conclusion in Leigh v. Clyde, 727 F.2d 113 (7th Cir. 1984).

Furthermore, merely failing to segregate plan assets from personal or other corporate assets is, itself, a fiduciary violation.  For example, in Corley v. Hecht Co., the district court found that a fiduciary violated its duty of care, prudence, and diligence when it failed to clearly differentiate between its own money and that belonging to the ERISA plan.  530 F. Supp. 1155, 1163 (D.D.C. 1982).  In that case, an employer serving as the fiduciary to an employee benefit group life insurance plan used dividends from the plan to recoup voluntary contributions that the employer made to the plan.  In essence, the fiduciary

made interest-free loans to the plan and subsequently reimbursed itself for those loans.  Although the Corley court found no prohibited transaction under ERISA Section 406, the court held that "[i]nformal transactions between the fiduciary and the Plan, for whatever purpose, are barred under section 404."  Id.

The Court finds the reasoning of Donovan, Leigh, and Corley persuasive.  Although the facts in Donovan and Leigh involved fiduciaries in a corporate takeover, the legal principle still applies to this case.  Here, it would be unrealistic to expect complete loyalty to the Plan beneficiaries where plan assets were transferred to accounts held out of the reach of the trustee and solely by Koresko and Bonney.  Regardless of what use ultimately came of those assets, there is no evidence that there was ever a consideration by the Koresko fiduciaries of how putting the funds in an account not controlled by the trustee would impact the interests of the Plans' participants and beneficiaries.  The Court sees no reason why the REAL VEBA trustee could not have served as the signatory or account holder on the Ferraro FUNB Account, the Wachovia Kelling Account, and the Wachovia Castellano Account.  Likewise, the remainder of unpaid benefits could presumably have been deposited back into the REAL VEBA Trust as opposed to the Koresko Law Firm Death Benefit Escrow Account to be used for the benefit of other participating employees and their beneficiaries.

69

Therefore, the Court finds that the Koresko fiduciaries breached their duties of loyalty and prudence under ERISA Section 404.

C.   ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D)

Congress enacted ERISA Section 406, 29 U.S.C. § 1106, titled "Prohibited Transactions," with the goal of creating a categorical bar to certain types of transactions that were regarded as likely to injure a plan.  Reich v. Compton, 57 F.3d 270, 275 (3d Cir. 1995).  ERISA Section 406(a)(1)(D) prohibits fiduciaries from causing the plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."[37]  ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).  At this stage, the Court finds that the Koresko fiduciaries violated section (a)(1)(D) as to the Cetylite Plan.

As an initial matter, there is no reasonable dispute that PennMont, Koresko, and Bonney are all parties in interest as defined by ERISA.  ERISA defines "party in interest" as any fiduciary (including any administrator, officer, trustee, or custodian) or counsel of an employee benefit plan, or any person

_____

[37] Section 408, 29 U.S.C. § 1108, enumerates exceptions to the prohibitions in ERISA Section 406.  The Koresko Defendants do not argue that any of these exceptions pertain to this case.

70

providing services to such plan.  ERISA Section 3(14), 29 U.S.C. § 1002(14).  The Court has already explained above that PennMont, Koresko, and Bonney were fiduciaries of the Plans.

The Secretary argues that transfers of plan assets to parties in interest are per se violations of ERISA Section 406(a)(1)(D) regardless of the motivations of the parties involved in the transaction.  The Court agrees.

In <u>Reich v. Compton</u>, the Court of Appeals for the Third Circuit considered whether a fiduciary violated (a)(1)(D)'s prohibition of the use of plan assets for the benefit of a party in interest.  57 F.3d 270, 275-76, 278-79 (3d Cir. 1995).  The Third Circuit held that proof of subjective intent to benefit a party in interest was required.  <u>Id</u>. at 279.  However, this Court does not read <u>Compton</u> as requiring the same showing of subjective intent for a *transfer* of plan assets to a party in interest. Such a reading comports with the statutory language itself, which uses the disjunctive "transfer to, *or* use by *or* for the benefit of" language.  ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) (emphasis added).  Moreover, the Court's interpretation of <u>Compton</u> and (a)(1)(D) also finds support in the legislative history:

> [Subsection (a)(1)(D) ] prohibits the direct or indirect transfer of any plan income or assets to *or* for the benefit of a party-in-interest.  It *also* prohibits the use of plan income or assets by or for the benefit of any party-in-interest.  As in other situations, this prohibited transaction may occur even though there has not been a

transfer of money or property between the plan and a
party-in-interest.

H.R. Rep. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N.
5038, 5089, 1974 WL 11542 (emphasis added).  The legislative
history expresses Congress's intent to prohibit several outcomes:
transfer of plan assets to parties in interest, use of plan
assets by parties in interest, or use of plan assets for the
benefit of parties in interest.  Compton's holding that
subjective intent is required does not apply to the first
outcome.

The evidence at this partial summary judgment stage
does not establish that the Koresko fiduciaries caused plan
assets to be used by or used "for the benefit of" parties in
interest.  It is not clear to the Court what became of the funds
initially transferred into the Ferraro FUNB Account, the Wachovia
Kelling Account, and the Wachovia Castellano Account, and
ultimately deposited into either the Angermeier Account or the
Koresko Law Firm Death Benefit Escrow Account.  There is no
evidence that plan assets were used for non-trust purposes -
merely that they failed to be held in trust by a trustee named in
the plan and trust documents.

Nevertheless, the undisputed record does establish that
plan assets were "transfer[red] to" accounts held by Koresko and
Bonney, parties in interest.  However, except as to the Cetylite
Plan, the Secretary has not proffered evidence that the Koresko

72

fiduciaries *caused* the Plans to engage in these transactions.
The record reflects that CTC wrote the checks from the CTC Trust
Account to the three accounts held by Koresko and Bonney.  The
Secretary argues in her brief that the Koresko Defendants
directed CTC to do so, but only submitted evidence of such
direction as to the Cetylite Plan.  PennMont, through Jeanne
Bonney and Maggie Carroll, directed the insurance proceeds on
Dale Kelling's life to be transferred out of the CTC Trust
Account and into the Wachovia Kelling Account.  GX 42 at 5-6.
Although the Court recognizes that CTC was a directed trustee,
the Court cannot grant summary judgment as to the Decor and
Castellano Plans without evidence that the Koresko fiduciaries
caused the plans to engage in a transfer of plan assets to
parties in interest.

Thus, at this stage, the Court will grant summary
judgment as to the violation of Section 406(a)(1)(D) as to the
Cetylite Plan and deny without prejudice as to the Decor and
Castellano Plans.

D.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1)

ERISA Section 406(b) prohibits a fiduciary from dealing
with assets of the plan in his own interest or for his own
account.  ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1).
Section 406(b) prohibits a plan fiduciary from engaging in

73

various forms of self-dealing and creates a per se ERISA violation even in the absence of bad faith.  See Reich v. Compton, 57 F.3d 170, 287 (3d Cir. 1995); Cutaiar v. Marshall, 590 F.2d 523 (3d Cir. 1979); Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1213 (2d Cir. 1987); Gilliam v. Edwards, 492 F. Supp. 1255, 1263 (D.N.J. 1980).  At this stage, the Court denies summary judgment on the self-dealing claim without prejudice.

     The Secretary cites several cases in support of her argument that the Koresko Defendants' conduct constitutes prohibited self-dealing.  However, those cases are factually distinguishable.  For example, in Patelco v. Sahni, the fiduciary (1) overcharged the employer for insurance premiums on a stop-loss insurance policy that the fiduciary purchased for the plan; (2) determined his own administrative fees and collected them himself from the plan's funds; and (3) failed to account for two benefit checks meant for the plan.  262 F.3d 897, 901-02, 911 (9th Cir. 2001).  Similarly, the evidence in NYSA-ILA Med. & Clin. Servs. Fund v. Catucci showed that the fiduciary used plan assets to pay corporate expenses for a corporation in which he had a majority interest.  60 F. Supp. 2d 194, 203-04 (S.D.N.Y. 1999).

     By contrast, the Secretary has not pointed to anything in this summary judgment record regarding the Koresko fiduciaries

setting their own administrative fees,[38] using plan assets to pay

for personal or corporate expenses, making determinations that

gave themselves benefits, or otherwise personally benefitting

because of how plan assets were handled.  As discussed above,

there is no evidence at this stage that the plan assets in those

accounts were used for non-trust purposes.  Indeed, the record

shows that at least a portion of the plan assets were used to pay

benefits to beneficiaries of the Decor and Cetylite Plans.  The

rest went to the U.S. Treasury, the Angermeier Account, and the

Koresko Law Firm Death Benefit Escrow Account, but it is unclear

whether the fiduciaries benefitted therefrom.

Therefore, the Court cannot grant summary judgment on

the self-dealing claim at this time.


V.   Relief

ERISA Section 502(a)(5) permits the Secretary to bring

an action to "enjoin any act or practice which violates any

provision of this title," or obtain appropriate equitable relief

to redress the violation and enforce the provisions of the title.

29 U.S.C. § 1132(a)(5).  Section 409 of ERISA also subjects

fiduciaries who breach their obligations to "such other equitable

or remedial relief as the court may deem appropriate, including

---

[38] The Court notes, however, that the Koresko Defendants
appear to admit that they paid themselves administrative
expenses.  Koresko Opp. 43-44.

removal of such fiduciary." 29 U.S.C. § 1109(a). This Court has discretion to determine the appropriate relief. See Delgrosso v. Spang & Co., 769 F.2d 928, 937 (3d Cir. 1985) ("A federal court enforcing fiduciary obligations under ERISA is thus given broad equitable powers to implement its remedial decrees.")

The Secretary requests that the Koresko fiduciaries be barred from serving as fiduciaries; that the Court appoint a Special Master to make an accounting of the Plans; that assets of the Plans be transferred to new fiduciaries; and that the Koresko fiduciaries be ordered to make the Plans whole.

At this time, the Court does not have sufficient information to decide whether the Secretary's requested relief is appropriate. The instant motion for partial summary judgment moves only as to three ERISA plans. The Secretary has also informed the Court that there are both ERISA and non-ERISA covered plans in the REAL VEBA Trust. Tr. of Oral Arg. 96. Furthermore, ongoing discovery may yet reveal additional facts that may bear on the Court's exercise of discretion regarding appropriate relief. The Court therefore defers a decision as to the Secretary's requested relief for the Plans until a later date.

Nevertheless, in the interim, the Court will consider any request for narrower, more limited injunctive relief that the Secretary may seek based on the Court's decision on the instant

motion.

An appropriate order follows.