# UNITED STATED DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARRIS,<br>SECRETARY OF LABOR<br><br>v.<br><br>KORESKO, ET AL | )<br>)<br>)<br>)<br>)<br>)<br>) | NO. 09-cv-00988 |

### KORESKO PARTIES REQUEST FOR EMERGENCY INJUNCTION –
### AND
### MOTION FOR RULE 11 SANCTIONS

### MEMORANDUM ON APPLICATION OF
### THE ANTI-PROPAGANDA LAWS
### AND
### MOTION FOR RULE 11 SANCTIONS

ERISA permits the Secretary of Labor to prescribe certain rules and regulations for the enforcement of ERISA. The predicate, of course, is that a matter is within the ambit of ERISA. ERISA is a jurisdictional statute and Labor has no authority unless and until it proves that ERISA applies. Today, the Department of Labor strikes a new low. After being denied additional relief concerning an interim Order, they have decided to affect a worse remedy, unilaterally, by using the press as a vehicle of their unproven innuendo.

Regulatory authority cannot be read in a vacuum. The authority to promulgate needful regulations or rules or opinions cannot by law include violations of the Administrative Procedure Act or the authority to issue propaganda. The Secretary has no right to use agency actions to hurt people in any way. *U.S. v. Mead Corp.*, 533 U.S. 218 (2001); *Chevron v. Nat. Resource Defense Council*, 467 U.S. 837 (1984). The Press Release, sent to the court – which was implemented and enforced by a press machine instead of by the notions of due process or by Regulation as required by the statute –

now leads to the destruction of a business and to the irreparable harm of a person who perhaps may not be subject to fiduciary liability at all. The Press Release required intentional disregard of the anti-propaganda laws. Further, it is a blatant violation of this Court's order not to give any further relief pending a full evidentiary hearing.

Since 1951, Congress has annually forbidden agencies like the Department of Treasury from using appropriations for the purposes of propaganda. [1] *See, e.g.* Stop Propaganda Act of 2005, Cong. Rec. P. S895-898 (Feb. 2, 2005), http://www.fas.org/sgp/congress/2005/s020205.html ("Since 1951, the following prohibition on the use of appropriated funds for propaganda purposes has been enacted annually: 'No part of any appropriation contained in this or any other Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by Congress.'"). Congress first included restrictions on the use of funds for "publicity or propaganda" in appropriations statutes in 1951. *See, e.g.*, Labor and Federal Security Appropriations Act, Pub. L. No. 82-134, 65 Stat. 209 (1951); cited in U.S. Dept of Justice, "Memorandum re Expenditure Of Appropriated Funds For Informational Videonews Releases" (July 30, 2004), available electronically at http://www.usdoj.gov/olc/opfinal.htm ("The Consolidated Appropriations Resolution,

---

[1] Examples include: E.g. Treasury and General Government Appropriations Act, 2002, Pub. L. No. 107-67, §§ 623, 626 115 Stat. 514, 551052 (2001). Congress has in recent years included in various appropriations bills a "publicity and propaganda" clause forbidding the use of appropriations for unauthorized publicity or propaganda. For example, Section 632 of the Treasury and General Government Appropriations Act, 2000, Pub. L. 106-58 provides that: "No part of any appropriation in this or any other Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by Congress." By virtue of the "this or other act" language, this provision applied to all appropriations acts for the fiscal year 2000. *See* generally, the *GAO compilation* "Restrictions on Lobbying the Congress Included in Fiscal Year 1996 Appropriations Act and Final Continuing Resolutions" [hereinafter GAO Compilation], accompanying Statement of Robert P. Murphy, General Counsel GAO, in *House Hearings on H.R. 3078, supra* noe3, at 159. Attachment 1,(listing 13 separate restrictions), and the compilation of "Statutory Constraints" on executive branch lobbying contained in Statement by Louis Fisher, Congressional Record Research Service, *House Hearings on H.R. 3078, supra* note 3, at 167, Appendix A (summarizing a wide variety of approaches Congress has taken to constrain executive lobbying).

2003 ("CAR") provides that "[n]o part of any appropriation contained in this or any other Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by the Congress." Pub. L. No. 108-7, tit. VI, § 626, 117 Stat. 11, 470 (2003)). The purpose of the legislation, repeatedly included in general appropriations bills as well as those for specific agencies, was to get administrative agencies out of the advertising business – to do the people's bidding, not their own.[2] The Department of Justice was asked to write a memorandum in response to numerous determinations by the General Accounting Office that there were widespread violations of the anti-propaganda legislation throughout the Bush administration.[3] *Id.*[4]

When used in a statute, the term "propaganda" means: "--*e.g.,* "ideas, facts, or allegations spread deliberately to further one's cause or to damage an opposing cause,"

---

[2] The DOJ wrote in the Memorandum: "[T]he legislative history of the original enactment of the "publicity or propaganda" prohibitions indicates that Congress intended to eradicate (i) agency efforts to direct and control public thinking on various issues of public debate, particularly through overt political action;(10) (ii) useless, excessive, or frivolous agency publications;(11) and (iii) agency self-promotion, aggrandizement, or puffery.(12) The overarching concern was the use of federal funds to manipulate and control public opinion about policy issues: "[P]ublic opinion ought not . . . be subjected to influence and direction by the executive agencies, the administrative branch of the government, in the manner that it is today. . . . The people should not finance use of these agencies to foster and perpetuate the bureaucrats [sic] not the people's objectives in national policy." 97 Cong. Rec. at 4099 (statement of Rep. Meader); *see also id.* at 6733-34 (statement of Sen. Byrd) (calling propaganda from the federal bureaucracy "one of the greatest abuses in our [time]" and suggesting that riders would "result in more news and less 'bull' from the Federal publicity mill")."

[3] *See* Digests of Appropriations Law Decisions and Opinions (January 1 to December 31, 2005), available electronically at *www.gao.gov/special.pubs/appforum2006/2005digest.pdf*.
On February 17, 2005, GAO wrote: "Since 1951, Congress has enacted an annual, government-wide prohibition on the use of appropriated funds for purposes of "publicity or propaganda." During the past year, GAO found that several prepackaged news stories produced and distributed by certain government agencies violated this prohibition. In the course of this work, GAO learned that prepackaged news stories have become common tools of the public relations industry, and that some federal agencies are adopting them as well. The purpose of this Circular Letter is to remind agencies of the constraints imposed by the publicity or propaganda prohibition on the use of prepackaged news stories and to advise vigilance to assure that agencies' activities comply with the prohibition." *Id.* at 8.

[4] This was subsequently confirmed in a recent book by former White House Press Secretary Scott McClellan, as he described propaganda as a typical mode of operation. Scott McClellan. 2008. *What Happened: Inside the Bush White House and Washington's Culture of Deception.* (New York: PublicAffairs).

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 942 (1983); "information or ideas methodically spread to promote or injure a cause, group, nation, etc.," THE RANDOM HOUSE COLLEGE DICTIONARY 1060 (1982)." *Block v. Meese*, 793 F.2d 1303, 1311 (D.C. Cir. 1978) (SCALIA,J.)(interpreting "political propaganda" in 22 U.S.C. § 611(j) [Foreign Agents Registration Act] as "communication that is simply 'reasonably adapted to ... prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public ... with reference to the political or public interests, policies, or relations' . . . of the United States"). No element of the definition lends any support to a claim that propaganda means or is limited to untruth, half-truth, distortions, omissions or even pejorative comment. *Id.* [5] The Commissioner may be surprised to learn that the government is not permitted to spend money on legal positions that do not reflect the views of Congress on the law. The anti-propaganda provisions have partially removed from the government's arsenal the refuge of "good faith belief for creation of law," unless public money is not used.

In the anti-propaganda provisions of the various appropriations bills, Congress has repeatedly sent the Executive Branch a clear message. The Legislative Branch, the law*makers*, reserve exclusively to themselves the molding of opinion that is the essence

---

[5] It is not shocking that in order to justify its lack of vigilance in this area, in the aforesaid Memorandum, the DOJ rejected Justice [then Judge] Scalia's plain language definition (based on today's English) in favor of dictionary definitions from 1944 and 1951. DOJ seems content with interpreting a contemporary statute with antiquated secondary ideas formulated in the heyday of communist scares. The General Accounting (now Government Accountability) Office has found certain agency activities to be sufficiently questionable to warrant referral to Justice, but no prosecutions have ensued. *See* U.S. General Accounting Office, 1 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 4-160 (2d ed. 1991), available at http://www.gao.gov/special.pubs/og91005.pdf [hereinafter *Appropriations Principles*]. ""Having the Department of Justice watch over the executive branch is like having the fox guard the chicken coop," observed a congressional staffer working to strengthen the law. *Backing Off on Agency Lobbying*, NAT'L J., 2986 (Dec. 2, 1995). William V. Luneburg, Thomas M. Susman, The Lobbying Manual: A Complete Guide to Federal Law Governing Lawyers and Lobbyists, American Bar Association Section of Administrative Law and Regulatory Practice (3d ed. Rev. 2005), p. 316. fn. 17, 25.

of politics.  On the other hand, for the executive agencies whose job it is to execute and administer the laws made by Congress, it is illegal to express *their* opinions or advance *their* own agendas with taxpayers' money.

As illustrated above, this case represents a clear departure from decades of guidance relating to the notion of due process.  And the application of *Kennedy* and *McCutcheon* are still not the subject of a final, unappealable order, at least until the Third Circuit says so.  This action by the Secretary smacks of the unbridled administrative policy-creation that Congress sought to prohibit through the anti-propaganda acts.

Propaganda is not necessarily a message with falsehoods.  *Id*.  This remains the definition binding on those, like the Secretary, who are within the jurisdiction of the D.C. Circuit Court of Appeals.  The propaganda laws are annual constraints on the legal ability of Secretary to make their opinions or policy initiatives into administrative law, or to supplant the decisions of courts in contrast to their duty to enforce only the tax laws enacted by Congress – in the fashioned evidenced by the statute's words -- at least by a Conference Committee Report.  When one considers this press release in the light of the anti-propaganda statutes,  judges are thrust into unfamiliar territory, but the words are very clear.  The authority of the Solicitor of Labor and its press machine appears to be constrained in a fashion not discussed in Supreme Court precedents with respect to review of regulatory pronouncements.   The power to make policy can be delegated only in a specific power to make legislative regulations.   The Administrative Procedure Act, and its remedies, were designed to remedy this type of final action which

5

has caused harm to citizens. A court can enjoin the actions of the Secretary, and to prevent irreparable harm, it must.

It is impossible for defendants to know all the recipients of this propaganda. Yet, the Secretary can tell us and do all necessary to stop circumventing the orders of this court through the outrageous use of publication methods rather than the legitimate use of judicial process.

Defendants request an immediate, emergency injunction to prevent this Press Release from being published. Further, Defendants request immediate relief to prevent any further harm to their constitutional rights to due process, confrontation, and protection of their reputations, guaranteed by Article I, sec. 1 of the Pennsylvania Constitution, preserved by U.S.CONST. AMENDMENT IX.

Without this court's immediate action, the court will effectively allow lawyers to ignore court orders by ordering subordinates to publish things into the public domain. The Pennsylvania Supreme Court strongly dealt with such a practice in the *Bochetto* case, and this is the type of situation where the court should act to protect its own integrity and the rights of the litigants. An immediate injunction, sanctions against lawyers for the Secretary, and perhaps dismissal due to conduct in violation of law, all must be considered as appropriate responses to this outrageous publication of half truths. We may as well not have any hearings if freeze orders are to be enforced by the mechanism of character assassination. If they could prove their case, the Secretary would never have stooped so low. Americans have a right to be free from such attack, and they have a right to reputations and to make a living until a final order says otherwise.

DOL must be stopped, and only this court can prevent further harm. Defendants pray for the broadest possible relief available to a court of law and equity. The pending publication, if not already complete, requires the most immediate response. If DOL must issue a retraction, and get back everything it has published, then it is their violation which requires the burden be on them. The Defendants are the victims, and the government has simply overstepped its boundaries in the most alarming fashion.

There is no way the DOL can justify its actions under any balancing of equities. And there is certainly more harm to the defendants than could ever be asserted by the government. August 12 is weeks away, and this court has no idea what that hearing will show. However, the harm is already apparently done.

The power of contempt is to protect the court's integrity, and that is the institutional issue before the court today, although the Defendants are apparently in danger of virtual destruction by the most illegal acts. The Court must protect the victims, the Defendants, in this case. The Court must punish those who try to use innuendo and subtle language to do what the court has refused to give them.

Respectfully,

John J. Koresko, V

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **KORESKO PARTIES REQUEST FOR EMERGENCY INJUNCTION – AND MOTION FOR RULE 11 SANCTIONS** has been served upon all interested parties and counsel by electronic means or facsimile to the addresses appearing below and on the date noted:

Linda M. Henry, Esquire
Joanne Roskey, Esquire
Ashton S. Phillips, Esquire
U.S. Dept of Labor Office of the Solicitor
170 S. Independence Mall West
Suite 630 The Curtis Center
Philadelphia, PA 19106

Ira B. Silverstein, Esquire
Hargraves McConnell & Costigan, P.C.
10 Penn Center
1801 Market Street
Suite 2300
Philadelphia, PA 19103

_____
John J. Koresko, V, Esquire

July 17, 2013