IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS E. PEREZ, SECRETARY OF :   CIVIL ACTION
LABOR, UNITED STATES          :
DEPARTMENT OF LABOR         :
                                  :
     v.                     :
                                  :
JOHN J. KORESKO, V, et al.   :    No. 09-988

## TABLE OF CONTENTS

I.    Procedural History . . . . . . . . . . . . . . . . . . 5

     A.    Administrative Enforcement Proceedings . . . . . . 5

     B.    Initial Complaint . . . . . . . . . . . . . . . . 6

     C.    Motion for Summary Judgment . . . . . . . . . . . 10

     D.    Supplemental Complaint . . . . . . . . . . . . . 12

     E.    Motion for Temporary Restraining Order and
          Preliminary Injunction . . . . . . . . . . . . . 13

     F.    September 16 Hearing and Appointment of the
          Independent Fiduciary . . . . . . . . . . . . . . 20

     G.    Discovery and Contempt Proceedings . . . . . . . 21

     H.    IF Reports . . . . . . . . . . . . . . . . . . . 28

     I.    Jeanne Bonney . . . . . . . . . . . . . . . . . 29

     J.    Pretrial Proceedings . . . . . . . . . . . . . . 30

     K.    Trial . . . . . . . . . . . . . . . . . . . . . 34

     L.    Post-Trial . . . . . . . . . . . . . . . . . . . 36

II. <u>Findings of Fact</u> . . . . . . . . . . . . . . . . . 40

    A.   The Defendants and Their Relationships to
        One Another . . . . . . . . . . . . . . . . . . 40

    B.   The Trustees and the Plan Administrator . . . . . 42

    C.   Participating Employers in the REAL VEBA or
        SEWBP Trust . . . . . . . . . . . . . . . . . . 45

    D.   Transfers from the Trust. . . . . . . . . . . . 77

    E.   Establishment of "Death Benefit" Accounts . . . . . 92

    F.   Depositing Death Benefit Proceeds into KLF's
        Account . . . . . . . . . . . . . . . . . . . . 94

    G.   Transfer of Death Benefit Proceeds into
        a Second Account. . . . . . . . . . . . . . . . 96

    H.   Transfer of Death Benefit Proceeds to Nevis
        and to KLF. . . . . . . . . . . . . . . . . . . 97

    I.   Loans on Insurance Policies. . . . . . . . . . . 102

    J.   Transfer of Loan Proceeds into Mr. Koresko's
        Escrow Account . . . . . . . . . . . . . . . . 103

    K.   Transfer of Death Benefit and Loan Proceeds
        to an IOLTA Account. . . . . . . . . . . . . . 105

    L.   Transfer of Funds to Nevis . . . . . . . . . . 108

    M.   Transfer of Death Benefit and Loan Proceeds
        to the Pershing Account. . . . . . . . . . . . 118

    N.   The Creation and Use of the 1187 Account . . . . . 119

    O.   Deposit of Plan Assets into the 1195 Account
        and the Subsequent Transfer of Those Assets. . . . 126

    P.   The Creation and Use of the 1146 Account . . . . . 130

    Q.   The Creation and Use of the 1112 Account . . . . . 133

    R.   The Creation and Use of the Penn Public
        Trust, Inc., SPC, Account. . . . . . . . . . . 137

S.    The Creation and Use of an Account in the
      Name of CTC, the Former Trustee. . . . . . . . . 139

T.    Depositing of Plan Assets into a Separate Account
      After the Court's Freeze Orders and After the
      Installation of the IF . . . . . . . . . . . . . 144

U.    Transfer of Moneys from Employers to the 8384
      Account. . . . . . . . . . . . . . . . . . . . . 149

V.    Depositing of Plan Assets into Yet Another
      Account, After the Court Instructed to Return
      Loan Proceeds. . . . . . . . . . . . . . . . . . 152

W.    Total Amount of Diverted Plan Assets at Issue. . 153

III. Conclusions of Law. . . . . . . . . . . . . . . . . . 155

      A.    ERISA Coverage. . . . . . . . . . . . . . . . 155

      B.    Fiduciary Status. . . . . . . . . . . . . . . 165

      C.    ERISA Fiduciary Duties. . . . . . . . . . . . 180

      D.    Relief . . . . . . . . . . . . . . . . . . . 203

            1.    Removal as Fiduciaries. . . . . . . . . 203

            2.    Restitution and Disgorgement. . . . . . 206

            3.    Prejudgment Interest. . . . . . . . . . 215

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS E. PEREZ, SECRETARY OF :    CIVIL ACTION
LABOR, UNITED STATES       :
DEPARTMENT OF LABOR        :
                         :
   v.             :
                         :
JOHN J. KORESKO, V, et al.   :    No. 09-988

MEMORANDUM

McLaughlin, J.                        February 6, 2015

This action arises out of alleged violations of fiduciary duties under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in connection with a multiple-employer employee death benefit arrangement. The Secretary of Labor[1] ("the Secretary" or "DOL") brought this suit against the Koresko Defendants,[2] Jeanne Bonney, Community Trust Company,[3] the Regional Employers Assurance Leagues

---

[1] The current Secretary of Labor is Thomas E. Perez. Although the Secretary of Labor has changed throughout the course of this litigation, in this opinion the Court will refer to the Secretary with male pronouns where appropriate.

[2] The "Koresko Defendants" include John J. Koresko, V; PennMont Benefit Services, Inc.; Koresko & Associates, P.C.; Koresko Law Firm, P.C.; and Penn Public Trust.

[3] Farmers & Merchants Trust Company of Chambersburg ("F&M Trust"), successor by merger to Community Trust Company, entered into a consent judgment with the Secretary, which the Court approved on November 27, 2012 (Docket No. 352).

Voluntary Employees' Beneficiary Association Trust ("REAL VEBA Trust"), and the Single Employer Welfare Benefit Plan Trust ("SEWBPT") (together, "the Trusts")[4].  The Secretary alleges that the defendants have violated Sections 403, 404, and 406 of ERISA, 29 U.S.C. §§ 1103, 1104, and 1106.  The Secretary also seeks to find certain parties liable for co-fiduciary liability under Section 405 of ERISA, 29 U.S.C. § 1105.

The Secretary requests a permanent injunction against the Koresko Defendants and Jeanne Bonney, barring each of them from serving as a trustee or fiduciary, or as a representative in any capacity, to any employee benefit plan.  The Secretary also seeks a permanent injunction against those defendants from serving in any capacity that involves decisionmaking authority or custody or control of the assets of any employee benefit plan.  Finally, the Secretary seeks over fifty million dollars in restitution and disgorgement to the Trusts.

The Court held a three-day bench trial on June 9 through June 11, 2014.  The Court had previously granted the Secretary's motion for partial summary judgment on August 3, 2012, and the Court incorporates that decision into this

---

[4] Per the Complaint, the Secretary joined the Trusts as party defendants pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, "solely to assure that complete relief can be granted" (Docket No. 1).  To that end, the Court does not address the Trusts for liability.

memorandum.  Solis v. Koresko, 884 F. Supp. 2d 261 (E.D. Pa.
2012).  This memorandum and the Court's earlier decision on
partial summary judgment comprise the Court's findings of fact
and conclusions of law.  The Court finds for the Secretary on
all claims.

        The Court concludes that the plans at issue are
employee welfare benefit plans as defined by ERISA; that the
plans have plan assets in the form of employee contributions,
insurance policy proceeds, and earnings therefrom; and that the
defendants are ERISA fiduciaries with respect to those plan
assets.

        The Secretary presented voluminous evidence of many
violations of ERISA by the defendants, including: (1) the
diversion of tens of millions of dollars of plan assets through
more than 21 accounts in the names of more than 18 different
entities (all the creation of Mr. Koresko) at 8 or more
different banks; (2) the transfer of millions of dollars of plan
assets into accounts which only Mr. Koresko controlled and which
were out of the reach of the Trustee; (3) the taking out of over
$35 million in loans on the Trusts' insurance policies, and the
transfer of the resulting monies to accounts which only Mr.
Koresko controlled and which were out of the reach of the
Trustee; (4) the creation and subsequent depositing of plan
assets into various IOLTA accounts and accounts in Mr. Koresko's

                            3

personal name; (5) the transfer of millions of dollars of plan assets to law firms and consulting firms, from which neither the plans nor the beneficiaries benefitted, and only the defendants benefitted ; (6) the use of death benefit proceeds to purchase property in the Caribbean island of Nevis and in South Carolina in Mr. Koresko's personal name; (7) the use of plan assets to pay Mr. Koresko's expenses, including utility bills and boat rentals; and (8) the use of plan assets to pay the defendants directly.

The Court, therefore, removes the defendants from any position of fiduciary authority and permanently bars the defendants from ever serving as fiduciaries or service providers to ERISA-covered plans.  The Court also finds the Koresko Defendants liable for $19,852,114.88 in restitution for losses and disgorgement of profits.

Although the Court grants a permanent injunction against Ms. Bonney and finds that she did violate her fiduciary obligations, the Court will not order restitution or disgorgement from Ms. Bonney.  Ms. Bonney did not personally benefit from the diversion or mishandling of the plan assets and acted only under the direction of Mr. Koresko.  She therefore cannot be found financially liable.  In addition, Ms. Bonney was seriously ill during most of the litigation and was represented primarily by Mr. Koresko -- who the Court ultimately found had a

4

non-waivable conflict of interest with respect to that
representation.


I.   Procedural History

     A.   Administrative Enforcement Proceedings

          The Secretary issued subpoenas to Mr. Koresko and
certain of the Koresko Defendants in 2004 in connection with an
investigation into possible ERISA violations.  The Secretary
then filed two administrative enforcement actions related to
those subpoenas, each of which were assigned to me:  Chao v.
Koresko, No. 04-mc-74 (E.D. Pa. filed Apr. 19, 2004), and Chao
v. Koresko, No. 06-mc-192 (E.D. Pa. filed Oct. 12, 2006).[5]  In
the first Chao case, the Court granted the DOL's petition on
August 23, 2004, to enforce the subpoenas.  The Third Circuit
subsequently affirmed the Court's orders.  Because Mr. Koresko
refused to comply with the subpoenas, the Court ordered him to
be incarcerated until he produced the documents requested.  The
day before he was to be put in jail, Mr. Koresko complied with
the subpoenas.

          The second administrative enforcement proceeding was
based on new subpoenas issued by the DOL in 2006.  The Court

---

[5] There was also a third administrative enforcement action
brought before this Court, in which the DOL sought to enforce a
subpoena against Community Trust Company (the then-trustee of
the REAL VEBA Trust) in 2005.  See Chao v. Community Trust Co.,
No. 05-mc-18 (E.D. Pa. filed Jan. 25, 2005).

ordered enforcement for five of the six categories of requested documents on December 8, 2008.  In an April 26, 2010, non-precedential opinion, the Third Circuit affirmed orders in both the '04 and '06 Chao cases and recommended that "all of the Koresko litigation be assigned to one district judge."  Opinion at 4, Secretary of Labor v. Koresko, Nos. 09-1142, 09-2191 (3d Cir. Apr. 26, 2010).

### B.  Initial Complaint

While appeals from decisions in the administrative enforcement actions were pending, the Secretary instituted this civil suit against the Koresko Defendants on March 6, 2009.  The Secretary also sued Jeanne Bonney and Community Trust Company, and it named the Trusts as defendants.  This case was initially assigned to the Honorable C. Darnell Jones, II.

Within days of the filing of the complaint, the Koresko Defendants, Ms. Bonney, and the Trusts filed emergency motions, requesting that the case be placed under seal and other injunctive relief, in response to a press release issued by the Secretary (Docket Nos. 6, 7).  The Court concluded that the moving defendants did not meet their burden to justify a seal of the record in this case.  Furthermore, the Court declined to enter injunctive relief because the defendants had not filed any responsive pleadings (Docket No. 15).  The Court also denied a

6

motion for reconsideration of that order (Docket No. 22).  The defendants appealed, and that decision was affirmed by the Third Circuit on April 28, 2010, in a second non-precedential opinion. Opinion, <u>Secretary of Labor v. Koresko</u>, No. 09-2192 (3d Cir. Apr. 28, 2010).

On July 14, 2009, the Secretary filed an application for a temporary restraining order ("TRO") and preliminary injunction (Docket No. 63).  The Secretary sought an order prohibiting the Koresko Defendants from removing F&M Trust as trustee and from directing the transfer of any trust assets to themselves.  Judge Jones held a TRO hearing on July 17, 2009, during which he denied the TRO request (Docket Nos. 71, 75). Prior to the TRO hearing, the defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Docket No. 69).  Judge Jones denied that motion in its entirety on August 31, 2009 (Docket Nos. 107, 108).

Judge Jones held a preliminary injunction hearing on September 2 and 3, 2009, and on October 6, 2009.[6]  On January 15,

---

[6] Following the October 6 hearing, both Penn Mutual Life Insurance Company and TD Bank entered the case as intervenors due to confusion and uncertainty with regard to the trust assets (Docket Nos. 143, 146).  On November 16, 2009, the Court allowed Penn Mutual to intervene and TD Bank to intervene in order to file an intervenor complaint (Docket No. 165).  On November 1, 2010, the Court granted Penn Mutual's motion for voluntary dismissal and dismissed Penn Mutual's complaint in intervention without prejudice (Docket No. 240).  The Court granted TD Bank's

2010, the Court denied without prejudice the Secretary's motion for a preliminary injunction because "the DOL has not made the significantly high required showing to succeed in securing injunctive relief at this stage."  Order at 2 (Docket No. 195). The Court also permitted transfer of the corpus of the Trusts to Penn Public Trust, which became the sole trustee.

At the defendants' request, on March 17, 2010, the Court stayed this case for sixty days due to Ms. Bonney's serious medical condition (Docket No. 210).[7]

On May 3, 2010, as a result of the Third Circuit's recommendation that all of the Koresko litigation be assigned to one judge, then-Chief Judge Bartle reassigned the DOL's civil case to me (Docket No. 213), along with several other cases involving Mr. Koresko and the Trusts.[8]

---

motion for a summary judgment of discharge in interpleader on December 2, 2010 (Docket No. 246).

[7] The defendants then requested an indefinite stay.  After this case was transferred to me, I denied that indefinite stay and allowed discovery to go forward without Ms. Bonney's participation.  I allowed for reconsideration of the decision not to stay the case once discovery was complete (Docket No. 239).

[8] On May 6, 2010, I was reassigned the following cases, which were previously assigned to Judge Jones:  Single Employer Welfare Benefit Plan Trust v. MIDA, Inc., No. 10-1921; Farmers and Merchants Trust Company of Chambersburg v. Koresko, No. 09-5112; Koresko v. TD Bank, N.A., No. 09-5054; Neste v. General American Life Insurance Company, No. 09-4581; Koresko v. Solis, No. 09-3152; and Regional Employers' Assurance Leagues Voluntary

On December 10, 2010, the Court placed this action in
suspense for sixty days for the parties to pursue settlement
(Docket No. 244).  In February 2011, the parties filed status
reports indicating that settlement talks continued.  At that
time, the DOL stated that it would request that the cases be
removed from civil suspense if no progress was made (Docket No.
252).  The Court removed the case from suspense in January 2012

---

Employees' Beneficiary Association Trust v. Castellano, No. 03-
6903.

    This Court currently has on its docket twenty-three cases
related to Mr. Koresko or the Trusts that are in active or
suspense status:  Perez v. Koresko, No. 09-988; Regional
Employers' Assurance Leagues Voluntary Employees' Beneficiary
Association Trust v. Castellano, No. 03-6903; Neste v. General
American Life Insurance Company, No. 09-4581; Single Employer
Welfare Benefit Plan Trust v. MIDA, Inc., No. 10-1921; Langlais
v. PennMont Benefit Services, Inc., No. 11-5275; Larkin v. Penn
Public Trust, No. 11-7421; Sharkey v. Penn Public Trust, No. 12-
1166; Regional Employers' Assurance Leagues Voluntary Employees
Beneficiary Trust v. O'Brien, No. 12-2207; Oswood v. Penn Public
Trust, No. 13-666; Sun Life Assurance Company of Canada v.
Morton, No. 13-1088; Koresko v. Office of Disciplinary Counsel
of the Disciplinary Board of the Supreme Court of Pennsylvania,
No. 14-1154; In re: REAL VEBA Trust, No. 14-1484 (bankruptcy);
In re: Koresko Law Firm, P.C., No. 14-1485 (bankruptcy); In re:
Single Employer Welfare Benefit Plan Trust, No. 14-1486
(bankruptcy); In re: PennMont Benefit Services, Inc., No. 14-
1487 (bankruptcy); In re: Koresko & Associates, P.C.; No. 14-
1488 (bankruptcy); In re: Penn Public Trust, No. 14-1489
(bankruptcy); Kalan v. Koresko Financial, No. 14-5216; Croushore
v. American General Life Insurance Cos., No. 14-5271; Mohsseni
v. Western Reserve Life Assurance Co. of Ohio, No. 14-5285;
Erdman v. American General Life Insurance Cos., No. 14-5286;
Spokane v. Nationwide Life Insurance Co., No. 14-5287; Gilcrease
v. American General Life Insurance Cos., No. 14-5288.

and held a status conference on February 10, 2012 (Docket No. 260).  The Court issued a scheduling order on February 13, 2012.[9]

     C.   Motion for Summary Judgment

          On February 28, 2012, the Secretary filed a motion for partial summary judgment (Docket Nos. 267-269).  The Secretary sought to prove ERISA violations by Mr. Koresko, Ms. Bonney, PennMont, Koresko Law Firm, and Koresko & Associates with regard to three of the employee welfare benefit plans participating in the Trusts.

          The Court issued a decision on August 3, 2012, granting partial summary judgment in favor of the DOL (Docket Nos. 314, 315).[10]  The Court concluded that Mr. Koresko, Ms. Bonney, and PennMont had violated Sections 403, 404, and 406 of ERISA as to certain employee welfare benefit plans participating in the REAL VEBA Trust.  Although the Court deferred its decision on the relief requested by the Secretary, it stated

_____

[9] Based on a submission by Ms. Bonney's doctor regarding her health, the Court ordered on February 28, 2012, that the litigation would proceed without Ms. Bonney.  The Court concluded that Ms. Bonney was unable to participate in the proceedings at that time (Docket No. 270).

[10] Until August 1, 2012, Mr. Koresko was acting as counsel for himself, Jeanne Bonney, Koresko Law Firm, Koresko & Associates, PennMont, Penn Public Trust, and the Trusts.  On August 1, Jeanne Bakker, Esq., and Richard Martin, Esq., from Montgomery, McCracken, Walker & Rhoads, LLP, entered their appearance on behalf of those defendants.

that it would consider a request for narrower, more limited injunctive relief.

The Court also made the following conclusions that are relevant to this decision.  First, although the master REAL VEBA Trust is not an employee welfare benefit plan, the Domenic M. Castellano, D.D.S, P.A. Plan, the Cetylite Industries, Inc. Plan, and the Décor Coordinates, Inc. Plan are employee welfare benefit plans under ERISA.  Solis v. Koresko, 884 F. Supp. 2d 261, 274 (E.D. Pa. 2012), appeal dismissed (Aug. 19, 2013).  ERISA fiduciary responsibility provisions applied to the Cetylite, Décor, and Castellano plans, and those plans had "plan assets" to which ERISA fiduciary responsibilities could attach.  Id. at 285.  The Court also ruled that the July 29, 2009, Amendment to the REAL VEBA Plan Document, which purported to eliminate non-owner employees ("NOEs") from the arrangement altogether, was invalid.  Id. at 280.

In addition, the Court made several conclusions as to liability, not just to the structure of the REAL VEBA arrangement.  First, the Court concluded that PennMont, Mr. Koresko, and Ms. Bonney are fiduciaries of the three plans at issue, and they each violated their fiduciary duties under Section 403(a) of ERISA by holding assets of the three plans even though they were not trustees of those plans.  Id. at 290, 292.  Furthermore, the Court held that those three defendants

violated the fiduciary duty of loyalty and duty of care under
Section 404(a)(1) of ERISA by directing or permitting plan
assets to be diverted into accounts subject to their sole
control.  Id. at 294.

Lastly, the Court also held that PennMont, Mr.
Koresko, and Ms. Bonney violated Section 406(b)(1) of ERISA as
to the Cetylite plan.  Section 406 prohibits fiduciaries from
engaging in transactions that involve a transfer of plan assets
to a party in interest.  The Court concluded that, as
fiduciaries, PennMont, Mr. Koresko, and Ms. Bonney were parties
in interest as defined by ERISA.  PennMont directed that certain
insurance proceeds related to the Cetylite plan be transferred
to an account held in the name of Ms. Bonney and Mr. Koresko.
Id. at 295-97.

D.   Supplemental Complaint

As discovery progressed in this case,[11] the Secretary
filed a supplemental complaint on November 8, 2012 (Docket No.
349).  Although the Secretary did not change his request for
relief, the Secretary added new claims against Mr. Koresko and
Penn Public Trust as well as new allegations of co-fiduciary

---

[11] On October 25, 2012, the Court entered an order, as
requested by the parties, modifying the discovery schedule and
allowing the parties until March 31, 2013, to complete discovery
(Docket No. 342).

12

liability against Mr. Koresko, Penn Public Trust, PennMont, and Koresko Law Firm.  These allegations involve loans taken out against insurance policies held by the Trusts for the benefit of the plans.

The Secretary alleges that, from July 9, 2009, until January 15, 2010, Mr. Koresko and Penn Public Trust applied for and received insurance policy loans on the policies that insured the lives of participants in the plans.  Although the checks were made payable to the Trusts and the plans, the checks were deposited into an account in Mr. Koresko's name.  The Secretary alleges that beneficiaries will now receive less from those insurance policies where loans were taken out.  The Secretary alleges that these actions by Mr. Koresko and Penn Public Trust constituted another violation of Sections 404 and 406 of ERISA. Supplemental Compl. ¶¶ 43-48, 55 (Docket No. 349).

On January 30, 2013, the Court held a status conference with the parties.  At that conference, the parties requested the assistance of a judge for settlement negotiations. On March 19, 2013, the Court referred the case to the Honorable William H. Yohn, Jr. for settlement (Docket No. 360).  Through May 2013, the Court decided several discovery motions, and the parties negotiated settlement with Judge Yohn.  No settlement was reached.

E.   <u>Motion for Temporary Restraining Order and Preliminary Injunction</u>

On June 19, 2013, the Secretary filed another application for a TRO and preliminary injunction (Docket No. 377).  At that time, the Secretary presented evidence and argued that the Koresko Defendants had diverted death benefit proceeds totaling approximately $2.5 million for their own use and benefit.  There was also evidence that the Koresko Defendants had diverted $35 million in loans on insurance policies owned by the Trusts for the benefit of the plans and employer arrangements participating in the Trusts to accounts titled to entities other than the plans' trustee.  Finally, the Secretary alleged that the Koresko Defendants had misappropriated at least $3.5 million of these loan proceeds for their own use and benefit.  Ultimately, the Secretary asserted that the Koresko Defendants dissipated and misappropriated over $6.8 million in loan and death benefit proceeds.  The Secretary sought the appointment of an independent fiduciary to administer the plans, pay out benefit claims, and repay the loans.[12]

---

[12] The DOL also raised in its motion that other money and real estate traceable to the Trusts were located in the Caribbean island of Nevis.  The DOL asserted that Mr. Koresko invested money in condominiums in Nevis that can be traced to trust accounts.  Furthermore, the DOL included evidence in its motion that Mr. Koresko has a Nevis business bank account, as well as a personal account; the Nevis business account contained over $1 million.

The Court scheduled an evidentiary hearing on the motion for July 8, 2013.[13]  The Koresko Defendants filed a motion under seal for a continuance of the evidentiary hearing (Docket No. 388).  That motion was based on Mr. Koresko being physically unwell, and it attached an affidavit by a neurologist, Dr. Christopher Bradley.  Dr. Bradley's opinion was based primarily on Mr. Koresko's complaints to him and not on Dr. Bradley's independent medical examination of Mr. Koresko.  Dr. Bradley explained that he had ordered Mr. Koresko to undergo EEG and MRI testing during the next week.

On June 28, 2013, the Court held an on-the-record telephone conference with counsel in the case to discuss Mr. Koresko's request for a continuance and the potential for interim relief during that four-week continuance, among other items (Docket No. 420).  After the call, the Court issued a follow-up order, which stated that the July 8 hearing would not be a full evidentiary hearing, but instead the Court would hear

---

[13] On June 26, 2013, the Court ordered that the July 8 hearing would be combined with an evidentiary hearing on similar temporary restraining order and preliminary injunction motions filed in three related cases before this Court:  Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Trust v. Castellano, No. 03-6903; Larkin v. Penn Public Trust, No. 11-7421; and Oswood v. Penn Public Trust, No. 13-666 (Docket No. 385).  Ira Silverstein, Esq., from Feldman Morgado, Pennsylvania, is counsel for the non-Koresko parties in each of these cases.

arguments regarding interim relief and discuss with counsel the scheduling of an evidentiary hearing (Docket No. 391).

The Court also directed Mr. Koresko's counsel to submit further medical documentation on or before the July 8 hearing, including:

> a second declaration from Dr. Bradley that describes the results of Mr. Koresko's MRI and EEG and any other diagnostic tests performed on Mr. Koresko up to that point as well as Dr. Bradley's diagnosis of Mr. Koresko and opinion regarding Mr. Koresko's ability to participate in a deposition and evidentiary hearing; accident reports and other documentation regarding Mr. Koresko's automobile accident; and medical records regarding Mr. Koresko's concussion sustained approximately five years ago that the recent automobile accident is alleged to have exacerbated

(Docket No. 391).

Lastly, with the consent of the parties, the Court entered an interim order on June 28 freezing sixteen bank accounts pending a hearing on the motion for a TRO (Docket No. 392).  The Court allowed PennMont and Penn Public Trust to pay the insurance premiums on the pending life insurance policies out of a certain account.

On the morning of the July 8 hearing, Montgomery, McCracken, Walker & Rhoads LLP ("Montgomery McCracken"), who had previously been representing the defendants, notified the Court of its intention to file a motion to withdraw as counsel.[14]  Mr.

---

[14] The motion to withdraw by Montgomery McCracken was granted on July 31, 2013 (Docket No. 456).

Koresko was not present because he had not attended the hearing.
The Court therefore provided Mr. Koresko with the opportunity to
come to the courtroom or to participate by phone.  Mr. Koresko
chose to participate in the proceedings by phone and objected to
Montgomery McCracken's motion to withdraw.  The Court discussed
the motion with Montgomery McCracken and Mr. Koresko in chambers
ex parte.[15]

After the discussion in chambers, the scheduled
hearing proceeded in the courtroom.  The Court considered only
whether to continue, narrow, or expand the interim order
regarding the frozen accounts, which had already been put into
place with the consent of counsel, as discussed above.  At the
end of the hearing, the Court scheduled another hearing for
August 12, with the concurrence of Mr. Koresko, to allow him the
opportunity to appear in person.

On July 9, 2013, the Court entered a modified interim
order, removing three bank accounts included in the frozen
accounts but otherwise continuing the temporary freeze (Docket
No. 407).  On July 22, 2013, the Court denied the Koresko

---

[15] Montgomery McCracken did not have the requested medical
information in response to the Court's June 28 order.  Id. at
9:13-9:25.  The Court did, however, receive numerous faxes from
Mr. Koresko directly while the proceedings were ongoing,
including a declaration from an occupational therapist and an
affidavit from Mr. Koresko himself regarding medical procedures
relating to his head injury.

Defendants' motion to postpone the August 12 evidentiary hearing (Docket No. 434).  The Court also issued a third interim order on July 23, following a telephonic hearing on July 22, in response to the Koresko Defendants' attempts after the July 8 evidentiary hearing to remove cash value from the insurance policies at issue (Docket No. 436).

In the July 23 interim order, the Court concluded that the Secretary and the private litigants had shown a likelihood of success on the merits of the ERISA violation and breach of fiduciary duty claims and that there was a probability of irreparable injury to the public, plan participants, and beneficiaries.  The Court enjoined the Koresko Defendants from expending or otherwise disposing of the cash value, or reducing the value, of any life insurance policies owned by or for the benefit of Trusts or the plans.  The Court also ordered the Koresko Defendants to produce certain documents related to the policy loans, to withdraw their pending requests to remove cash value from the policies, and to restore any cash value removed after July 8, 2013.

Two days later, on July 25, 2013, the Koresko Defendants filed a suggestion of bankruptcy (Docket No. 441).[16]

---

[16] On July 23, 2013, Mr. Koresko filed for bankruptcy on behalf of Penn Public Trust, PennMont, Koresko & Associates, Koresko Law Firm, and the two Trusts in the Eastern District of Pennsylvania.  The bankruptcy court dismissed those cases on

The Court ruled that the case would remain active and proceed

because the Secretary's action was exempt from the automatic

stay under 11 U.S.C. § 362(b)(4), which excepts actions to

enforce a governmental unit's police or regulatory power (Docket

No. 446).  The Koresko Defendants filed a motion for

reconsideration of that order on July 30 (Docket No. 449).  The

Court continued the hearing scheduled for August 12 (as well as

---

September 3, and Mr. Koresko appealed.  The appeals were
assigned to this Court, and Mr. Koresko voluntarily dismissed
them on November 12, 2013.

On October 1, 2013, involuntary bankruptcy petitions were
filed against the six entities in the United States Bankruptcy
Court for the Middle District of Florida.  Prior to the filing
of those bankruptcies, and after Mr. Koresko had already been
enjoined from representing the Trusts, Mr. Koresko met with the
attorneys responsible for the filing of the Florida
bankruptcies.  The bankruptcy court determined that the
bankruptcies were filed in an attempt to seek protection from
the automatic stay and to delay this case.  The bankruptcy court
in the Middle District of Florida transferred those cases to the
Eastern District of Pennsylvania in an order dated December 6,
2013.

In his decision to transfer the bankruptcies, Judge Funk
stated that "the Debtors are the primary, if not the sole,
beneficiaries of the involuntary petitions filed in this Court
to side-step the rulings in both the Pennsylvania District Court
and the Pennsylvania Bankruptcy Court. . . . [T]his Court cannot
sanction such apparent abuse of the bankruptcy process."
Findings of Fact and Conclusions of Law and Order Transferring
Venue of Cases at 15, In re: Koresko & Associates, P.C., No. 13-
5991 (Bankr. M.D. Fla. Dec. 6, 2013) (Docket No. 63).

In February 2014, the Court withdrew the reference to the
bankruptcy court in those six cases (Docket No. 709).  Those
cases are currently suspended pending the outcome of this case.

depositions scheduled for early August) in light of the motion
for reconsideration (Docket No. 457).

The Court ultimately denied the Koresko Defendants'
motion for reconsideration on August 28, 2013, and ordered the
parties to file proposed schedules for the outstanding
depositions and the preliminary injunction hearing (Docket Nos.
474, 475).  The Court then scheduled a hearing for September 16,
2013, to hear arguments on motions to modify the freeze orders
and on whether the appointment of an independent fiduciary was
appropriate (Docket No. 486).

F.   September 16 Hearing and Appointment of the
     Independent Fiduciary

At the September 16, 2013, hearing, the Court
appointed the Independent Fiduciary ("IF"), The Wagner Law
Group.  Based on input from the parties, the Court issued an
order on September 16 concluding that the Secretary had shown a
likelihood of success on the merits on his ERISA claims and that
there was the probability of irreparable injury to the public,
plan participants, and beneficiaries absent the relief requested
(Docket No. 496; see also Docket Nos. 502, 515).

In the September 16 Order, the Court also issued an
injunction removing the Koresko Defendants and their agents from
any position they held at that time with regard to the Trusts

20

and prohibiting them from serving as any type of representative
of the plans or employer arrangements participating in the
Trusts.  The IF was ordered to administer the plans, employer
arrangements, and the Trusts and was given full authority and
control with respect to the management or disposition of the
assets of the plans, employer arrangements, and the Trusts.  The
IF was also directed to inventory the assets of the Trusts and
the plans or employer arrangements, as well as to create a
listing of diverted assets.  The IF was also ordered to develop
a process for day-to-day administration of the Trusts.  The
Court ordered an initial status report from the IF by the end of
October 2013.  Lastly, Mr. Koresko was ordered to turn over all
assets of the plans, employer arrangements, and the Trusts to
the IF as well as to provide the IF with the name, account
number, and location of any bank accounts containing plan assets
(Docket No. 496).


        G.    Discovery and Contempt Proceedings

        Mr. Koresko did not comply with the September 16
order, which spawned numerous motions for contempt and contempt
hearings in the following months.  The Secretary filed his
initial motion for contempt on September 27, 2013 (Docket No.
518).  In that motion, the Secretary detailed how Mr. Koresko
had made clear that he did not intend to comply with the

                                21

September 16 order to provide the IF with (1) all documentation related to the plans and employer arrangements; (2) the name, account number, and location of any accounts containing plan assets; and (3) all records relating to the finances and administration of the plans and an accounting of all transfers, payments, and expenses paid in connection with the plans.  In communications to the IF, Mr. Koresko stated that he would not permit his employee to answer queries about the Trusts, that he himself would not answer such questions, and that he would not provide any documents to the IF.  Because Mr. Koresko appealed the September 16 order, he told the DOL that he need not comply with it.

The Court scheduled a contempt hearing for October 2, 2013, at which time the Koresko Defendants were to show cause why they should not be held in civil contempt and subject to sanctions for their failure to comply with the September 16 order (Docket No. 522).  Much of the hearing on October 2 discussed the possible retention of Lawrence McMichael, Esq., from Dilworth Paxson LLP ("Dilworth"), on behalf of Mr. Koresko for purposes of the contempt hearing, and whether Mr. McMichael could be paid a retainer from a certain account that had been frozen by the bank.

The Court hesitated to find Mr. Koresko in contempt, stating that it "would like to attempt to see if we can't get

22

this order complied with without" having to "find people in contempt and the sanctions that come with that civil contempt which includes incarceration."  10/2/13 Hr'g Tr. at 37:7-37:11 (Docket No. 534).

The following day, as the contempt hearing continued, Mr. McMichael produced to the DOL and IF an inventory, created by Mr. Koresko the night before, of insurance policies, insurance policy loans, and cash assets of the Trusts.  The remainder of the hearing was spent establishing processes for obtaining further information on other bank accounts and for the ex parte freezing of appropriate bank accounts (Docket No. 536). Following Mr. McMichael's submission to the Court, the Court approved Dilworth's representation of Mr. Koresko in the contempt proceedings on October 4 and authorized a retainer to be paid from one of the frozen accounts (Docket No. 530).

On October 7, the Court issued an order referring the September 16 order regarding the IF to Judge Hey in order to monitor its implementation (Docket No. 532).  After the parties held several telephone conferences with Judge Hey, the Court scheduled another contempt hearing for November 18 and 19, 2013, to take stock of the parties' progress (Docket No. 616).  The Court then issued a number of orders, including the establishment of a procedure for the IF to review and for Mr.

23

Koresko to produce files from Mr. Koresko's office and offsite storage (Docket No. 604).

On February 27, 2014, the Court directed the DOL to inform the Court of any outstanding contempt issues.  On March 10, the DOL filed a supplemental memorandum and exhibits that focused on the refusal of the Koresko Defendants to turn over certain trust assets to the IF, particularly with regard to certain condominiums on the Caribbean island of Nevis and a property in South Carolina.  At this point, Mr. Koresko also refused to turn over more than $1 million held in a Nevis off-shore account.  The DOL emphasized how, since the Court ordered the transfer of those funds on September 16, Mr. Koresko had flown to Nevis and moved the money from Scotia Bank into a new account at the Royal Bank of Trinidad and Tobago in the name of Koresko Law Firm (Docket No. 726).  Mr. Koresko, represented by Dilworth, responded in opposition to the DOL's supplemental motion for contempt on March 17, 2014 (Docket No. 736).

Mr. Koresko's deposition was taken on December 17 and 18, and January 7 and 8, in the Court's jury room, with Dilworth's representation.  Several third-party depositions were also taken during these months.

The Court held a subsequent contempt hearing on April 1.  Rather than holding Mr. Koresko in contempt, the parties agreed on language in an order permitting the IF to engage

24

Nevisian counsel to obtain written guidance on certain issues of Nevisian law (Docket No. 762). The Court also ordered Mr. Koresko to sign letters authorizing the Nevis banks to give information to the IF about the accounts held at those banks, which Mr. Koresko did sign.

The IF obtained the requested information from Nevisian counsel and submitted a letter to the Court on June 4, 2014 (Docket No. 834). The Court held a conference with counsel for Mr. Koresko and the DOL on June 25, 2014, concerning the Nevis condominiums and bank account. On June 27, 2014, the Court ordered Mr. Koresko to wire transfer the Nevis funds by July 14 to a frozen account, used for the administration of the Trusts and in the control of the IF (Docket No. 898).

On July 11, 2014, Mr. Koresko filed a declaration that the Royal Bank of Trinidad and Tobago would not wire the Nevis funds into the United States as requested (Docket No. 912). As a result, it was agreed to that Mr. Koresko would travel to Nevis, along with Ms. Catherine Pappas, an associate at Dilworth, to arrange for the transfer in person (Docket No. 945). While Mr. Koresko was visiting Florida, however, evidently driving to the Miami Airport in preparation for his travel to Nevis, he became involved in a single-car accident on the early morning of July 16, 2014 (Docket No. 977). His plans

to travel to Nevis were indefinitely postponed due to continuing health issues.[17]

On September 10, 2014, the Court denied the Secretary's motion for contempt except with respect to Mr. Koresko's failure to transfer to the United States the accounts held in the Nevis branch of the Royal Bank of Trinidad and Tobago (Docket No. 990).  The Court provided Mr. Koresko until October 3, 2014,[18] to transfer the Nevis accounts or face contempt by the Court.  However, given Mr. Koresko's purported health concerns, the Court allowed Mr. Koresko to submit medical documentation by a treating physician, in lieu of transferring the accounts himself, which would explain "with sufficient specificity" how Mr. Koresko's condition inhibits him from transferring the accounts (Id.).

On October 10, 2014, Mr. Koresko chose to submit medical documentation instead of transferring the accounts (Docket No. 1026).  The documentation submitted, however, did not meet the Court's directive that Mr. Koresko submit documentation of "sufficient specificity" (Docket No. 1033).  In

---

[17] On July 30, 2014, the Court ordered Mr. Koresko's counsel to submit weekly reports to the Court and to the DOL regarding Mr. Koresko's health status (Docket No. 961).  The Court suspended the weekly reports on January 14, 2015 (Docket No. 1123).

[18] The Court granted counsel's request for an extension until October 10, 2014, to comply with the order.

fact, the Court found that the filed physician letters were "contradictory" and "fail[ed] to include any supporting results from physical examinations, clinical findings, or supporting tests," instead "repeat[ing] the claims made by Mr. Koresko himself" (Id.).

As a result, the Court ordered that Mr. Koresko transfer the accounts from Nevis by October 31, 2014, or sign a power of attorney providing the IF control of the accounts by the same date (Id.). The Court also authorized Mr. Koresko to draft his own power of attorney, but, if Mr. Koresko chose to do so, the Court directed that the new version be "similar in effect to the IF's draft" in order for Mr. Koresko to avoid the Court's contempt (Id.).

Mr. Koresko chose to draft his own power of attorney, which, according to Nevisian counsel, was technically defective (Docket No. 1108). Subsequently, the Court ordered Mr. Koresko to sign the power of attorney by December 8, 2014, as already approved by Nevisian counsel, or face contempt of the Court (Docket No. 1087).[19] On December 15, 2014, after Mr. Koresko's counsel informed the Court that it was "unable to reach Mr. Koresko despite multiple efforts to determine the status" of the

_____

[19] In response, Mr. Koresko filed, pro se, an emergency motion to stay the Court's order and a general stay (Docket No. 1091). The Court denied the motion on December 9, 2014, for having no merit (Docket No. 1092).

power of attorney (Docket No. 1094) -- and after a full week

elapsed since the last Court imposed deadline -- the Court held

Mr. Koresko in contempt (Docket No. 1098).  The Court provided

Mr. Koresko three days to purge himself of contempt before he

would be required to surrender himself to the Office of the

United States Marshal (Id.).  On the morning of the day that Mr.

Koresko was to surrender himself, his counsel informed the Court

that Mr. Koresko had executed the revised power of attorney

(Docket No. 1102).  On December 30, 2014, the IF confirmed that

it had received the signed power of attorney, executed by Mr.

Koresko and witnessed by a notary (Docket No. 1115).[20]


H.   <u>IF Reports</u>

In the September 16 order, the IF was directed to

report to the Court on the status of its work by October 28,

2013 (Docket No. 496).  After an extension, the IF submitted its

report and exhibits to the Court on October 31, 2013.  The Court

docketed that report under seal (Docket Nos. 566, 567, 573).

On February 4, the Court ordered the IF to submit a

supplemental report by March 14, 2014, to serve as a final

---

[20] Although Mr. Koresko had signed the revised power of
attorney by December 18, as affirmed by his counsel, the notary
who he had witness his signing had failed to sign next to the
line designated for her signature (Docket No. 1121).  The Court
therefore directed Mr. Koresko's counsel to obtain the
appropriate signature, which he did by December 30 (Id.; Docket
No. 1115).

report on the IF's tasks (Docket No. 681).  On March 3, the
Court directed the IF to draft the report in a way that
participant-specific information could be redacted, if necessary
(Docket No. 712).  The IF submitted its March 14 report in a
timely fashion, and that report was docketed under seal (Docket
Nos. 738, 739).

On March 26, 2014, the Court directed the IF to submit
a supplementary report by March 31.  The Court ordered the IF to
provide additional information, as requested by the DOL, to
assist the Court in making determinations as to coverage,
outstanding loans, and the assets and liabilities of the plans
(Docket No. 750).  The March 31 report was timely received and
docketed under seal (Docket Nos. 760, 761).

I.   <u>Jeanne Bonney</u>

On February 19, 2014, the Secretary filed a motion
requesting that the Court reconsider its earlier order directing
that this case proceed without the participation of Ms. Bonney
(Docket No. 704).  The Secretary filed this motion seeking to
depose Ms. Bonney, and he requested that the Court order Ms.
Bonney to inform the Court about her current ability to
participate in the litigation and to submit documentary evidence
to substantiate her medical conditions.  The Secretary also

moved to have Mr. Koresko disqualified as Ms. Bonney's attorney
due to a non-waivable conflict of interest.

The Court issued an order on April 22, 2014, granting
the Secretary's motion, allowing the DOL to depose Ms. Bonney,
and disqualifying Mr. Koresko as Ms. Bonney's attorney (Docket
No. 782).  The Court then received a detailed affidavit from Ms.
Bonney on May 5, which discussed her health.  Based on that
affidavit, the Court reconsidered its decision as to Ms. Bonney
and concluded that Ms. Bonney had adequately shown that she is
unable to participate in these proceedings (Docket No. 795).

On June 2, at the Court's request, the DOL responded
as to its position on proceeding against Ms. Bonney.  The DOL
also submitted a response to Ms. Bonney's affidavit on June 7.
Both of these letters are filed under seal (Docket Nos. 865,
866).  The Court also held several on-the-record telephone
conferences with Ms. Bonney and the DOL as to whether Ms. Bonney
was able to be deposed.

Prior to the start of trial, Ms. Bonney informed the
Court that she would be willing to agree to be permanently
disbarred in return for dismissal of the case against her.  The
DOL would not agree to those terms.  Ms. Bonney's deposition was
held on July 30 at the courthouse in Montgomery County,
Pennsylvania, with Judge Hey presiding.  In large part, the

Court accepted the facts presented in Ms. Bonney's deposition as true, per the findings of fact below.

    J.    Pretrial Proceedings

        On March 3, 2014, the Court issued a trial scheduling order (Docket No. 720).  The trial was scheduled to begin June 9, 2014, potentially running through June 20.  The Court scheduled the final pretrial conference for June 2, 2014. Deadlines for pretrial memoranda, pretrial motions, and the exchange of exhibits were also set in that order.  The Court also ruled that Mr. Koresko would not be represented at trial by counsel paid from funds in the frozen accounts, although Mr. Koresko could represent himself, or retain counsel using his own funds, for the trial and pretrial proceedings (Docket No. 720).

        On May 19, the Secretary timely filed a motion in limine to admit summaries of voluminous documents (Docket No. 813).  Mr. Koresko did not timely respond by May 27, as required by the trial scheduling order.  Mr. Koresko also failed to submit a pretrial memorandum.[21]

_____

[21] The DOL filed a motion to compel F&M Trust's response to a subpoena on May 21 (Docket No. 815).  Mr. Koresko did respond to that motion, on June 1.  In that response, Mr. Koresko also objected briefly to the DOL's motion in limine as follows: "Defendants respectfully voice their objection to every document DOL has said it will introduce or summarize, and upon reflection on the Motions in Limine already of record from 2009, the same

31

On June 2, the Court held the final pretrial conference.  Although the final pretrial conference was scheduled to be held in person, Mr. Koresko did not appear and participated by phone only after he was contacted by the Court. When on the phone, Mr. Koresko stated that he was unaware of the pretrial conference, although it had been scheduled on the docket approximately three months earlier.  Mr. Koresko also told the Court that he had materials pending before the Third Circuit to postpone the trial.  The Court stated that the trial would go forward as scheduled unless the Third Circuit took action otherwise.  Final Pretrial Conference Tr. at 4:5-7:5 (Docket No. 868).  The Court subsequently granted the Secretary's motion in limine to admit summaries of voluminous documents on June 4 (Docket No. 827).  The Court also received copies of the DOL's exhibits prior to trial.  At no point did Mr. Koresko submit any exhibits.

Mr. Koresko then filed his own motion in limine on June 4, including on behalf of Jeanne Bonney and the Trusts. (Docket No. 830).  That same day, Mr. Koresko also filed a motion for recusal, postponement of trial, stay, and transfer of

issues with respect to DOL evidence are plain upon this record" (Docket No. 822).

Mr. Koresko did, however, file a motion for summary judgment on May 19 (Docket No. 814).  The Court denied that motion without prejudice to Mr. Koresko's rights to raise those issues in connection with the trial (Docket No. 819).

32

the case (Docket No. 831).  The Court denied Mr. Koresko's motion in limine as late and declined to engage with Mr. Koresko's arguments on the merits at that juncture.  The Court stated that those arguments had either been rejected or were premature given the trial on June 9 (Docket No. 838).  The Court also denied the motion for recusal because the Court had addressed many of those merits-related issues previously (Docket No. 837).  The Court then denied a renewed motion for recusal and a corrected renewed motion for recusal on July 6 (Docket No. 847).

K.   <u>Trial</u>

Mr. Koresko filed several motions, both in this Court and in the Third Circuit, over the weekend leading up to the June 9 trial date.  On Sunday, June 8, Mr. Koresko filed a "notice" that he had filed a motion for emergency stay of the trial in the Third Circuit on June 7 (Docket No. 848).  The Third Circuit declined to take any action on the motion because it was not filed in sufficient time to allow the DOL to respond or in sufficient time for the Court to properly consider the motion.  The Third Circuit directed the parties to show cause within three days why the motion should not be dismissed as moot.  Order, <u>Secretary United States Department of Labor v. Koresko</u>, No. 13-3827 (3d Cir. June 9, 2014).[22]

Without a definitive ruling from the Third Circuit, on the morning of June 9, Mr. Koresko sent in a letter to the Court stating that he would not appear at the trial, which the Court gave to the DOL and docketed under seal (Docket No. 854).  On

---

[22] Mr. Koresko filed his response to the order to show cause on June 9.  On June 10, the Third Circuit ordered that the DOL could respond to the show cause order by June 12, and any arguments on the merits must be filed by June 17.  The DOL filed its show cause response on June 12.  On June 16, the Third Circuit ordered that the Secretary's response time for the merits arguments was stayed pending the Third Circuit's consideration of the responses to the show cause order.  On June 17, after the trial had concluded on June 11, the Third Circuit dismissed Mr. Koresko's motion as moot.  Order, <u>Secretary United States Department of Labor v. Koresko</u>, No. 13-3827 (3d Cir. June 17, 2014).

June 9, prior to the beginning of the trial, Mr. Koresko also filed a motion on behalf of his brother, Lawrence Koresko, seeking to quash the subpoena from the Secretary requiring his appearance at trial (Docket No. 849).  After hearing from the DOL on that motion, the Court denied the motion to quash because Mr. Lawrence Koresko was already represented by another attorney (Docket No. 852).

      The Court chose to proceed with the trial, without Mr. Koresko, allowing for the possibility that he might yet choose to appear.[23]  The DOL completed its case on June 11, but neither Mr. Koresko nor any representative of Mr. Koresko appeared at the trial.

---

    [23] The Court elaborated on its reasoning for beginning the trial on June 9, 2014, after Mr. Koresko sent a letter to the Court stating that he would not appear, in an order dated June 11 (Docket No. 858).

L.   Post-Trial[24]

On June 20, 2014, the Court scheduled a telephone conference for June 23 with the DOL and Mr. Koresko in order to discuss a schedule for the remainder of the case (Docket No. 875).  Mr. Koresko did not participate in that telephone conference, but he submitted a letter on June 23, in part

_____

[24] On December 19, 2013, Mr. Koresko was placed on temporary suspension from practicing law, resulting from a disciplinary proceeding in the Supreme Court of Pennsylvania.  The Supreme Court of Pennsylvania also ordered that "[a]ll financial institutions in which Respondent holds fiduciary funds shall freeze such accounts pending further action by a court of appropriate jurisdiction."  Copy of Order from Supreme Court of Pennsylvania, In the Matter of: John J. Koresko, V, No. 13-mc-294 (E.D. Pa. Dec. 27, 2013) (Docket No. 1).

The Eastern District of Pennsylvania instituted a reciprocal disciplinary proceeding.  On June 17, as a result of a vote by the Board of Judges, in which I did not participate, Chief Judge Tucker ordered that Mr. Koresko be placed on temporary suspension from practice in the Eastern District of Pennsylvania, pending further definitive disciplinary action by the Supreme Court of Pennsylvania.  Order, In the Matter of: John J. Koresko, V, No. 13-mc-294 (E.D. Pa. June 17, 2014) (Docket No. 37).  Mr. Koresko filed a motion for reconsideration of that order on July 2, which was denied on July 11.  Mr. Koresko has also appealed the June 17 order.  See In re: John J. Koresko, V, No. 14-3393 (3d Cir. filed July 29, 2014).  A related attorney discipline case has been instituted in the Third Circuit.  See In re: John Koresko, No. 14-8085 (3d Cir. filed June 20, 2014).

As a result of these disciplinary proceedings, this Court issued an order on June 18, 2014, stating that Mr. Koresko could continue to represent himself pro se, but that he could not act as counsel for any other individuals or entities due to his suspension (Docket No. 871).  The Court gave the entities represented by Mr. Koresko in this case (PennMont, Koresko & Associates, Koresko Law Firm, and Penn Public Trust) thirty days to retain new counsel.  As of that date, no new counsel entered an appearance on behalf of these entities.

discussing his desire to supplement the trial record and what evidence he wanted the Court to consider in making its final decision (Docket No. 886).

The Court issued a scheduling order on June 26, 2014, allowing Mr. Koresko to submit information to be included in the trial record, such as whether he would like to testify or have anyone else testify, or whether he wanted to present any documents or depositions.  The Court also set a schedule for the parties to submit their proposed findings of fact and conclusions of law (Docket No. 894).  On June 27, the Court expanded Dilworth's representation of Mr. Koresko, over the objection of the DOL, to include those tasks from the June 26 order (Docket No. 898).

Mr. Koresko's counsel submitted a document stating what documents Mr. Koresko sought to add to the trial record and what witnesses Mr. Koresko sought to call in his defense (Docket No. 924).  After the Court held a conference with the parties on July 15, the Court issued a scheduling order requiring the DOL to submit its proposed findings of fact and conclusions of law by July 24.  The Court allowed Mr. Koresko to submit a revised request regarding evidentiary submissions by August 7, and the Court would hold a hearing to discuss those requests on August 12 (Docket No. 926).

The DOL submitted its proposed findings of fact on July 24, 2014 (Docket No. 941).  On August 6, the DOL filed a supplemental attachment to its proposed findings of fact and conclusions of law (Docket No. 964).  On August 7, Mr. Koresko's counsel submitted a supplemental designation of documents and witnesses (Docket No. 967).

The Court held an on-the-record status conference on August 12 to determine what additional evidence, if any, Mr. Koresko could still submit after the June trial (Docket No. 977).  In an order that same day, the Court directed both the Secretary and Mr. Koresko's counsel to submit to the Court updated documents by September 5, 2014: the Secretary would file a revised findings of fact and conclusions of law, which would include Ms. Bonney's deposition testimony, while Mr. Koresko's counsel would file his response to the Secretary's findings of fact, including a section on legal defenses he intends to make and what additional evidence he may need admitted to support those legal defenses (Docket No. 975).

On September 12, 2014, the Secretary filed a revised findings of fact and conclusions of law memorandum (Docket No. 997).  Two weeks later, on September 26, 2014, the Secretary filed his objections to Mr. Koresko's memorandum of law and defenses while Mr. Koresko's counsel filed his response to the

Secretary's second revised findings of fact and conclusions of law (Docket Nos. 1014, 1015).

On October 21, 2014, Mr. Koresko's counsel filed a second supplemental memorandum of law regarding defenses (Docket No. 1036),[25] which the Secretary responded to on October 29 (Docket No. 1041).

Upon review of the proposed findings of fact and Mr. Koresko's challenges to those facts, the Court directed the Secretary to answer several questions regarding the findings of fact by November 24, 2014, and for Dilworth to respond by December 4, 2014 (Docket Nos. 1052, 1056).  The Secretary confirmed that some of its calculations were incorrect and amended its findings of fact accordingly (Docket No. 1075).[26]

---

[25] On September 26, 2014, in response to the Court deducting certain billings from Dilworth's July 2014 invoice, Dilworth requested a meeting with the Court to determine what billing would be appropriate to request for reimbursement.  Following a conference in the courtroom on October 1, 2014, the Court directed Dilworth that billing involving certain defenses would no longer be reimbursed by the Court (Docket No. 1020).  The Court explained that, "given the volume of briefings the Court has already received on these issues," it could no longer in good faith reimburse Dilworth form the Trusts' assets for these particular defenses (Id.).  The Court also granted Dilworth the opportunity to file an additional memorandum on the appropriate amount of restitution and disgorgement Mr. Koresko would owe in the event the defendants are found to have violated ERISA (Id.).

[26] In Mr. Koresko's reply to the DOL's answers, he argues that, to the extent the Secretary filed new exhibits in response to the Court's questions, those exhibits "were not properly admitted at the trial" (Docket No. 1086 at 1).  As a starting point, given that Mr. Koresko refused to participate at the

II.   Findings of Fact

    A.   The Defendants and Their Relationships to One Another

    1.   Penn Mont Benefit Services, Inc. ("PennMont") is a Pennsylvania corporation with offices at 200 W. 4th Street, Bridgeport, Pennsylvania.  Government Exhibit ("GX")[27] 43; June 11, 2014, Tr. 43:6-43:13 (L. Koresko).

    2.   John J. Koresko, V ("Mr. Koresko" or "John Koresko"), is the president and, until July 2013, was a 70% owner of PennMont, which was a corporate affiliate of Koresko & Associates, P.C. ("KAPC"), a law firm.  GX148 at 63:18-63:22 (J. Koresko Dep., Dec. 13, 2013); GX147 at 78:3-78:10 (J. Koresko Dep., Aug. 25, 2009); June 11, 2014, Tr. 11:22-11:23 (L. Koresko).  His brother, Lawrence Koresko, was the vice president and, until July 2013, was a 30% shareholder of PennMont.  June 11, 2014, Tr. 12:2-12:6 (L. Koresko).  In July 2013, John

---

trial (filing several motions to stay and then informing the Court that he would not appear), it is unfair for Mr. Koresko to now, after the trial, challenge the production of evidence. Because Mr. Koresko did not participate, neither party was able to benefit from the normal back-and-forth that generally occurs in a trial of such a voluminous record. Moreover, before trial, both sides agreed that they could rely on exhibits used in other parts of the case. Mr. Koresko has produced no evidence to suggest that these "new exhibits" were indeed new. Finally, the exhibits themselves are simply the missing pages of bank records. They are not, on their own, untrustworthy and would have been admitted at trial had Mr. Koresko actually participated.

    [27] "GX" refers to the exhibits admitted as Government Exhibits (including subparts).

Koresko became the sole shareholder of PennMont after Lawrence Koresko stepped down. June 11, 2014, Tr. 11:6-11:23 (L. Koresko).

3.   John Koresko is the sole shareholder and founder of the Koresko Law Firm ("KLF"), the successor to KAPC.  GX44; GX46; GX148 at 64:3-64:10 (J. Koresko Dep., Dec. 17, 2013).

4.   Jeanne Bonney is an attorney who was a salaried employee of Mr. Koresko's law firms.  GX153; June 11, 2014, Tr. 7:11-7:12, 55:1-55:12 (L. Koresko).  Her employment with KLF ended on March 10, 2010.  GX176 at 4:10-4:12 (Bonney Dep., July 30, 2014).  At no point in her career did she have an ownership interest in either KLF or KAPC.  GX176 at 18:20-18:25 (Bonney Dep., July 30, 2014).  Like all employees of KAPC and KLF, she reported to John Koresko or Lawrence Koresko, with John Koresko serving as the "boss."  GX176 at 125:25-126:1 (Bonney Dep., July 30, 2014); GX176 at 23:25-24:3 (Bonney Dep., July 30, 2014) ("I could instruct others.  But I didn't supervise those other people.  That wasn't my job.  My job was to just get them up and running.  Everybody reported directly to John or Larry, or both, depending on the function.").

5.   KAPC and KLF also had offices at 200 W. 4th Street, Bridgeport, Pennsylvania.  June 11, 2014, Tr. 42:15-42:18 (L. Koresko).

6.    PennMont did not have any employees of its own.  GX148 at 66:21-67:1 (J. Koresko Dep., Dec. 13, 2013); GX176 at 41:6-41:7 (Bonney Dep., July 30, 2014).  All persons who performed administrative work for PennMont, including Ms. Bonney, Larry Townsend, and Lawrence Koresko, were employees of KAPC and KLF. June 11, 2014, Tr. 44:4-44:7 (L. Koresko); GX148 at 67:1-67:17 (J. Koresko Dep., Dec. 13, 2013); GX176 at 41:10-42:1 (Bonney Dep., July 30, 2014).

7.    Penn Public Trust ("PPT") is a non-profit corporation with offices at 200 W. 4th Street, Bridgeport. June 11, 2014, Tr. 43:6-43:15 (L. Koresko).  Mr. Koresko is the sole director of PPT, having signed its articles of incorporation and directed its fiduciary activities.  GX42; GX147 at 31:17-31:19, 41:6-41:15 (J. Koresko Dep., Aug. 25, 2009).

8.    John Koresko effectively served as Trustee and "CEO" of PennMont, while Lawrence Koresko, in his time with PennMont, served as the "banker" and "COO."  GX176 at 24:25, 28:23-24 (Bonney Dep., July 30, 2014); see also id. at 24:15-25:2 (Bonney Dep., July 30, 2014).


B.    The Trustees and the Plan Administrator

9.    PennMont was the named Plan Administrator of the Plans.  GX48 at § 1.13; GX49 at § 1.12; GX1a1 through 1a23 at ¶

42

2.a.c.; GX148 at 65:19-66:1 (J. Koresko Dep., Dec. 13, 2013);
GX147 at 127:21-128:2 (J. Koresko Dep., Aug. 25, 2009).

10.  PennMont created a fictitious business association
named the Regional Employers Assurance Leagues ("REAL").  This
association does not exist "as an entity" and the "association"
consisted of John Koresko and Lawrence Koresko.  GX147 at 85:23-
86:7 (J. Koresko Dep., Aug. 25, 2009).

11.  On or around March 10, 2002, Community Trust Company
("CTC") entered into an amended and restated Master Trust
Agreement for the Regional Employers Assurance League Voluntary
Employees' Beneficiary Association ("REAL VEBA") with PennMont,
naming CTC as the Trustee of the REAL VEBA.  See generally GX48.
Lowell Gates, chairman of the Board of CTC, John Koresko, and
Lawrence Koresko each signed the Master Trust Agreement, which
John Koresko had drafted.  GX48; GX176 at 34:21-34:23 (Bonney
Dep., July 30, 2014).

12.  On or around December 30, 2002, CTC entered into
another Master Trust Agreement naming CTC as the Trustee for the
Single Employer Welfare Benefit Plan ("SEWBP").  GX49.  Similar
to REAL VEBA's trust agreement, Mr. Gates, John Koresko, and
Lawrence Koresko each signed the Master Trust Agreement for the
Single Employer Welfare Benefit Plan Trust ("SEWBPT").  GX49.

13.  CTC was the only trustee of the Plans from March 2002
to November 30, 2008. PennMont had rejected a "co-trustee" model

with CTC, seeking instead a "custodian agreement."  GX52 (Email from Jeanne Bonney to Donald Walters, Vice President, CTC).

14.  On November 30, 2008, CTC merged with Farmers & Merchants Trust Company of Chambersburg ("F&M Trust").  July 17, 2009, Tr. 13:16-13:18.

15.  After the merger, CTC ceased to exist as an independent entity and its Board of Directors was dissolved. GX156 at 36:2-36:4, 37:6-37:25 (Gates Dep., Mar. 12, 2014).  Mr. Gates involvement with the Trust ended at the time of the merger.  Id. at 8:14-8:22 (Gates Dep., Mar. 12, 2014).

16.  F&M Trust was the successor by merger to CTC, and thus became the Trustee and a named fiduciary of the Plans. Docket No. 282, 268.

17.  On July 14, 2009, the Secretary of Labor ("the Secretary"), U.S. Department of Labor ("DOL"), moved for a Temporary Restraining Order ("TRO") and Preliminary Injunction enjoining Mr. Koresko from dismissing F&M Trust and installing PPT as Trustee. Docket No. 63.  While that motion pending, Judge Jones issued a "standstill Order" on November 6, 2009, prohibiting all parties from transferring "any funds of any kind for any purpose."[28]  Docket No. 151.

---

[28] Judge Jones vacated his "standstill Order" on January 15, 2010.  Docket No. 195.

18.  F&M Trust continued as the sole Trustee, as memorialized in Judge Jones' Orders, until January 15, 2010, when Judge Jones denied the Secretary's motion, and issued an Order permitting PPT to become the Trustee.  Docket Nos. 165, 181, 195.

   C.   Participating Employers in the REAL VEBA or
        SEWBP Trust
        a.   Plan Establishment

19.  Employers participating in the REAL VEBA or SEWBPT established employee benefit plans by signing adoption agreements.  The first, unnumbered paragraph of this adoption agreement reads, "The undersigned Employer . . . hereby adopts the Voluntary Employees' Beneficiary Association Health and Welfare Plan and its companion Trust . . . by executing this Adoption Agreement and the provision herein set forth . . .." See, e.g., GX1a1 at JJKDOL129951; GX1a2 at JJKDOL073620; GX1a3 at JJKDOL066086; GX 1a11 at JJKDOL050646; GX1a21 at JJKDOL220787.  The column labeled "Adoption Agreements" in the DOL's exhibit GX1 illustrates whether an adoption agreement was signed by each employer and, if so, the date it was signed.  See June 9, 2014, Tr. 20:8-29:91 (Sweeting) ("[W]e looked at the Adoption Agreement.  We wanted to see that this employer did, in fact, agree to participate in the arrangement.").

20.   Jocelyn Diaz Sweeting is a supervisory investigator
with DOL's Employee Benefits Security Administration.   She has
participated in the investigation of the REAL VEBA Trust and
SEWBPT since 2006 and became the lead investigator in 2008.
June 9, 2014, Tr. 10:9-10:16; 11:14-11:21 (Sweeting).

21.   On March 10, 2006, in response to the DOL's
administrative subpoenas, Mr. Koresko produced documents
regarding the various plans.   June 9, 2014, Tr. 19:13-19:21.
Because the documents were unidentified and unindexed, the DOL
organized the documents and created a database based on those
documents and additional documents supplied during litigation by
Mr. Koresko's former counsel and by the Independent Fiduciary
(the "IF"), the Wagner Law Group.   Id. at 17:9-17:16, 19:13-
19:21, 22:13-22:17, 27:22-28:7 (Sweeting).   That database is
summarized in GX1.   Approximately eight to ten DOL staff and
investigators worked to compile the documents for the database.
June 9, 2014, Tr. 18:12-18:15 (Sweeting).

22.   KAPC and KLF had its own database.   June 10, 2014, Tr.
139:25-141:13 (Townsend).   While an employee of the Koresko law
firms, Larry Townsend was assigned to develop a database to
capture all of the data associated with the Trusts.   Id.   He
tracked the employees, the participants, whether the
participants had signed participation agreements, and whether
they were participating in a death benefit plan.   Id.   All

46

financial transactions related to the REAL VEBA and SEWBPT would be recorded in the database.  If a payment arrived from an employer, and Mr. Townsend was aware of it, he would enter that payment as a financial transaction into the database.  In addition, if a payment was made from the Trusts, and Mr. Townsend was aware of it, he would record that into the database as well.  Id. at 180:9-180:16 (Townsend).

23.  In creating the database, Mr. Townsend reviewed documents maintained by PennMont during the course of its plan administration business.  June 10, 2014, Tr. 141:24-142:1; 142:10-142:21 (Townsend).  Mr. Townsend summarized the documents in this database in GX4.  June 10, 2014, Tr. 148:5-16 (Townsend).  The Koresko Defendants never produced this electronic database to the DOL, and the IF only produced a copy of the more than 60,000 documents contained in this database about a month before trial.  June 9, 2014, Tr. 27:22-28:25 (Sweeting).

24.  The dates listed under the column "Adoption Date" on GX4 are the dates that the employer signed the adoption document.  June 10, 2014, Tr. 151:12-151:15 (Townsend).

25.  The adoption agreements established a plan in the name of the adopting employer, as noted on the first page of each adoption agreement.  See, e.g., GX1; GX1a12 at JJKDOL051424; GX1a17 at JJKDOL229925; see also June 9, 2014, Tr. 25:10-25:17

47

(Sweeting).   The DOL listed the name found on the first page of
the adoption agreement as the name of the plan in GX1.   June 9,
2014, Tr. 29:20-30:7 (Sweeting).

   26.   The adoption agreements often contained John Koresko's
signature.   See, e.g., GX1a1 at JJKDOL129953; GX1a5 at
JJKDOL131461; June 9, 2014, Tr. 29:12-29:19; 32:3-32:11
(Sweeting).

   27.   PennMont issued Summary Plan Descriptions ("SPD"s) to
employers, on behalf of their Plans, and encouraged the
employers to provide the SPDs to their employees.   GX1 (column
"Summary Plan Descriptions"); June 9, 2014, Tr. 32:12-32:20;
GX176 at 34:6-34:18 (Bonney Dep., July 30, 2014).   The language
in the body of each of the SPDs was the same.   June 9, 2014, Tr.
33:3-33:14.   The SPDs reviewed by the DOL investigators all
contained an identical Section 13, which was headed as "YOUR
RIGHTS UNDER THE PLAN."   June 9, 2014, Tr. 34:2-34:9.   This
section stated that "[t]he Plan is covered by the Employee
Retirement Income Security Act of 1974 ('ERISA') which was
designed to protect employees' rights under benefit plans."
See, e.g., GX1a1 at JJKDOL129762 (Section 13 of the SPD for
Anthem Medical Management Voluntary Employee's Beneficiary
Association Health and Welfare Plan); GX1a2 at JJKB3690 (Section
13 of SPD for the B&L Sheet Metal Roofing, Inc. Voluntary
Employees' Beneficiary Association Health and Welfare Benefit

Plan); GX1a7 at JJKDOL246320 (Section 13 of the SPD for Classic

Design, Incorporated Voluntary Employees' Beneficiary

Association Health and Welfare Benefit Plan).  Of the 132 plans

listed on GX1, the DOL located an SPD for all but 19 plans.[29]

b.   Plan Benefits and Benefit Adjudication

28.   The adoption agreements signed by the employers had

uniform language at Section 5 establishing benefits.  The

agreements differed mainly in the name of the company and the

signature line.  June 9, 2014, Tr. 31:20-32:2 (Sweeting).  The

employers chose the benefits that they wished to make available

to their employees and memorialized them in the relevant

adoption agreement.  See, e.g., GX1a1 at JJKDOL129952; GX1a4 at

JJKDOL125108; GX1a8 at JJKDOL215884; GX1a13 at JJKDOL052988;

GX1a15 at JJKDOL11435; see also June 9, 2014, Tr. 16:9-16:12.

29.   The employer established the benefits available to

employees in Section 5.01 of the adoption agreement.  See, e.g.,

GX1a8 at JJKB003638, JJKDOL215884 (life benefits); GX1a11 at

JJKDOL050647 (life benefits); GX1a15 at JJKDOL111435-111438

---

[29] The nineteen plans on GX1 without Summary Plan
Descriptions listed are Access Communication, LTD; A-Tech
Concrete Co.; Coast to Coast Computers, Inc.; CSI Management
Company, Inc.; Dan Madison & Co, Inc.' Décor Coordinates, Inc.;
Fairshare, Inc.; Haddon Orthodontics, PC; Hazlet Pharmacy, Inc.;
Horn Electric; Law Offices of Eugene L. Weisbein; Law Offices of
Michael W. Lucansky, PA; Ogre Holdings; Paul J. Corrado Jr, DDS;
Peveto Companies; Rizzo & Associates, Inc.; Robert G. Ostoyich,
DMD PC; Sheffield Distributing Company, Inc.; and Walter F.
Zoller, DMD PA.

(life benefits and severance); GX1a19 at JJKDOL239372 (life
benefits); GX1a25 at JJKDOL242174 (life benefits).

30.   The plan documents establishing and governing the
employer's plan set up a mechanism for adjudicating benefits.
The Master Plan Document adopted by each employer through its
adoption agreement sets forth at Section 5.06 the "Claim
Procedure" to be followed upon a participant's death, and it
sets forth at Section 5.07 a "Claims Review Procedure" for
employees or beneficiaries who have been denied a benefit.   GX47
at JJKDOL025253-025254.   The plan documents further state in
Section 6.03 that the administrator shall assume all duties of
the committee referenced in Section 5.06 and 5.07.   GX47 at
JJKDOL025255.   The plan documents thus set up a claims procedure
for the adjudication of claims by PennMont, the Plan
Administrator.

c.   Plan Participants

31.   Section 3 of the Master Plan Document sets forth
eligibility requirements for participation.   GX47 at
JJKDOL025249-025250.   Each Plan's adoption agreement also sets
forth that particular Plan's eligibility requirements.   See,
e.g., GX1a16 at JJKDOL244387; GX1a18 at JJKDOL062654; GX1a20 at
JJKDOL237218.   Every Plan has a number of months of service
required before someone could become eligible for participation,

50

from zero to thirty-six months.  June 10, 2014, Tr. 165:8-165:10
(Townsend).

32.  Every participation agreement signed by participating
employees contain the following language, or similar language:
"The undersigned employee hereby agrees to participate in the
Employer's Welfare Benefit Plan, adopted under the Regional
Employer's Assurance Leagues ('REAL') Voluntary Employees'
Beneficiary Association ('VEBA') plan and trust."  See, e.g.,
GX1a14 at JJKDOL112765; GX1a21 at JJKDOL220731, 220774; GX1a26
at JJKDOL082120, 082122, 082123, 082125, 082136.  Participation
agreements demonstrate which individual employees elected to
participate and receive benefits under the arrangement.  June 9,
2014, Tr. 34:22-34:25 (Sweeting).  The DOL summarized the
participation agreements for each Plan in GX1 by listing the
name of each employee who signed a participation agreement under
the column "Participation Agreement," with the date that the
participation agreement was signed next to the person's name.
June 9, 2014, Tr. 35:1-35:10 (Sweeting).

33.  Larry Townsend entered the name of each participant
and the date that he or she signed the participation agreement
in the database he maintained for PennMont.  June 10, 2014, Tr.
143:23-144:4 (Townsend).  All persons listed in the column "Last
Name Insured" for the Plans in GX4 had forwarded signed
participation agreements to PennMont, which were received by

51

PennMont on the date listed under the column "Part. Agreement Received."  June 10, 2014, Tr. 154:10-154:16 (Townsend).

   d. <u>Plan Funding</u>

34.  Employers wrote checks payable to the Trusts on behalf of the Plans.  <u>See, e.g.</u>, GX1a1 at JJKDOL129975, 129981 (checks written by Anthem Medical Management to "COMMERCE BANK FBO REAL VEBA TRUST"); GX1a6 at PNMNT8000, PNMNT8003 (checks written by Coast to Coast Computer Products, Inc. to "Community Trust Company, Trustee"); GX1a7 at JJKDOL245953 (bank check issued to "First Union Bank N.A. Trustee FBO Classic Design W.B.P.").  The DOL summarized checks written by employers to the Trust under the column "Check (From ER to TRUST)" in GX1.  June 9, 2014, Tr. 26:9-26:16 (Sweeting).

35.  The Trust wrote checks to purchase insurance in the names of the Plans' participants.  <u>See, e.g.</u>, GX1a1 at JJKDOL130034 (check written from CTC to New York Life, with heading "Account [-]0000 REAL VEBA …. JOHN CROUSHORE POLICY"; GX1a9 at JJKDOL015140 (check written from PennMont VEBA Escrow to Southland Life Insurance Company, with memo line "Technocean, WBP").  The DOL accurately summarized the checks written by the Trusts to various insurance carriers for policies insuring the lives of participants under the column "Check (From TRUST to INS CARRIER)" on GX1.  June 9, 2014, Tr. 26:17-26:22 (Sweeting).

e.   <u>Insurance Policies Issued in the Names of Plan
     Participants</u>

36.   PennMont sent "year-end" letters to employers,
typically in December.  These letters were prepared by PennMont,
signed off by John Koresko, and sent to employers in order to
give them information regarding census forms that needed to be
completed and sent back to PennMont and to bill the employers
for administrative and trustee fees.  June 9, 2014, Tr. 49:23-
50:5 (Sweeting); June 10, 2014, Tr. 145:4-145:6 (Townsend);
GX176 at 38:12-38:16 (Bonney Dep., July 30, 2014); <u>see also</u>
GX1a10 at JJKDOL061707, 061729, 191028; GX1a19 at JJKDOL184693,
239129, 239130, JJKB00820, 00831; GX1a27 at JJKDOL058424,
058862, 186821.

37.   PennMont attached "Taxable Economic Benefits" forms
("TEB"s) or "PS-58" forms to these year-end letters.  June 10,
2014 167:17-167:24 (Townsend).  The TEBs contain policy numbers
for policies issued in the names of participants. June 10, 2014,
Tr. 174:19-175:24.  The policy numbers and names of insured
listed in the TEBs were based on the information stored in the
database maintained by PennMont in the course of PennMont's
business of administering the Plans.  June 10, 2014, Tr. 168:3-
168:25 (Townsend); GX176 at 40:22-41:4 (Bonney Dep., July 30,
2014); <u>see also</u> June 9, 2014, Tr.51:12-52:1 (Sweeting).

53

f.   Census Forms

38.   PennMont forwarded "census forms" to employers participating in the REAL VEBA and SEWBPT.  Upon adoption of the arrangement, PennMont submitted an installation audit that explained to the employer that PennMont would request census data twice a year regarding the employer's employees.  Sept. 9, 2009, Hr'g Tr. At 74:8-74:16 (Bonney).  The purpose of this census was to verify that the employer was complying with the arrangement and that employees were not being discriminated against or dropped from coverage if they were entitled to a death benefit.  Id.

39.   The census form is a report from the employer that lists the employees and all of their critical information, such as a Social Security number, date of birth, date of hire, salary, and whether the employee is active or not, or whether the employee had been terminated during that period.  June 10, 2014, Tr. 144:13-144:18 (Townsend).  The employer also filled out each participant's percentage of ownership of the employer on the census forms.  June 10, 2014, Tr. 146:12-146:22 (Townsend).

40.   Mr. Townsend assisted in mailing out blank census forms to employers as a part of his duties.  June 10, 2014, Tr. 144:24-145:11 (Townsend).  When employers returned completed census forms, PennMont used the information in the returned

54

census forms, including percentage of ownership for each participant, in the course of its business.  Id. at 144:24-147:4; 155:6-155:18 (Townsend).

### g.   Participating Employers

41.  As of 2014, almost 99% of the participating employers were S corporations.  GX175 at 43:18-43:22 (J. Koresko Dep., Jan. 8, 2014); Sept. 9, 2009, P.I. Hr'g Tr. At 74:8-74:16 (Bonney).  Most of the companies listed on GX1 are corporations, as indicated by the suffix of the company name.  See GX1 (shaded box containing company name).  The majority of the companies listed in GX4 are either S or C corporations.  See GX4 (column "Company Type").

### h.   Non-Owner Employees

42.  The Plans listed on GX1 fall into one of two categories.  In the first category, the sponsoring employer has a 100% owner, or an opposite sex couple with the same last name who jointly owns 100% of the company, and the plan has participants other than the owner or owners as described above. See, e.g., GX1 (listing under Central Georgia Cardiology, LLC, Mirza Ahmed as 100% owner and eleven other participants); id. (listing under Cleburne Medical Clinic, Inc., Igor Bidikov as 100% owner, Tatiana Bidikov, and ten other participants); id.

55

(listing under Mario Magcalas, MD PA, Mario Magcalas as 100% owner and five other participants).

43. In the second category, the sponsoring employer has multiple owners beyond a 100% owner or a couple who jointly owns 100% of the company. See, e.g., GX1 (listing under Advanced Dental Consulting, Inc., Bryan Spilmon as 2% owner, Diane Spilmon as 2% owner, and no additional participants); id. (listing under CSI Management Company, Inc., Michael Kern as 79% owner, Maureen Evans as 3% owner, and additional participants); id. (listing under Peveto Companies, Freda Lynn Ahlstrom as 33% owner, David Peveto as 33% owner, Johnnie Peveto III as 33% owner, Johnnie Peveto Jr. as 1% owner, and no additional participants).

44. GX1 contains only those plans which had a non-owner or partial owner participants. Only those TEBs that list non-owner employees were included in the column "Taxable Economic Benefit" on GX1. The DOL investigators identified those TEBs that listed more than one individual, and those additional individuals were non-owner employees. GXI contains those TEBs that showed more than one person participating in the arrangement, and whether those additional people were employees. The non-owner employees on the TEBs also have insurance policies issued under their names. June 9, 2014, Tr. 23:5-24:8 (Sweeting).

45.   Listed under the columns "Census (Signed)" and "Census (Unsigned)" on GXI are census forms that include at least one non-owner or partial owner employee.  The DOL used the census forms to ensure that those individuals listed on GXI as employees were also listed with a participation agreement, either on the TEB form or with an insurance policy.  The census forms show whether those individuals have any ownership interest in the company.  June 9, 2014, Tr. 37:18-40:5, 45:11-45:18 (Sweeting).

46.   The column "Reported Ownership %" in GX4 summarizes the ownership stake that each participant held in its sponsoring employer as represented on the census forms maintained by PennMont.  June 10, 2014, Tr. 155:10-155:18 (Townsend).

47.   Based on the column "Reported Ownership %" in GX4, twenty-four plans have only one participant, with that participant being a 100% owner:

   1) 2-H Enterprises, Inc. Welfare Benefit Plan
   2) 8103 Inc. Welfare Benefit Plan
   3) Active Fire Sprinkler Corporation Welfare Benefit Plan
   4) Altissimus, Inc. Welfare Benefit Plan
   5) Ascent Resources Corporation Welfare Benefit Plan
   6) Compu-Site Technologies, Inc. Welfare Benefit Plan
   7) Flagship Development West, LLC Welfare Benefit Plan
   8) Florida Super Site Welfare Benefit Plan
   9) Gaspari Nutrition, Inc. Welfare Benefit Plan
   10)  George G. Wooten, Jr., MGT Co., Inc. Welfare Benefit
        Plan
   11)  J. Richard Cox, Attorney at Law, P.C. Welfare Benefit
        Plan
   12)  JKH Management, Inc. Welfare Benefit Plan
   13)  John B. McKinnon, III, P.C. Welfare Benefit Plan

57

14) Jose Crespo, M.D., P.A. Welfare Benefit Plan
15) Landair Wireless, LTD (A) Welfare Benefit Plan
16) Manellnic, Inc. Welfare Benefit Plan
17) Meritt Diversified Enterprises, Inc. Welfare Benefit Plan
18) Och Consulting LLC Welfare Benefit Plan
19) Peter W Moran PhD PC Welfare Benefit Plan
20) R & D Enterprises, Inc. Welfare Benefit Plan
21) SWL Builders, Inc. Welfare Benefit Plan
22) The Blazer Corporation Welfare Benefit Plan
23) The Montgomery Co., Inc. Welfare Benefit Plan
24) Wadie Alkhouri, MD, Inc. Welfare Benefit Plan

48. Based on the column "Reported Ownership %" in GX4, twenty-five plans have only two participants; those participants have the same last name and jointly own 100% of the company:

1) Alexander Management, Inc. Welfare Benefit Plan
2) Baisch-Harris Enterprises, LTD. Welfare Benefit Plan
3) Boyle Enterprises, Inc Welfare Benefit Plan
4) BTB Newman Enterprises, Inc Welfare Benefit Plan
5) Cairn Management Corporation Welfare Benefit Plan
6) Charles J. Meakin, Inc. Welfare Benefit Plan
7) D&V Investments, Inc. Welfare Benefit Plan
8) Del Norte Homecare, Inc. Welfare Benefit Plan
9) DIMA, Inc. Welfare Benefit Plan
10) Ellertson Family, Inc. Welfare Benefit Plan
11) Energy Alternatives Studies, Inc. Welfare Benefit Plan
12) G & R Enterprises, Inc. Welfare Benefit Plan
13) Gleason Management Co., Inc. Welfare Benefit Plan
14) Hilow Corporation Welfare Benefit Plan
15) J.M. Hill & Associates, Inc. Welfare Benefit Plan
16) K & G Management, Inc. Welfare Benefit Plan
17) M. & E. Zenni, Inc. Welfare Benefit Plan
18) Midway Adjusting, Inc. Welfare Benefit Plan
19) Pineville Chiropractiv, P.A. Welfare Benefit Plan
20) Raffinan & Raffinan, M.D., P.A. Welfare Benefit Plan
21) Ram Technical Services Inc Welfare Benefit Plan
22) Rocky, Inc. Welfare Benefit Plan
23) Snow Mountain Management Welfare Benefit Plan
24) TA Sanders, LLC Welfare Benefit Plan
25) Techops Services, Inc. Welfare Benefit Plan

49.  Based on the column "Reported Ownership %" in GX4, sixty-five plans have only two participants; those participants have the same last name and one of the participants is the 100% owner of the company:

1) AAJ Associate, Inc Welfare Benefit Plan
2) Allamo Ventures, Inc. Welfare Benefit Plan
3) Allen's Telephone and TV Service, Inc. Welfare Benefit Plan
4) BJH Management Corporation Welfare Benefit Plan
5) Brigman Investments, L.L.C. Welfare Benefit Plan
6) Buggie Ventures, Inc. Welfare Benefit Plan
7) C. Andrew Childers, P.C. Welfare Benefit Plan
8) Cavaliere Professional, P.C. Welfare Benefit Plan
9) Caw Imaging, PC Welfare Benefit Plan
10) Cedar Obstetrics & Gynecological Associates, P.C. Welfare Benefit Plan
11) Central Georgia Cardiocare, P.C. Welfare Benefit Plan
12) Central Georgia Cardiology Management P.C. Welfare Benefit Plan
13) Chicago Energy Exchange of Chicago, Inc. Welfare Benefit Plan
14) Children's Neurological Associates, Inc. Welfare Benefit Plan
15) Collins Management, Inc. Welfare Benefit Plan
16) Coolidge Management Corp. Welfare Benefit Plan
17) Core Contracting, Inc. Welfare Benefit Plan
18) Daniel R. Fagan and Associates, P.C. Welfare Benefit Plan
19) Dick's Double D., Inc. Welfare Benefit Plan
20) Dr. Eric Katz, P.C. Welfare Benefit Plan
21) Dynamic Management Group, Inc. Welfare Benefit Plan
22) East Coast Transport, Inc. Welfare Benefit Plan
23) EBJ Management, Inc. Welfare Benefit Plan
24) EMN Paradox Welfare Benefit Plan
25) EN SCI, Inc. Welfare Benefit Plan
26) Eseen, Inc. Welfare Benefit Plan
27) Fico Meidcal, Inc. Welfare Benefit Plan
28) Gerald G. Angermeier, P.C. Welfare Benefit Plan
29) Grace P. Waldrop Consulting, Inc. Welfare Benefit Plan
30) Imagine Consultants, Inc. Welfare Benefit Plan
31) Jacole Management, Inc. Welfare Benefit Plan
32) James M. LaRose, D.O. & Associates Welfare Benefit Plan

33) Joe Matthews, Anesthesiologist, MD., PC Welfare
    Benefit Plan
34) John LeDonne, MD Welfare Benefit Plan
35) John Roland Enterprises, Inc. Welfare Benefit Plan
36) Johnson City Health & Fitness Center, Inc. Welfare
    Benefit Plan
37) Kenneth Fowler Drywall, Inc. Welfare Benefit Plan
38) Law Offices of Duane Kumagai, P.C. Welfare Benefit
    Plan
39) Law Offices of Richard Rueda, P.C. Welfare Benefit
    Plan
40) Lawrence J. Eisenberg Welfare Benefit Plan
41) Linker Marketing Company, Inc. Welfare Benefit Plan
42) LM Financial Group, Inc. Welfare Benefit Plan
43) M.A.L. Enterprises, Inc. Welfare Benefit Plan
44) Mark J. Paget, Inc. Welfare Benefit Plan
45) Mary-Theresa Popa, P.C. Welfare Benefit Plan
46) Masted Corporation Welfare Benefit Plan
47) MB Textile Consultants, Inc. Welfare Benefit Plan
48) McCarthy Management Services Welfare Benefit Plan
49) Mehulauto, Inc. Welfare Benefit Plan
50) Mike Sill Agency, Inc. Welfare Benefit Plan
51) Network Outfitters Welfare Benefit Plan
52) PCR, Inc. Welfare Benefit Plan
53) Paresh Shah, MD, PA Welfare Benefit Plan
54) Parker's Drive In, Inc. Welfare Benefit Plan
55) Perfume Center of America Welfare Benefit Plan
56) Professional Marketing Systems Welfare Benefit Plan
57) Rex Leasing of NC Welfare Benefit Plan
58) Robert Ridge Land Company, Inc. Welfare Benefit Plan
59) Roy Skaff, Inc. Welfare Benefit Plan
60) Sydney Tyson, MD, LLC Welfare Benefit Plan
61) Terry S. Wood, M.S., D.D.S., P.C. Welfare Benefit Plan
62) The Landings of Sarasota, Inc. Welfare Benefit Plan
63) Thomson Financial & Tax Services, Inc. Welfare Benefit
    Plan
64) TNL Company, Inc. Welfare Benefit Plan
65) TYC Management, Inc. Welfare Benefit Plan

50. The 419 remaining plans in GX4 have participants other
than those described above:

1) 2001 Capital Corporation Welfare Benefit Plan
2) 2001 Enterprises Management Corp. Welfare Benefit Plan
3) AAA Bookkeeping & Tax, Inc. Welfare Benefit Plan
4) AAF Management Group, Inc. Welfare Benefit Plan

60

5) Abner Creek Family Medicine, Inc. Welfare Benefit Plan
6) Access Communications, Inc. Welfare Benefit Plan
7) Act Management Co. Welfare Benefit Plan
8) Adams, Inc. Welfare Benefit Plan
9) Advanced Dental Consulting, Inc. Welfare Benefit Plan
10) Advanced Plastic System, Inc. Welfare Benefit Plan
11) Aero-Med LTD. Welfare Benefit Plan
12) Affordable Luxury Homes, Inc. Welfare Benefit Plan
13) Allen Park Agency, Inc. Welfare Benefit Plan
14) Allergy & Asthma Consultants, P.C. Welfare Benefit Plan
15) Altered Image Welfare Benefit Plan
16) Amaro Management Corp. Welfare Benefit Plan
17) Ambience Landscape Corporation Welfare Benefit Plan
18) American Packaging Group, Inc. Welfare Benefit Plan
19) Angela Leung, DDS, P.C. Welfare Benefit Plan
20) Annette E. Merlino, DMD, Inc. Welfare Benefit Plan
21) Anthem Medical Management Welfare Benefit Plan
22) Appliance Parts Distributors, Inc. Welfare Benefit Plan
23) Arch Dental Associates, P.C. Welfare Benefit Plan
24) Arizona Otolaryngology Center, P.C. Welfare Benefit Plan
25) A-Tech Concrete Co. Welfare Benefit Plan
26) Atlantic Body Shop, Inc. Welfare Benefit Plan
27) Augustine B Jimenez, III, P.C. Welfare Benefit Plan
28) Aztec Steel, Inc. Welfare Benefit Plan
29) B'The Best, Inc. Welfare Benefit Plan
30) B&L Sheet Metal & Roofing, Inc. Welfare Benefit Plan
31) B2, Inc. Welfare Benefit Plan
32) Back & Neck Rehab Center, P.C. Welfare Benefit Plan
33) Baker Management Company Welfare Benefit Plan
34) Barry Diamond, P.A. Welfare Benefit Plan
35) Baseline Holdings, Inc. Welfare Benefit Plan
36) Baxter Management Co., Inc. Welfare Benefit Plan
37) BBD Car, Inc. Welfare Benefit Plan
38) Ben Franklin Management, Inc. Welfare Benefit Plan
39) Ben-Lin Associates, LTD. Welfare Benefit Plan
40) Beth Blanton Enterprises, Inc. Welfare Benefit Plan
41) Blue Moon Design & Display, LTD Welfare Benefit Plan
42) Bogatay Construction, Inc. Welfare Benefit Plan
43) Braddock Construction, Inc. Welfare Benefit Plan
44) Bradford Construction, Inc. Welfare Benefit Plan
45) Bradley J. Brown, D.D.S. Welfare Benefit Plan
46) Briarpatch, Inc. Welfare Benefit Plan
47) Brigham City Arthritis Clinic P.C. Welfare Benefit Plan

48) Brite Management, Inc. Welfare Benefit Plan
49) Brown & Luke Contracting, Inc. Welfare Benefit Plan
50) BPS Solutions, Inc. Welfare Benefit Plan
51) Buckner Crane & Rigging, Inc. Welfare Benefit Plan
52) Business Ventures Unlimited Welfare Benefit Plan
53) C & J Wholesale Floral Services, Inc. Welfare Benefit Plan
54) C & LF Management Company, Inc. Welfare Benefit Plan
55) Capital Alliance Welfare Benefit Plan
56) Capital Messengers, Inc. Welfare Benefit Plan
57) Cardinal Anesthesia & Pain Management, PA Welfare Benefit Plan
58) Carlisle Insurance Agency, Inc. Welfare Benefit Plan
59) Carolina Flooring and Carpets, Inc. Welfare Benefit Plan
60) Carolina Seafood, Inc. Welfare Benefit Plan
61) Carson's Steak Warehouse, Inc. Welfare Benefit Plan
62) Carter Electric Management Company, Inc. Welfare Benefit Plan
63) Caste Area Chiropractic, Inc. Welfare Benefit Plan
64) Central Georgia Cardiology, LLC Welfare Benefit Plan
65) Central Georgia Heart Institute, LLC Welfare Benefit Plan
66) Cetylite Industries, Inc. Welfare Benefit Plan
67) Cevene Care Clinic Welfare Benefit Plan
68) Charles Parsons & Associates, CHTD, Welfare Benefit Plan
69) Chin Management, Inc Welfare Benefit Plan
70) Christopher Lyden, D.C., P.C. Welfare Benefit Plan
71) Circle City Heat Treating, Inc. Welfare Benefit Plan
72) Classic Design, Incorporated Welfare Benefit Plan
73) Cleburne Medical Clinic Welfare Benefit Plan
74) Coast to Coast Computer Products, Inc. Welfare Benefit Plan
75) Coldwater Management Co., Inc. Welfare Benefit Plan
76) Columbia Data Products, Inc. Welfare Benefit Plan
77) Comfort Engineers, Inc. Welfare Benefit Plan
78) Commercial Masonry Welfare Benefit Plan
79) Complete Medical Care Service of NY, P.C. Welfare Benefit Plan
80) Composite Resources, Inc Welfare Benefit Plan
81) Concrete Structures, Inc. Welfare Benefit Plan
82) Consumer Trend Welfare Benefit Plan
83) Cook Management, Inc. Welfare Benefit Plan
84) Cornerstone Masonry, Inc. Welfare Benefit Plan
85) Countryside Builders, LLC Welfare Benefit Plan
86) Covert Management, Inc. Welfare Benefit Plan

87) Crandall Investments Welfare Benefit Plan
88) Crimson Cardinal, Inc. Welfare Benefit Plan
89) Crown Mechanical, Inc. Welfare Benefit Plan
90) CSI Management Company, Inc. Welfare Benefit Plan
91) Cuomo Construction Co, Inc Welfare Benefit Plan
92) D.M. Records, Inc. Welfare Benefit Plan
93) Dan Ho Professional Chiropractic Corp. Welfare Benefit Plan
94) Dan Madison & Co., Inc. Welfare Benefit Plan
95) Dansko, Inc. Welfare Benefit Plan
96) Datalink Electronics, Inc. Welfare Benefit Plan
97) David C. Spokane Orthodontic Assoc., P.C. Welfare Benefit Plan
98) David P. Novak, Chartered Welfare Benefit Plan
99) Dayton Penn Associates, Inc. Welfare Benefit Plan
100) Decor Coordinates, Inc. Welfare Benefit Plan
101) Delaware County Urological Associates, LTD. Welfare Benefit Plan
102) Delchester Professional Services Welfare Benefit Plan
103) Device Engineering Incorporated Welfare Benefit Plan
104) Dimensions Architects International Welfare Benefit Plan
105) DK Merk Construction, Co. Welfare Benefit Plan
106) DMK Marketing Welfare Benefit Plan
107) Domenic M. Castellano, D.D.S., P.A. Welfare Benefit Plan
108) Dorothy P. Elkner, Inc. Welfare Benefit Plan
109) Double Eagle Nutrition, Inc. Welfare Benefit Plan
110) Dow Management Corporation Welfare Benefit Plan
111) Dr. Kevin Kelly, M.D., P.C. Welfare Benefit Plan
112) Dr. Philip Baldeo, Medical Services, P.C. Welfare Benefit Plan
113) Dr. Samuel M. Sepuya MD Welfare Benefit Plan
114) Duke's Landscape Management, Inc. Welfare Benefit Plan
115) DVB Management, Inc. Welfare Benefit Plan
116) Dynomark, Inc. Welfare Benefit Plan
117) E. Robert Fussel Welfare Benefit Plan
118) Eagle Managed Subcontractors Welfare Benefit Plan
119) Earth Shelter Developers, A California Corporation Welfare Benefit Plan
120) Ed Lloyd, PA Welfare Benefit Plan
121) Eisler Nurseries, Inc. Welfare Benefit Plan
122) Elam Enterprises, Inc. Welfare Benefit Plan
123) Eldercare Home Pharmacy, LLC Welfare Benefit Plan
124) Ellis Landscape, Inc. Welfare Benefit Plan
125) Elm Street Group Inc. Welfare Benefit Plan
126) Ema, Inc. Welfare Benefit Plan

127) Emergency Care Physician Services, LTD Welfare Benefit
    Plan
128) Emergency Medicine Resources Welfare Benefit Plan
129) Engineered Systems & Products Welfare Benefit Plan
130) Engineering Manufacturing Services Welfare Benefit
    Plan
131) Enrico F. Verrico Welfare Benefit Plan
132) ENT & Facial Plastic Surgery Welfare Benefit Plan
133) ERA Trend Setter Realty, INc. Welfare Benefit Plan
134) EuroHomes, Inc. Welfare Benefit Plan
135) Everything for Love.Com Inc. Welfare Benefit Plan
136) Excelerated Management, Inc. Welfare Benefit Plan
137) Fairshare, Inc. Welfare Benefit Plan
138) First Street Grille Management Co., Inc. Welfare
    Benefit Plan
139) Flagship Management, LLC Welfare Benefit Plan
140) Fleming Consulting, Inc. Welfare Benefit Plan
141) Foot & Leg Centers of GA, PC Welfare Benefit Plan
142) Fremont Millwork Co. Welfare Benefit Plan
143) Frog Pond Turf Management, Inc. Welfare Benefit Plan
144) Gail F. Schwartz, M.D., P.A. Welfare Benefit Plan
145) Gary L. Murray, M.D., P.C. Welfare Benefit Plan
146) George R. Brezina, Jr., P.A. Welfare Benefit Plan
147) Georgia Cardiology Center, LLC Welfare Benefit Plan
148) Georgia Dermasurgery Centers, Inc. Welfare Benefit
    Plan
149) GM Kuhlman, Inc. Welfare Benefit Plan
150) Gold & Vilim Welfare Benefit Plan
151) GP Construction Services Welfare Benefit Plan
152) Graham-Malone, Inc. Welfare Benefit Plan
153) Greenwood Financial Services, Inc. Welfare Benefit
    Plan
154) Griffin Land Surveying Co., Inc. Welfare Benefit Plan
155) H & H Leasing, Inc. Welfare Benefit Plan
156) Haddon Orthodontics, P.C. Welfare Benefit Plan
157) Hank Bailey Financial Services, Inc. Welfare Benefit
    Plan
158) Harrell-Fish, Inc. Welfare Benefit Plan
159) Harry H. Monokian, D.M.D., P.A. Welfare Benefit Plan
160) Harvey A. Kalan, M.D., Inc. Welfare Benefit Plan
161) Harvey Passes, DDS, P.C. Welfare Benefit Plan
162) Hazlet Pharmacy Welfare Benefit Plan
163) HB International Group, Inc. Welfare Benefit Plan
164) Heart Treasures, Inc. Welfare Benefit Plan
165) Henry Norris & Associates, Inc. Welfare Benefit Plan
166) Hills Family Chiropractic Officers, P.C. Welfare
    Benefit Plan

167) Horizon Tile & Carpet, Inc. Welfare Benefit Plan
168) Horn Electric Welfare Benefit Plan
169) Howard Greils, M.D., Inc. Welfare Benefit Plan
170) Hudson Phamatech, Inc. Welfare Benefit Plan
171) Hyannis Marina, Inc. Welfare Benefit Plan
172) ICCO Management Corp. Welfare Benefit Plan
173) Inderjit Singh, M.D., P.C. Welfare Benefit Plan
174) Indu Garg, Inc. Welfare Benefit Plan
175) Innovative Design, Inc. Welfare Benefit Plan
176) International Institute of Trading Mastery, Inc.
     Welfare Benefit Plan
177) International Travel Consultants, Inc. Welfare Benefit
     Plan
178) IQ Systems, Inc. Welfare Benefit Plan
179) J. Blakslee International Welfare Benefit Plan
180) J.R. Computech, Inc. Welfare Benefit Plan
181) Jagjit Singh, M.D., Inc. Welfare Benefit Plan
182) Jaloudi & Lee, P.C. Welfare Benefit Plan
183) James Barrie Publishing, Inc. Welfare Benefit Plan
184) Jay Steer, CPA Welfare Benefit Plan
185) JB Roof & Associates, Inc. Welfare Benefit Plan
186) Jeff Brown Enterprises, Inc. Welfare Benefit Plan
187) Jeffrey L. Lipkowitz, M.D., P.A. Welfare Benefit Plan
188) Jen Management, Inc. Welfare Benefit Plan
189) Jerome Caruso Design International, Inc. Welfare
     Benefit Plan
190) JES Realty Associates, LLC Welfare Benefit Plan
191) JLJ Management Co. Welfare Benefit Plan
192) JLNC, Inc. Welfare Benefit Plan
193) JMS Management, Inc. Welfare Benefit Plan
194) Joe Rizzi & Sons Construction, Inc. Welfare Benefit
     Plan
195) John M. Bourlon, P.A., Inc. Welfare Benefit Plan
196) John M. Porter, D.D.S., Inc. Welfare Benefit Plan
197) John Sharrat Associates, Inc. Welfare Benefit Plan
198) Johnson*Graham*Malone Welfare Benefit Plan
199) Jose Aun, M.D., P.A. Welfare Benefit Plan
200) Joseph P. Iaria Real Estate Welfare Benefit Plan
201) Joyce & Associates Construction, Inc. Welfare Benefit
     Plan
202) Kaplan & Tyson, LLC Welfare Benefit Plan
203) KBL Management, Inc. Welfare Benefit Plan
204) Kenneth B. Lewis, D.D.S., P.A. Welfare Benefit Plan
205) Kerry Investments, Inc. Welfare Benefit Plan
206) Kin W. Lui, M.D. Welfare Benefit Plan
207) Kinetics Sales, Inc. Welfare Benefit Plan

208) Kline, Scott, Visco Commercial Real Estate, Inc. Welfare Benefit Plan
209) KMR Rehabilitation Consultants, Inc. Welfare Benefit Plan
210) KP Builders, Inc. Welfare Benefit Plan
211) Krengel Painting Co. Welfare Benefit Plan
212) Krishnan S. Kumar, M.D., P.C. Welfare Benefit Plan
213) Kushco Florist, Inc. Welfare Benefit Plan
214) L. T. Management, Inc. Welfare Benefit Plan
215) L.A. Downey & Son, Inc. Welfare Benefit Plan
216) L.T. Designs, Inc. Welfare Benefit Plan
217) Lafayette Cancer Care, PC Welfare Benefit Plan
218) Lafayette Compass, Inc. Welfare Benefit Plan
219) Landair Wireless, LTD  (B) Welfare Benefit Plan
220) Landair Wireless, LTD (-C) Welfare Benefit Plan
221) Law Offices of Eugene L. Weisbein Welfare Benefit Plan
222) Law Offices of Gregory P. Chocklett, J.D. Welfare Benefit Plan
223) Law Offices of Michael W. Lucansky, P.A. Welfare Benefit Plan
224) Lawrence Orthopaedics Welfare Benefit Plan
225) Leon Brothers Farm Welfare Benefit Plan
226) LGS Specialty Sales, LTD Welfare Benefit Plan
227) Little Joes d/b/a Edison Motors Welfare Benefit Plan
228) LJK Enterprises, Inc. d/b/a Larry  Johnson Insurance Welfare Benefit Plan
229) Lyle J. Micheli, M.D., P.C. Welfare Benefit Plan
230) M & D Roebuck, Inc. Welfare Benefit Plan
231) M. J. Hoag Contracting, Inc. Welfare Benefit Plan
232) Makasu, Inc. Welfare Benefit Plan
233) Management Recruiters of Melbourne, Inc. Welfare Benefit Plan
234) Manchester Partners, LTD. Welfare Benefit Plan
235) Mario Magcalas, M.D., P.A. Welfare Benefit Plan
236) Marketing Systems Group, Inc. Welfare Benefit Plan
237) Martin Wier, Inc. Welfare Benefit Plan
238) Mary Ellen Reding, DDS, PC Welfare Benefit Plan
239) Masco Construction Co., Inc. Welfare Benefit Plan
240) Max I. Lilling, M.D., P.C. Welfare Benefit Plan
241) MBA Management Company, Inc. Welfare Benefit Plan
242) MBT Management, Inc. Welfare Benefit Plan
243) McReg Industries, Inc. Welfare Benefit Plan
244) Med Group Medical Supplies, Inc. Welfare Benefit Plan
245) Megaco, Inc. Welfare Benefit Plan
246) Mel Stewart Homes, Inc. Welfare Benefit Plan
247) Metropolitan ENT Welfare Benefit Plan
248) Michael & Co. Interiors Welfare Benefit Plan

249) Michael O'Brien, D.M.D., P.C. Welfare Benefit Plan
250) Michael P. Halpin, M.D. Welfare Benefit Plan
251) Michael Petty Management Company, Inc. Welfare Benefit
     Plan
252) Michael Sallen, D.O., P.A. Welfare Benefit Plan
253) Mida, Inc. Welfare Benefit Plan
254) Miles V. Schmidt & Assoc., Inc. Welfare Benefit Plan
255) Ming Court Management, Inc. Welfare Benefit Plan
256) Mini Precision Devices, Co., Inc. Welfare Benefit Plan
257) Mistral Management Co., Inc. Welfare Benefit Plan
258) MKBS Management Corporation Welfare Benefit Plan
259) Mojoe's, Inc. Welfare Benefit Plan
260) Montwood Family Medical Center Welfare Benefit Plan
261) Moran Industries, Inc. Welfare Benefit Plan
262) Morgen & Oswood Construction, Co., Inc. Welfare
     Benefit Plan
263) Mountain West Helicopters, L.L.C. Welfare Benefit Plan
264) Nautical Marine Welfare Benefit Plan
265) Neil W. McAllister, O.D., P.C. Welfare Benefit Plan
266) New England Finish Systems, Inc. Welfare Benefit Plan
267) New View Gifts & Accessories Ltd. Welfare Benefit Plan
268) New-Bio, Inc. Welfare Benefit Plan
269) Newell Brothers Construction Co., Inc. Welfare Benefit
     Plan
270) Newell Management Corporation Welfare Benefit Plan
271) Niculae Ciobanu Physician, P.C. Welfare Benefit Plan
272) O. Fayrell Furr, Jr., P.A. Welfare Benefit Plan
273) Oakpoint Management Corp. Welfare Benefit Plan
274) Ogre Holdings, Inc. Welfare Benefit Plan
275) Olouakan Comluct, Inc. Welfare Benefit Plan
276) Olympic Horticultural Products Welfare Benefit Plan
277) Omni Management and Consultants Unlimited, Inc.
     Welfare Benefit Plan
278) Orange Park Chiropractic Center, P.A. Welfare Benefit
     Plan
279) Oxford Circle Family Medicine Welfare Benefit Plan
280) P. D. Patel, MD, P.S.C. Welfare Benefit Plan
281) P.C. Delta Corporation Welfare Benefit Plan
282) P.J. Reddy, M.D., P.A. Welfare Benefit Plan
283) Pace King Corporation Welfare Benefit Plan
284) Pamela K. Erdman, M.D., Inc. Welfare Benefit Plan
285) Pathamerica Resource, Inc. Welfare Benefit Plan
286) Paul J. Corrado, Jr., D.D.S. Welfare Benefit Plan
287) Payne Family Investments, Inc. Welfare Benefit Plan
288) Perry Reding, M.D., P.A. Welfare Benefit Plan
289) Peveto Companies, LTD Welfare Benefit Plan
290) Phoenix Contractors Welfare Benefit Plan

291) Pinto Koff Sales & Marketing Associates, Inc. Welfare Benefit Plan
292) PJP Management Co., Inc. Welfare Benefit Plan
293) Polaris Sales Co., Inc. Welfare Benefit Plan
294) Powercom Electrical Services, Inc. Welfare Benefit Plan
295) PPRVS, LLC Welfare Benefit Plan
296) Prism Publishing, Inc. Welfare Benefit Plan
297) Progressive Door Corp. Welfare Benefit Plan
298) Progressive Motion, Inc. Welfare Benefit Plan
299) Promotrim International, Inc. Welfare Benefit Plan
300) Proslink, Inc. Welfare Benefit Plan
301) Psychiatry Associates of Cherry Hill, P.A. Welfare Benefit Plan
302) PTL Test Equipment, Inc. Welfare Benefit Plan
303) R.A. Grovenstein, D.C., P.A. Welfare Benefit Plan
304) Radiology Consultants of El Paso, P.A. Welfare Benefit Plan
305) Ralph W. Price, D.D.S., P.C. Welfare Benefit Plan
306) Ram Pipe & Supply, Inc. Welfare Benefit Plan
307) Rank Technology Corporation Welfare Benefit Plan
308) Ransom Design, Inc. Welfare Benefit Plan
309) Reid, Jones, McRorie & Williams, Mgt. Co., Inc. Welfare Benefit Plan
310) Reno Heating & Air, Inc Welfare Benefit Plan
311) Resource Management, Inc. Welfare Benefit Plan
312) Resource Realizations, Inc. Welfare Benefit Plan
313) Re-Vita Manufacturing Co. Welfare Benefit Plan
314) Rizzo & Associates, Inc. Welfare Benefit Plan
315) RLS II, Inc. Welfare Benefit Plan
316) Robert G. Ostoyich, D.M.D., P.C. Welfare Benefit Plan
317) Robert S. Block Technologies Welfare Benefit Plan
318) ROR Management, Inc. Welfare Benefit Plan
319) Roy N. Gay, M.D., P.C. Welfare Benefit Plan
320) Roy R. Oates, Jr., P.C. Welfare Benefit Plan
321) Royal Johannessen Management Corporation Welfare Benefit Plan
322) RPS&V Corp. Welfare Benefit Plan
323) RSK Management Company, Inc. Welfare Benefit Plan
324) Rukeyser Television, Inc. Welfare Benefit Plan
325) Rushing Management, Inc. Welfare Benefit Plan
326) S & S Salvage, Inc. Welfare Benefit Plan
327) S. Davis Enterprises, Inc. Welfare Benefit Plan
328) S.H. Silver Company, Inc. Welfare Benefit Plan
329) S.T. Mitchell, M.D., Inc. Welfare Benefit Plan
330) Salvucci Masonry Co., Inc. Welfare Benefit Plan
331) Sanjiv Bansal, M.D., P.C. Welfare Benefit Plan

332) Sanjiv Bhatia, DDS, PC Welfare Benefit Plan
333) Sarasota OB/GYN Associates, P.A. Welfare Benefit Plan
334) Saratoga Surgical Specialties, P.C. Welfare Benefit Plan
335) Sarma Behavioral Health Clinic, LLC Welfare Benefit Plan
336) Schauer and Associates, Inc. Welfare Benefit Plan
337) Scientific Systems Company, Inc. Welfare Benefit Plan
338) Scott L. Busch, D.O., P.A. Welfare Benefit Plan
339) Seeders Consulting Welfare Benefit Plan
340) SGK, Inc. Welfare Benefit Plan
341) Shannon Res, Inc. Welfare Benefit Plan
342) Sheffield Distributing Company, Inc. Welfare Benefit Plan
343) Sherasgold Corporation Welfare Benefit Plan
344) Sheree B. Lipkis, M.D., P.C. Welfare Benefit Plan
345) Sidney Charles Markets, Inc. Welfare Benefit Plan
346) SJM Engineering, Inc. Welfare Benefit Plan
347) Skulls Unlimited International, Inc. Welfare Benefit Plan
348) Smart Inventions Welfare Benefit Plan
349) Smeester Bros., Inc. Welfare Benefit Plan
350) Solloway Enterprises, Inc Welfare Benefit Plan
351) South Texas Woodmill, Inc. Welfare Benefit Plan
352) Southerland Construction, Inc. Welfare Benefit Plan
353) Southern Dental Laboratory, Inc. Welfare Benefit Plan
354) Southern Insurance Consultants, Inc. Welfare Benefit Plan
355) Spartan Inc. Welfare Benefit Plan
356) Spencer Management, Inc. Welfare Benefit Plan
357) Spicer, Inc. Welfare Benefit Plan
358) Spire Media Corporation Welfare Benefit Plan
359) SPJ Management, Inc. Welfare Benefit Plan
360) Stafford Construction Services, Inc. Welfare Benefit Plan
361) Steven G. Reitan, DDS, LTD Welfare Benefit Plan
362) Steven Locnikar, D.O., P.C. Welfare Benefit Plan
363) Stewart Family Partnership, LLLP Welfare Benefit Plan
364) Stockwell Construction Co., Inc. Welfare Benefit Plan
365) Suketu Nanavati, M.D., P.C. Welfare Benefit Plan
366) Sun City Pediatrics, P.A. Welfare Benefit Plan
367) Sunny D Manufacturing, Inc. Welfare Benefit Plan
368) Superior Bindery, Inc Welfare Benefit Plan
369) Surgical Specialty Group Welfare Benefit Plan
370) SW OB-GYN Associates, P.A. Welfare Benefit Plan
371) Swan International, Inc. Welfare Benefit Plan
372) Swordfish, Inc. Welfare Benefit Plan

373) Taitronics, Inc. Welfare Benefit Plan
374) TDF Metal Finishing Co., Inc. Welfare Benefit Plan
375) Technocean Welfare Benefit Plan
376) The New Customware Company Welfare Benefit Plan
377) The Quantic Group, LTD. Welfare Benefit Plan
378) The Roberts Group, P.A. Welfare Benefit Plan
379) The Underwood Group, Inc. Welfare Benefit Plan
380) Thomas C. Cochran, M.D., P.C. Welfare Benefit Plan
381) Thomas G. Tadvick, DDS, P.C. Welfare Benefit Plan
382) Thorpe Morieux, Inc. Welfare Benefit Plan
383) Timothy Clark, P.A. Welfare Benefit Plan
384) TMC Enterprises, Inc. Welfare Benefit Plan
385) Tobey Karg Sales Agency, Inc. Welfare Benefit Plan
386) Tower Components Corporation Welfare Benefit Plan
387) Traina Management, Inc Welfare Benefit Plan
388) Transchem, Inc. Welfare Benefit Plan
389) Trimm, Inc. Welfare Benefit Plan
390) U.E. Systems, Inc. Welfare Benefit Plan
391) Umesh C. Shah, M.D., P.C. Welfare Benefit Plan
392) Uniquities, Inc. Welfare Benefit Plan
393) Urgent Medical Care, Inc. Welfare Benefit Plan
394) Utah CSI, Inc. Welfare Benefit Plan
395) Victoria, Inc. Welfare Benefit Plan
396) Vuaykumar K. Gandhi, M.D., P.A. Welfare Benefit Plan
397) W&A Prichard, LLC Welfare Benefit Plan
398) W. S. Newell, Inc. Welfare Benefit Plan
399) W.S. Associates, Inc. Welfare Benefit Plan
400) Wade Hampton Dental Laboratory, Inc. Welfare Benefit
     Plan
401) WAJ Consulting Co., Inc. Welfare Benefit Plan
402) Walser, Inc. Welfare Benefit Plan
403) Walter F. Zoller, D.M.D., P.A. Welfare Benefit Plan
404) Walter Umphrey, P.C. Welfare Benefit Plan
405) Wang Electric, Inc. Welfare Benefit Plan
406) Waterloo Contractors, Inc. Welfare Benefit Plan
407) Webb Core, Inc. Welfare Benefit Plan
408) Wella Mena, Inc. Welfare Benefit Plan
409) Wendell J. Courtney, M.D., P.A. Welfare Benefit Plan
410) Whiteside Machine & Repair Co, Inc. Welfare Benefit
     Plan
411) Whole Earth Landscaping Design, Inc. Welfare Benefit
     Plan
412) Wilhelm Enterprises, Inc. Welfare Benefit Plan
413) William Y. Akerman, Jr., D.M.D., P.C. Welfare Benefit
     Plan
414) Wilshire Palisades Law Group, P.C. Welfare Benefit
     Plan

415) Winchester Land and Development Corporation Welfare Benefit Plan
416) Winema Electric, Inc. Welfare Benefit Plan
417) Winterton Company Welfare Benefit Plan
418) Women's Group for Obstetrics and Gynecology Welfare Benefit Plan
419) Wuest Estate Company Welfare Benefit Plan

i.  Active Plans

51.  Of the Plans listed on GX1, 104 employers submitted census forms in either 2013 or 2014. See GX160. Those 104 Plans are as follows:

1) 8103 Inc. Welfare Benefit Plan
2) Act Management Co. Welfare Benefit Plan
3) Advanced Dental Consulting, Inc. Welfare Benefit Plan
4) Allamo Ventures, Inc. Welfare Benefit Plan
5) Angela Leung, DDS, P.C. Welfare Benefit Plan
6) Annette E. Merlino, DMD, Inc. Welfare Benefit Plan
7) Arch Dental Associates, P.C. Welfare Benefit Plan
8) 'B' The Best, Inc. Welfare Benefit Plan
9) Baseline Holdings, Inc. Welfare Benefit Plan
10)  Ben-Lin Associates, LTD. Welfare Benefit Plan
11)  Bradley J. Brown, D.D.S. Welfare Benefit Plan
12)  Briarpatch, Inc. Welfare Benefit Plan
13)  Brigham City Arthritis Clinic P.C. Welfare Benefit Plan
14)  Brigman Investments, L.L.C. Welfare Benefit Plan
15)  Brite Management, Inc. Welfare Benefit Plan
16)  Cavaliere Professional, P.C. Welfare Benefit Plan
17)  Cedar Obstetrics & Gynecological Associates, P.C. Welfare Benefit Plan
18)  Central Georgia Cardiocare, P.C. Welfare Benefit Plan
19)  Central Georgia Cardiology Management, P.C. Welfare Benefit Plan
20)  Cetylite Industries, Inc. Welfare Benefit Plan
21)  Cleburne Medical Clinic Welfare Benefit Plan
22)  Collins Management, Inc. Welfare Benefit Plan
23)  Columbia Data Products, Inc. Welfare Benefit Plan
24)  Commercial Masonry Welfare Benefit Plan
25)  Complete Medical Care Service of NY, P.C. Welfare Benefit Plan
26)  Concrete Structures, Inc. Welfare Benefit Plan

71

27) Covert Management, Inc. Welfare Benefit Plan
28) Crandall Investments Welfare Benefit Plan
29) Datalink Electronics, Inc. Welfare Benefit Plan
30) David P. Novak, Chartered Welfare Benefit Plan
31) Delaware County Urological Associates, LTD. Welfare Benefit Plan
32) Delchester Professional Services Welfare Benefit Plan
33) Dick's Double D, Inc. Welfare Benefit Plan
34) DK Merk Construction, Co. Welfare Benefit Plan
35) Dr. Eric Katz, P.C. Welfare Benefit Plan
36) DVB Management, Inc. Welfare Benefit Plan
37) Dynamic Management Group, Inc. Welfare Benefit Plan
38) Earth Shelter Developers, A California Corporation Welfare Benefit Plan
39) Ellertson Family, Inc. Welfare Benefit Plan
40) Emergency Medicine Resources Welfare Benefit Plan
41) Energy Alternatives Studies, Inc. Welfare Benefit Plan
42) Engineering Manufacturing Services Welfare Benefit Plan
43) Gail F. Schwartz, M.D., P.A. Welfare Benefit Plan
44) Gleason Management Co., Inc. Welfare Benefit Plan
45) GP Construction Services Welfare Benefit Plan
46) Grace P. Waldrop Consulting, Inc. Welfare Benefit Plan
47) Graham-Malone, Inc. Welfare Benefit Plan
48) Haddon Orthodontics, P.C. Welfare Benefit Plan
49) Hazlet Pharmacy Welfare Benefit Plan
50) HB International Group, Inc. Welfare Benefit Plan
51) Heart Treasures, Inc. Welfare Benefit Plan
52) Howard Greils, M.D., Inc. Welfare Benefit Plan
53) J.R. Computech, Inc. Welfare Benefit Plan
54) Jagjit Singh, M.D., Inc. Welfare Benefit Plan
55) James M. LaRose, D O & Associates Welfare Benefit Plan
56) Jay Steer, CPA Welfare Benefit Plan
57) JMS Management, Inc. Welfare Benefit Plan
58) John Roland Enterprises, Inc. Welfare Benefit Plan
59) John Sharratt Associates, Inc. Welfare Benefit Plan
60) Johnson*Graham*Malone Welfare Benefit Plan
61) Kerry Investments, Inc. Welfare Benefit Plan
62) L.T. Management, Inc. Welfare Benefit Plan
63) L.T. Designs, Inc. Welfare Benefit Plan
64) Lafayette Compass, Inc. Welfare Benefit Plan
65) Law Offices of Michael W. Lucansky, P.A. Welfare Benefit Plan
66) M.J. Hoag Contracting, Inc. Welfare Benefit Plan
67) MB Textile Consultants, Inc. Welfare Benefit Plan
68) MBT Management, Inc. Welfare Benefit Plan

69) McCarthy Management Services, Inc. Welfare Benefit Plan
70) Michael P. Halpin, M.D. Welfare Benefit Plan
71) Midway Adjusting, Inc. Welfare Benefit Plan
72) Ming Court Management, Inc. Welfare Benefit Plan
73) Montwood Family Medical Center Welfare Benefit Plan
74) Nautical Marine Welfare Benefit Plan
75) Newell Brothers Construction Co., Inc. Welfare Benefit Plan
76) Och Consulting LLC Welfare Benefit Plan
77) PJ Reddy M.D., P.A. Welfare Benefit Plan
78) PPRVS, LLC Welfare Benefit Plan
79) Peveto Companies, LTD Welfare Benefit Plan
80) Progressive Door Corp. Welfare Benefit Plan
81) PTL Test Equipment, Inc. Welfare Benefit Plan
82) Rank Technology Corporation Welfare Benefit Plan
83) Robert G. Ostoyich, D.M.D., P.C. Welfare Benefit Plan
84) Rushing Management, Inc. Welfare Benefit Plan
85) S.H. Silver Company, Inc. Welfare Benefit Plan
86) Schauer and Associates, Inc. Welfare Benefit Plan
87) Sheffield Distributing Company, Inc. Welfare Benefit Plan
88) Sherasgold Corporation Welfare Benefit Plan
89) Sheree B. Lipkis, M.D., P.C. Welfare Benefit Plan
90) Smeester Bros., Inc. Welfare Benefit Plan
91) Swordfish, Inc. Welfare Benefit Plan
92) Taitronics, Inc. Welfare Benefit Plan
93) Techops Services, Inc. Welfare Benefit Plan
94) The Quantic Group, LTD. Welfare Benefit Plan
95) Thomson Financial & Tax Services, Inc. Welfare Benefit Plan
96) Tobey Karg Sales Agency, Inc. Welfare Benefit Plan
97) Transchem, Inc. Welfare Benefit Plan
98) Victoria, Inc. Welfare Benefit Plan
99) Walter F. Zoller, D.M.D., P.A. Welfare Benefit Plan
100) Waterloo Contractors, Inc. Welfare Benefit Plan
101) Webb Core, Inc. Welfare Benefit Plan
102) Winchester Land and Development Corporation Welfare Benefit Plan
103) Winterton Company Welfare Benefit Plan
104) Wuest Estate Company Welfare Benefit Plan

52. In GX4, Mr. Townsend recorded under the column

"Current Plan Status" those plans which were active. June 10,

2014, Tr. 151:16-152:20 (Townsend) (stating that "Active-Audit,"

"Active-Issues," and "Active" all signify an active Plan).  In

addition to the 104 Plans on GX1 with 2013 or 2014 census forms,

another sixty-seven Plans listed in GX4 are identified as active

as of 2014.  See GX1, GX4.  Those sixty-seven Plans, and their

respective statuses, are as follows:

1) AAF Management Group, Inc. Welfare Benefit Plan (Active-Issues)
2) Anthem Medical Management Welfare Benefit Plan (Active)
3) A-Tech Concrete Co. Welfare Benefit Plan (Active-Issues)
4) Baxter Management Co., Inc. Welfare Benefit Plan (Active-Issues)
5) BSP Solutions, Inc. Welfare Benefit Plan (Active-Issues)
6) C & J Wholesale Floral Services, Inc. Welfare Benefit Plan (Active)
7) C & LF Management Company, Inc. Welfare Benefit Plan (Active-Issues)
8) C. Andrew Childers, P.C. Welfare Benefit Plan (Active-Issues)
9) Carter Electric Management Company, Inc. Welfare Benefit Plan (Active-Issues)
10) Charles Parsons & Associates, CHTD. Welfare Benefit Plan (Active)
11) Coast to Coast Computer Products, Inc. Welfare Benefit Plan (Active)
12) Coolidge Management Corp. Welfare Benefit Plan (Active-Issues)
13) Daniel R. Fagan and Associates, P.C. Welfare Benefit Plan (Active-Issues)
14) David C. Spokane Orthodontic Assoc., P.C. Welfare Benefit Plan (Active-Issues)
15) Eisler Nurseries, Inc. Welfare Benefit Plan (Active-Issues)
16) Elam Enterprises, Inc. Welfare Benefit Plan (Active-Issues)
17) Engineered Systems & Products Welfare Benefit Plan (Active-Issues)
18) Flagship Development West, LLC Welfare Benefit Plan (Active)
19) Fleming Consulting, Inc. Welfare Benefit Plan (Active-Audit)
20) Harry H. Monokian, D.M.D., P.A. Welfare Benefit Plan (Active-Issues)

74

21) Harvey A. Kalan, M.D., Inc. Welfare Benefit Plan (Active-Issues)
22) James Barrie Publishing, Inc. Welfare Benefit Plan (Active-Issues)
23) JES Realty Associates, LLC Welfare Benefit Plan (Active-Audit)
24) John B. McKinnon, III, P.C. Welfare Benefit Plan (Active)
25) Johnson City Health & Fitness Center, Inc. Welfare Benefit Plan (Active-Issues)
26) Krengel Painting Co. Welfare Benefit Plan (Active)
27) Landair Wireless, LTD (A) Welfare Benefit Plan (Active-Audit)
28) Landair Wireless, LTD (B) Welfare Benefit Plan (Active-Audit)
29) Landair Wireless, LTD (-C) Welfare Benefit Plan (Active-Audit)
30) Law Offices of Duane Kumagai, P.C. Welfare Benefit Plan (Active-Issues)
31) Law Offices of Richard Rueda, P.C. Welfare Benefit Plan (Active-Issues)
32) Lyle J. Micheli, M.D., P.C. Welfare Benefit Plan (Active)
33) M & D Roebuck, Inc. Welfare Benefit Plan (Active-Issues)
34) M. & E. Zenni, Inc. Welfare Benefit Plan (Active-Issues)
35) Makasu, Inc. Welfare Benefit Plan (Active-Issues)
36) Manellnic, Inc. Welfare Benefit Plan (Active-Audit)
37) Mario Magcalas, M.D., PA. Welfare Benefit Plan (Active)
38) Marketing Systems Group, Inc. Welfare Benefit Plan (Active-Issues)
39) Mini Precision Devices, Co., Inc. Welfare Benefit Plan (Active-Issues)
40) MKBS Management Corporation Welfare Benefit Plan (Active-Issues)
41) Moran Industries, Inc. Welfare Benefit Plan (Active-Issues)
42) Morgen & Oswood Construction, Co., Inc. Welfare Benefit Plan (Active-Issues)
43) Ogre Holdings, Inc. Welfare Benefit Plan (Active-Issues)
44) Olouakan Comluct, Inc. Welfare Benefit Plan (Active-Issues)
45) Pamela K. Erdman, M.D., Inc. Welfare Benefit Plan (Active)

46) Paresh Shah, MD, PA Welfare Benefit Plan (Active-Issues)
47) Perfume Center of America Welfare Benefit Plan (Active-Issues)
48) Perry Reding, M.D., P.A. Welfare Benefit Plan (Active)
49) Peter W Moran PhD PC Welfare Benefit Plan (Active-Audit)
50) Phoenix Contractors Welfare Benefit Plan (Active-Issues)
51) Powercom Electrical Services, Inc. Welfare Benefit Plan (Active-Issues)
52) Radiology Consultants of El Paso, P.A. Welfare Benefit Plan (Active)
53) Rex Leasing of NC Welfare Benefit Plan (Active)
54) Roy R. Oates, Jr., P.C. Welfare Benefit Plan (Active-Issues)
55) S & S Salvage, Inc. Welfare Benefit Plan (Active)
56) Sarma Behavioral Health Clinic, LLC Welfare Benefit Plan (Active)
57) Solloway Enterprises, Inc. Welfare Benefit Plan (Active-Issues)
58) Suketu Nanavati, M.D., P.C. Welfare Benefit Plan (Active-Issues)
59) SW OB-GYN Associates, P.A. Welfare Benefit Plan (Active-Issues)
60) Terry S. Wood, M.S., D.D.S., P.C. Welfare Benefit Plan (Active-Issues)
61) TMC Enterprises, Inc. Welfare Benefit Plan (Active)
62) U.E. Systems, Inc. Welfare Benefit Plan (Active-Issues)
63) W.S. Newell, Inc. Welfare Benefit Plan (Active-Issues)
64) WAJ Consulting Co., Inc. Welfare Benefit Plan (Active-Issues)
65) Whiteside Machine & Repair Co., Inc. Welfare Benefit Plan (Active-Issues)
66) Wilshire Palisades Law Group, P.C. Welfare Benefit Plan (Active-Issues)
67) Women's Group for Obstetrics and Gynecology Welfare Benefit Plan (Active-Issues)

Therefore, a total of 171 Plans either have a 2013 or 2014 census form and are listed on GX1, or are listed as active on GX4, or both.

76

D.   <u>Transfers from the Trust</u>

    a.   <u>Removal of Money from the Trusts</u>

53.  To transfer money out of the Trusts, PennMont would send emails to CTC or F&M Trust employees, directing CTC or F&M Trust as trustee to transfer funds from the Trusts to various other accounts.  June 9, 2014, Tr. 62:18-63:4 (Sweeting); <u>see, e.g.</u>, GX58, 60, 62, 63, 65, and GX2a1 to 2a2, 2a5, 2a7, 2a8, 2a13, 2a14, 2a15.

54.  Jeanne Bonney typically sent these emails to CTC and F&M Trust on behalf of PennMont, using either a PennMont email account or some sort of Koresko law firm email account.  <u>See, e.g.</u>, GX2a19; GX2a21.  The two email accounts were "interchangeable."  GX176 at 55:3 (Bonney Dep., July 30, 2014).

55.  Prior to the merger with F&M Trust, CTC did not require PennMont to submit any invoices, bills, or other documentation supporting its requests to transfer money from the Trusts.  GX152 at 37:14-37:20 (Bonney Dep., Aug. 9, 2009).  Upon becoming trustee, F&M Trust required PennMont to submit additional documentation along with its transfer requests.  <u>Id</u>. at 37:14-38:7 (Bonney Dep., Aug. 9, 2009).

56.  Previously, CTC's oversight consisted of "random policy check[s]" and random invoice checks "every six months."  GX176 at 68:9-68:10 (Bonney Dep., July 30, 2014).

b.   <u>Trustee's Withdrawal Documentation</u>

57.   CTC prepared monthly reports, documenting the cash flow of the REAL VEBA or SEWBP Trusts.  <u>See, e.g.,</u> GX2a3; GX2a5.

58.   CTC forwarded three reports to PennMont each month, one for REAL VEBA and two for SEWBP, so that Jeanne Bonney and John Koresko could each have their own copy of the report. GX62.  In turn, PennMont relied on the reports to administer the Plans, including reviewing all of the contribution checks and premium advisories.  Sept. 9, 2009, P.I. Hr'g Tr. at 159:12-159:20 (Bonney).

59.   F&M Trust also prepared reports that documented deposits into and withdrawals from the Trusts, similar to those prepared by CTC.  <u>See, e.g.,</u> GX2a23.  Upon the merging of CTC and F&M Trust, CTC prepared a summary report showing all deposits into and withdrawals from the REAL VEBA Trust and the SEWBPT for the time period of January 1, 2002, to December 31, 2008.  GX73.

60.   The DOL summarized expenses from the VEBA Trust in GX2.  June 9, 2014, Tr. 53:17-54:8 (Sweeting).

c.   <u>Transfer of $211,575.62 in Interest to PPT Before PPT Became Trustee</u>

61.   In an email dated May 16, 2002, Ms. Bonney, writing from her PennMont email account, directed CTC to "setup payment of interest earned monthly in the Federated Account" and to wire

78

such interest monthly to "Penn Public Trust Escrow."  GX60.  At
the time, PPT was not the Trustee of the Plans.  June 9, 2014,
Tr. 59:19-60:4 (Sweeting).  Ms. Bonney emailed CTC in accordance
to CTC's custodial agreement with PennMont, which Mr. Koresko
had drafted.  GX176 at 74:24-75:8 (Bonney Dep., July 30, 2014).

62.  At the direction of PennMont and Ms. Bonney, CTC
transferred the interest earned each month on the Trusts' funds
to PPT.  CTC recorded the transfers in its monthly reports as
"dividends earned."  See, e.g., GX2a8 at CTC10051; GX2a9 at
CTC9793; GX2a10 at CTC9701.  GX2 is a summary of these transfers
of interest to PPT during the time period of June 2, 2002, to
January 4, 2005.  GX2 (listing transactions 3, 4, 6, 10, 14, 17,
20, 24, 28, 32, 34, 38, 40, 43, 46, 49, 52, 56, 58, 61, 62, 64,
67, 71, 73, 75, 80, 84, 90, 94, 96, 99, and 103).  For this
period, CTC transferred a total of $626,093.50 in interest
earned on Trust accounts to PPT.  GX2; GX171.

63.  Section 4:02 of the Master Plan document provides that
"[a]ny and all other contributions to this Plan by the Employer
shall be irrevocable and neither such contribution nor any
income therefrom, nor any increments thereon shall be used for
or diverted to purposes other than for the exclusive Benefit of
participating Beneficiaries of the adopting Employer."  GX47 at
JJKDOL025251.  The Master Plan further states at Section 2:03
that there shall be no diversion of plan assets.  Id. at

79

JJKDOL025248 ("It shall be impossible at any time prior to the satisfaction of all liabilities under the Trust, with respect to the Employees of the Employer and their Beneficiaries, for any part of the corpus, or income of the Trust to be used for, or diverted to purposes other than for the exclusive Benefit of such Employees or their Beneficiaries.")

64.   The REAL VEBA and SEWBP Master Trust documents similarly state at Section 2.1 that "all assets and earnings of the Trust are solely the net earnings of the Trust and shall not in any manner whatsoever inure to the benefit of any other person other than a Person designated as an employee or beneficiary of an Adopting Employer under the terms of the Plan."   GX49 at § 2.1; GX48 at § 2.1.

d.   <u>Transfer of $414,517.88 to PPT from CTC for "Expenses" in April 2002</u>

65.   In an email dated April 11, 2002, Ms. Bonney, writing from her PennMont email account, directed CTC that, "upon receipt of REAL VEBA Trust assets from FUNB," CTC should wire "an amount to be determined by PennMont Benefit Services" to Penn Public Trust Escrow, account XXX-828-1, "for the purposes of payment of Trust expenses."   GX58 at CTC2675.   Four days later, Ms. Bonney sent a follow-up email to CTC, directing it to "wire transfer to PPT $414,517.88."   GX2a1 at CTC2371.

66.   The CTC "Report of Principal Cash" for April 2002 documents that $414,517.88 was wired on April 16, 2002, to "Penn Mont Benefit Services Plan Administrator for the purposes of payment of trust expenses per email dated 4/12/02 from Jeanne Bonney."  GX2a1 at CTC10188.  Commerce Bank records confirm that CTC wired $414,517.88 to account XXX-8281, "Penn Public Trust Escrow - Koresko & Assoc. PC Agents," on April 16, 2002.  Id. at Commerce242.

67.   John Koresko directed the transfer of this amount based on his categorizing it as "surplus."  GX176 at 75:9-76:2 (Bonney Dep., July 30, 2014).

> e.   Transfer of $2,916,832.71 to PennMont from July 2002 to May 2008

68.   During the time period of July 22, 2002, to May 27, 2008, CTC transferred a total of $2,916,832.71 to PennMont. GX2; GX171.  GX2 is a summary of the emails that Ms. Bonney, writing on behalf of PennMont, sent to CTC requesting the funds, the CTC monthly reports showing that the funds were transferred to PennMont, and, where available, checks written on the Trust account to PennMont.  GX2 (listing transactions 8, 12, 15, 18, 19, 21, 27, 31, 36, 37, 41, 44, 48, 54, 59, 65, 70, 77, 82, 85, 87, 89, 92, 97, 101, 102, 104, 106, 108, 109, 111, 113, 124, 128, 129, 141, 153, 154, 155, 157, 159, 163, 164, 165, 166, 167, 175, 176, 194, and 199).  In internal CTC records, these fees

81

were intermittently described as "Setup Fees" and
"Administrative fees."  Id.

69.  PennMont did not submit separate invoices to CTC with
these payment requests.  GX176 at 130:24-131:6 (Bonney Dep.,
July 30, 2014).

70.  PennMont billed and was paid fees directly from
employers for its plan's administrative services.  June 9, 2014,
Tr. 50:11-21 (Sweeting).  Mr. Townsend was responsible for
sending invoices for fees to plans on behalf of PennMont.  June
10, 2014, Tr. 176:9-176:19 (Townsend).

71.  Those fees were the only fees charged to employers.
June 10, 2014, Tr. at 177:2-177:14 (Townsend); see also June 11,
2014, Tr. 17:24-18:5 (L. Koresko).  No other trustee or
administrator fees were disclosed to employers in the start-up
packet they received before establishing a plan under the REAL
VEBA.  June 11, 2014, Tr. 37:24-40:21 (L. Koresko) (discussing
fees disclosed to employers in REAL VEBA "proposal package");
see also GX176 at 32:1-32:4) (Bonney Dep., July 30, 2014) ("The
cover sheet [of the proposal package] would list the fees, and
basically, they [the employers] just signed off on that, that
they understood there were fees, and that they were in a
particular league at that time.")

82

      f.   Transfer of $389,780.62 out of the Trusts to KAPC
          and $988,140.39 out of the Trusts to KLF

72.  At the direction of PennMont and Ms. Bonney, CTC transferred a total of $1,377,921.01 to KAPC and KLF during the time period of July 22, 2002, to August 25, 2008.  GX2 is a summary of the emails that Ms. Bonney, writing on behalf of PennMont, sent to CTC directing the transfer of these amounts, and the corresponding CTC monthly reports showing the amounts transferred to PennMont.  GX2 (listing transactions 9, 29, 60, 74, 76, 81, 100, 112, 151, 152, 156, 161, 168, 169, 170, 171, 172, 177, 178, 179, 195, 200, 201, and 205).

73.  No documents were provided to CTC to support the transfers of Trusts' assets to KAPC or KLF.

74.  In May 2009, F&M Trust requested "detailed information" from Ms. Bonney to support her request to pay KLF for legal fees incurred.  GX63.  In response, Ms. Bonney forwarded a spreadsheet to F&M Trust, consisting of all of the "documents, emails and other correspondence" for the fees, and stated that the fees were to be paid because KLF "represents six employers in US Tax Court where the [Internal Revenue Service] has adjusted their personal and corporate income tax because they participate in the 419 plan."  Id.  Ms. Bonney sought reimbursement from the Trust for her work on these "test cases" because she considered it would impact more than a hundred of

KLF's clients that were then being examined and adjusted by the Internal Revenue Service (the "IRS").  Id.

75.  GX63 provides the spreadsheet that Ms. Bonney attached to the email to F&M Trust, listing for each employer the work performed by KLF employees on the employer's tax court case and the hourly rate per employee.  See, e.g., GX63 (listing eighteen entries under "Advanced Dental/Tax"); id. (listing forty entries under "Solloway/Tax Court"); see also GX176 72:21-72:25 (Bonney Dep., July 30, 2014).

### g.   Transfer of $276,147.93 out of the Trusts to a Lobbying Firm

76.  Jefferson Government Relations ("JGR") was a lobbying firm in Washington, D.C.  See generally GX72 (representation agreement).  In June 2001, JGR entered into a contract with REAL VEBA Trust, which was signed by Mr. Koresko in his capacity as "Chairman" of PennMont, Plan Administrator.  Id. at JGR00001632. Among other things, the contract called for a monthly retainer of $15,000 to be paid to JGR.  Id. at JGR00001631.

77.  In an email dated May 16, 2002, Ms. Bonney, writing from her PennMont email account to CTC, characterized the "monthly fee due to our lobbyist firm in D.C." as a "trust expense."  GX60 at CTC00002654.  She followed-up on May 21, 2002, requesting that CTC "set up a payment system for a monthly

expense of approximately $10,000 for our DC lobbyist."  GX61 at
CTC00002652.

78.   During the time period of May 21, 2002, to June 27,
2005, the Trust sent thirty-four monthly payments, totaling
$276,147.93, to JGR.  GX2; GX171.  The monthly payments
corresponded to the amount requested by JGR in its invoices to
PennMont.  See, e.g., GX2a2 at JGR00001681, CTC00010172; GX2a8
at JGR00001699, JJKDOL165810; GX2a11 at JGR00001749,
JJKDOL258039.  GX2 is a summary of the emails that Ms. Bonney,
writing on behalf of PennMont, sent to CTC directing payment to
JGR, the invoices JGR sent to PennMont and Mr. Koresko
requesting payment, and the corresponding checks issued to JGR.
GX2 (listing transactions 2, 5, 7, 11, 13, 16, 22, 25, 26, 30,
33, 35, 39, 42, 45, 50, 51, 55, 57, 63, 68, 69, 72, 78, 79, 83,
88, 93, 95, 98, 105, 107, 110, and 142).

79.   JGR was paid from the Trusts for lobbying members of
Congress and their staff regarding the tax treatment of the
employers who sponsored the Plans.  The letters, addressed to
"Mr. John Koresko, Pennmont Benefit Services, Inc." during the
time frame that JGR was paid from the Trust, detail the work
performed for each corresponding invoice.  GX72 at JGR00001682-
1779.  These invoices contain numerous entries on political
activities concerning tax litigation, IRS regulations and

activities, and the deductions available to individual employers for participating in the Trust.  Id.

80.  For example, the April 10, 2002, JGR letter enclosing the March 2012 invoice includes activities such as discussions with congressional and agency staff on "proposed Treasury regulations" and "IRS actions and how best to counter them." GX72 at JGR00001682.  Similarly, the May 13, 2002, JGR letter enclosing the April invoice includes activities such as discussions regarding the "merits of the Section 419(a)(f)(6) deduction and the importance of careful regulation thereof." Id. at JGR00001685.

81.  The June 12, 2002, letter to Mr. Koresko enclosing the May invoice charged for ongoing discussions with "you" and "Larry Koresko" regarding fundraising events for a congressional candidate; for speaking with "you and Larry Koresko" regarding "targeted campaign contributions"; and for speaking with Larry Koresko regarding how best to involve insurance carriers and their lobbyists in the "legislative effort."  GX72 at JGR00001688-89.  Similarly, the August 11, 2003, letter listed JGR's activities on behalf of Mr. Koresko and PennMont, as, among other things, attending the "NRCC summer retreat" with several congressional representatives, holding discussions with "you" regarding "Treasury regulations, potential litigation approaches, and next steps on legislative strategy," and

86

conversations regarding "possible events" for several congressional representatives.  GX72 at JGR00001730-31.  The July 8, 2004, letter included a breakfast with a congressional Representative, "outlining the agenda for the remainder of the 108th Congress" and discussions of "possible approaches to tax shelter issues," while the June 11, 2005, letter listed work performed as discussions with "you and the National Republican Congressional Committee about a possible conversation between you and Chairman Boehner" and "arranged and attended an event with Senate Republican Policy Committee Chairman Jon Kyl (R-AZ)."  GX72 at JGR00001754, JGR00001780.

### h.   Transfer of $276,970.75 to Outside Attorneys Before July 2009

Before 2009, every contract entered into by PennMont or Ms. Bonney was first vetted by Mr. Koresko, including the hiring of various outside attorneys.  GX176 at 137:11-137:21 (Bonney Dep., July 30, 2014).

### i.   $107,651.90 to Caplin & Drysdale and its Affiliated Local Counsel in 2008 and 2009

82.  During the time period of March 14, 2008, to April 3, 2009, the Trust paid a total of $107,651.90 to Caplin & Drysdale, Chartered ("C&D"), and $1,485.00 to C&D's local counsel, Gilbert, Harrell, Sumerford & Martin, P.C, for a total payment of $109,136.90.  GX2.  C&D is a Washington, D.C.,-based

law firm, which was engaged to represent Wayne and Sara
Sheffield, Gary and Peggy Sheffield, and Sheffield Distributing
Co. in a "tax refund" case regarding disallowed tax deductions,
in which Gilbert Harrell served as local counsel in Georgia.
GX64 (memo of understanding between C&D and Gilbert Harrell
regarding representation before the IRS regarding disallowed
contributions to the REAL VEBA Employee Welfare Benefit Plan);
see also Sheffield Distributing Co. v. United States, No. 09-
0040-LGW (S.D. Ga. Apr. 9, 2009).

    83.  Once the invoices arrived from C&D and Gilbert
Harrell, Mr. Koresko decided what amount of the invoices would
be reimbursed.  GX176 at 76:13-76:24 (Bonney Dep., July 30,
2014).  After that amount was relayed to Ms. Bonney, she emailed
CTC on behalf of PennMont requesting the amounts to be
transferred to C&D and Gilbert Harrell.  Id.  The CTC monthly
reports document the amounts transferred.  GX2 (listing
transactions 196, 202, 208, 212, 213, 219, 226, 227, and 230).
GX2 is a summary of C&D's invoice billing and the subsequent
checks written from the Trust.  GX2.  In her weekly email
requests to CTC for payment, Ms. Bonney did not attach C&D's
invoices.  GX176 at 130:7-130:10 (Bonney Dep., July 30, 2014).

    84.  In addition to paying for the attorneys representing
the Sheffields and their employer, the Trusts also paid for the
individual taxes owed by Wayne and Sara Sheffield and Gary and

Peggy Sheffield.  See GX176 at 114:5-114:14 (Bonney Dep., July 30, 2014); GX2a21 at C&D0001 (invoice for payments to "Treasury of the United States; Tax Payment" for the Sheffields for $16,983.60), CTC00006168 (payment of $16,983.60 to "NA").  Ms. Bonney considered PennMont's decision to pay the taxes as a "litigation position" because the Sheffields were the "perfect case" and "there was no other way to ... get into court."  GX176 at 114:8-114:14 (Bonney Dep., July 30, 2014).

85.  The remaining invoices from C&D characterize the billings as either for the Sheffields as clients or for the "Single Employer Welfare Benefit Plan Trust" as a client.  Where the Sheffields are listed as clients, C&D billed for litigation in the Southern District of Georgia case, including conversations with the "DOJ attorney," legal research, and discussions with Ms. Bonney.  See, e.g., GX71 at C&D0038-40. Where the "Single Employer Welfare Benefit Plan Trust" is listed as a client, the work listed on invoices refers to the specific cases and issues in tax court.  See, e.g., GX71 at C&D0041-42.

86.  In one such entry under SEWBPT where an "advisor" is mentioned, Lawrence Koresko was required to submit corresponding disclosure forms to the IRS.  GX176 at 116:15-117:6 (Bonney Dep., July 30, 2014); id. at 117:13-22.

### ii. $41,590.76 to Gates Halbruner & Hatch in 2009

87.   During the time period of March 20, 2009, to April 3, 2009, the Trust paid a total of $41,590.76 to the law firm Gates Halbruner & Hatch ("GHH").   GX2 (listing transactions 228, 229, 231, 232).   GHH was retained by CTC in response to the DOL's subpoenaing JGR, which occurred after the Third Circuit issued its decision in Chao v. Cmty. Trust Co., 474 F.3d 75 (3d Cir. 2007), as amended (Mar. 7, 2007), and Chao returned to this Court.   GX156 at 69:2-70:22 (Lowell Dep., Mar. 12, 2014).

88.   The invoices from GHH record billing for preparation of a brief in opposition to the DOL's petition to enforce a subpoena against CTC and billing with respect to JGR, including telephone calls with JGR's attorney, reviewing and revising JGR's motion to quash, and reviewing emails from KLF regarding JGR.   GX66 at GATES0007-10.

### iii. $16,383.60 to Stoel Rives LLP in 2005 and 2006 and $10,000 to Richard Coffman, Esq., in 2006

89.   During the time period of August 29, 2005, to August 14, 2006, the Trust paid a total of $16,383.60 to the law firm of Stoel Rives LLP and $10,000.00 to Richard L. Coffman, Esq. GX2 (listing transactions 149, 158, and 162).   Stoel Rives represented multiple Koresko Defendants, including Mr. Koresko, PennMont, and REAL VEBA, in the case of RAM Technical Services

Inc. v. Koresko, 2005 WL 6358783 (Sep. 22, 2005 Or.).  GX69 at
STOEL-003-32.  After several years, and after the case went up
to Oregon's Supreme Court, Stoel Rives won the lawsuit.  GX176
at 78-19 (Bonney Dep., July 30, 2014); see also id. at 78:13-
78:20.  Mr. Koresko hired Mr. Coffman to represent him in a case
in the 168th Judicial Court in El Paso County Texas, RPS & V,
Inc. v. GP Graham Capital Management Group.  GX67 at
COFFMAN0001-009; GX176 at 137:9-137:14 (Bonney Dep., July 30,
2014).  Mr. Coffman was able to negotiate a settlement, which
had the effect of keeping the "trust corpus" intact.  GX176 at
79-12 (Bonney Dep., July 30, 2014); see also id. at 79:9-79:13.

### iv.  $101,344.49 to Anderson, Kill and Olick P.C. in 2005 and 2006

90.  During the time period of August 29, 2005, to May 8,
2006, the Trust paid a total of $101,344.49 to the law firm
Anderson, Kill and Olick P.C. ("Anderson Kill").  GX2 (listing
transactions 148 and160).  Anderson Kill represented Mr. Koresko
in contempt proceedings before this Court with respect to the
enforcement of a DOL administrative subpoena.  Chao v. Koresko,
No. 04-MC-74, 2004 WL 1102381 (E.D. Pa. May 11, 2004) aff'd, 04-
3614, 2005 WL 2521886 (3d Cir. Oct. 12, 2005).  The firm had
appeared before this Court and the Court of Appeals in 2004 and
2005.  After I held Mr. Koresko, PennMont, and KAPC in civil
contempt for failing to comply with the administrative subpoena,

and I granted the Secretary's motion for the incarceration of
Mr. Koresko, the subpoena remained outstanding until documents
pursuant to the subpoena were produced and the case was
dismissed without prejudice on March 3, 2014.  Chao, No. 04-MC-
74, Docket No. 78, 118, 244.

91.  Anderson Kill's work involved the filing of
oppositions of motion to incarcerate and appeals of the contempt
orders.  GX70 at AK000015-36.

E.  Establishment of "Death Benefit" Accounts

92.  Between 2002 and 2010, the Koresko Defendants
established multiple "Death Benefit Trust" accounts at First
Union National Bank, N.A., Wachovia Bank, N.A., and TD Bank,
N.A., including the following eight accounts:  Ferraro Death
Benefit Trust account (5890 account), Kelling Family Death
Benefit Trust (1675 account), Castellano Death Benefit Trust
(7994 account), Lilling Death Benefit Trust (5874 account),
Levinson Death Benefit Trust (5887 account), Alexander Death
Benefit Trust (8771 account), Elkner Death Benefit Trust (8768
account), and Nadeau Death Benefit Trust (1727 Account).  See,
e.g., GX122 (bank documentation of the several accounts); GX123
(same); GX124 (same); see also June 9, 2014, Tr. 97:5-117:22
(Ottley); GX130 (listing other death benefit accounts).

93.   Sporadically, Ms. Bonney, writing from her PennMont email account, requested that CTC forward some of these amounts to the death benefit trusts.  See GX125 at CTC00005336-37; GX127 at 00005263-64 (bank documentation of the several accounts). Each of these "death benefit trust" accounts held assets transferred out of the CTC-controlled REAL VEBA Trust.  June 9, 2014, Tr. 105:1-105:5 (Ottley); accord GX122 at CTC00091 (dates and amounts of disbursements from REAL VEBA listed); GX124 at CTC000263 (same).

94.   As listed "trustees," Mr. Koresko and Ms. Bonney were responsible for controlling these death benefit trust accounts. See, e.g., GX124 at PNMNT00953; see also id. at PNMNT00957 (IRS application for Employer Identification Numbers, listing Mr. Koresko as trustee).  Ms. Bonney's role consisted of serving as a backstop, or a "protectorate trustee," in case Mr. Koresko was out of town.  GX176 at 84:9 (Bonney Dep., July 30, 2014); see also id. at 84:7-84:15.  She had no independent discretion to sign the checks and only signed if Mr. Koresko was unavailable. Id. at 84:7-84:15.  It was Mr. Koresko who decided the amount of benefits to be paid to each beneficiary.  Id. at 85:7-85:11.

95.   The death benefit trust accounts held assets of the REAL VEBA trust.  GX149 at 161:20-162:7 (J. Koresko Dep., Dec. 18, 2013); see also GX122 (bank documentation of the several accounts); GX123 (same); GX124 (same).  The funds that went into

these trusts came from checks written by CTC.  GX149 at 164:7-
164:11 (J. Koresko Dep., Dec. 18, 2013).

96.  At the recommendation of the law firm Anderson Kill,
Mr. Koresko directed Ms. Bonney that each death benefit received
be segregated into a separate account.  GX176 at 79:14-81:15
(Bonney Dep., July 30, 2014).  This meant that after the
insurance company issued a death benefit check to CTC and CTC in
turn deposited that check into the Trust account, CTC would
transfer the funds to a specific death benefit trust account,
identified by either KAPC or KLF, that had been specifically
set-up for that death.  Id. at 81:16-84:1.


F.  Depositing Death Benefit Proceeds into KLF's Account

97.  On December 31, 2004, eight checks totaling
$3,756,996.44 were deposited into an account at TD Bank in the
name of "Koresko Law Firm PC," with an account number ending in
6507 ("the 6507 Account").  See, e.g., GX74 at TD556-560
(deposit slips with checks in the amount of $3,756,996.44 on
December 31, 2004), PNMNT00598 (bank statement showing deposit).
The eight checks were written on the following death benefit
trust accounts:  Ferraro Death Benefit Trust (5890 account),
Kelling Family Death Benefit Trust (1675 account), Castellano
Death Benefit Trust (7994 account), Lilling Death Benefit Trust
(5874 account), Levinson Death Benefit Trust (5887 account),

Alexander Death Benefit Trust (8771 account), Elkner Death
Benefit Trust (8768 account), and Nadeau Death Benefit Trust
(1727 account).  See GX3-1 (PennMont spreadsheet detailing the
deposit); GX74 at TD556-560 (deposit slips with checks in the
amount of $3,756,996.44 on December 31, 2004), PNMNT00598 (bank
statement showing deposit).

98.  It was Mr. Koresko's decision to move the checks from
the death benefit trust accounts to the 6507 Account.  GX176 at
85:19-86:-17 (Bonney Dep., July 30, 2014).  Mr. Koresko told his
staff that he wanted the various death benefit accounts
"consolidated" and moved "someplace else where there was a
higher rate of interest."  Id. at 86:4-86:6.

99.  By December 30, 2004, immediately prior to this
deposit, the balance of the 6507 Account was $0.  See GX3-1;
GX74 at PNMNT00598.

100. There were no other deposits into the 6507 Account.
GX3-1; June 9, 2014, Tr. 117:13-117:21 (Ottley).

101. The only withdrawals from the 6507 Account until the
account closed on February 2, 2005, were $300,000 on January 12,
2005, to Constance Nadeau, Trustee for Estate of Conrad Nadeau;
$200,000 on January 12, 2005, to M. Rachid Och, Trustee Prescott
Health Care, LLP; and $350,000 on February 1, 2005, to Wilma J.
Alexander.  GX3-1; GX74 at PNMNT00598-601.

102. On February 2, 2005, a little over one month after depositing the eight death benefit trust account checks into the 6507 Account, the 6507 Account was closed and the then-remaining account balance of $2,906,912.80 in retained death benefit proceeds was transferred to a new account at TD Bank, in the name of "Koresko Law Firm PC Escrow Account" or, alternatively, "Koresko Law Firm PC Escrow Account Death Benefit Escrow Account," with an account number ending in 0175 (the "0175 Account").  GX3-2; GX74 at PNMNT00599, PNMNT00602.

G.   Transfer of Death Benefit Proceeds into a Second Account

103. By February 1, 2005, immediately prior to the deposit of $2,906,912.80 from the 6507 Account, the balance of the Koresko Law Firm PC Escrow Account Death Benefit Escrow Account, the 0175 Account, was $0.  See GX3-2; GX75 at TD-3886.

104. John Koresko was the sole signatory on the 0175 Account.  Supplemental GX174.

105. Between February 5, 2005, and February 28, 2010, after the initial deposit of $2,906,912.80, there were two additional deposits into the 0175 Account:

- On October 14, 2005, $640,000.00 in death benefit proceeds was deposited from the Angermeier Death Benefit Trust into the 0175 Account.  See GX 3-2; GX75 at TD-3891 (statement showing deposit of $640,000 in the 0175 Account); GX76 at TD -3695 (account ending in 8992 showing a withdrawal of $640,000); id. at PNMNT00676

96

(debit slip from Commerce Bank showing "Telephone Transfer" from an account ending in 8992 Account to the 0175 Account, "Per Jeanne D. Bonney").

- On December 29, 2006, $294,259.84 was deposited, which purports to reverse an erroneous withdrawal from the 0175 Account on April 13 and 14, 2006, in the same amount. GX 3-2.

106. On April 13, 2005, $750,000.00 was withdrawn from the 0175 Account and transferred to the Castellano Death Benefit Trust account at TD Bank, account number ending in 7994 (the "7994 Account").  GX3-2; GX75 at TD3238, TD3646, PNMNT00766.

107. The remaining funds in the 7994 Account, $836,108.14, were subsequently transferred on February 23, 2010, to a Bank of America account in the name of "Pennsylvania IOLTA[30] Trust Accounts, Koresko Law Firm TRTEE," with an account number ending in 5455 (the "5455 Account").  GX77 at TD 3238-3301 (monthly statements); GX79 at BOA0565-66 (deposit slips).

H.   Transfer of Death Benefit Proceeds to Nevis and to KLF

   a.   Purchase of Condominiums at Nelson's Spring Development

108. Over $2 million in death benefit proceeds remained in the 0175 Account for several years until 2008.  GX75a at TD3886-TD3902.

---

[30] An "IOLTA" account refers to an "Interest on Lawyer Trust Accounts."  Thomas W. Merrill, The Landscape of Constitutional Property, 86 VA. L. REV. 885, 895 (2000).

109. On April 2, 2007, Mr. Koresko entered into an agreement to purchase a three-bedroom unit (Unit A of Block 3) for $605,000.00 in the Nelson Spring Condominium development ("Nelson Spring") in the Caribbean nation of Nevis from Nevisian real estate developer Deon Daniel ("Mr. Daniel"). GX107 at JJKB005702 at ¶ 9 (Mar. 7, 2012, Claim Form); GX105 at JJKB005767 (Apr. 2, 2007, Purchase Agreement). The following year, on June 9, 2008, Mr. Koresko agreed to purchase an additional six condominium units from Mr. Daniel in Nelson Spring (Units 5A, 5B, 5C, 5D, 6A, and 6B) at a price of $600,000.00 per unit. GX107 at JJKB005702-5703 at ¶ 10-11; accord GX110 at JJKB005619 (June 9, 2008, Purchase Agreement).

110. The Purchase Agreement, which Mr. Koresko signed in his personal capacity, required him to make various staged payments as the condominiums were constructed. GX110 at JJKB005619, JJKB005626; see also id. at JJKB005625 (showing name above signature line as "John J. Koresko"). The total purchase price of these additional six condominiums was $3,600,000.00. GX110 at JJKB005619. In both the April 2007 and June 2008 agreements, Mr. Koresko is listed as the purchaser of the units. GX105 at JJKB05766; GX110 at JJKB05618.

111. On May 12, 2008, Mr. Koresko wired $250,000.00 from the 0175 Account to Mr. Theodore Hobson, an attorney practicing in Nevis, with the reference line: "fbo Deon Daniel." GX75 at

PNMNT00761; see also id. at PNMNT00759.  Over the next several

months, Mr. Koresko made five additional wire transfers and one

withdrawal (via a cashier's check) from the 0175 Account to Mr.

Hobson:

- $450,000 on July 1, 2008;
- $152,000 on August 5, 2008;
- $240,000 on September 5, 2008;
- $750,000 on September 15, 2008; and
- $540,000 on October 15, 2008.[31]

GX3-2; see also GX75 at PNMNT00752-753, PNMNT00755, PNMNT00758-

759, TD3684-85, TD3666.  The funds were wired by Mr. Koresko to

Mr. Hobson so that Mr. Hobson could in turn pay Mr. Daniel for

the purchase of the condominiums.  See, e.g., GX109 at

JJKB005712-14, JJKB005723, JJKB005735, JJKB005757-58,

JJKB005761-62 (email correspondence between Mr. Koresko, Mr.

Hobson, and Mr. Daniel, as well as receipts from Mr. Daniel

confirming stage payments "Received from: John Koresko" for

"Condos at Nelson's Spring").

112. On January 30, 2009, Mr. Koresko filed a Complaint

against Mr. Daniel in the High Court of Justice for the

Federation of the Saint Christopher and Nevis, in which Mr.

Koresko confirmed that he had paid Mr. Daniel for the purchase

---

[31] See also GX109 at JJKB005761 (receipt for payment of
$479,966.33), JJKB005762 (receipt for payment of $270,000.00),
JJKB005735 (receipt for payment of $539,964.45), and JJKB005714
(receipt for payment of $240,000.00).

of units at the Fern Hill Development and Nelson Spring
Condominium.  See, e.g., GX106 at JJKB005688.

113. By October 2008, Mr. Koresko had paid Mr. Daniel a
total of $2,442,000.00, by the following stages over the course
of 2008:

| Date | Explanation | Block 5/6 | Lot A3 | Lot A4 |
|------|-------------|-----------|--------|--------|
| April 17 | Deposit | | 30,000 | 30,000 |
| May 8 | Additional deposit 7% | 250,000 | | |
| June 2 | Foundation 15% | 450,000 | | |
| August 9 | Floor slab block | 152,000 | | |
| September 5 | Floor slab block 20% | 240,000 | | |
| September 17 | Floor slab block 20% | 480,000 | | |
| September 17 | | | 270,000 | |
| October 15 | Window/beam | 540,000 | | |
| | | $2,112,000 | $300,000 | $30,000 |

GX106 at JJKB005690.  The payment schedule matches the dates and
amounts of transfers from the 1075 Account to Mr. Hobson.  Mr.
Korekso in fact confirmed that he paid "around $3 million" to
Mr. Daniel in accordance with purchase agreements.  GX149 at
187:20 (J. Koresko Dep., Dec. 18, 2013).

> b.   Transfer of Death Benefit Proceeds in the 0175
>      Account to KLF and to Caribbean Attorneys

114. In addition to the six transfers from the 0175 Account
to Mr. Hobson, Mr. Koresko and KLF also caused the following
withdrawals from the 0175 Account:

- On May 10, 2005, $6,526.64 was wired to "Koresko Law Firm
  PC Acct.," with an account number ending in 6523.  GX3-2.
- On September 21, 2005, and then September 22, 2005,
  $2,500.00 was wired to a Continental Bank account having
  the name "Koresko Law Firm Operating Account," with

account number ending in 1112 (the "1112 Account"), for a total transfer of $5,000.00.  GX3-2.

- On October 14, 2005, $5,000.00 was withdrawn to an unknown recipient.  GX3-2.

115. On October 14, 2008, $15,000.00 was wired to the law firm Webster, Dyrud, and Mitchell ("Webster"), which practiced out of the Caribbean nation of Anguilla.  GX75 at TD3667, TD3686.  Mr. Koresko hired Webster to provide advice with respect to his agreement of sale with Nelson's Springs, in addition to having an "ongoing consulting retainer for other matters of Nevisian law."  GX149 at 206:11-206:12 (J. Koresko Dep., Dec. 18, 2013).

116. On February 24, 2010, the 0175 Account was closed and the then-remaining account balance of $794,163.38 in retained death benefit proceeds was transferred to an account at Bank of America in the name of "Pennsylvania IOLTA Trust Account, Koresko Law Firm TRTEE," the 5455 Account.  GX3-2 (listing a closeout of $793,988.25); GX75 at TD3681-82 (listing a balance of $793,988.25 and an interest payment of $175.13), TD3885 (photocopy of check for $794,163.38 made out to "Koresko Law Firm PC Death Benefit"); GX3-4 (balance sheet for "Pennsylvania IOLTA Trust Accounts, Koresko Law Firm TRTEE Acct 5445"); GX79 at BOA0562-564 (photocopy of check for $794,163.25 made out to "Koresko Law Firm PC Death Benefit" and accompanying Bank of America deposit slip).

I.   <u>Loans on Insurance Policies</u>

117. While the hearing on the Secretary's first preliminary injunction motion was pending, Mr. Koresko and Ms. Bonney began taking out loans on the insurance policies which were owned by the Trust for the benefit of the Plans.  <u>See</u> GX5 (spreadsheet summary of loan applications); GX5a-1 through 5a-37 (examples of loan applications).

118. Between August 24, 2009, and November 10, 2009, Mr. Koresko and Ms. Bonney withdrew over $35 million in loans on insurance policies owned by the REAL VEBA or SEWBP Trusts for the benefit of the Plans.  <u>See</u> GX5; GX3-3; <u>accord</u> GX150 at 119:18-122:4 (J. Koresko Dep., Jan. 7, 2014); <u>see generally</u> June 10, 2014, Tr. 169:1-173:20 (Townsend).

119.  In addition to filling out the applications himself, Mr. Koresko also directed Mr. Townsend to fill out the applications, which either Mr. Koresko or Ms. Bonney then signed.  GX150 at 119:13-120:12 (J. Koresko Dep., Jan. 7, 2014).

120. In signing the applications, Mr. Koresko and Ms. Bonney sometimes represented that they were acting on behalf of CTC as a Trustee.  <u>See, e.g.</u>, GX5a1 at JJKB004174 (Mr. Koresko signing); GX5a2 at JJKB004093 (same); GX5a-4 at JJKB00418 (Ms. Bonney signing).  When Mr. Koresko signed the applications, he often signed under the name "Single Employer Welfare Plan Trust, CTC Trustee," with a stamp stating "John J. Koresko, Esq. for

CTC Trustee, Pres.-Plan Admin. & Insured's Atty in Fact, Signature and Authority Guaranteed." See, e.g., GX5a1 at JJKB004174; GX5a2 at JJKB004093; see also Supplemental GX5.[32]  In other applications, before PPT's stewardship of the Trusts, Mr. Koresko sometimes represented that PPT was the Trustee of SEWBPT.  See, e.g., GX5a8 at JJKB003979; see also Supplemental GX5.

121. Mr. Koresko was not then and has never been an officer or an employee of CTC, an institution that, at the time of these loans, had merged into and was succeeded by F&M Trust as Trustee of the REAL VEBA and SEWBPT.  Nor was Mr. Koresko or PPT the Trustee of the REAL VEBA or SEWBPT in 2009.  Pursuant to Judge Jones' November 14, 2009 and January 14, 2010, Orders, F&M Trust remained the sole Trustee of the REAL VEBA and SEWBPT arrangements until January 15, 2010.

## J.   Transfer of Loan Proceeds into Mr. Koresko's Escrow Account

122. The vast majority of the approximately $35 million in loan proceeds was deposited into an account with the name of "John Koresko Esquire Attorney Escrow Account" at TD Bank, with

---

[32] Mr. Koresko, Ms. Bonney, PennMont, and PPT took out loans on policies issued in the names of participants as summarized in GX5.  The chart marked as Attachment E, at Docket No. 941-5, shows in which Plan each of the named insured participated. Docket No. 941-5.

an account number ending in 7801 (the "7801 Account").[33]   GX3-3;
GX78 at TD240-296, TD3869, TD3871-72.

123. Mr. Koresko is the only individual with signatory
authority over the 7801 Account.   GX 3-3; GX78b at TD3759-60.

124. On August 24, 2009, the day before the first insurance
policy proceeds was deposited, the balance of the 7801 Account
was $203.67.   GX78 at TD3868.

125. As of January 31, 2010, after the final insurance
policy loan proceeds were deposited, the 7801 Account held
$34,512,775.29.   GX78 at TD3635.

126. Mr. Koresko made only one successful withdrawal from
the 7801 Account at TD Bank after the initial deposit of the
loan proceeds and before Judge Jones's January 15, 2010, Order
naming PPT as the Plans' trustee: a check to "Deon Daniel" on
October 1, 2009, in the amount of $200,000.00, which was
deposited into a bank located in Nevis.   GX3-3; GX78 at TD 313,
TD 3629.[34]

---

[33] On November 10, 2009, Mr. Koresko also deposited
$833,910.90 in insurance policy loans into an account at
Citizens Bank, account number ending in 4872 (the "4872
Account").   See GX3-11.   See generally GX81.   Mr. Koresko is the
only individual with signatory authority over the 4872 Account.
GX81 at CITIZENS0430.

[34] Between September 26 and September 29, 2009, Mr. Koresko
wired $25,000,000.00 to an account at ING Bank, via twenty-four
$1,000,000.00 wire transfers, one $999,500.00 wire transfer, and
one $500.00 wire transfer.   See June 10, 2014, Tr. 39:6-40:14
(Ottley); see also GX78 at TD3869-72.   On January 10, 2010, ING

127. In February 2010, Mr. Koresko closed out all of his accounts at TD Bank, including the 7801 Account, which contained $34,512,775.29 in insurance policy loan proceeds at the time of closing.  GX3-3; GX78a at TD3883; GX150 at 55:3-55:16.

128. The $34,512,771.29 balance[35] in the 7801 Account was paid out at closing in the form of a cashier's check.  GX79 at BOA0570 (copy of the official bank check); GX78 at TD298.

K.   Transfer of Death Benefit and Loan Proceeds to an IOLTA Account

129. On March 1, 2010, the proceeds of several TD Bank accounts were deposited into the "Pennsylvania IOLTA Trust Account, Koresko Law Firm Trtee" at Bank of America, the 5455 Account.  GX3-4; see, e.g., GX79 at BOA575-76; GX75 at TD3681, TD3885.  These checks included:

- A check for $34,512,771.29, the closeout balance of the TD Bank 7801 Account, which held insurance policy loan proceeds;
- A check for $794,163.38, the closeout balance of the TD Bank 0175 Account, which held death benefit claim proceeds;
- A check for $836,108.14, the balance of the TD Bank Castellano Death Benefit Trust account, account number ending in 7994 (the "7994 Account); and

---

Bank credited the funds to TD Bank and TD Bank joined this litigation. GX3-3; June 10, 2014, Tr. 40:14 (Ottley); Docket No. 167.

[35] There is an unexplained $4.00 discrepancy between the cashier's check ($34,512,771.29) and the account balance ($34,512,775.29).

- The balances of the Angermeier, Castellano, Donofrio, Karpinski, Paredes, Thomas, Weisbein, and Williams "death benefit trust" accounts.

GX3-2; GX3-4; GX75 at TD3681-82; GX79 at BOA0566, BOA0562, BOA0570, BOA0575-77; GX130 (Angermeier death benefit trust documents); GX131 (Paredes death benefit trust documents); GX132 (Weisbein death Benefit Trust documents); GX133 (Thomas Family Death Benefit Trust documents); GX134 (Karpinski Family Death Benefit Trust documents); GX135 (Donofrio Death Benefit Trust documents); GX136 (Williams Family Death Benefit Trust); GX176 at 93:20-95:11 (Bonney Dep., July 30, 2014) (identifying individuals named above as participants who died, who CTC in turn received insurance for, and who Mr. Koresko directed should not be paid for having failed to send a claim); accord June 10, 2014, Tr. 49:1-51:10 (Ottley).

130. Immediately prior to the March 1, 2010, deposit, the balance of the 5455 Account was $0.  After the deposit, the balance was $36,510,438.28.  GX3-4; GX79 at BOA0575.

131. There were no other deposits into the 5455 Account prior to December 6, 2011.  GX3-4; June 10, 2014, Tr. 51:11-51:24 (Ottley); GX79 at BOA0575-0652.[36]

---

[36] On December 6, 2011, $12,000,000.00 was wired into the 5455 Account from Penn Public Trust, Continental Bank, account number ending in 1302 (the "1302 Account").  GX3-4; GX79 at BOA0649-651.  Nine days later, on December 15, 2011, two checks for $6,000,000.00 were paid out of the 5455 Account: the first to Daniel Keith Newell, noting "Newell Death Benefit" in the

132. Mr. Koresko was and is the only individual with signatory authority over the 5455 Account.  GX3-4; GX79 at BOA0731-732.  He confirmed that the 5455 Account contained proceeds from loans he caused to be taken out on policies owned by the Trusts.  See GX150 at 119:14-119:16 ("[T]he only thing that's left there [in the 5455 Account] are loans from insurance or the proceeds of loans from insurance companies."); accord GX148 at 200:19-200:22 (J. Koresko Dep., Dec. 13, 2013) ("The Bank of America account consists of the money that was kicked out of TD Bank and the amounts of loans that Judge Jones ordered from TD Bank to surrender back to PPT.").

133. In response to this Court's Order, Mr. Koresko summarized the 5455 Account as "relating to REAL VEBA and SEWBPT assets, containing amounts transferred from TD Bank in 2009 comprising of loan proceeds and consolidation of death benefit

---

memo line; and the second to  William S. Newell III, noting again "Newell Death Benefit" in the memo line.  GX3-4; GX79 at BOA0649-651, BOA0538-39 (check numbers 1007 and 1008).  Similarly, on February 14, 2012, a $4,196,348.08 check from the "Penn Public Trust, Inc. PIC Account," the 1302 Account, was deposited into the 5455 Account, noting "Sadie Newell Death Benefit" in the memo line.  GX3-4; GX79 at BOA 655-657, BOA0555-556.  One day later, two checks were paid out of the 5455 Account for a total of $4,196,348.08: (1) the first for $2,016,594.04 to Daniel Keith Newell, noting "Sadie Newell Death Benefit" in the memo line; and the second for $2,179,754.04 to William S. Newell III, noting again "Sadie Newell Death Benefit" in the subject line.  GX3-4; GX79 at BOA0534-35 (check numbers 1021 and 1022), BOA0655-657.

accounts."  GX92 (Mr. Koresko's bank account information); see also Docket No. 552.

134. On PPT's schedule of assets filed in its second bankruptcy proceeding, Mr. Koresko represented under penalty of perjury that the 5455 Account contains the "Policy Loan Proceeds . . . (estimated FBO Real Veba 70%, SWEBPT 30%)."  GX93 (Schedule of Assets in In re Penn Public Trust, No. 3:13-bk-05989, M.D. Fla.) [hereinafter PPT Schedule of Assets].

L.   Transfer of Funds to Nevis

a.   Mr. Koresko Wrote Checks to Mr. Daniel from the 5455 Account

135. A little over a month after the March 1, 2010, deposit into the 5455 Account, Mr. Koresko wrote two checks for a total of $720,000.00 to Deon Daniel, with the memo line of each noting "Block 5/6."  GX3-4; GX79 at BOA0553-54.  Mr. Koresko paid Mr. Deon per Mr. Deon's individual requests for payments on the different blocks.  GX150 at 147: 19-148:3 (J. Koresko Dep., Jan. 7, 2014).  Mr. Koresko considered the property an "extraordinary [investment] opportunity" because, according to his estimates, he had "a seven million dollar claim."  Id. at 148:6-148:11.

b.   Mr. Koresko Transferred $1.68 Million from the 5455 Account to an Off-Shore Bank Account

136. Mr. Koresko also transferred $1.68 million from the 5455 Account to an account at Scotia Bank in the Caribbean island of Nevis, in the name of "John J. Koresko Client Escrow." GX150 at 152:6-153:1 (J. Koresko Dep., Jan. 7, 2014).   The account was established to "facilitate the transfer of funds for construction" of the Blocks 5 and 6 of the Nevis property.   Id. at 153:4-153:7.   Specifically, he wrote checks for:

- $500,000.00 on May 12, 2010, noting in the memo line "new acct," from the 5455 Account to "John J. Koresko Client Escrow."  The cancelled check shows that the funds were deposited into an account in Nevis on May 12, 2010, Bank of Nova Scotia, account number ending in 5553.
- $180,000.00 on January 25, 2011, from the 5455 Account to "John Koresko Client Escrow Acct."
- $1,000,000.00 on April 19, 2011, from the 5455 Account to "John Koresko Client Escrow Acct."

GX3-4; GX79 at BOA0546-47, BOA0552.

137. These transactions and the off-shore Client Escrow Account were discussed during the July 8, 2013, hearing on the Secretary's Application for a TRO.   There, Mr. Koresko confirmed that the funds were sent to Scotia Bank "because that was the amount that was necessary to complete the payments on the contract."   July 8, 2013, T.R.O. Hr'g 121:22-121:24.

138. A few months later, during the October 3, 2013, contempt hearing, Mr. Koresko's counsel stated that there were two bank accounts in Nevis: one belonging to the Trust and the other a personal account of Mr. Koresko's.   See October 3, 2013, Contempt Hr'g 29:16-29:22 (McMichael).   At that time, Mr.

Koresko averred that the trust account contained anywhere from $500.000.00 to one million dollars, while his personal account contained "about $20,000." GX95 (email dated October 3, 2013, from L. McMichael to the IF).

139. After the appointment of the IF, Mr. Koresko traveled to Nevis and transferred the balance of the Scotia Bank accounts to new accounts at the Royal Bank of Trinidad and Tobago ("RBTT"). GX150 at 171:3-171:10, 176:16-176:21, and 236:4-236:17 (J. Koresko Dep., Jan. 7, 2014); see also GX100 (emails from Scotia Bank to J. Koresko, among others, verifying the bank drafts); GX101 (balance sheet for Mr. Koresko's primary Nevis account); GX102 (balance sheet for one of Mr. Koresko's secondary accounts).

140. Mr. Koresko estimated that he transferred anywhere between $850,000.00 and one million to RBTT. GX150 at 237:8-237:19 (J. Koresko Dep., Jan. 7, 2014). Mr. Koresko stated that he did not consider the money to be the "IF's money" but instead was his own money. Id. at 237:13-237:14, 238:8.

141. RBTT records verify that Mr. Koresko maintained at least two accounts at RBTT, one under "Koresko Law Firm" and the other under "John J. Koresko." GX99 (letter dated January 29, 2014, from RBTT to the IF). Together, the accounts held $1,423,167.43 as of January 29, 2014. Id. ($1,422,367.41 in the

Koresko Law Firm account and $800.02 in the John J. Koresko account).

### c. Mr. Koresko Purchased Real Estate in South Carolina Using Death Benefits and Loan Proceeds

142. In addition to the above transfers from the 5455 Account, Mr. Koresko also spent some of the assets in the 5455 Account on the purchase of real property at 4250 Clemson Boulevard in Anderson, South Carolina:

- On August 2, 2011, Mr. Koresko wrote a $25,000.00 check from the 5455 Account to "Christ Pract Auctioneer," noting in the memo line "4250 Clemson Blvd, Anderson, SC." GX3-4; GX79 at BOA0545 (check number 1010). That payment consisted of a non-refundable deposit for the purchase of a piece of real property in Anderson, South Carolina, which was auctioned on August 2, 2011.
- Consistent with the terms of this auction announcement, Mr. Koresko forwarded another $203,769.70 from the 5455 Account via check to "Bank of America" on September 1, 2011, thirty days after the purchase of the property at auction. GX3-4; GX79 at BOA0544 (check number 1009).
- The next day, Mr. Koresko forwarded an additional $10,000.00 from the Bank of America 5455 Account to "Bank of America," noting in the memo line "Settlement expense SC." GX3-4; GX79 at BOA0543 (check number 1011).

143. Property records show that the Anderson, South Carolina, property is currently owned by Peter Vertabedian, Inc. GX138. Peter Vertabedian, Inc. is a Nevada-registered corporation. Id. Mr. Koresko is listed as the President, Vice President, Secretary, and Treasurer of Peter Vertebedian, Inc. Id.

111

144. Mr. Koresko confirmed that he controls and owns Peter Vertebedian, Inc.  GX149 at 54:22-55:17, 57:5-58:13, and 59:7-59:16 (J. Koresko Dep., Dec. 18, 2013).  The property was purchased with the intent "to ultimately move the offices of the entire operation into the office building."  GX150 at 112:15-112:17 (J. Koresko Dep., Jan. 7, 2014).

145. In the PPT Schedule of Assets, which Mr. Koresko signed under penalty of perjury, he listed the property as an asset of PPT and described it as "4250 Clemsen Blvd, Anderson, South Carolina (nominee name, Perter Betabedian, Inc.)."  GX93.

      d.   <u>Mr. Koresko Wrote Checks from the 5455 Account To Pay Litigation Expenses and Outside Attorneys</u>

146. In addition to the above withdrawals from the 5455 Account, Mr. Koresko transferred more than $250,000.00 from the 5455 Account to "Koresko Law Firm PC, Operating Account" at Continental Bank, the 1112 Account, in the following payments:

- $155,089.50 was transferred on August 11, 2010;
- $50,000.00 was transferred on November 4, 2011, noting in the memo line "On acct for litigation expense"; and
- $50,000.00 was transferred on March 9, 2012, noting in the memo line "Solis v. Koresko."

GX3-4; GX79 at BOA0550 (check number 1004), BOA0541 (check number 1014), BOA0533 (check number 1023); GX86 at Continental0592, Continental0654, Continental0672.

147. Between October 2011 and June 2012, Mr. Koresko also forwarded $364,370.99 from the 5455 Account to outside

attorneys.  GX3-4; GX79 at BOA0522 (check number 1035), BOA0523

(check number 1034), BOA0525 (check number 1032), BOA0526 (check

number 1031), BOA0529 (check number 1028), BOA0530 (check number

1027), BOA0531 (check number 1024), BOA0536 (check number 1012),

BOA0542 (check number 1013), BOA00650 (bank statement of wire

transfer).  These transfers went to the following law firms:

| Date | Law Firm (Memo Line) | Amount | Check No. |
|------|----------------------|--------|-----------|
| 12/23/2011 | Leo C. Salzman (Mediation) | $1,200.00 | 1012 |
| 10/5/2011 | Gilbert, Harrell, Sumerford & Martin (Retainer Case No. 09-00040 (S.D. Ga)) | $10,000.00 | 1013 |
| 12/13/2011 | Locke Lord Bissell, Liddell LLP, JP Morgan Chase Bank | $150,000.00 | Wire transfer |
| 3/15/2012 | Montgomery, McCracken, Walker & Rhoads, LLP (Sharkey, et al v Penn Public Trust, 2-12cv-01166) | $25,000.00 | 1024 |
| 4/10/2012 | James T. Duff, Esquire (Sepuya v. Penn Mont et al.) | $5,000.00 | 1027 |
| 4/10/2012 | Samuels Yoelin Kantor, LLP (Ram Tech Services, Inc. et al v. J.J Koresko et al) | $11,754.99 | 1028 |
| 5/4/2012 | Samuels Yoelin Kantor, LLP (Ram Technical Services, Inc. et al v. John J. Koresko et al) | $34,747.55 | 1031 |
| 5/24/2012 | Locke Lord, LLP (Solis v. Koresko File # 0054215.00002) | $50,000.00 | 1032 |

113

| 6/13/2012 | James T. Duff, Esquire (Dr. Samuel Sepuya v. Penn Mont, Inc., et al.) | $8,854.70 | 1034 |
|---|---|---|---|
| 6/27/2012 | Samuels Yoelin Kantor LLP (INV 162202-RAM TECH Services v. JJ Koresko) | $67,813.75 | 1035 |
| Total | | $364,370.99 | |

148. The law firm of Locke Lord Bissell & Liddell, LLP ("Locke Lord") represented Mr. Koresko, PennMont, PPT, KAPC, KLF, Lawrence Koresko, Ms. Bonney, and Mr. Townsend in litigation in the Eastern District of Texas in Thomas Walter Umphrey, P.C. v. PennMont Benefit Services, Inc., No. 1:12-cv-00355-MAC (E.D. Tx. Jul. 15, 2013). Mr. Koresko applied the $167,922.00 that Walter Umphrey had contributed to his plan to pay Locke Lord's retainer in the litigation that resulted from Mr. Umphrey's suit. GX148 at 245:6-245:24 (J. Koresko Dep., Dec. 13, 2013). Mr. Koresko considered the retainer as an exercise of his "right of indemnification under the arrangement to retain counsel in order to defend [the Koresko Defendants] from the allegation[s]." Id. at 245:21-245:24.

149. James T. Duff was a lawyer who represented "the trust" in "the Data Link litigation ... [and the] Sequoias [sic] lawsuit against REAL VEBA trust or PennMont as administrator." GX150 at 192:14-192:19 (J. Koresko Dep., Jan. 7, 2014). On May 14, 2012, Samuel M. Sepuya filed a notice of removal in Regional

114

Employers' Assurance League Voluntary Employees' Beneficiary
Association v. Samuel Sepuya, M.D., Inc., No. 12-02623-LDD (E.D.
Pa. 2012) (Docket No. 1).  Dr. Sepuya also removed the case of
Single Employer Welfare Benefit Plan Trust v. Samuel Sepuya,
M.D., Inc., Docket No. 2010-04021, Court of Common Pleas
(Montgomery County).  GX177 (Docket No. 1-2).

150. Samuels Yoelin Kantor LLP ("SYK") is a law firm based
out of Portland, Oregon.  The firm entered an appearance on
behalf of PennMont, PPT, KAPC, KLF, Mr. Koresko, Lawrence
Koresko, Ms. Bonney, and Mr. Townsend in the case of Bogatay
Trust of 2000 v. PennMont Benefit Services, Inc., No. 13-cv-
0700 (D. Ore.); see also GX150 at 192:22-192:25 (J. Koresko
Dep., Jan. 7, 2014) ("They are counsel . . . and continue to be
counsel for trust-related matters and indemnity-related matters
involving litigation.")  Bogatay Trust of 2000 and Bogatay
Construction, Inc., filed suit on April 25, 2013, alleging that,
upon Mr. Bogatay's death, the defendants refused to transfer the
"cash value life insurance policy" that Mr. Bogatay had
"purchased and funded through a trust arrangement with the
Koresko Defendants."  Bogatay Trust, No. 13-cv-0700 (Docket No.
1).  SYK also represented Mr. Koresko, PennMont, and REAL VEBA
in the case of Ram Technical Services, Inc. v. Koresko in the
Circuit Court of the State of Oregon for the County of
Clackamas.  Ram Technical (Docket No. CV4100199).

115

151. As noted above, Gilbert Harrell represented plan sponsors Wayne and Sara Sheffield, Gary and Peggy Sheffield, and Sheffield Distributing Company in <u>Sheffield Distributing Co. v. United States</u>, No. 09-0040-LGW (S.D. Ga. Apr. 9, 2009), litigation regarding disallowed tax deductions.  <u>See also</u> GX64 (memorandum of understanding between Gilbert Harrell and C&D regarding representation before the IRS with respect to disallowed contributions to the REAL VEBA Employee Welfare Benefit Plan).  Sheffield Distributing Company is an employer plan sponsor of a plan participating in the REAL VEBA.  GX1 at 39-40; GX4 at 187-190.  Employees of Sheffield Distributing Company participated in the plan.  <u>Id</u>.  PennMont's administration database reflects that Gary Sheffield was a 50% owner of the Sheffield Distributing Company.  GX4 at 189.

      e.   <u>Mr. Koresko Transferred Almost $25 million out of the 5455 Account to Other Accounts and To Purchase Annuities</u>

152. On July 8, 2010, $1.9 million dollars was paid to Lincoln Financial Group to purchase an annuity titled to the W.S. Newell Welfare Benefit Plan, care of PennMont, and naming Daniel K. Newell as the annuitant.  GX3-4; GX168 at 22; <u>see also</u> GX79 at BOA0551.  PPT is the Trustee of the W.S. Newell Welfare Benefit Plan Trust.  GX150 at 251:18-252:2 (J. Koresko Dep., Jan. 7, 2014).  On December 2, 2011, Mr. Koresko transferred

$1,974,017.04 from the 5455 Account to another account at
Continental Bank titled "Penn Public Trust, Inc., PIC Account,"
with an account number ending in 1302 (the "1302 Account").
GX3-4, GX79 at BOA0540 (check number 1015), BOA0649-51 (bank
statement).  In the PPT Schedule of Assets, Mr. Koresko
characterized the 1302 Account as relating to the W.S. Newell
Trust: "Account No. XXXX1302 – Continental Bank (FBO W.S. Newell
Trust) estimated aka PIC acct."  GX93 at 2 (spaces and italics
removed); see also GX176 at 106:22-25 (Bonney Dep., July 30,
2014) (confirming that that the 1302 Account dealt with the W.S.
Newell Trust).  The Newell trust was not a part of the REAL VEBA
Trust but was "separate and distinct."  GX150 at 253:9 (J.
Koresko Dep., Jan. 7, 2014); see also GX176 at 109:4-109:9
(Bonney Dep., July 30, 2014).

    153. Between September and November of 2010, Mr. Koresko
transferred $21 million from the 5455 Account to a brokerage
account ending in 8509, at Pershing, LLC, in the name of Penn
Public Trust, Trustee (the "Pershing Account").  GX3-4; GX3-5.
The transfers included $2 million paid by check and a wire
transfer of $19 million.  GX79 at BOA0548 ($2 million, check
number 1002), BOA0607-08 ($19 million, bank statement of wire
transfer); GX91 at Pershing0546.

    154. Mr. Koresko also transferred a total of $1,676,081.53
to the Continental Bank, Penn Public Trust's 419 Account,

account number ending in 1187 (the "1187 Account").  GX3-4; GX79
at BOA0520 ($71,000.00, check number 1038), BOA0521
($500,000.00, check number 1036), BOA0524 ($150,000.00, check
number 1033), BOA0528 ($160,000.00, check number 1030), BOA0532
($776,831.53, check number 1026), BOA0537 ($13,000.00, check
number 1019), BOA0549 ($5,250.00, check number 1006), BOA0599-
601 (bank statement), BOA0649-51 (same), BOA0659-661 (same),
BOA0663-65 (same), BOA0671-73 (same), BOA0675-77 (same),
BOA0683-85 (same).

155. Of the approximately $36 million deposited into the
5455 Account on March 1, 2010, only $4,906,617.42 remained in
the account as of May 2013.  GX3-4; GX79 at BOA0575-78, BOA0738-
41.

M.    Transfer of Death Benefit and Loan Proceeds to the
      Pershing Account

156. Mr. Koresko is the sole signatory of the Pershing
Account.  GX3-5; GX91 at Pershing0875-76.

157. On October 3, 2010, the balance of the Pershing
Account was $0.  GX3-5; GX91 at Pershing0096.

158. After the September and November 2010 transfers from
the 5455 Account, totaling $21 million, there were no other
deposits into the Pershing Account until May 31, 2013.  GX3-5.

159. Between July and August of 2012, Mr. Koresko and PPT transferred $18.7 million from the Pershing Account to the 1187 Account.  GX3-5; GX88 at Continental1342 ($10 million wire transfer credit), Continental1346 ($8.7 million wire transfer credit); GX91 at Pershing0748-51 (wire transfer of $8.7 million to Continental Bank), Pershing0754-66 (wire transfer of $10 million to Continental Bank), Pershing0873-74 (wire transfer confirmation sheets).  The balance of the Pershing Account as of January 31, 2013, was $3,757,624.53.  GX91a at Pershing0670.

160. On May 31, 2013, the balance of the Pershing Account was $3,769,255.14.  GX3-5; GX91 at Pershing0954-58.

161. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko included the Pershing Account, identifying the Account Owner as PPT.  GX92; see also Docket No. 552.

162. In the PPT Schedule of Assets, Mr. Koresko characterized the Pershing Account as "Transamerica account No. xxxx8509 (Real Veba loan policy 3,800,000.00 funds; subject to $1,400,000 claim by KLF)."  GX93 at 2.


N.   The Creation and Use of the 1187 Account

a.   Deposit of Plan Assets into the 1187 Account

119

163. Mr. Koresko opened the 1187 Account on February 5, 2010, at Continental Bank.  GX88 at Continental0948-49, Continental1249.

164. Mr. Koresko and Ms. Bonney were the sole signatories of the 1187 Account, although Ms. Bonney never authorized any withdrawals out of the account.  GX3-6; GX88 at Continental0948-49; GX176 at 106:16-106:21 (Bonney Dep., July 30, 2014).

165. The account functioned as REAL VEBA and SEWBPT's day-to-day operating account beginning on or about February 24, 2010.  June 10, 2014, Tr. 67:22- 73:6 (Ottley); GX 148 at 225:10-225:17 (J. Koresko Dep., Dec. 13, 2013) (confirming that the 1187 Account functioned as the Trusts checking account).

166. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko similarly described the 1187 Account as the "'419 checking account, which serves as trust operating account."  GX92; see also Docket No. 552.

167. In the PPT Schedule of Assets, Mr. Koresko characterized the 1187 Account as "Continental Bank checking for REAL VEBA and SEWBPT arrangements."  GX93 at 2 (italics removed).

168. Mr. Koresko deposited numerous checks addressed to SEWBPT into this account, including contribution checks from

plan sponsors and checks from life insurance companies.  See, e.g., GX88 at Continental2226-229.

169. A check from F&M Trust referencing SEWBPT and made payable to PPT was also deposited into Account 1187.  GX88 at Continental2226.

170. Between February 24, 2010, and June 28, 2013, Mr. Koresko withdrew the following sums from the 1187 Account, among others:

- 8 transfers to Montgomery, McCracken, Walker, and Rhodes LLP ("Montgomery McCracken") for a total of $1,240,338.63;
- 5 wires to the law firm of Locke Lord for $160,297.62;
- 2 transfers to the Law Offices of Jeffrey Neiman ("Mr. Neiman") for $165,800.00;  and
- 1 wire transfer to "GLF IOLTA Account" San Antonio, TX, "Ref: WILHITE V REAL VEBA ET AL" in the amount of $1,974,017.04.

GX3-6.  For Montgomery McCracken: GX88 at Continental1069 ($5,000.00), Continental1190 ($60,000.00), Continental1208 ($85,483.04), Continental1320 ($13,000.00), Continental1354 ($100,000.00), Continental1582 ($191,328.26), Continental004761 ($322,368.58); GX88a at Continental4518-19 ($463,158.75).  For Locke Lord: GX88 at Continental1327 ($50,000.00), Continental1355 ($38,297.62); GX88b at Continental1350 ($22,000.00), Continental1353 ($25,000.00), Continental4520 ($25,000.00).  For Nieman: GX88 at Continental1345 ($50,000.00); GX88c at Continental1357 ($115,800.00).  For GLF IOLTA Account: GX88 at Continental 1316 ($1,974,017.04).

171. The law firm of Montgomery McCracken represented Mr. Koresko and other Koresko Defendants in litigation before this Court, including in the instant case.  See, e.g., Larkin v. Penn Public Trust, No.11-7421 (involving PPT, PennMont, KAPC, KLF, Mr. Koresko, Lawrence Koresko, and Ms. Bonney as defendants); Oswood v. Penn Public Trust, No. 13-0666 (involving PPT, PennMont, KAPC, KLF, Koresko Financial, PennMont Benefits, Inc., Mr. Koresko, and Lawrence Koresko as defendants); Sharkey v. Penn Public Trust, No. 12-1166 (involving PPT, PennMont, KAPC, KLF, Mr. Koresko, Lawrence Koresko, and Ms. Bonney as defendants); REAL VEBA Trust v. Castellano, No. 03-6903; REAL VEBA Trust v. Heart Treasures, No. 12-2605 ("Heart Treasures"); REAL VEBA Trust v. Michael O'Brien, DMD, No. 12-2207.  In Larkin, Oswood, and Sharkey, the Trust was not named as a Defendant.  In Castellano, Heart Treasures, and O'Brien, the Trust, at the direction of Mr. Koresko, filed suit against the beneficiaries and participants.

172. As mentioned above, the law firm of Locke Lord represented Mr. Koresko and other Koresko Defendants, but not the Trust itself, in litigation in the Eastern District of Texas in Thomas Walter Umphrey, P.C. v. PennMont Benefit Services, Inc., No. 1:12-cv-00355-MAC (E.D. Tx. Jul. 15, 2013).

173. Mr. Nieman represents Mr. Koresko in the Eastern District of Pennsylvania relating to a tax penalty that was

assessed against him personally and against PennMont.  GX149 at 222:21-223:17 (J. Koresko Dep., Dec. 18, 2013); see also Koresko v. United States, No. 13-04131-LS; PennMont Benefit Services, Inc. v. United States, No. 13-04130-LS.  Mr. Koresko paid Mr. Nieman out of the accounts titled to Penn Public Trust, 419 account.  GX149 at 224:21-224:23 (J. Koresko Dep., Dec. 18, 2013).

174. The Gomez Law Firm ("GLF") represented the REAL VEBA Trust, PennMont, and PPT in litigation in the Southern District of Texas.  Wilhite v. Regional Employers' Assurance Leagues Veba Trust, No. 11-59 (S.D. Tex. Feb. 9, 2012).  On March 30, 2011, the trustees of the David Walton Wilhite Trust filed a complaint seeking payment of the full amount of death benefits secured by the insurance policy issued in Mr. Wilhite's name.  Wilhite, No. 11-59 (Docket No. 1).  At the TRO hearing on September 6, 2011, the court entered an order directing defendants to deposit $1,974.017.04 into the district court registry.  Id. (Docket No. 39).  Because Mr. Koresko failed to comply, an order directing his arrest was entered on November 22, 2011.  Id. (Docket No. 69).  Following Mr. Koresko's incarceration on November 25, GLF of McAllen, Texas, entered an appearance on behalf of Mr. Koresko and moved the court to rescind its contempt order, attaching as an exhibit a "receipt evidencing deposit of $1,974,017.04" with the Registry of the Court of the Southern

District of Texas.  Id.  (Docket No. 77).  Mr. Koresko was

thereafter released from federal custody on November 29 and the

case closed on February 9, 2012, following the deposit of

$1,974,017.04 into the plaintiffs' counsels' account.  Id.

(Docket No. 125).

        b.   Mr. Koresko and PPT Withdrew $3.9 million in Cash
             and Transfered an Additional $8 million from the
             1187 Account to Other Koresko Controlled Entities

    175. Between February 24, 2010, and June 28, 2013, Mr.

Koresko also caused millions of dollars to be transferred from

the 1187 Account to other accounts controlled by Mr. Koresko,

including:

- 13 transfers for a total of $1,031,619.75 to the "Koresko
  Law Firm PC, Operating Account," also doing business as
  "PennMont Benefit Services, Inc.," at Continental Bank, the
  1112 Account;
- 1 transfer in the amount of $3.8 million to the "Penn
  Public Trust 419 Account" at Continental Bank, account
  number ending in 1195 (the "1195 Account");
- 4 transfers for a total of $1,619,035.44 to the
  "Pennsylvania IOLTA Koresko Law Firm Account" at
  Continental Bank, account number ending in 1146 (the "1146
  Account"); and
- 2 cash or cashier's check withdrawals, one in the amount of
  $1,000.00 on July 26, 2012, and the second in the amount of
  $3.9 million on October 9, 2012.

GX3-6.  For the 1112 Account: GX88 at Contintental0971 (checks

written for $5,000.00, $1,565.00, and $85,494.75 to KLF),

Continental0974 (checks written for $5,000.00, $10,000.00, and

$10,000.00 to KLF), Continental0982 (check written for $5,000.00

to KLF), Continental1050 (check written for $100,000.00 to

PennMont), Continental1097 (check written for $27,762.50 to KLF
and check written for $462,443.56 to PennMont), Continental1123
(check written for $40,391.65 to PennMont), Continental1250-53
(bank statement), Continental1279-82 (same), Continental1302-04
(same), Continental1311-43 (same); GX88d at Continental1185
(checks written for $117,400.00 and $161,562.29 to PennMont).
For the 1195 Account: GX3-6; GX88 at Continental1267 (bank
statement of wire transfer).  For the 1146 Account: GX3-6; GX88
at Continental1309 (bank statement of wire transfer of
$18,249.00), Continental1346 (bank statement of wire transfer of
$1,158,773.98, $119,832.17, $322,180.29); GX87 at
Continental0810 (1146 Account statement), Continental0822 (1146
Account Statement).  For the cash or cashier's check
withdrawals: GX3-6; GX88 at Continental1186 (checking withdrawal
of $1000.00), Continental1207 (checking withdrawal for $3.9
million); GX88e at Continental1352 (bank statement of
withdrawal).

176. The 1187 Account served as the account "for the
payment of expenditures, reimbursements, indemnifications and
any and all other purposes relating to the welfare
arrangements." GX150 at 199:5-199:8 (J. Koresko Dep., Jan. 7,
2014).  As of June 28, 2013, the balance of the 1187 Account was
$477,421.51.  GX88a at Continental4518.

O.   Deposit of Plan Assets into the 1195 Account and the
     Subsequent Transfer of Those Assets

     a.   Deposit of Plan Assets into the 1195 Account

177. The 1195 Account is a money market account opened at
the same time as the 1187 Account. GX89 at Continental0948-49.
Both of the accounts are titled "Penn Public Trust Inc. 419
Account" at Continental Bank. Id. While the 1187 Account
serves as the Trusts' operating account, as discussed above, the
1195 Account functioned as the REAL VEBA and SEWBP Trusts
savings account. GX92; GX148 at 225:10-2 (J. Koresko Dep., Dec.
13, 2013); see also GX150 at 209:8-209:13 (J. Koresko Dep., Jan.
7, 2014).

178. In Mr. Koresko's summary of "Bank Account Information
for John Koresko Entities," which he submitted to the IF through
counsel in response to an Order of this Court, Mr. Koresko
described the Continental 1195 Account as "419 money market
account, containing assets relating to Baxter and Lutz matters,
which are in dispute." GX92; see also Docket No. 552; GX149 at
112:4-112:18 (J. Koresko Dep., Dec. 18, 2013) (confirming that
the 1195 Account contains monies that were issued by insurance
companies to PPT). Both Mr. Baxter and Mr. Lutz had died and
both were part of plans that participated in REAL VEBA: the
Baxter Management, Inc. Welfare Benefit Plan and the Waterloo
Contractors, Inc. Welfare Benefit Plan, respectively. GX4 at

126

11, 223; see also GX148 at 114-119 (J. Koresko Dep., Dec. 13, 2013) (discussing the Lutz death benefit claim and noting no portion of those proceeds have been forwarded to Norman Lutz' beneficiaries); GX149 at 112:4-112:18 (J. Koresko Dep., Dec. 18, 2013).

179. Mr. Koresko and Ms. Bonney were the sole signatories of the 1195 Account, although Ms. Bonney never authorized any withdrawals out of the account.  GX3-7; GX89 at Continental0948-49; GX176 at 106:16-106:21 (Bonney Dep., July 30, 2014).

180. As of February 24, 2010, the balance of the 1195 Account was $0.  GX3-7; GX89 at Continental1361.

181. As noted above, the 1195 Account received a $3.8 million transfer of assets from the 1187 Account on August 13, 2010.  Previously, on February 25, 2010, a bank check from TD Bank in the amount of $2,023,053.04 was deposited into the 1195 Account.  GX3-7; GX89 at Continental1361 (bank statement), Continental2230 (check).  The check was made out to "Penn Public Trust, Inc. 419 Acct" and was from "Penn Public Trust."  GX89 at Continental2230 (check).

182. Four transfers that were made out to REAL VEBA Trust, the SEWBP, or the SEWBPT were also deposited into the 1195 Account:

- On December 3, 2010, Lincoln Financial Group wrote a check to SEWBPT in the amount of $1,974,017.04;

- On April 13, 2012, Western Reserve Life Insurance Company wrote a check to SEWBPT in the amount of $290,460.54;
- On May 21, 2012, Transamerica wrote a check to REAL VEBA Trust in the amount of $2,018,416.36; and
- On May 21, 2012, Penn Mutual wrote a check to SEWBP in the amount of $993,547.20.

For Lincoln Financial Group: GX3-7; GX89 at Continental1371 (bank statement), Continental2270 (check).  For Western Reserve Life Insurance Company: GX3-7; GX89 at Continental1387 (bank statement), Continental2348 (check).  For Transamerica: GX3-7; GX89 at Continental1388 (bank statement), Continental2354 (remote deposit slip).  For Penn Mutual: GX3-7; GX89 at Continental1388 (bank statement), Continental2354 (remote deposit slip).

183. Until June 28, 2013, the date the account was frozen by this Court, there were no other deposits into the 1195 Account other than the reverse of a $5,000.00 outgoing wire. GX3-7; GX89b at Continental1361-96, Continental4532-34, Continental4584-85.

      b.    <ins>Mr. Koresko Transfers Funds from 1195 Account To KLF and To Other Accounts and Entities Benefiting Mr. Koresko</ins>

184. Out of the more than $11,000,000 deposited into the 1195 Account, Mr. Koresko transferred $8,458,043.77 to the 1187 Account.  GX3-7; GX89 at Continental1214 ($433,043.77), Continental1362 ($270,000.00), Continental1364-65 ($125,000.00),

ConContinental1367-68 ($3,920,000.00), Continental1371-80

($3,710,000.00), Continental1387 ($1,173,71).

185. Mr. Koresko also transferred $2,822,200.00 from the

1195 Account to the 1146 Account, another account at Continental

Bank, titled "Pennsylvania Interest on Lawyers Trust Account

Koresko Law Firm PC IOLTA."  GX3-7; GX89 at Continental1380

(bank statement), Continental810 (same); see also GX3-8.

186. In addition, Mr. Koresko made the following

withdrawals out of the 1195 Account:

- On March 8, 2010, he wired $30,000.00 to Octagon
  Consultants.  GX3-7; GX89 at Continental1362.
- On March 8, 2010, he wired $15,000.00 to First Anguilla
  Trust Company.  GX3-7; GX89 at Continental1362.
- On June 2, 2010, he wrote a check for $200,000.00 to
  Investors Insurance Corporation.  GX3-7; GX89 at
  Continental1365, Continental1214.
- On September 14, 2010, he made two wire transfers of
  $5,000.00 each to the Law Offices of Scott A. Orth, one of
  which was reversed.  GX3-7; GX89 at Continental1368-69.
- On December 17, 2010, he wired $50,000.00 to "Koresko Fin
  LP," account number ending in 1161.  GX3-7; GX89 at
  Continental1371.
- On April 15, 2011, he wrote a check for $50,000.00 to
  PennMont Benefit Services, with the memo line noting "Admin
  Fees," which was deposited into the Koresko Law Firm
  Operating Account, the 1112 Account.  GX3-7; GX89 at
  Continental1375, Continental1214.
- On April 25, 2012, and then again on June 13, 2012, he
  wrote a check for $20,000.00 to Montgomery McCracken, with
  the memo line noting Sharkey et al v. Penn Public Trust for
  both checks.  GX3-7; GX89 at Continental1215, Continental
  1388.

187. Octagon Consultants was the consulting firm that Mr.

Koresko had retained "with respect to the condominium

transaction needs." GX148 at 223:7-223:8 (J. Koresko Dep., Dec. 13, 2013).

188. Scott Orth was retained to represent PennMont in the TYC Management case. GX150 at 241:19-241:22 (J. Koresko Dep., Jan. 7, 2014). Although Mr. Orth eventually resigned from representing PennMont, he continues to represent Lawrence Koresko in the TYC litigation. Id. at 243:7-243:23. Not until 2014 did Mr. Orth seek legal fees from Lawrence Koresko directly. June 11, 2014, Tr. 68:2-69:22 (L. Koresko); see also Gerhardt v. Crowe, 118 So. 3d 1006 (Fla. Dist. Ct. App. 2013); Koresko v. Crowe, 97 So. 3d 828 (Fla. Dist. Ct. App. 2012).

189. As of June 30, 2013, the balance of the 1195 Account was $3,278,445.37. GX3-7; GX89a at Continental4534.

P.   The Creation and Use of the 1146 Account

a.   Mr. Koresko Deposits Plan Assets into 1146 Account

190. Mr. Koresko is the sole signatory on the 1146 Account, the Continental Bank account in the name of "Penna Interest on Lawyers Trust Account." GX3-8; GX87 at Continental0176-77.

191. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko

described the 1146 Account as "IOLTA account, containing amounts owed to Newell PIC account."  GX92; see also Docket No. 552.

192. As of February 24, 2010, the balance of the 1146 Account was $0.  GX3-8; GX87 at Continental0791.

193. Between February 24, 2010, and the Court's initial freeze order of June 28, 2013, the following moneys were deposited into the 1146 Account:

- $2,822,200.00 from the 1195 Account, as described in Section II.O.b.2 above;
- $1,619,035.44 from the 1187 Account, as described in Section II.N.b.1 above;
- 6 deposits that were immediately passed through the account, including to Locke Lord and the 1187 Account;
- $58,561.04 from an unknown account;
- more than $2 million from the 1302 Account, the PPT PIC account; and
- more than $300,000.00 in checks written from insurance companies and made payable to the SEWBP Trust or one of its constituent plans.

GX3-8; GX87.  For the 1302 Account: GX87 at Continental0810 ($2,105,491.84 deposit on September 27, 2011).  For the unknown account: GX87 at Continental2116; GXb at Continental0791.  For the plans and Trust: GX87 at Continental0811, Continental2164-2166 (October 7 and 11, 2011, deposits).

194. There were no other deposits into the 1146 Account after February 26, 2010, and before June 28, 2013.  GX3-8; GX87b at Continental0791-827, Continental004747, Continental004749-54, Continental4504-05.

    b.   <u>Mr. Koresko Transfers Plan Assets from the 1146 Account to Lawyers Representing Him in Private Litigation</u>

195. Between February 24, 2010, and June 28, 2013, the following moneys were withdrawn from the 1146 Account:

- $7,149,917.04 transferred to the Continental 1187 Account;
- $30,000.00 across two transfers in November 2011 to "GLF IOLTA Acct," noting "Wilhite v. REALVEBA et al No. 1 Retainer"[37];
- $50,000.00 in April 2010 to Locke Lord, noting "Retainer for (The Umphrey Disp.";
- $17,943.62 in January 2013 to Lessie Mae Brown Trust, noting in the memo line that the check is in regards to the final settlement per the Montgomery County Orphans Court;
- $17,943.62 in January 2013 to John Koresko, noting in the memo line that the check is in regards to the final settlement per the Montgomery County Orphans Court; and
- $10,000 in April 2013 to Firestone, Brehm, Wolf, Whitney & Young LLP ("Firestone"), noting "Retainer PennMont Benefit Svcs for trust acct."

GX3-8.  For 1187 Account: GX87 at Continental0811-12, Continental0814-19.  For GLF IOLTA Acct: GX87 at Continental0812-13 (bank statement).  For Locke Lord: GX87 at Continental0818.  For Lessie Mae Brown Trust: GX87 at Continental0529, Continental0827.  For Mr. Koresko: GX87 at Continental004747-48.  For Firestone: GX87 at Continental4503.

196. Firestone represented PennMont in a patent infringement lawsuit that Mr. Koresko filed against Nationwide Life Insurance Company in the Southern District of Ohio on

---

[37]  These two transfers are ultimately reversed by a credit of $30,000.00.

behalf of himself and PennMont.  Koresko v. Nationwide Life Ins. Co., No. 06-00066 (S.D. Oh.).

197. On December 18, 2009, Mr. Koresko removed a state court matter brought by the Lessie Mae Brown Trust to the Eastern District of Pennsylvania.  See Estate of Lessie Mae Brown v. Koresko, No. 09-06059-PBT (E.D. Pa.) (Docket No. 1). The subject dispute arose from Mr. Koresko and KLF's alleged improper retention of assets belonging to the Lessie Mae Brown Trust after the sale of real property owned by that Trust.  Id. (Docket No. 3-1).  The Petitioners sought $35,887.24 in that case, exactly twice the amount of money that was eventually transferred in January 2013 to the Lessie Mae Brown Trust out of the 1146 Account.  Id.; see also GX87 at Continental0529.

198. As of June 28, 2013, the balance of the 1146 Account was $1,588,660.01.  GX3-8; GX87a at Continental4505.

Q.  The Creation and Use of the 1112 Account

a.  Mr. Koresko Deposits Plan Assets into the 1112 Account

199. Mr. Koresko and Lawrence Koresko are the signatories on the 1112 Account, the Continental Bank account in the name of "Koresko Law Firm, PC."  GX3-9; GX86 at Continental0157-58.

200. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through

counsel in response to an Order of this Court, Mr. Koresko described the 1112 Account as "Operating account of Koresko Law Firm, which contains the earnings of the firm.  It is also the 'paymaster' account for PennMont and other affiliates, as the law firm acted as the central payment entity for all affiliates and performed the administration duties of PennMont."  GX92; see also Docket No. 552.

201. As of February 15, 2010, the balance of the 1112 Account was $0.  GX3-9; GX86 at Continental0568-69.

202. Between February 15, 2010, and June 28, 2013, Mr. Koresko transferred the following plan assets into the 1112 Account:

- $1,031,619.75 from the 1187 Account at Continental Bank by the following checks:

    o $92,059.75 on March 2, 2010, from three checks made out to Koresko Law Firm, all noting in the memo line "Legal Service Fees."  GX3-9; GX86 at Continental0570-74; GX86a at Continental2116-17.
    o $25,000.00 on March 9, 2010, from three checks made out to Koresko Law Firm, all noting in the memo line "Legal Service Fees."  GX3-9; GX86 at Continental0570-74; GX86a at Continental2117.
    o $5,000.00 on March 29, 2010, from a check made out to Koresko Law Firm, with the memo line noting "Winchester, David Stradinger."  GX3-9; GX86 at Continental0570-74; GX86a at Continental2119.
    o $100,000.00 on December 30, 2010, from a check made out to PennMont.  GX3-9; GX86 at Continental0608-12; GX86a at Continental2135.
    o $490,206.06 on July 6, 2011, from two checks made out to Koresko Law Firm, all noting in the memo line "Admin fees taken and Sheffield case."  GX3-9; GX86 at Continental0638-41; GX86a at Continental2157-58.

o $40,391.65 on October 21, 2011.  GX3-6; GX3-9; GX86
at Continental0651-53; GX86a at Continental2169;
GX88 at Continental1312 (statement), Continental1123
(check).

o $278,962.29 on July 24, 2012, from two checks made
out to PennMont, with the memo line for both noting
"Administrative fee per Trust Doc and Direction."
GX3-9; GX86 at Continental0687-89; GX86a at
Continental2193.

- $250,000 from the 5455 Account at Bank of America by the
following checks:

o $150,000.00 on August 11, 2010, from a Pennsylvania
IOLTA Trust check made out to Koresko Law Firm.
GX3-9; GX86 at Continental0591-95; GX86a at
Continental2121-22.

o $50,000.00 on November 4, 2011, from a Pennsylvania
IOLTA Trust check made out to Koresko Law Firm, with
the memo line noting "On acct. for litigation
expense."  GX3-9; GX86 at Continental0654-57; GX86a
at Continental2169.

o $50,000.00 on March 9, 2012, from a Pennsylvania
IOLTA Trust check made out to Koresko Law Firm, with
the memo line noting "Solis v. Koresko."  GX3-9;
GX86 at Continental0671-74; GX86a at
Continental2185.

- $50,000.00 from the 1195 Account at Continental Bank by
the following check:

o $50,000.00 on April 15, 2011 from a check made out
to PennMont, with the memo line noting "Admin fees."
GX3-9; GX86 at Continental0671-74; GX86a at
Continental2153.

    b.   Mr. Koresko Transfers Plan Assets from the 1112
         Account to Lawyers Representing Him in Private
         Litigation

203. Funds from the 1112 Account were spent on KLF

operating expenses and Mr. Koresko's personal expenses,

including boat rentals, transfers to Mr. Koresko's ex-wife,

Bonnie Koresko, and bills to Sussex County.  GX3-9; see e.g.,
GX86 at Continental0247 (check to Sussex County Council Utility
Billing Division), Continental0250 (check to Walt Kimble for a
boat rental), Continental0630-34 (wire transfer to Mrs.
Koresko); see also June 10, 2014, Tr. 91:13-20 (Ottley) ("This
account, the activity was very voluminous. This is the operating
account for the Koresko Law Firm.  There's a lot of transactions
to paying bills, utilities, upkeep of the office."); GX86 at
Continental0238-59.

204. There were also regular transfers from the 1112
Account to accounts in the name of Koresko Law IOLTA; Koresko
and Associates PC; BNB Properties, LLC ("BNB"); and Freedom
Brokers, LLC.  GX3-9; GX86 at Continental0568-715.

205. BNB Properties was created by Mr. Koresko for the
purpose of purchasing the property at 200 West 4th Street.
GX176 at 20:2-20:6 (Bonney Dep., July 30, 2014); June 11, 2014,
Tr. 43:10-43:11 (L. Koresko).  Transfers from the 1112 Account
to BNB Properties were to pay office rent, as indicated on the
bank records.  GX 3-9; June 10, 2014, Tr. at 94:22-95:2
(Ottley); see, e.g, GX86 at Continental0571 (bank statement).

206. Freedom Brokers is an insurance brokerage.  John
Koresko is a limited partner in Freedom Brokers, in which he had
a "passive" ownership interest.  GX148 at 188:10 (J. Koresko
Dep., Dec. 13, 2013).

207. Koresko Financial LP is an insurance brokerage firm. GX149 at 28:15-28:16 (J. Koresko Dep., Dec. 18, 2013).  Mr. Koresko was a limited partner of Koresko Financial.  Id. at 26:19.  PennMont Benefits Inc., a corporation separate and apart from PennMont, served as Koresko Financial's general partner. Id. at 29:3-29:7.  Mr. Koresko and Lawrence Koresko each owned 50% of PennMont Benefits, Inc.  Id. at 29:12-29:14. Mr. Koresko currently owns 1% of Koresko Financial, while Lawrence Koresko continues to run the business.  June 11, 2014, Tr. 6:20-6:23 (L. Koresko).

208. As of June 28, 2013, the balance of the 1112 Account was $26,842.75.  GX3-9; GX86a at Continental4481-4482.

R.   The Creation and Use of the Penn Public Trust, Inc., SPC, Account

209. Mr. Koresko is the sole signatory of the Continental Bank account, with account number ending in 2185 (the "2185 Account").  June 10, 2014, Tr. 96:12 – 97:1 (Ottley); GX90b at Continental004574-75.

210. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko described the 2185 Account at Continental Bank as "'SPC' account containing assets relating to Bogatay matter, which is in

137

litigation in District of Oregon." GX92; see also Docket No. 552.

211. The 2185 Account contains the proceeds of an insurance policy owned by the REAL VEBA Trust. GX150 at 257:25-258:3 (J. Koresko Dep., Jan. 7, 2014).

212. In the PPT Schedule of Assets, Mr. Koresko described the 2185 Account as "Account No. XXXX2185- Continental Bank (Real Veba/Bogotay claim) aka Continental SPC acct." GX93 at p. 2 (italics removed).

213. As of July 25, 2012, the balance of the 2185 Account was $0. GX3-10; GX90 at Continental1508.

214. Between July 25, 2012, and June 28, 2013, the following moneys were deposited into the 2185 Account:

- $1,000.00 from the 1187 Account on July 26, 2012. GX3-10; GX90 at Continental1508, Continental2362; June 10, 2014, Tr. at 97:5-95:7 (Ottley).
- $4,007,613.65 from Great Southern Life Insurance Company on September 5, 2012, in a check made out to Single Employer Welfare Benefit Plan. GX3-10; GX90 at Continental1510; GX90a at Continental2369; June 10, 2014, Tr. at 97:7-97:11 (Ottley).

215. There were no other deposits into the 2185 Account after July 25, 2012, and before June 28, 2013. GX3-10; June 10, 2014 Tr. at 97:12-97:14 (Ottley).

216. There were no withdrawals out of the 2185 Account between July 25, 2012, and June 28, 2013. GX3-10; June 10, 2014 Tr. at 97:15-97:17 (Ottley).

217. As of June 28, 2013, the balance of the 2185 Account was $4,022,222.21.  GX3-10; GX90a at Continental4554.

S.    The Creation and Use of an Account in the Name of CTC, the Former Trustee

    a.    Mr. Koresko Set Up the Account in the name of "CTC Trustee," Even Though CTC Was Not the Trustee

218. On or around November 9, 2009, Mr. Koresko created the "CTC TTEE KNPC EA Pennmont Welfare Trust" account at Citizens Bank, with account number ending in 4872 (the "4872 Account"). GX3-11; GX81 at Citizens0430; GX150 at 71:1-71:12 (J. Koresko Dep., Jan. 7, 2014).

219. Mr. Koresko is the sole signatory of the 4872 Account. GX3-11; GX81 at Citizens0430.

220. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko failed to provide any description for the Citizens Bank 4872 Account stating only that the description is to be provided. GX92; see also Docket No. 552.

221. Mr. Koresko confirmed that the name CTC, which was a part of the title of the 4872 Account, was "a fictitious name which is owned by Penn Public Trust [and] registered with the Commonwealth of Pennsylvania."  Mr. Koresko claims that he used

CTC because, after Community Trust Company went out of business, it was easier to keep CTC than "create[] an extraordinary administrative problem" given the number of documents that did and continue to reference the Community Trust Company."  GX149 at 125:14-125:15 (J. Koresko Dep., Dec. 18, 2013); accord GX150 at 68:22-69:2 (J. Koresko Dep., Jan. 7, 2014).

222. Mr. Gates, the chairman of CTC prior to its dissolution, was unaware of the existence of the 4872 Account. GX156 at 75:8-76:5 (Gates Dep., Mar. 12, 2014).

> b.   Mr. Koresko Deposits Loan Proceeds into the 4872 Account

223. As of November 9, 2009, the balance of the 4872 Account was $0.  GX3-11; GX810 at Citizens0433.

224. On November 10, 2009, Mr. Koresko deposited the following checks into the 4872 Account that were made out to the Trust, the Trustee, or to Plans:

| Payor | Payee | Amount | Exhibit No. |
|-------|-------|--------|-------------|
| New York Life Insurance Company | Single Employer Welfare Benefit, C/O Community Trust Company | $127,901.20 | GX3-11,GX81 at Citizens0516 |

| Hartford Life and Annuity | Law Offices M. Lucansky Pa Wel Plan Trust, Community Trst Co., Ttee C/O Pennmont Benefit Srvcs, Inc. | $162,514.03 | GX3-11,GX81 at Citizens0516 |
|---|---|---|---|
| MetLife | Community Trust Co Trte U Sing | $682.62 | GX3-11,GX81 at Citizens0516 |
| Midland National | Individual Employer Welfare Plan C/O Penn Mont Benefit Services | $249,479.35 | GX3-11,GX81 at Citizens0516 |
| American General Life Insurance Company | Penn Public Trust, Ttee Fbo Single Employer Welfare Plan Trust 12-30-02 | $0.60 | GX3-11,GX81 at Citizens0517 |
| Phoenix | Single Employer Welfare Plan Trust Dtd 12-30-02 | $142,551.00 | GX 3-11,GX81 at Citizens0517 |
| Phoenix | Single Employer Welfare Plan Tr Community Trust Co Tte | $150,782.10 | GX 3-11,GX81 at Citizens0517 |
| TOTAL | | $833,910.90 | GX 3-11,GX81 at Citizens0433 |

These checks were issued for loans taken on policies insuring the life of Jatinder Sahi of the J.R. Computer Plan ($127,901.20); Michael Lucansky of the Law Offices of Michael Lucansky Plan ($162,514.03); Robin Porter of the Heart Treasures, Inc. Plan ($249,479.35); Donna D'Elia of the Women's

Group for Obstetrics and Gynecology ($142,551.00); Alan Bandes

of U.E. Systems Plan ($150,782.10).  GX5; see, e.g., GX81 at

Citizens0516-17; GX179 at NYL0734; GX180 at H00008759-61; GX181

at Midland.Porter0278-79.

225. There were no other deposits into the 4872 Account

between November 11, 2009, and September 25, 2013.  June 10,

2014, Tr. 108:7-108:11 (Ottley).

       c.   Mr. Koresko Transfers Funds from the 4872 Account
           For Personal Expenses

226. Between November 9, 2010, and September 25, 2013, Mr.

Koresko transferred the following moneys from the 4872 Account:

- $70,000.00 to Deon Daniel on May 14, 2010, with the memo line noting "further pymt Blocks 5 and 6."  GX3-11; GX81 at Citizens0449, Citizens0512.
- $9,000.00 to the Koresko Law Firm, the 1112 Account, on November 5, 2010.  GX3-11; GX81 at Citizens0437, Citizens0513; GX86c at Continental0604.
- $25,00.00 to a personal checking account at Citizens Bank held in the name "Bonnie Jean Koresko, John J Koresko 5th," account number ending in 3380 (the "3380 Account") over the course of three transfers: February 2, 2010, February 9, 2011, and April 18, 2011.  GX3-11; GX81 at Citizens0455, Citizens0518; GX85 at Citizens0026 ($10,000.00 on February 2, 2010), Citizens0061 ($10,000.00 on February 9, 2011), Citizens0234; GX85a at Citizens0477-78 ($5,000.00 on April 18, 2011).
- $10,000.00 to a personal savings account at Citizens Bank held in the names Bonnie Jean Koresko and John J Koresko 5th, account number ending in 4511 (the "4511 Account"), on April 18, 2011.  GX81 at Citizens0478; GX81a at Citizens0013-14.
- $2,000.00 to a personal checking account at Bank of America held in the name of John J. Koresko, with account number ending in 7301 (the "7301 Account"), on February 10, 2011.  GX3-11; GX81 at Citizens0482, BOA0405.

- $2,000.00 to the 7301 Account on April 18, 2011.  GX3-11; GX81 at Citizens0478, BOA0417.
- $250,000.00 to the "Koresko Law Firm, IOLTA" account at Citizens Bank, account number ending in 6018 (the "6018 Account"), on August 16, 2012.  GX3-11; GX81 at Citizens0498, Citizens0514; see also June 10, 2014, Tr. at 107:11-107:14; 109:15-110:16 (Ottley).  Four days later, $250,000.00 was transferred from the 6018 Account to "Christie Parabue, et al. IOLTA."  June 10, 2014, Tr. at 110:3-110:16 (Ottley).  Christie Parabue Moreten & Young is a Philadelphia-based law firm and is listed as co-counsel along with Mr. Koresko in the case of Single Employer Welfare Benefit Plan Trust v. Connelly, No. 11-5276 (E.D. Pa., Nov. 11, 2011).[38]
- $5,000.00 to Nancy Bonner, a paralegal at KLF, with memo line noting "Bonus."  GX3-11; GX81 at Citizens0667-68; GX81b at Citizens0576; GX176 at 118:19-118:24 (Bonney Dep., July 30, 2014).

227. Mr. Koresko confirmed that any $5,000.00 amount transfers from the 4872 Account "would have represented the amount due on the mortgage" he shared with Mrs. Koresko. GX150 at 97:17-98:2.

228. As of September 25, 2013, the balance of the 4872 Account at Citizens Bank was $460,879.90.  GX3-11; GX81 at Citizens0673-74.

---

[38] In that case, Mr. Koresko filed an emergency injunction in the Montgomery County Court of Common Pleas, enjoining Claire M. Connelly, an arbitrator with the American Arbitration Association, from conducting any arbitration or rendering any decision with respect to the arbitration case of Langlais v. PennMont Benefit Services, No. 11-5275, 2012 WL 2849414, at *1 (E.D. Pa. July 11, 2012) aff'd, 527 F. App'x 215 (3d Cir. 2013). PennMont, REAL VEBA, and Mr. Koresko were the named defendants in Langlais. Id. (Docket No. 1-2).

T.   Depositing of Plan Assets into a Separate Account
     After the Court's Freeze Orders and After the
     Installation of the IF

229. Mr. Koresko is the sole signatory of the 6018 Account at Citizens Bank.  GX3-12; GX82 at Citizens0523.

230. As of July 1, 2013, the balance of the 6018 Account was $1,000.12.  GX3-12; GX82 at Citizens0681.

231. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko described the 6018 Account at Citizens Bank as the "IOLTA account established with the inception of Koresko Law Firm, Ltd. Account was originally funded with a $1000 personal contribution from John Koresko.  The account was unused for many years. Recently, Mr. Koresko has deposited amounts related to the liquidation of 'orphan' annuities, which are trust assets, into this account." GX92; see also Docket No. 552.

232. In the PPT Schedule of Assets, Mr. Koresko described the 6018 Account as "[u]nallocated annuity contract proceeds held in Koresko Law Firm Iolta account - Citizens Bank 6018." GX93 at 2.  Mr. Koresko confirmed that the funds in the 6018 Account are proceeds on annuity contracts that were owned by or for the benefit of the REAL VEBA or SEWBP Trust.  GX150 at 249:16-249:19 (J. Koresko Dep., Jan. 7, 2014).

233. On July 9, 2013, I issued an Order freezing certain accounts held by the Koresko Defendants.  Docket No. 407.  On July 23, 2013, I issued an interim Order enjoining the Koresko Defendants and their agents from, among other things, expending, disposing or encumbering the cash value of any insurance policies.  Docket No. 436.  After the Secretary moved for clarification of these Orders, requested a supplemental Order, and moved for an immediate rescheduling of the evidentiary hearing on the Secretary's Motion for a Temporary Restraining Order and Preliminary Injunction, I entered an Order on September 10, 2013, setting a hearing for September 16, 2014. At this point, I notified that parties that I would consider the appointment of an Independent Fiduciary as requested by DOL. Docket Nos. 472, 486.

234. While these motions were pending, Mr. Koresko deposited fourteen checks into the 6018 Account on September 4, 2013, several of which contain references to "reorganization" fees.[39]  GX3-12; GX82 at Citizens0685-86, Citizens0700-15.  These

---

[39]    Prior to September 4, 2013, Mr. Koresko made the following deposits into the 6018 Account:

- $134,500.00 on July 22, 2013, from Penn Public Trust Inc., the 1302 Account at Continental Bank. GX3-12; GX82 at Citizens0681-82, Citizens0745.
- $200,000.00 on August 16, 2013, from Bonnie J. Koresko, account number ending in 4831, to John J. Koresko Esq. IOLTA, with the memo line on the check noting "BNB

checks were from employers and totaled $78,995.00.  Id.  Shortly before this deposit, Mr. Koresko had sent letters to employers participating in the REAL VEBA and SEWBP Trusts, demanding immediate payment of bankruptcy reorganization fees and administrative fees at threat of cancelling the employers' plan benefits "forever."   See, e.g., GX161-GX167 (affidavits from employers and correspondence).  These employers were sponsors of plans participating in the REAL VEBA and SEWBP Trusts.   See GX1 (identifying the following as plan sponsors of REAL VEBA and SEWBPT plans: Baseline Holdings, Inc., Cleburne Medical Clinic, Inc., PPRVS, LLC, Progressive Door Corp.); GX4 (identifying the following as plan sponsors of REAL VEBA and SEWBPT plans: Brigham City Arthritis Clinic PC, Gleason Management Co., Inc., GP Construction Services, Inc., Grace P. Waldrop Consulting, Inc., Lafayette Compass, Inc., Thomson Financial & Tax Services, Inc., WAJ Consulting Co., Inc.).

235. Mr. Koresko deposited thirteen checks on September 9, 2013, into the 6018 Account, an account for which the Secretary was unaware about and which had not been frozen by the Court.

---

Purchase." GX3-12; GX82 at Citizens0683-84, Citizens0698-99.
- $60,000.00 on August 16, 2013, from an account at Citizens Bank, account number ending in 5154 with the name of "PennMont Benefit Serv." GX3-12; GX82 at Citizens0683-84, Citizens0692-93.
- Two deposits of $6,000.00 on August 16, 2013. GX3-12; GX82 at Citizens0683-84, Citizens695-97.

Two checks from John Hancock, which were made payable to the
Single Employer Welfare Benefit Plan: one for $124,455.02 and
the second for $121,361.91.  GX82 at Citizens685-86,
Citizens0727-29.  Ten checks from Sun Life Financial, which were
made payable to the following plans:

- Vijay Gandhi WBP Trust DTD, C/O Community Trust Company
  Tstee;
- Vijay Gandhi WBP Trust DTD, C/O Community Trust Company
  Tstee;
- Ming Court Management Inc. WBP, C/O Community Trust
  Company Tstee;
- LM Financial Grp Welfare Ben Plan DTD, C/O Community
  Trust Company Tstee;
- LM Financial Grp Welfare Ben Plan DTD, C/O Community
  Trust Company Tstee;
- Brown & Luke Contracting, Inc. WBP, C/O Community Trust
  Company Tstee;
- Brown & Luke Contracting, Inc. WBP, C/O Community Trust
  Company Tstee;
- Corestates Bank NA Trustee FBO Stokes Johnson WBP, C/O
  Community Trust Company Tstee;
- Corestates Bank NA Trustee FBO Stokes Johnson WBP, C/O
  Community Trust Company Tstee; and
- Ming Court Management Inc. WBP, C/O Community Trust
  Company Tstee.

GX3-12; GX82 at Citizens685-86, Citizens0716-29 (adding up to a
total deposit of $3,371.16).  And one check from the County of
Chester Pronthonotary's Office for $49,725.12, which was made
out to KAPC.  GX82 at Citizens0726, Citizens0729.

236. On September 13, 2013, Mr. Koresko deposited three
additional checks from Sun Life Financial into the 6018 Account.
These checks were made payable to:

147

- LM Financial Grp Welfare Ben Plan DTD, C/O Community Trust Company Tstee;
- Corestates Bank NA Trustee FBO Stokes Johnson WBP, C/O Community Trust Company Tstee; and
- Brown & Luke Contracting Inc. WBP, C/O Community Trust Company Tstee.

GX3-12; GX82 at Citizens0685-86, Citizens0730-33 (adding up to the deposit of $762.18).

237. On September 16, 2013, I ordered the installation of the IF and gave it authority over the assets of the plans. Docket No. 496. A little over ten days later, on September 27, 2013, Mr. Koresko deposited $336,939.52 in plan assets into the 6018 Account. This included:

- Two checks from Sun Life Financial made payable to Ming Court Management Inc. WBP, C/O Community Trust Company Tstee, for $634.62, and Vijay Gandhi WBP Trust DTD, C/O Community Trust Company Tstee, for $203.46.
- Three checks from American National Insurance Company made payable to Single Employer Welfare Benefit Plan Trust for $88,290.63, $73,888.43, and $169,663.83, respectively.
- One check from L.T. Management made payable to Penn Public Trust, Trustee, for $4,258.55.

GX3-12; GX82 at Citizens0685-86, Citizens0734-40.

238. The entities described above are Plans that participated in the REAL VEBA or SEWBPT arrangements. See GX1 (identifying Brown & Luke Contracting, Inc. Benefit Plan and Stokes Johnson & Co. Inc. Benefit Plan as plans that participated in the REAL VEBA/SEWBP Trusts); GX4 (identifying the Vijay Kumar Gandhi, M.D., P.A., Welfare Benefit Plan and the

148

Ming Court Management Inc, Welfare Benefit Plan as plans that participated in the REAL VEBA or SEWBP Trust).

239. Between July 21, 2013, and September 30, 2013, there were no other deposits in the 6018 Account.  GX3-12; GX82 at Citizens0681-86.

240. After the IF was installed, Mr. Koresko made the following two withdrawals from the 6018 Account: a check for $1,788.00 made payable to Clerk United States Bankruptcy Court on September 19, 2013, with the memo line noting "Notices of Appeal," and then a check for $4,000.00 made payable to Firestone, "Attorneys for PennMont," on September 25, 2013. GX3-12; GX82 at Citizens0685-686, Citizens 689-90) (with check stating "on account Nationwide v. PennMont").  The first check related to Judge Fitzsimon's decision dismissing the six Koresko-related bankruptcy cases pending before her.  The debtors in those cases included PennMont, PPT, KLF, and KAPC. See E.D. of Pa. Bankr., Civ. Act No. 13-21178, 13-21179, 21180, 21181, 21182, 21183.

241. As of September 30, 2013, the balance of the 6018 Account was $910,103.19.  GX3-12; GX82 at Citizens0685-86.


U.    Transfer of Moneys from Employers to the 8384 Account

242. Mr. Koresko is the sole signatory of the John J. Koresko, Esq. account at Citizens Bank, account number ending in

149

8384 (the "8384 Account").  GX3-13; GX84 at Citizens0240,
Citizens0524.

243. In Mr. Koresko's summary of "Bank Account Information
for John Koresko Entities," which he submitted to the IF through
counsel in response to an Order of this Court, Mr. Koresko
described the 8384 Account at Citizens Bank as "Account
established as Koresko Law Firm, Ltd. alternative account.
Account was funded with a personal capital contribution from
John Koresko of $100,000 -- the amount that Koresko & Associates
received as the purchase price for furniture and equipment upon
the formation of Koresko Law Firm, P.C.  The account was
established under the Koresko Law Firm, Ltd. EIN."  GX92; see
also Docket No. 552.

244. As of December 15, 2011, the balance of the 8384
Account was $0.  GX3-13, GX84 at Citizens0242-43.  Prior to
September 8, 2013, only $7,000.00 in deposits were placed in
this account: two checks for $1,000.00, each made out to John
Koresko, were deposited on December 15, 2011, and a $5,000.00
check from the bank account of "Bonnie Jean Koresko" and "John
J. Koresko 5th," made out to "cash," was deposited on August 19,
2013.  GX3-13; GX84 at Citizens0242-43, Citizens0271,
Citizens0751-52, Citizens0756-57.

245. Between September 9, 2013, and September 17, 2013, Mr.
Koresko deposited twenty-four checks from various employers,

twenty-two of which were made out to the KLF or to KAPC, one of which was made out to Penn Public Trust, and one of which was made out to PennMont, totaling $144,905.00.  In addition, he deposited two checks from Prudential, totaling $34.00, which were made out to John J Koresko V.  GX3-13; GX84 at Citizens0753-54, Citizens0758-86.

246. The twenty-four checks issued by employers were all written shortly after Mr. Koresko wrote to them requesting payment under threat of cancelling participants' benefits.  See GX161-GX167 (affidavits from employers and correspondence).

247. These twenty-four checks were all issued by employers that sponsored plans that participated in the REAL VEBA or SEWBP Trust arrangement.  See GX1, GX4; see also GX150 at 250:5-251:10 (J. Koresko Dep., Jan. 7, 2014) (confirming that he deposited moneys that he received in response to the subject bankruptcy threat letters in a "[Koresko Law Firm] non-IOLTA fund account that's frozen over there at Citizens"); accord GX149 at 152:19-153:11 (J. Koresko Dep., Dec. 18, 2013).

248. There were no other deposits into the 8384 Account. GX3-13; GX84a at Citizens0242-69, Citizens0583-88, Citizens0743-54.

249. Between July 21, 2013, and September 30, 2013, the following moneys were withdrawn from the 8384 Account:

- $3,317.78 to pay a credit card balance on Barclay's U.S. card on August 19, 2013.  GX3-13; GX84 at Citizens0751-52.
- $300.00 in an ATM withdrawal on September 9, 2013.  GX3-13; GX84 at Citizens0753-54.
- $103.15 purchase at the Paradies Shops, an airport concessionaire, on September 12, 2013.  GX3-13; GX84 at Citizens0753-54.

250. As of September 30, 2013, the balance of the 8384 Account was $148,117.07.  GX3-13; GX84 at Citizens0753-54.


V.   Depositing of Plan Assets into Yet Another Account, After the Court Instructed to Return Loan Proceeds

251. Mr. Koresko is the sole signatory of the PennMont Benefit Services VEBA Escrow account at Citizens Bank, account number ending in 5154 (the "5154 Account").  GX3-14; GX83 at Citizens0794.

252. In Mr. Koresko's summary of "Bank Account Information for John Koresko Entities," which he submitted to the IF through counsel in response to an Order of this Court, Mr. Koresko described the 5154 Account at Citizens Bank as the "VEBA Escrow account. Account is successor to the same accounts held at Commonwealth Federal Savings Bank and TD Bank, and consists of administrative fees from the pre-REAL VEBA Delaware Valley Leagues."  GX92; see also Docket No. 552.

253. As of September 1, 2013, the balance of the 5154 Account was $454.63.  GX83 at Citizens0891.

254. Between September 1, 2013, and April 30, 2014, the following moneys were deposited into the 5154 Account:

- On September 9, 2013, one check from Minnesota Life Insurance Company made out to Single Employer Welfare Benefit Plan Trust, C/O PennMont, in the amount of $580,543.58 and two checks from Nationwide Life Insurance Company made out to Single Employer Welfare Benefit Plan Trust, C/O PennMont totaling $131.50.  GX3-14; GX83 at Citizens891-92, Citizens0903.
- On September 13, 2013, one check from Integrity Life Insurance Company made out to Single Employer Welfare Benefit Plan in the amount of $32,433.29 and one check from Nationwide Life Insurance Company made out to PennMont Benefit Services, Inc. in the amount of $63.34.  GX3-14; GX83 at Citizens0891-92, Citizens904.

255. There were no other deposits in the 5154 Account after September 1, 2013.  June 10, 2014, Tr. 123:12-16 (Ottley); GX83a at Citizens0891-900.

256. On September 13, 2013, Mr. Koresko withdrew $40,000.00 and then $10,000.00 in cash from the 5154 Account.  GX3-14; GX 83 at Citizens0891-92, Citizens0906-07; accord June 10, 2014, Tr. 124:13-124:17 (Ottley) (confirming that the withdrawal slips included Mr. Koresko's signature).

257. As of April 30, 3014, the balance of the 5154 Account was $425,640.34.  GX3-14; GX83 at Citizens0899-900.


W.    Total Amount of Diverted Plan Assets at Issue

258. Given all of the transfers of plan assets identified above, the total amount of plan assets at issue in this case is

153

$39,839,477.04.   Appendix A.   This sum includes: 159 transfers from the REAL VEBA and/or SWEBP Trust accounts by CTC; 20 transfers from the 5455 Account at Bank of America; 9 transfers from the 4872 Account at Citizens Bank; 2 transfers from the 5154 Account at Citizens Bank[40]; 2 transfers from the 6018 Account at Citizens Bank[41]; 3 transfers from the 8384 Account at Citizens Bank; 5 transfers from the 1146 Account at Continental Bank; 28 transfers from the 1187 Account at Continental Bank; 8 transfers from the 1195 Account at Continental Bank; 10 transfers from the 0175 Account at TD Bank; 1 transfer from the 7801 Account at TD Bank[42]; and the last known balances of the 5455 Account at Bank of America, the 4872 Account at Citizens Bank, the 5154 Account at Citizens Bank, the 6018 Account at Citizens Bank, the 1146 Account at Continental Bank, the 1187 Account at Continental Bank, the 1195 Account at Continental Bank, the 2185 Account at Continental Bank, the Pershing Account at Pershing, LLC, and the RBTT Account.[43]

---

[40] Prior to the deposit of loan proceeds into the 5154 Account, its balance was $454.63.  FOF253.

[41] Prior to the deposit of plan assets into the 6018 Account, its balance was $1,000.12.  FOF230-31.

[42] Prior to the deposit of plan assets into the 7801 Account, its balance was $203.67.  FOF124.

[43] The Court relied on GX172 to identify those transfers that constitute the alleged ERISA violations.  Although the Court excluded those transactions that were either redundant or

259. Because $19,987,362.16 of the $39,839,477.04 constitutes those last known balances in the frozen accounts -- which are under the authority of the IF -- the total amount of plan assets that remain unaccounted for is $19,852,114.88.

260. From October 2013 until January 2015, Dilworth has been paid $822,655.82 from trust assets.

261. From November 2013 until December 2014, the IF has been paid $1,522,962.81 from trust assets.


III.  Conclusions of Law

A.  ERISA Coverage

1.  Employee Plans

Section 3(1) of ERISA defines an employee benefit plan[44] as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of

---

were not properly classified as prohibited transactions, the Court did not add additional prohibited transfers that the Secretary may have overlooked.

[44] As the Court held in 2012, although ERISA covers "employee benefit plan[s]" broadly, of which there are two types -- employee pension plans and employee welfare benefit plans -- the only question before us is whether the plans at issue constitute employee welfare benefit plans.  Solis, 884 F. Supp. 2d at 274; see also 29 U.S.C. § 1002(3).

insurance or otherwise, ... (A)... benefits
in the event of ... sickness, accident,
disability, death ....

29 U.S.C. § 1002(1).  In August 2012, in ruling on the

Secretary's partial motion for summary judgment, I held that

three of the Plans listed in Findings of Fact ("FOF") Section C

-- the Domenic M. Castellano, D.D.S, P.A. Plan, the Cetylite

Industries, Inc. Plan, and the Décor Coordinates, Inc. Plan --

are Employee Welfare Benefit Plans ("EWBPs") under ERISA.  I

found that these plans satisfy the criteria for ERISA covered

plans in that they constitute (1) a plan, fund, or program (2)

established or maintained (3) by an employer or by an employee

organization, or by both (4) for the purpose of providing

various benefits, including death benefits (5) for its

participants or their beneficiaries.  Solis v. Koresko, 884 F.

Supp. 2d 261, 274-76 (E.D. Pa. 2012).

      The Court now finds that the additional plans listed

in FOF Section C also meet the Section 3(1) standard for ERISA-

covered EWBPs, for the same reasons identified in the Court's

2012 decision.

      Under Donovan v. Dillingham, 688 F.2d 1367 (11th Cir.

1982), which the Third Circuit adopted in Gruber v. Hubbard Bert

Karle Weber, Inc., 159 F.3d 780, 789 (3d Cir. 1998), an ERISA

plan exists if, "from the surrounding circumstances[,] a

reasonable person can ascertain the intended benefits, a class

of beneficiaries, the source of financing, and procedures for receiving benefits." Donovan, 688 F.2d at 1373. The predominant factor "in determining whether a plan has been established is whether the employer has expressed an intention to provide benefits on a regular and long-term basis," Deibler v. United Food & Commercial Workers' Local Union 23, 973 F.2d 206, 209 (3d Cir. 1992), regardless of whether the employer did so by purchasing insurance or by subscribing to an multiple employer trust. Solis, 884 F. Supp. 2d at 275; see also Gruber, 159 F.3d at 789 ("A number of courts have held that an employer's payment of insurance premiums, standing alone, is substantial evidence of the existence of an ERISA plan." (internal quotation marks omitted) (emphasis removed)). At bottom, the regulations are sufficiently broad that an employer can easily establish an ERISA plan. Gruber, 159 F.3d at 789 (citation omitted).

Here, employers signed adoption agreements on behalf of all of the plans listed in FOF Section C. This means that those plans adopted the REAL VEBA or SEWBP Master Plan and chose among the benefits offered in those Plans. A reasonable person could thus ascertain that the employer intended benefits for those Plans, including the receipt of death benefits. The individuals listed in FOF Section C either signed a participation agreement or had an insurance policy purchased by

157

the Trust in their names.  A reasonable person would therefore determine that the class of beneficiaries includes those individuals.

Because checks were sent to the Trusts by employers, and the Trusts in turn sent checks to the insurers, a reasonable person would also determine that the financing for the plans comes from the REAL VEBA or SEWBP Trusts through employers, as reinsured through the purchase of life insurance policies on the lives of participating employees.  Finally, a reasonable person would determine that, to receive benefits, beneficiaries would need to apply to the Plan Administrator, PennMont, upon the death of the insured.  Therefore, the 533 plans listed in FOF Section C all meet the threshold test laid out in <u>Gruber</u> for determining that a plan is covered by ERISA.  59 F.3d at 789. For each plan, there are "intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."  <u>Donovan</u>, 688 F.2d at 1373.  The fact that the employers also paid insurance premiums to purchase the plans only further corroborates the existence of an ERISA-covered plan.[45]  <u>Gruber</u>, 159 F.3d at 789.

---

[45] As the Court noted in its 2012 decision, the fact that the plans at issue involve one more organizational layer of complexity than those in <u>Gruber</u> "does not strike the Court as changing the crucial factor in the <u>Gruber</u> analysis," namely, "whether the employers expressed an intention to provide benefits on a regular and long-term basis."  <u>Solis</u>, 884 F. Supp.

In addition, at least 113 of the plan sponsors listed in FOF Section C also issued Summary Plan Descriptions ("SPDs") for their plans.  Section 13 of those SPDs uniformly asserted that the plans were covered under ERISA.  This Court has previously found persuasive the fact that the Cetylite SPD stated that the plan was covered under ERISA, noting that, "[a]lthough statements in summary documents do not constitute the terms of an ERISA plan,[] here they provide evidence of the plan's existence and its coverage under ERISA."  Solis, 884 F. Supp. 2d at 277.

2.   Non-Owner Employees[46]

Federal regulations nonetheless exempt certain plans from ERISA coverage.  Pursuant to 29 C.F.R. § 2510.3-3(b), the term "employee benefit plan" does not include any plan, fund, or program in which no employees are participants.  The regulation further states that "[a]n individual and his or her spouse shall not be deemed to be employees with respect to a trade or

---

2d at 277; see also Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc., 805 F.2d 732 (7th Cir. 1986).

[46] The Court reiterates that the July 29, 2009, amendment, which excluded any non-owner employees from plans, is invalid. Solis, 884 F. Supp. 2d at 280.

159

business ... which is wholly owned by the individual or by the individual and his or her spouse." 29 C.F.R. § 2510.3-3(c).[47]

> With regard to a corporation, the regulation provides that only a 100% owner or a married couple who jointly own 100% of a corporation qualify as "owners" exempt from coverage. As the Third Circuit has stated:

> > The regulation only prevents spouses who wholly own a business from being counted as employees... . Indeed, in a 1976 advisory opinion, the Department of Labor made clear that a ... plan covering only the shareholders of a company or their spouses would lie outside ERISA's scope 'only where the stock of the corporation is wholly owned by one shareholder and his or her spouse and the shareholder or the shareholder and his or her spouse are the only participants in the plan. Department of Labor Pension and Welfare Benefit Programs, Opinion 76-67, 1976 ERISA Lexis 58 (May 21, 1976).

Leckey v. Stefano, 263 F. 3d 267, 271-72 (3d. Cir. 2001). In Leckey, the Court of Appeals held that a company owned entirely by a man, his wife, and his stepdaughter, in which those three individuals were the only participants of a plan, was nonetheless covered by ERISA. "If we read the regulation literally to apply only when a company is owned by an individual or by his spouses, [the stepdaughter's] ownership requires that both she and [the father] be counted as employees ... ." Id. at

---

[47] Section 2510.3-3(c)(2) of Title 29 of the Code of Federal Regulations provides that "a partner in a partnership and his or her spouse should not be deemed to be employees." None of the Plans in FOF Section C appear to be partnerships.

270.   In other words, the stepdaughter's ownership defeated the exemption and exposed the company to ERISA coverage because she was a non-owner employee.

Thus, under the regulation, a less than 100% owner of a corporation is a non-owner employee, as long as his or her spouse does not own the remaining shares.  This interpretation applies even if the remaining participants are family members because the only plans excluded under 29 C.F.R. § 2510.3-3 from ERISA coverage are those whose only participants are a 100% owner and his spouse, or a married couple who jointly own 100% of the corporation sponsoring the plan.

Of the 533 plans listed in FOF47-50, at most 114 could be excluded from coverage pursuant to the regulation.  This includes 24 plans that have listed as their only participants a 100% owner (FOF47) and 90 that list only two participants who may be married and who together own 100% of the company sponsoring the plan (FOF48-49).  Thus, upon excluding the 114 plans from the 533 total plans, at least 419 plans identified in PennMont's own database survive exemption from coverage under the applicable regulation.  Put differently, based on the records currently available and in evidence, at least 78% of the plans that participated in the REAL VEBA and SEWBPT are covered plans under ERISA.

Although Mr. Koresko failed to participate at trial,

161

and in fact never turned over the record evidence of the electronic database at issue -- despite being ordered to do so by this Court on December 8, 2008[48] -- Mr. Koresko now disputes the veracity of the Secretary's evidence.  Mr. Koresko contends that the "record of this case suggests inconsistent and outdated plan census data," which was collected by the Secretary and the IF (Docket No. 984).

Section 3(42) of ERISA, 29 U.S.C. 1002(42), provides that at least 25% "of the total value of each class of equity interest in the entity [must be] held by benefit plan investors" in order for assets to be considered "plan assets" subject to ERISA.  Id.  Mr. Koresko argues that the Secretary has failed to establish that "ERISA-covered plans and IRAs own 25% or more of the equity interests in the Trusts," which would effectively remove the Trusts from ERISA coverage (Docket No. 984).  The Court is unpersuaded.  Given that the Secretary's information is based entirely on what Mr. Koresko himself has or has not provided, there is no reason to think that the Secretary has out of date information.  Moreover, under general rules of statutory construction, "[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his

---

[48] The Court ordered Mr. Koresko to turn over the electronic database to the Secretary during the Chao litigation.  That Order was affirmed by the Third Circuit in Secretary of Labor v. Koresko, Nos. 09-1142, 09-2191 (3d Cir. Apr. 26, 2010).

claim comes within the exception." 2A C. Sands, Sutherland on Statutory Construction § 47.11, p. 90 (4th ed. 1973); see also Mills Music, Inc. v. Snyder, 469 U.S. 153, 188 (1985).  During the course of this over five-year-long litigation, Mr. Koresko had ample time to prove as much but did not.  Mr. Townsend confirmed that, during his employment under Mr. Koresko, PennMont had a searchable database and yet Mr. Koresko never provided that database to the Secretary or to the Court.  He therefore cannot now benefit from the exception and there is no evidence to suggest he would come under the exception in any case.

### 3.   The "Top Hat" Exception

Even if a plan is covered by ERISA, the fiduciary responsibility provisions of ERISA still may not apply.  ERISA Section 401, 29 U.S.C. § 1101, provides two exceptions to the application of ERISA's fiduciary obligations.  Mr. Koresko argues that one of these exceptions, the "top hat" exception,[49] applies to the plans herein, exempting them from ERISA's fiduciary responsibility provisions.

---

[49] Section 1101(a)(1) of Title 29 of the U.S. Code, ERISA Section 401, defines "top hat" plans as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  Id.

The Court fully addressed the top hat exception in its 2012 decision and found that the "top hat" exception is inapplicable under these facts.  Nonetheless, Mr. Koresko continues to argue the "top hat" exception, now citing the Secretary's regulation, 29 C.F.R. § 2520.104-23(d)(2), for the proposition that the plans are "unfunded."  (Docket No. 984.) Although subsection (d)(2), at first glance, appears to buttress Mr. Koresko's claim that the plans are indeed unfunded, which they would need to be to benefit from the exception, Mr. Koresko reads the regulation out of context.  The full regulation makes clear that the alternative form of compliance provided by this section applies only to employee pension benefit plans:

> (1) Which are maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, and
> (2) For which benefits (i) are paid as needed solely from the general assets of the employer, (ii) are provided exclusively through insurance contracts or policies, the premiums for which are paid directly by the employer from its general assets, issued by an insurance company or similar organization which is qualified to do business in any State, or (iii) both.

29 C.F.R. § 2520.104-23(d).  Not only are the plans at issue not pension plans, as required by subsection d, but the regulation itself assumes that the plan is a top hat plan under (d)(1). Mr. Koresko has offered no evidence to suggest that the 533

164

plans meet the statutory requirement of being a top hat plan and
he cannot now claim tautologically that it is a top hat plan
because it is a top hat plan.


    B.   Fiduciary Status

        Under ERISA, a fiduciary is not defined "in terms of
formal trusteeship, but in functional terms of control and
authority." Glaziers & Glassworkers Union Local No. 252 Annuity
Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1184 (3d Cir. 1996)
(quoting Mertens v. Hewitt Assoc., 508 U.S. 248, 260-62 (1993)).
A person[50] is considered to be a fiduciary of a plan if:

> (i) he exercises any discretionary authority or
> discretionary control respecting management of such
> plan or exercises any authority or control respecting
> management or disposition of its assets,
> (ii) he renders investment advice for a fee or other
> compensation, direct or indirect, with respect to any
> moneys or other property of such plan, or has any
> authority or responsibility to do so, or
> (iii) he has any discretionary authority or
> discretionary responsibility in the administration of
> such plan. Such term includes any person designated
> under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A); see also Solis, 844 F. Supp. 2d at 284.
In other words, even if a person is not named as a fiduciary in
plan documents, he may still be a fiduciary to a plan. See
Solis, 884 F. Supp. 2d 261 at 284. Moreover, the definition of

---

    [50] ERISA defines "person" as an "individual, partnership,
joint venture, corporation, mutual company, joint-stock company,
trust, estate, unincorporated organization, association, or
employee organization." ERISA § 3(9), 29 U.S.C. § 1002(9).

who is to be considered a fiduciary under ERISA is to be construed broadly.  Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 233 (3d Cir. 1994).  The statutory definition requires only that a fiduciary be someone "acting in the capacity of manager, administrator, or financial advisor to a plan." Pegram v. Herdrich, 530 U.S. 211, 222 (2000) (quotation marks omitted).  As the Court stated in its 2012 decision, it is primarily concerned with the extent to which the Koresko Defendants "exercise[] any discretionary authority or discretionary control" over the management of the plans or the plans' assets, recognizing as well that management alone of plan assets, even without discretion, is sufficient to confer fiduciary status.  Solis, 884 F. Supp. 2d at 284 (citing 29 U.S.C. § 1002(21)(A)(i)).  To determine fiduciary status, therefore, the Court must first establish whether the monies held in the REAL VEBA and SWEBP Trusts and handled by the Koresko Defendants were indeed "plan assets" under ERISA.

   1. Plan Assets

    Under Title I of ERISA, an employee benefit plan need not have "plan assets" to qualify as a plan subject to ERISA. See 99-08A Op. Dep't. of Labor (May 20, 1999) ("[A]n employer sponsor of a welfare plan may maintain such a plan without identifiable plan assets by paying plan benefits exclusively

from the general assets of the employer.")  Nonetheless, plan
assets and the control of plan assets serve as proxy for ERISA's
reach.  Although there is no statutory definition of plan
assets, the Department of Labor describes "plan assets" in two
specific contexts: (1) where an employee benefit plan invests in
another entity, 29 C.F.R. § 2510.3-101, and (2) where
contributions to a plan are withheld by an employer from
employees' wages, 29 C.F.R. § 2510.3-102.  Secretary of Labor v.
Doyle, 675 F.3d 187, 203 (3d Cir. 2012); see also Solis, 884 F.
Supp. 2d at 285.

        As the Court noted in its 2012 decision, the term
"plan assets" should be given its ordinary meaning and should
therefore be construed to refer to property owned by an ERISA-
covered plan.  Doyle, 675 F.3d at 203.  In Doyle, the Third
Circuit cited with approval a Department of Labor advisory
opinion which stated that "the assets of a plan generally are to
be identified on the basis of ordinary notions of property
rights under non-ERISA law."  Id. (citing 93-14A Op. Dep't. of
Labor, 1993 WL 188473, *4 (May 5, 1993)).  To that end, the
Doyle Court found that plan assets would include any property
"in which the plan has a beneficial ownership interest."  Id.

        Although the Third Circuit in Doyle did not define
"beneficial ownership interest," the Eighth Circuit has stated
that the existence of a beneficial ownership interest "depends

167

on 'whether the plan sponsor expresses an intent to grant such a beneficial interest or has acted or made representations sufficient to lead participant and beneficiaries of the plan to reasonably believe that such funds separately secure the promised benefits or are otherwise plan assets.'" Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647 (8th Cir. 2007) (citing 94-31A Op. Dep't. of Labor at *7 (Sept. 9, 1994)); see also Solis, 884 F. Supp. 2d at 286.

2.   Beneficial Ownership

In the Court's 2012 decision, after consulting the documents establishing the existence of a plan and contracts establishing the rights of a plan, the Court held that the three Plans which were the subject of the Secretary's motion:

> have an undivided beneficial interest in the corpus of the REAL VEBA Trust (including employer contributions, insurance policy proceeds, and income therefrom) under the governing plan documents and are, therefore, plan assets to which fiduciary duties attach. The nature of any particular beneficiary's interest in the assets of the REAL VEBA Trust is irrelevant to the inquiry of whether the Plans have assets.

Solis, 884 F. Supp. 2d at 289-90.  The Court found support for its holding in the Secretary's plan assets regulation, 29 C.F.R. § 2510.3-101. Section 2510.3-101(h)(2) states:

> When a plan acquires or holds an interest in any entity (other than an insurance company licensed to do business in a State) which is

> established or maintained for the purpose of
> offering or providing any benefit described
> in section 3(1) or section 3(2) of the Act
> to participants or beneficiaries of the
> investing plan, its assets will include its
> investment and an undivided interest in the
> underlying assets of that entity.

Id.

The finding that ERISA-governed plans have an undivided beneficial interest means that all plan assets are available for all plans. Because the 419 covered plans have an undivided beneficial interest, that means they have an interest in all of the assets in the REAL VEBA or SEWBP Trust, including those assets which may have been contributed by a non-covered plan. Put simply, regardless of whether an individual plan is an ERISA governed plan on its own, all Trust assets are protected by ERISA, including all plan assets. Therefore, each of those 533 plans holds an undivided beneficial interest in each of the Trusts' underlying assets and each of these underlying Trust assets is a plan asset of each of these 533 plans.

This analysis applies equally to those Trust assets which remain in Trust accounts, which were removed from Trust accounts, or which Mr. Koresko, PennMont and/or PPT failed to deposit into Trust accounts.[51]

---

[51]   To be sure, the above fact pattern does not require any analysis regarding "commingling." The monies do not become

Mr. Koresko's argument that the Court misunderstands the plans' "beneficial interest" is itself a misunderstanding of ERISA law.  In hopes of skirting the applicability of ERISA -- and the fiduciary duties that correspondingly attach -- Mr. Koresko maintains that, what the Court has described as a "beneficial interest," is better understood as simply a "contractual right to payment from the Trusts": what Mr. Koresko has come to label as a "defined benefit" (Docket No. 984).  Under that prism, when an employer adopts a plan, it and its individual employer-level plan become potential creditors of the Trusts for a specific amount.  To Mr. Koresko, that claim does not "morph into an ownership interest in the Trust's assets, but is simply a contingent right to payment" (Id.).  In that case, if there are sufficient assets in the Trusts and insurance policies to cover the contractual obligations owed to employer-level plans, whether or not money has been transferred out of the Trust is irrelevant.

Although Mr. Koresko's argument may be attractive in its simplicity, being based on the ordinary rules of contract

plan assets because they are "commingled" but because, under ERISA, participants in these plans hold an undivided beneficial interest in each of those assets.  An analysis regarding commingling, however, is appropriate in Section C, below, where the Koresko Defendants diverted monies from the Trust or that belonged to the Trust into accounts in the name of Mr. Koresko, PennMont, or the law firms.  For some of those accounts set forth below, there is no evidence available to trace the source of all the funds in the account.

law, it overlooks the dispositive context in which the plans
operate.  As a starting point, the term "defined benefit plans"
has a specific definition under ERISA, namely, as a "pension
plan other than an individual account plan."  ERISA § 3(36), 29
U.S.C. § 1002(36).  Because this case does not deal with pension
plans, the arrangement at issue cannot be described as involving
a "defined benefit plan."  Second, framing the issue as one of
simply contractual rights does nothing to defeat the fact that
ERISA governs.  In In re Laher, the Third Circuit considered a
similar argument, although in the context of the existence of a
Trust.  The Court of Appeals noted that, although a relationship
"can be cast, in part, as debtor-creditor or as a contractual
relationship," such a framing "has no bearing on the trust
analysis" because all trusts can be described as contractual
relationships "insofar as the obligations of all the parties as
set forth in an agreement, and the trustee can be described as a
debtor to the beneficiary creditor under a trust."  496 F.3d
279, 289 (3d Cir. 2007).  The Court further noted that:

> describing them as such does not mean they are not
> trusts. See Restatement (Second) of Trusts, § 197 cmt.
> b ("The creation of a trust is conceived of as a
> conveyance of the beneficial interest in the trust
> property rather than as a contract.").  We do not view
> the framing of the relationship as "debtor-creditor"
> to be helpful to the inquiry at hand.

Id.  The same can be said here.  The fact that the relationship
can be described in contract terms does not mean that there was

171

not an undivided beneficial relationship underpinning the plans in the Trusts, such that ERISA governs.  The contractual relationship is therefore irrelevant to the applicability of ERISA.

### 3.   Plan Administrators and Trustees

Generally, plan administrators and trustees are automatically considered to be fiduciaries.  See 29 C.F.R. § 2509.75-8, D-3 ("Some offices or positions of an employee benefit plan ... require persons who hold them to perform one or more of the functions [of a fiduciary].")  By the very nature of the position, "a plan administrator or a trustee named in plan documents must ... have 'discretionary authority' or 'discretionary responsibility in the administration' of the plan."  Id.; see also 29 U.S.C. § 1102(a).  The Court therefore holds them as fiduciaries.  In 2012, the Court found that it was "undisputed" that PennMont, as plan administrator, was "necessarily a fiduciary."  Solis, 884 F. Supp. 2d. at 290.  By the same measure, the trustees of REAL VEBA and SWEBP Trusts are also necessarily fiduciaries.  Over the course of the Trusts' lifetimes, these include: CTC, which was the named Trustee in the REAL VEBA and SEWBP Master Trust documents, until CTC was dissolved; F&M Trust, the successor to CTC from November 30, 2009, to January 15, 2010, when Judge Jones permitted Mr.

Koresko to name a new Trustee; and PPT, who continued to act as Trustee under the authority of its sole director, Mr. Koresko, until September 16, 2013, when the Court ordered that all of the Koresko Defendants be removed from all positions they held with regard to the Trusts.

4.   Mr. Koresko, Ms. Bonney, PPT, and the Koresko Law Firms

Any control over the disposition of plan assets renders a person a fiduciary to the plan.  Solis, 884 F. Supp. 2d at 290 (citing Bd. of Trustees of Bricklayers Allied Craftsmen Local 6 v. Wettlin Assoc., Inc., 237 F.3d 270, 273 (3d Cir. 2001)); see also Srein v. Frankford Trust, 323 F.3d 214 (3d Cir. 2003) (authority and control over assets confers fiduciary status).  Moreover, a fiduciary cannot shield himself and benefit from "shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control." Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir. 1987) ("Neither the separate corporate status of the three corporations nor the general principle of limited shareholder liability afford protection where exacting obeisance to the corporate form is inconsistent with ERISA's remedial purposes.").  In such circumstances, all entities are liable. Id.

a.   Mr. Koresko and Ms. Bonney

In the Court's 2012 opinion, it held that Mr. Koresko and Ms. Bonney were fiduciaries because they exercised control over the assets of the Domenic M. Castellano, D.D.S, P.A. Plan, the Cetylite Industries, Inc. Plan, and the Décor Coordinates, Inc. Plan. Solis, 884 F. Supp. 2d at 291.  The evidence now demonstrates that Mr. Koresko in fact exercised control over all of the assets forwarded out of the Trusts' accounts from April 2002 until September 16, 2013, when the Court froze Mr. Koresko's known accounts and removed him from all fiduciary authority.  When he was in control, however, Mr. Koresko forwarded plan assets to entities in which he was the sole director (e.g., PPT), entities to which he was the principal and managing officer (e.g., PennMont), entities to which he was the sole shareholder (e.g., KAPC and KLF), or to bank accounts to which he was a signatory.  Mr. Koresko was also the signatory on the loan applications that withdrew over $35 million from insurance policies owned by the Trust. FOF118.  Finally, Mr. Koresko was in charge of PPT, PennMont, KAPC, and KLF during all relevant time periods and it was his responsibility to review and evaluate whether or not to pay benefit claims relating to the Trust, among other plan management and administration duties.  FOF94.

Similarly, Ms. Bonney directed the transfer of monies before April 2009 from the Trust on behalf of PennMont and was thus a fiduciary as to those transactions.  She also signed loan applications for policies owned by the Trusts and performed day-to-day plan administration until March 2010, when she left the employment of KLF. FOF117-120.

### b.   PPT

Prior to becoming Trustee in January 2010, and thus a named fiduciary, PPT was a de facto fiduciary to the extent it controlled plan assets that were forwarded to it from the Trust, including the "interest" earned on plan assets.  FOF61-62.  It was PPT's decision, for example, to keep that interest or to further invest it in other accounts and other services.

### c.   KAPC and KLF

In 2012, the Court held off from determining the fiduciary status of KAPC and KLF, pending discovery regarding the amount of control these law firms actually exerted over the plan assets.  Solis, 884 F. Supp. 2d at 290 n.25.  The court is now able to hold that both KAPC and KLF are fiduciaries to the plans.

Mr. Koresko specifically created KAPC and KLF to function as fiduciaries because their sole shareholder, Mr. Koresko, and their employee, Ms. Bonney, exercised discretion

over the plans and their administration and management.  Mr.
Koresko considered KLF as the "paymaster" and the employer of
all PennMont employees.  FOF200.  In fact, PennMont had no
employees of its own, relying exclusively on KAPC and then KLF
for its manpower.  As the sole shareholder of KLF, Mr. Koresko
controlled the opening of accounts in the name of Koresko Law
Firm, including Accounts 6507 and 0175 at TD Bank, from which
plan assets were sent to the Caribbean island of Nevis and to an
account at the RBTT, among other transfers.  FOF111.  In each of
these transactions, Mr. Koresko was the sole signatory on the
account.  FOF97, FOF104.  Because ERISA provides that a person
is a fiduciary to the extent he "exercises any authority or
control respecting management or disposition of [plan] assets,"
ERISA § 3(21)(A), KLF is a fiduciary.  It exercises authority
over the management and disposition of plan assets when they
were deposited into accounts titled to it.  More to the point,
because Mr. Koresko is also a fiduciary, and is the sole
shareholder of KLF and its "boss," KLF can be held liable as a
mere "shell" of Mr. Koresko himself.  Lowen, 829 F.2d at 1220;
FOF4.  The same can also be said of KAPC, since it was the
predecessor to KLF and functioned in the same manner as KLF.  In
each case, the law firm existed solely to sponsor the various
plans operated by PennMont and ultimately by Mr. Koresko.  The

Koresko law firms must therefore be held responsible as fiduciaries.

     5.  <u>Parties in Interest</u>

     ERISA § 3(14), 29 U.S.C. §1002(14), defines a "party in interest" to an employee benefit plan as:

    (A)  any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
    (B)  a person providing services to such plan;
    (C)  an employer any of whose employees are covered by such plan;
    (D)  an employee organization of any of whose members are covered by such plan;
    (E)  an owner, direct or indirect, of 50 percent or more of—
       i. the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation.
      ii. the capital interest or the profits interest of a partnership, or
    iii. the beneficial interest of a trust or unincorporated enterprise,
   which is an employer or an employee organization described in subparagraph (C) or (D);
    (F)  a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E);
    (G)  a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—
       i.  the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,
      ii.  the capital interest or profits interest of such partnership, or
    iii.  the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);
    (H)  an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more

> shareholder directly or indirectly, of a person
> described in subparagraph (B), (C), (D), (E), or (G),
> or of the employee benefit plan; or
>
> (I)   a 10 percent or more (directly or indirectly in
>       capital or profits) partner or joint venture of a
>       person described in subparagraph (B), (C), (D), (E),
>       or (G).

Because they are fiduciaries to the plans, Mr. Koresko, Ms. Bonney, PennMont, KAPC, KLF, and PPT are parties in interest as defined by ERISA.  ERISA § 3(14)(A).  In fact, Mr. Koresko, Ms. Bonney, KAPC, and KLF are also service-provider parties in interest because, pursuant to ERISA § 3(14)(B), they at various times claimed to be counsel to the plans.  By the same token, all of the law firms and consulting firms that provided services to the Trusts are also parties in interest under ERISA § 3(14)(B).  These include Locke Lord, Montgomery McCracken, SYK, Mr. Leo Salzman, JGR, Anderson Kill, Stoel Rives, Mr. Richard L. Coffman, C&D, GHH, Webster, James T. Duff, GLF, and Octagon Consulting.

By ERISA § 13(H), every employee, officer, director, or any individual having powers or responsibilities similar to those of officers or directors, of PennMont, KAPC, KLF, and PPT is also a party in interest.  Because Lawrence Koresko was an officer of PennMont from the mid-1990s until the summer of 2013, and was an employee of the Koresko law firms for at least that long, he is also a party in interest during those periods.

Similarly, Nancy Bonner is a party in interest because she was an employee of KLF.  FOF226.

Mr. Koresko's children and spouse are also parties in interest, pursuant to ERISA § 3(14)(F).

Because Mr. Koresko is a fiduciary and he or another party in interest directly or indirectly own or owned more than fifty percent of BNB Properties, Koresko Law Firm, PC, Koresko Financial, LLP, and Freedom Brokers, LLC, each of those entities is also a party in interest under ERISA § 3(14)(G).  FOF205-07.

C.   ERISA Fiduciary Duties[52]

---

[52] Mr. Koresko argues that any fiduciary breach that may have occurred prior to March 6, 2003 -- six years before the Secretary filed his Complaint -- "cannot form the basis of the Secretary's breach of fiduciary duty claims because it is barred by ERISA's general six-year statute of limitations"(Docket No. 984 at 15).  Again, Mr. Koresko misreads the applicable statute.  Although Section 413 of ERISA, 29 U.S.C. § 1113, begins by stating that no action may be commenced with respect to a fiduciary's breach after the earlier of six years or three years, depending upon the "date of the last action which constituted a part of the breach or violation" or, "in the case of an omission[,] the latest date on which the fiduciary could have cured the breach or violation," the provision concludes by cabining "fraud" and "concealment" as justifications to commence an action "not later than six years after the date of discovery of such breach or violation."  Id.

Ordinarily, Mr. Koresko would be correct that six years govern from the Secretary's filing of his Complaint, but, here, Mr. Koresko cannot benefit from his own bad behavior.  The Secretary first issued Mr. Koresko, PennMont, and KAPC a subpoena in February 2004 (Docket No. 1014 at 25).  For the next two years, Mr. Koresko refused to hand over any documents.  The Court therefore finds that, absent the concealment, the first day that the documents were returnable after the first subpoena was issued, March 8, 2004, functions as the earliest date the Secretary could have learned of the breach.  In that case, only those transactions and transfers that occurred six years before that, in other words, before March 8, 1998, are time-barred.  Because none of the transactions underlying FOF258 occurred before March 8, 1998, none of the transactions are time-barred.

The Third Circuit has made clear that the actual knowledge requirement of Section 413 must be interpreted "stringently."  Richard B. Roush, Inc. Profit Sharing Plan v. New England Mut. Life Ins. Co., 311 F.3d 581, 587 (3d Cir. 2002).  When there is evidence of fraud or concealment, as in the facts herein, the "six-year limitation period of section 1113(1) [can]not protect defendants."  Gluck v. Unisys Corp., 960 F.2d 1168, 1177 (3d Cir. 1992)

According to the Supreme Court, Congress intended to incorporate the fiduciary standards of trust law directly into ERISA, such that fiduciaries would owe strict duties running "directly to beneficiaries in the administration and payment of trust benefits." Jordan v. Fed. Exp. Corp., 116 F.3d 1005, 1015 (3d Cir. 1997) (internal quotation marks removed). Here, the Secretary contends that the Koresko Defendants breached their fiduciary duties by: (1) violating ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), for failing to discharge duties solely in the interests of the participants and beneficiaries; (2) violating ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), for failing to act with the care, skill, prudence and diligence that a person acting in a like capacity and familiar with such matters would use; (3) violating ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), for dealing with plan assets for their own interest; (4) violating ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(b), for transferring plan assets to parties in interest; and (5) violating ERISA Section 403, 29 U.S.C. § 1103(a), for failing to hold plan assets in trust.

### 1.   ERISA Section 404(a)(1)(A)

Under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1)(A), plan fiduciaries must act for the "exclusive purpose" and "solely in the interest of [a plan's] participants

181

and beneficiaries."[53]  "[T]rustees violate their duty of loyalty when they act in the interests of [any other actor] rather than 'with an eye single to the interests of the participants and beneficiaries of the plan.'"  Reich v. Compton, 57 F.3d 270, 291 (3d Cir. 1995), amended (Sept. 8, 1995) (quoting Donovan, 680 F.2d at 271).  The cardinal obligation of a fiduciary is to act "with complete and undivided loyalty to the beneficiaries."  Donovan v. Walton, 609 F. Supp. 1221, 1228 (S.D. Fla. 1985) (citation omitted), aff'd, 794 F.2d 586 (11th Cir. 1986); cf. Reich, 57 F.3d at 288.  By definition, a fiduciary who diverts plan assets to his or her own use does not act with such undivided loyalty.  See Pell v. E.I. DuPont de Nemours & Co. Inc., 539 F.3d 292, 309 (3d Cir. 2008) ("ERISA plan funds are, as a matter of law, held in trust and are not available to the employer for general use").

---

[53] Under ERISA Section 404(a), a fiduciary must discharge his or her duties solely in the interest of the participants and beneficiaries and:

> (A) for the exclusive purpose of:
>     (i) providing benefits to participants
>     and their beneficiaries; and
>     (ii) defraying reasonable expenses of
>     administering the plan . . ..
> (B) with the care, skill, prudence, and
> diligence under the circumstances then
> prevailing that a prudent man acting in a
> like capacity and familiar with such matters
> would use in the conduct of an enterprise of
> a like character and with like aims.

Id.; 29 U.S.C. § 1104(a).

In deciding the Secretary's motion for partial summary judgment, this Court earlier held that certain of the Koresko Defendants violated ERISA Section 404(a)(1)(A) by, among other things, diverting death benefit assets from the Trust to accounts the Koresko Defendants personally controlled.  Solis, 884 F. Supp. 2d at 294.  It is now evident that all of the Koresko Defendants violated Section 404(a)(1)(A).

Under the authority of the Koresko Defendants, plan assets were routinely transferred to accounts held out of the reach of the Trustee and owned solely by Mr. Koresko and, in some instances, owned in conjunction with Ms. Bonney.  See Solis, 884 F. Supp. 2d at 295.  For example, between June 2, 2002, to January 4, 2005, under the direction of PennMont and Ms. Bonney, CTC transferred $626,093.50 in interest earned to PPT (FOF62), an entity, at that time, controlled exclusively by Mr. Koresko and not yet the Trustee of REAL VEBA or SWEPBT; and, between May 21, 2002, to June 27, 2005, the Trust sent thirty-four monthly payments, totaling $276,147.93, to JGR for lobbying and political activities that did not benefit the beneficiaries (FOF78).  By the same measure, PennMont, KLF, KAPC, and PPT -- entities that, at various times, received plan assets -- violated ERISA Section 404(a)(1)(A) by accepting and then keeping this money.  Such actions on the part of the Koresko

183

Defendants violate their duty of loyalty under Section 404(a)(1)(A).  See Solis, 884 F. Supp. 2d at 294.

Similarly, the use of death benefit proceeds to purchase condominiums in Nevis (FOF108-111) and the removal of over $35 million in loans from insurance policies used to secure the death benefits promised to participants (FOF118-20) were also violations of ERISA Section 404(a)(1).  Mr. Koresko, Ms. Bonney, PennMont, and PPT further violated their duty of loyalty when this money was deposited into non-trust accounts, including Mr. Koresko's various IOLTA accounts.  Mr. Koresko also violated his duty of loyalty when he set up an account in the name of CTC, a company that no longer existed and was not the Trustee, and then deposited loan proceeds into that account.  FOF221.

Finally, after January 15, 2010 -- when PPT was permitted by Judge Jones to assume Trusteeship -- Mr. Koresko, PennMont, KLF, and PPT violated Section 404(a)(1)(A) by, among other things, transferring plan assets to a bank account in the Caribbean island of Nevis in Mr. Koresko's name (FOF139-40); by paying the operating expenses of Mr. Koresko's law firms, of PennMont, and of PPT, all using plan assets (FOF61-62, FOF68, FOF203); and by purchasing real estate in South Carolina in the name of an entity that only Mr. Koresko controls (FOF142-44). Mr. Koresko, PennMont, KLF, and PPT further violated ERISA 404(a)(1)(A) by using Trust assets to pay outside attorneys,

184

including Jeffrey Nieman, to challenge Mr. Koresko's personal
tax penalty (FOF170); to pay Scott Orth to defend Lawrence
Koresko and PennMont in insurance litigation (FOF186, FOF188);
and to pay other third parties, such as Octagon Consulting,
whose work benefitted Mr. Koresko and PennMont, but did not
benefit the Plans' participants or beneficiaries (FOF186-87).

### 2.   ERISA Section 404(a)(1)(B)

ERISA § 404(a), 29 U.S.C. § 1104(a), establishes a
"prudent man" standard of care to govern the actions of plan
fiduciaries.  Under § 404(a)(1)(B), plan fiduciaries must
discharge their duties "with the care, skill, prudence, and
diligence" that a prudent person acting in a like capacity and
familiar with such matters would use.  ERISA § 404(a)(1)(B), 29
U.S.C. § 1104(a)(1)(B).  The prudence standard contained in
ERISA incorporates, but makes "more exacting[,] the requirements
of the common law of trusts relating to employee benefit trust
funds."  Donovan v. Mazzola, 716 F.2d 1226, 1231 (9th Cir.
1983), cert. denied 464 U.S. 1040 (1984); see also Varity Corp.
v. Howe, 516 U.S. 489, 497 (1996) ("[T]rust law does not tell
the entire story.  After all, ERISA's standards and procedural
protections partly reflect a congressional determination that
the common law of trusts did not offer completely satisfactory
protection.")

The duty of prudence necessitates that a fiduciary refrain from placing himself in a position where his personal interests may conflict with the interests of his beneficiaries. See Solis, 884 F. Supp. 2d at 294.  As the Second Circuit stated in Donovan v. Bierwirth, Section 404 "imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan."  680 F.2d 263, 271 (2d Cir. 1982).

It is the height of imprudence for Mr. Koresko, PennMont, KLF, and PPT to have, among other things, diverted almost $40 million in Trust assets out of the trust to three different IOLTA accounts in Mr. Koresko's or the law firms' names (FOF107, FOF175, FOF226); to the law firms', Trusts', and PennMont's operating accounts (FOF165, FOF200); to Mr. Koresko's personal accounts (FOF138, FOF226); and to other accounts not titled to the Trust's Trustee.  These defendants acted imprudently when they used Trust assets to pay a bonus for Mr. Koresko's paralegal and to pay boat slip rental fees (FOF203, FOF226).  They acted imprudently when they removed $35 million in cash value from insurance policies owned by the Trust and then deposited those and other Trust monies in various different accounts controlled by Mr. Koresko and titled to entities other

than the Plans' Trustee (FOF118, FOF122).  They acted
imprudently when they diverted Trust assets to pay for real
estate in the Caribbean island of Nevis under Mr. Koresko's name
and for real estate in South Carolina in the name of Peter
Vertabedian, Inc., an entity wholly controlled by Mr. Koresko
(FOF109-11, FOF142-44).

Mr. Koresko, Ms. Bonney, KLF, KAPC, and PennMont also
acted imprudently when they paid a lobbying firm with Trust
assets (FOF76-81), and when they paid themselves from Trust
assets (FOF203).  They acted imprudently when they used Trust
assets to pay the tax liabilities of one plan sponsor and then
to fund litigation on behalf of that sponsor (FOF82-85).  PPT,
PennMont, KAPC, and KLF acted imprudently when they failed to
return Trust assets.  The Koresko Defendants also breached their
duty of prudence by transferring Trust assets through and
between more than 21 accounts[54] in the names of at least 18
entities[55] at 8 or more banks[56] and then failing to maintain

---

[54] These accounts, as identified above, include: the 5890
Account, the 1675 Account, the 7994 Account, the 5874 Account,
the 5887 Account, the 8771 Account, the 8768 Account, the 1727
Account, the 6507 Account, the 0175 Account, the 5455 Account,
the 6523 Account, the 1112 Account, the 7801 Account, the 4872
Account, the 1302 Account, the 6018 Account, the 8384 Account,
the 5154 Account, the Pershing Account, and the RBTT Account.
The Government Exhibits included other accounts as well, not
here identified.

[55] These include, as identified above: Ferraro Death Benefit
Trust; Kelling Family Death Benefit Trust; Castellano Death

records for why such transfers were necessary.  All of these
actions violated ERISA Section 404 (a)(1)(B).

       3.   ERISA Section 406(b)(1)

      Section 406(b)(1) of ERISA specifically prohibits
fiduciaries from entering into certain transactions.  29 U.S.C.
§ 1106(b).  A fiduciary is forbidden from dealing with plan
assets "in his own interest or for his own account."  Id. §
1106(b)(1).  ERISA Section 406(b)(1) is therefore primarily
concerned with avoiding self-dealing, where a fiduciary would
sacrifice the plans' interests for his own personal gain.

      For example, a fiduciary violates Section 406(b)(1)
not only when it forwards money to itself, but also when it
hires itself to perform work and then sets its own fees.  "While
ERISA provides that a fiduciary may defray the reasonable
expenses of administering the plan, it does not allow a
fiduciary to set its own administrative fees and directly

---

Benefit Trust; Lilling Death Benefit Trust; Levinson Death
Benefit Trust; Alexander Death Benefit Trust; Elkner Death
Benefit Trust; Nadeau Death Benefit Trust; Koresko Law Firm PC;
Koresko Law Firm PC Escrow; Koresko Law Firm PC Escrow Death
Benefit Escrow; Pennsylvania IOLTA Trust Koresko Law Firm TRTEE;
Koresko Law Firm Operating; John Koresko Esquire Attorney
Escrow; Penn Public Trust, Inc. PIC; John Koresko; PennMont
Benefit Services VEBA Escrow; Single Employer Welfare Benefit
Plan Trust; and PennMont.

   [56] These banks, as identified above, include: TD Bank,
Continental Bank, Citizens Bank, Bank of America, Pershing, LLC
(a brokerage firm), ING Direct, Scotia Bank, and the Royal Bank
of Trinidad and Tobago.

collect those fees from plan assets." Chao v Crouse, 346 F.
Supp. 2d 975, 988 (S.D. Ind. 2004) (citing Patelco v. Sahni, 262
F.3d 897, 911 (9th Cir. 2001)).  "[T]he crucible of
congressional concern" in designing ERISA was the "misuse and
mismanagement of plan assets by plan administrators."
Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140
n.8 (1985) (quotation marks omitted).  Given that, courts have
generally construed the protective provisions of Section 406(b)
broadly.  See, e.g., Acosta v. Pac. Enterprises, 950 F.2d 611,
620 (9th Cir. 1991), as amended on reh'g (Jan. 23, 1992); Lowen
v. Tower Asset Management, Inc., 829 F.2d 1209, 1213 (2d Cir.
1987); Leigh v. Engle, 727 F.2d 113, 126 (7th Cir. 1984).

     To that end, the Third Circuit in Reich v. Compton
noted that the purpose of Section 406(b) is "to prevent a
fiduciary from being put in a position where he has dual
loyalties and, therefore, he cannot act exclusively for the
benefit of a plan's participants and beneficiaries."  57 F.3d at
287 (citing H.R. Conf. Rep. No. 93-1280, 93rd Cong., 2d Sess.
(1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5089).  In other
words, a fiduciary can violate ERISA Section 406(b)(1) even in
the absence of bad faith.[57]  See Solis, 884 F. Supp. 2d at 297;

----

     [57] This is in contrast to Section 406(a), which explicitly
references Section 408 as limiting its authority.  By "removing
the same limiting principle from § 406(b), Congress cast §
406(b) as unyielding."  Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d

see also Reich v. Compton, 57 F.3d at 287; Cutaiar v. Marshall,
590 F.2d 523, 528, 531 (3d Cir. 1979); Lowen v. Tower Asset
Mgmt., Inc., 829 F.2d 1209, 1213 (2d Cir. 1987); Gilliam v.
Edwards, 492 F. Supp. 1255, 1263 (D. N.J. 1980).

        In deciding the Secretary's motion for partial summary
judgment, the Court reserved its decision on whether the Koresko
Defendants violated Section 406(b)(1) for want of evidence
regarding "the Koresko fiduciaries setting their own
administrative fees,[] using plan assets to pay for personal or
corporate expenses, making determinations that gave themselves
benefits, or otherwise personally benefiting because of how plan
assets were handled." Solis, 884 F. Supp. 2d at 297. Given the
evidence now before the Court, it finds that the Koresko
Defendants violated Section 406(b)(1) when they made the
following transfers to themselves and when they accepted the
following transfers from the Trust.

---

65, 93-96 (3d Cir. 2012) ("Whether or not . . . compensation was
reasonable, the steady inflow of payments . . . may have
compromised [the fiduciary's] best judgment as fiduciary.
Skewed judgment of this order ranked among the principal abuses
motivating Congress to include the § 406(b) provisions in ERISA
in the first place.")

a.   Transfer of Plan Assets

Mr. Koresko, KLF, PPT, and PennMont personally benefitted from the diversion and misappropriation of Trust assets.

Like the other violations, the violation at issue arose from the same transactions already identified.  Mr. Koresko's buying of real estate in the Caribbean island of Nevis with Trust assets, in his own name (FOF110), is a per se violation of 406(b)(1).  To be certain, Mr. Koresko considered the property an "extraordinary [investment] opportunity" because, according to his estimates, he had "a seven million dollar claim."  FOF135.  He even considered the almost $1 million in plan assets that he transferred to the RBTT as his own money, not that belonging to the Trusts or plans.  FOF140. Similarly, Mr. Koresko's purchase of property in South Carolina, under the name of a corporation he solely controlled, is a violation of 406(b)(1).  FOF143-44.

Mr. Koresko also transferred more than $1 million in Plan assets to the Koresko Law Firm Operating Account, Account 1112 at Continental Bank, to fund operation of his law firms and the operations of PennMont and PPT, businesses which he owned and directed.  FOF202.  As a result, Mr. Koresko, PennMont, PPT, and KLF all benefitted from these transfers and all violated 406(b)(1).

b.   Accepting of Transfer of Plan Assets

The evidence also shows that the Koresko Defendants set their own fees.  Ms. Bonney, writing from her PennMont email account, directed through weekly emails that "fees" be paid to PennMont, KAPC, and KLF from the Trusts.  FOF68-75.  As Trustee, CTC complied with Ms. Bonney's requests and paid $2,916,832.71 to PennMont between July 22, 2002, and May 27, 2008.  FOF68.  At various times, CTC categorized these payments as either administrative or setup fees.  Id.  Similarly, until F&M Trust became Trustee, CTC also transferred $1,377,921.01 to KAPC and KLF, at Ms. Bonney's request, without any demand for clarification or explanation for why the law firms needed to be paid.  FOF72.  When F&M Trust asked in May 2009 for "detailed information" why it should pay KLF for legal fees, Ms. Bonney forwarded a spreadsheet to F&M Trust, explaining that KLF "represents six employers in Tax Court" and that these transfers would reimburse KLF for its work.  FOF74.

Even if PennMont had not already billed employers for its services as Plan Administrator, which it had, taking fees directly from the Trusts is a violation of ERISA Section 406(b)(1), since a fiduciary is forbidden from dealing with plan assets in "in his own interest or for his own account."  29 U.S.C. § 1106(b); FOF70-71.  At no point were the employers notified of these additional fees and expenses and they

192

certainly never approved of such transfers.  PennMont, through the actions of Ms. Bonney, therefore violated Section 406(b)(1), because it was prohibited from appointing itself to perform any work allegedly associated with these fees and from accepting such fees.

By the same measure, Mr. Koresko and Ms. Bonney, and by extension the Koresko law firms, also violated Section 406(b)(1) by hiring KAPC and KLF to perform legal services, setting the fees for those legal services, and directing CTC and then F&M Trust to pay for those legal services out of the Trust. The legal work that KLF performed was actually not on behalf of the Plans or their participants or beneficiaries.  Instead, KAPC and KLF only represented certain employers in litigation with the IRS regarding tax deductions and such litigation did not benefit the Plans.  FOF74-75.

### 4.   ERISA Section 406(a)(1)(D)

Congress enacted Section 406(a)(1) to "categorically bar[] certain transactions deemed 'likely to injure a . . . plan.'"  Harris Trust & Sav. Bank v. Saloman Smith Barney, Inc., 530 U.S. 238, 242 (2000).  Section 406(a)(1)(D) of ERISA specifically prohibits a fiduciary from causing a plan to engage in a transaction if he knows, or should know, that such a transaction constitutes a direct or indirect "transfer to, or

193

use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).  As the Court held in its 2012 decision, under the Third Circuit's reasoning in Reich v. Compton, 57 F.3d at 275-76, 278-79, as well as the plain meaning of the statute itself, it is not necessary to prove the subjective intent of the party.  Solis, 884 F. Supp. 2d at 296. Rather, it need only be established that the fiduciary knew or should have known that the transaction involved the transfer of plan assets to a party in interest.  Id.  Therefore, where a fiduciary exercises control over plan assets and knowingly transfers those assets to a party in interest, that fiduciary has violated Section 406(a)(1)(D).

Nonetheless, all violations of Section 406(a) are subject to exemptions under Section 408.  29 U.S.C. § 1108; see also Iola, 700 F.3d at 93-96; Jordan v. Michigan Conference of Teamsters Welfare Fund, 207 F.3d 854, 862 (6th Cir. 2000) ("The language in § 408(b) explicitly states that '[t]he prohibitions provided in § 406 will not apply' to reasonable arrangements with a party in interest for legal services. Nowhere is it mentioned that the exemption should apply only to § 406(a)(1)(D) and not to § 406(a)(1)(C).")  Section 408(b)(2) explicitly provides that the prohibitions provided in Section 406(a) shall not apply when a fiduciary "[c]ontract[s] or make[s] reasonable arrangements with a party in interest for office space, or

194

legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(B)(2). Courts have long recognized that the operative language in this provision is "necessary." Where there is no evidence that the legal or accounting work, or payment for office space, was "necessary for the establishment or operation of the plan," such payments cannot be shielded by Section 408. See, e.g., Whitfield v. Tomasso, 682 F. Supp. 1287, 1303 (E.D.N.Y. 1988) ("Payment by the Fund for such activities was not 'necessary for the establishment or operation of the plan' within the meaning of section 408(b)(2) of ERISA.").

Although the Court found in 2012 that the Koresko Defendants violated Section 406(a)(1)(D) with respect to the Cetylite Industries, Inc. Plan, the Court held that the evidence at that time did not establish that they caused the transfer of plan assets from the Domenic M. Castellano, D.D.S, P.A. Plan or the Décor Coordinates, Inc. Plan for the benefit of parties in interest and, therefore, summary judgment could not be granted. Id. at 295-297. Given the evidence now before it, the Court finds that the Secretary has proven that the defendants caused all of the transactions out of the Trust and therefore violated Section 406 (a)(1)(D), irrespective of the limited exemption provided by Section 408.

195

Mr. Koresko, Ms. Bonney, PPT, PennMont, KLF, and KAPC caused all of the transfers to the various parties in interest. For example, Ms. Bonney, as an employee of the law firms and writing from her PennMont email account, regularly sent directions to CTC and F&M Trust to forward specific amounts of money to PennMont, the Koresko law firms, and PPT. FOF53-75. CTC, without any objections or requests for additional information, in turn complied. Id. Although F&M Trust did ask for some further details once it became Trustee, it still transferred funds from the Trusts to parties in interest (FOF55). In so doing, Ms. Bonney and PennMont violated Section 406(a)(1)(D).

Similarly, when Mr. Koresko and Ms. Bonney, acting at various times under the authority of CTC and PPT as Trustee -- when neither were actually functioning as Trustee -- applied for loans on insurance policies held by the Trust and deposited the proceeds of those loans into accounts for which Mr. Koresko was the sole signatory, they too violated Section 406(a)(1)(D) (FOF122-23). Mr. Koresko deposited the proceeds of these loans in accounts in his name (FOF122-23), in an IOLTA account in his name (FOF129), and in accounts in the name of KLF (FOF146), among other transfers. Mr. Koresko even set up an account in the name of CTC, the former Trustee which ceased to exist after the merger with F&M Trust, where he held the remaining proceeds

196

(FOF15-16, FOF221, FOF224).  These transfers of loan proceeds by Mr. Koresko, Ms. Bonney, KLF, and PPT constituted violations of Section 406(a)(1)(D) because they were transfers of assets to parties in interest.

Further, because several of the subject accounts are held in the name of PennMont (FOF251), and PennMont (like the Koresko law firms) was simply a vehicle by which Mr. Koresko operated, PennMont could also be said to have caused the transfers.  Specifically, Mr. Koresko, KLF, PennMont, and PPT caused transfers of Trust assets to offshore accounts in the name of Mr. Koresko (FOF136), to real estate developers in the Caribbean island of Nevis to purchase condominiums in the name of Mr. Koresko (FOF135), and to an auctioneer to purchase real estate in South Carolina in the name of a corporation controlled by Mr. Koresko (FOF142).  Mr. Koresko, KLF, PPT, and PennMont also caused the transfer of more than $1 million in Trust assets to KLF to pay for its and PennMont's operating expenses, including rent and employee salaries (FOF175).  Some of those monies were used for Mr. Koresko's personal expenses, such as boat rentals and utility bills (FOF203).  Mr. Koresko, KLF, PennMont, and PPT also caused the transfer of Trust assets to accounts in the name of Mr. Koresko (FOF226), Bonnie Jean Koresko and John J. Koresko 5th (FOF226), and to Mr. Koresko's

IOLTA accounts (FOF129).  All of these transfers violated
Section 406 (a)(1)(D).

In addition, because PennMont, Ms. Bonney, Mr.
Koresko, and the Koresko law firms also caused the transfer of
monies to the service provider parties in interest under ERISA
3(14)(B), they violated ERISA Section 406(a)(1)(D).  Although
Section 408 provides a safe harbor for those legal and
accounting transactions that are "necessary for the
establishment or operation of the plan," 29 U.S.C. § 1108(B)(2),
the defendants have offered no evidence to suggest that the
hiring and use of Locke Lord, Montgomery McCracken, SYK, Mr. Leo
Salzman, JGR, Anderson Kill, Mr. Richard L. Coffman, C&D, GHH,
Webster, GLF, or Octagon Consulting was "necessary."  Mr.
Koresko's conclusory statement that service providers "provided
[] services which were necessary for the operation of the
defined benefit arrangements in the Trusts" (Docket No. 1036 at
11) fails to explain with any specificity how the actions of the
service-providers were indeed necessary.

Almost all of the cases with service provider parties
in interest involved litigation dealing with Mr. Koresko
directly or his various alter ego entities, i.e., KAPC, KLF, or
PTT, and not either of the Trusts.  For example, Locke Lord's
representation of Mr. Koresko, PennMont, PPT, KAPC, KLF,
Lawrence Koresko, Ms. Bonney, and Mr. Townsend, in the Thomas

Walter Umphrey, P.C. v. PennMont Benefit Services, Inc., No.
1:12-cv-00355-MAC (E.D. Tx. Jul. 15, 2013), dealt with the
failure of Mr. Koresko to pay the death benefit owed to Mr.
Umphrey's beneficiaries (FOF148).  It is improper for Mr.
Koresko to seek indemnification from the Trusts for his own
alleged bad behavior.

The same can be said for Montgomery McCracken in
Larkin v. Penn Public Trust, No.11-7421 (involving PPT,
PennMont, KAPC, KLF, Mr. Koresko, Lawrence Koresko, and Ms.
Bonney as defendants), Oswood v. Penn Public Trust, No. 13-0666
(involving PPT, PennMont, KAPC, KLF, Koresko Financial, PennMont
Benefits, Inc., Mr. Koresko, and Lawrence Koresko as
defendants), Sharkey v. Penn Public Trust, No. 12-1166
(involving PPT, PennMont, KAPC, KLF, Mr. Koresko, Lawrence
Koresko, and Ms. Bonney as defendants), REAL VEBA Trust v.
Castellano, No. 03-6903, REAL VEBA Trust v. Heart Treasures, No.
12-2605 ("Heart Treasures"), REAL VEBA Trust v. Michael O'Brien,
DMD, No. 12-2207,[58] and the present case (FOF171); SYK in the
Bogatay Trust of 2000 v. PennMont Benefit Services, Inc., No.
13-cv-0700 (D. Ore.), litigation (FOF150); Anderson Kill in Chao

---

[58]   In Larkin, Oswood, and Sharkey, the Trust was not named
as a Defendant.  In Castellano, Heart Treasures, and O'Brien,
although the Trust filed suit against the beneficiaries and
participants, it did so only at the behest of Mr. Koresko.  Mr.
Koresko cannot claim indemnification when he himself involved
the Trust in litigation (FOF171).

v. Koresko, No. 04-MC-74, 2004 WL 1102381 (E.D. Pa. May 11, 2004) aff'd, 04-3614, 2005 WL 2521886 (3d Cir. Oct. 12, 2005) (FOF90-91); Mr. Richard L. Coffman in RPS & V, Inc. v. GP Graham Capital Management Group, in the 168th Judicial Court in El Paso County Texas (FOF89); C&D in Sheffield Distributing Co. v. United States, No. 09-0040-LGW (S.D. Ga. Apr. 9, 2009) (involving the representation of certain employers in the "tax refund" "test case") (FOF74, FOF82);  GHH in Chao v. Cmty. Trust Co., 474 F.3d 75 (3d Cir. 2007), as amended (Mar. 7, 2007) (FOF87); and GLF in Wilhite v. Regional Employers' Assurance Leagues Veba Trust, No. 11-59 (S.D. Tex. Feb. 9, 2012) (FOF174)[59].

For JGR, Octagon Consulting, and Webster, none of the work performed has any relation to the "establishment or operation of the plan," 29 U.S.C. § 1108(B)(2).  Both Octagon Consulting and Webster were hired to support Mr. Koresko's purchase of condominiums in the Caribbean island of Nevis (FOF115, FOF187), while JGR was hired to lobby on behalf of Mr. Koresko on "proposed Treasury regulations" and "IRS actions and how best to counter them" (FOF76).  The "establishment or

---

[59] Although GLF ostensibly represented the Trusts in this matter, the firm only became involved after Mr. Koresko refused to comply with the Court's order and was thus incarcerated (FOF174).  GLF functioned only to get Mr. Koresko out of jail for his failure to obey the law (FOF174).

operation of the plan" is not at all contingent upon any Treasury or IRS regulations or actions, and using the Trusts' assets for such payments was not necessary.  29 U.S.C. § 1108(B)(2).

Finally, the hiring and payment of Mr. Leo C. Salzman for "mediation" does not strike the Court as necessary (FOF147).

Nevertheless, the Court has found three transactions that the Court is persuaded were necessary: the hiring and use of James T. Duff, who represented "the trust" in "the Data Link litigation . . . [and the] Sequoias [sic] lawsuit against REAL VEBA trust or PennMont as administrator" (FOF149); the hiring and use of the SYK, who represented Mr. Koresko, PennMont, and REAL VEBA in Ram Technical Services, Inc. v. Koresko, 2005 WL 6358783 (Sep. 22, 2005 Or.), in the Circuit Court of the State of Oregon for the County of Clackamas (FOF150); and the hiring and use of Stoel Rives, who also represented Mr. Koresko, PennMont, and REAL VEBA, in RAM Technical (FOF89).

All three transactions involve protecting the trusts, which can be seen as "necessary" for the "operation of the plan" under 29 U.S.C. § 1108(b)(2).  But these transactions amount to only a small fraction of the amount of plan assets the defendants illegally transferred: $64,986.10 out of a total loss of almost $40 million.  FOF147.

5.   ERISA Section 403

Section 403 of ERISA requires that:

> all assets of an employee benefit plan shall be held
> in trust by one or more trustees. Such trustee or
> trustees shall be either named in the trust instrument
> or in the plan instrument . . . or appointed by a
> person who is a named fiduciary, and upon acceptance
> of being named or appointed, the trustee or trustees
> shall have exclusive authority and discretion to
> manage and control the assets of the plan ... .

29 U.S.C. § 1103; see also Solis, 884 F. Supp. 2d at 292.  This

Court has already held that PennMont, Ms. Bonney, and Mr.

Koresko violated Section 403 when death benefit proceeds were

diverted from the Trust into accounts over which they had sole

control.  Solis, 884 F. Supp. 2d at 294.  The Court found that

the purported delegation of authority to KAPC did not abrogate

the statutory requirement in ERISA Section 403(a) that assets be

held in trust by a trustee.  Id. at 293.  Given the sheer number

of transactions, as described above, wherein monies were either

forwarded to accounts titled to entities other than the Trustee

or never placed in the Trust to begin with, the Koresko

Defendants violated Section 403(b).

D.   Relief[60]

   1.   Removal as Fiduciaries

---

[60] The DOL puts forward two additional theories of liability: co-fiduciary liability and knowing participation. Because the Court finds all of the defendants liable as ERISA fiduciaries who breached their obligations, the Court need not rely on either of these theories to find the defendants liable.

For a fiduciary to be liable for the actions of his breaching co-fiduciary, Section 405(a) of ERISA, 29 U.S.C. § 1105(a), provides that he must:

   (1) ... participate[] knowingly in, or knowingly undertake[] to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
   (2) ... by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
   (3) ... ha[ve] knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).  In other words, besides the liability established for each of the defendants as a result of his own fiduciary breaches, each defendant is also liable for the fiduciary breaches of his co-fiduciaries when the requirements of ERISA Section 405(a)(1), (a)(2), and (a)(3) are satisfied.

For a non-fiduciary party in interest to be liable for knowing participation, the Supreme Court has made clear that the non-fiduciary must have actual or constructive knowledge of the circumstances surrounding a fiduciary's breach of duty and knowingly participate in that breach.  Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 248 (2000). Although the Secretary discusses the principle of knowing participation in the context of parties in interest, the Secretary does not request a judgment against any specific non-defendant parties in interest and does not establish knowing participation by any particular non-defendant party in interest.

Section 502(a)(5) of ERISA permits the Secretary to bring an action "to enjoin any act or practice which violates any provision of this subchapter" or to obtain appropriate relief to redress any violations.  29 U.S.C. § 1132(a)(5). Section 409 of ERISA also subjects fiduciaries who breach their obligations to "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  29 U.S.C. § 1109(a).  A federal court enforcing fiduciary obligations is "thus given broad equitable powers to implement its remedial decrees."  Delgrosso v. Spang & Co., 769 F.2d 928, 937 (3d Cir. 1985) amended, (3d Cir. Oct. 31, 1985).

Over the course of this now six-year long litigation, Mr. Koresko, PPT, PennMont, KAPC, KLF, and Ms. Bonney have shown a complete disregard and disrespect for the law governing fiduciary conduct that requires that they be permanently barred from ever serving as fiduciaries or service providers to ERISA-covered plans.  In fact, their actions throughout their tenure with the Plans make clear that they believe that they are above the law such that a permanent bar is necessary.

Mr. Koresko has misappropriated and mishandled millions of dollars of Trust assets owned by the Plans.  At every instance, he has sought to obstruct the Secretary's investigation of the Plans and this Court's adjudication. During the pendency of Judge Jones's "standstill Order," for

204

example, where the Court prohibited all parties from transferring "any funds of any kind for any purpose" (FOF17), Mr. Koresko nonetheless deposited $833,910.90 in insurance policy loans into an account at Citizens Bank where he was the sole signatory (FOF122).  When the Court instructed Mr. Koresko in July 2013 to refrain from taking out loans, he filed for bankruptcy.  After being temporarily removed as fiduciary to the Plans, and after the United States Bankruptcy Court for the Eastern District of Pennsylvania dismissed his bankruptcy petitions, Mr. Koresko facilitated the commencement of involuntary bankruptcy proceedings in Florida, which the Florida court eventually dismissed as an obvious attempt to avoid the decision of the Pennsylvania Bankruptcy Court.  Finally, after the Court installed an IF in September 2013, thereby removing Mr. Koresko from any fiduciary authority over plan assets, Mr. Koresko transferred the balance of the Scotia Bank accounts to new accounts at RBTT under his name, asserting that he did not consider the money to be the "IF's money" but instead was his own money.  FOF139-40.

The employee participants and beneficiaries of the Plans at issue in this case, and of other and future employee benefit plans throughout the United States, must be protected from the type of fiduciary misconduct in which the defendants have relentlessly engaged for over twelve years.  The defendants

cannot be left in a position to do to other employee benefit plans, employees, and their families what they have done to the Plans, employees, and families in this case.

### 2.   Restitution and Disgorgement

In addition to authorizing removal, Section 409(a) of ERISA also provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . ..

29 U.S.C. § 1109(a).  In other words, the remedy is restitution for losses and disgorgement for profits.  See also Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock, 861 F.2d 1406, 1411 (9th Cir. 1988) ("ERISA § 409(a), 29 U.S.C. § 1109(a),[] requires a fiduciary to disgorge to an employee benefit plan any profits he makes through improper use of the plan's assets."); Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 415 (3d Cir. 2013) cert. denied, 134 S. Ct. 2291 (2014) ("[A] disgorgement claim 'is measured by the defendant's profits'" (citing Restatement (Third) on Restitution and Unjust Enrichment § 51 cmt. a (2011)).).[61]  Accordingly, ERISA requires

---

[61] Disgorgement of unjust enrichment is also available as a form of appropriate equitable relief under Sections 502(a)(3)

a breaching fiduciary to restore a plan to the position it would
have been in but for that fiduciary's illegal conduct.  See
Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985)
(quoting Restatement (Second) of Trusts § 205(c) (1959)).

    As a result of the above ERISA violations, the Koresko
Defendants are liable for restitution and disgorgement to the
Plans.  Each of the Koresko Defendants is liable for the losses
to the Plans resulting from the illegal appropriation of the
Plans' assets because: (1) each is an ERISA fiduciary; (2) each
breached its fiduciary duties by participating in the diversion
and mishandling of plan assets; and (3) these breaches directly
resulted in the diversion of plan assets and therefore losses to
the Plans.[62]

---

and 502(a)(5) of ERISA, against both breaching fiduciaries and
non-fiduciary "knowing participants" who have profited from
their participation in fiduciary breaches.  See generally Harris
Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238,
248 (2000); Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193,
213-14 (3d Cir. 2004) (discussing equitable principles of
disgorgement, constructive trust, and unjust enrichment
applicable in ERISA claims).

[62] Generally, liability of fiduciaries under ERISA is joint
and several.  Struble v. New Jersey Brewery Employees' Welfare
Trust Fund, 732 F.2d 325, 332 (3d Cir. 1984) ("It is a well-
established principle of trust law that multiple trustees who
are at fault may be held jointly and severally liable."),
abrogated on other grounds, Firestone Tire & Rubber Co. v.
Bruch, 489 U.S. 101 (1989); cf. Mertens v. Hewitt Associates,
508 U.S. 248, 262 (1993) ("All that ERISA has eliminated, on
these assumptions, is the common law's joint and several
liability, for all direct and consequential damages suffered by
the plan, on the part of persons who had no real power to

The Court will not hold Ms. Bonney liable for restitution or disgorgement.  Unlike the Koresko Defendants -- and, to be clear, the Court is talking about Mr. Koresko and his alter egos PennMont, KAPC, KLF, and the PPT -- Ms. Bonney did not personally benefit from the diversion and mishandling of the plans and acted only under the guidance and direction of Mr. Koresko himself.  It was Mr. Koresko who used plan assets to purchase property in Nevis and South Carolina and to pay his personal bills and expenses, not Ms. Bonney.[63]

The defendants' scheme involved the diversion of tens of millions of dollars of plan assets through more than 21 accounts in the names of more than 18 different entities at 8 or

control what the plan did" (emphasis added).).  That means that the Koresko Defendants are jointly liable for the full amount of disgorgement.

[63] Ms. Bonney was seriously ill during most of the litigation.  Although she was able to sit for a deposition close to her home, she was not well enough to appear at trial.  She was represented throughout most of the litigation by Mr. Koresko.  On April 22, 2014, the Court granted the DOL's motion to disqualify Mr. Koresko from representing Ms. Bonney on the basis of a non-waivable conflict of interest (Docket No. 782).  On May 15, 2014, the Court ordered that the parties should treat Ms. Bonney as a pro se defendant (Docket No. 812).

Although Ms. Bonney was not well enough to appear at trial, the Court concludes that a permanent bar against her is appropriate because the Court has accepted her deposition testimony as true and bases the injunction against her on that testimony and the documents.  In addition, in an on-the-record telephone conference with Ms. Bonney and the DOL, Ms. Bonney volunteered to be barred from further service as a fiduciary in the future if the DOL would agree to dismiss the case against her.

more different banks, in addition to the transfer of plan assets
directly out of the Trusts to parties in interest.  Although the
total amount of diverted plan assets at issue in this case is
$39,839,477.04,[64] $19,987,362.16 of this amount is in frozen
accounts under the control of the IF.  The Koresko Defendants
are therefore liable for $19,852,114.88 in restitution for
losses and disgorgement of profits, which represents the
remaining balance of the total diverted assets.  FOF258;
Appendix A.

From FOF53-91, it is clear that 158 transactions,
amounting to $5,459,067.30, involved the withdrawal of plan
assets out of the REAL VEBA Trust and/or SWEPB Trust while
either CTC or F&M Trust was the Trustee.  In Appendix A, these
transactions are listed as transaction 87 through transaction
244.

The remaining 99 transactions, constituting
$34,380,409.74 in plan assets, concern the depositing and
transferring of loan proceeds to various parties in interest and
other outside entities.  FOF258.

---

[64] The Secretary also asks that the Court include all
payments to Dilworth and the IF in our calculation of prohibited
transactions.  Because the Court approved the retention of both
Dilworth and the IF, and subsequently scrutinized every invoice
that each submitted to the Court (denying various bills when
appropriate) (Docket No. 496), the Court does not consider
payments to Dilworth or the IF from the Trust accounts as
equivalent to Mr. Koresko's illegal use of plan assets.

Of the 13 accounts listed in FOF258,[65] the opening balance of each of the following 5 accounts was zero prior to the deposit or deposits of known plan assets and no other moneys were deposited into the account before the subject withdrawals: the 5455 Account, the 4872 Account, the 2185 Account, the Pershing Account, and the 0175 Account.  FOF130-31, FOF223-25, FOF214-17, FOF157-59, FOF1-2-03.  Therefore, (1) all of the assets in the subject account at any particular time are REAL VEBA/SEWBP Trust assets, (2) withdrawals from the accounts are withdrawals of plan assets, and (3) the remaining balances on the accounts are entirely plan assets.  The total sum of these transactions and accounts is $22,774,146.29.  In Appendix A, these transactions are listed as transaction 1 through transaction 31 (the 5455 Account and the 4872 Account), transaction 87 (the 2185 Account), transaction 245 (the Pershing Account), and transaction 247 through transaction 256 (the 0175 Account).

Given that the 1187 and the 1195 Accounts functioned as the Trusts' operating account and savings account, respectively, all of the monies from these accounts are, by definition, plan assets.  In that case, (1) all of the assets in

_____

[65] These accounts include the 5455 Account, the 4872 Account, the 5154 Account, the 6018 Account, the 8384 Account, the 1146 Account, the 1187 Account, the 1195 Account, the 2185 Account, the Pershing Account, the RBTT Koresko Law Firm Account, the 0175 Account, and the 7801 Account.

these accounts are Trust assets, (2) withdrawals from the accounts are withdrawals of plan assets, and (3) the remaining balances on the accounts are entirely plan assets.  The total sum of these transactions and accounts is $6,743,922.88.  In Appendix A, these transactions are listed as transaction 48 through transaction 85 (the 1187 Account and the 1195 Account).

For the remaining 6 accounts, each had a positive balance prior to the deposit of plan assets[66] such that plan assets may have been commingled with non-plan assets.  The common law of trusts and ERISA each provide various principles for determining whether an identified withdrawal from a commingled account -- or any particular earnings on a commingled account -- should be attributed to the Trust or to the owner of the commingled non-Trust moneys.

Under Restatement (Third) of Restitution & Unjust Enrichment, any ambiguity of ownership resulting from the wrongful commingling of trust assets with non-trust assets should be resolved in favor of the trust's participants and beneficiaries and against the trustee who wrongfully commingled the assets.  Id. § 59(1) (2011). ("If property of the claimant is deposited in a common account or otherwise commingled with other property so that it is no longer separately identifiable,

---

[66] Or, for instance, where other moneys of unknown source was deposited into an account containing plan assets after the deposit of plan assets.

the traceable product of the claimant's property may be identified in (a) the balance of the commingled fund or a portion thereof, or (b) property acquired with withdrawals from the commingled fund, or a portion thereof, or (C) a combination of the foregoing ... .").[67]  However, if a claimant's property is commingled by a recipient "who is a conscious wrongdoer or a defaulting fiduciary," then:

> (a) Withdrawals that yield a traceable product and withdrawals that are dissipated are marshaled so far as possible in favor of the claimant.
>
> (b) Subsequent contributions by the recipient do not restore property previously misappropriated from the claimant, unless the recipient affirmatively intends such application.
>
> (c) After one or more withdrawals from a commingled fund, the portion of the remainder that may be identified as the traceable product of the claimant's property may not exceed the fund's lowest intermediate balance.

Id. at (2).  In other words, "[d]isadvantageous or untraceable withdrawals are attributed to the wrongdoer's funds, to the extent the available balance permits."  Id. Comment d.

---

[67] A comment to the Restatement well illustrates what this would entail.  If a recipient wrongfully takes $1000.00 of a claimant's money and uses that money plus $1000.00 of his own money to purchase Blackacre, the claimant is entitled at his election to either an undivided one-half interest in Blackacre or an equitable lien on Blackacre securing a claim to restitution of $1000.00.  Restatement (Third) of Restitution and Unjust Enrichment § 59 (2011) Comment c.

Under ERISA, a fiduciary's failure to segregate and earmark plan funds is a breach of the duty to exercise care and diligence of a prudent man acting in like capacity and familiar with such matters.  Rodrigues v. Herman, 121 F.3d 1352 (9th Cir. 1997; see also Corley v. Hecht Co., 530 F. Supp. 1155, 1163 (D.D.C. 1982).

Relying on ERISA's broad remedial provisions and the principle enunciated in Varity Corp, 516 U.S. at 496-497, that Courts should look to the common law of trusts when construing ERISA's fiduciary provisions, courts generally apply these common law principles to ERISA claims to ensure that parties injured by a fiduciary's wrongful commingling of plan assets with other assets are not further disadvantaged by any ambiguity in ownership resulting from that commingling.  For example, in Leigh v. Engle, 727 F.2d 113, 138-39 (7th Cir. 1984), the Seventh Circuit relied on the common law of trusts to hold that a fiduciary who commingles plan assets with his own assets bears the burden of apportioning those profits that arise from the commingled fund: "The trustee is responsible both for the difficulty and for resolving it."  Id. at 139.

Here, where the Koresko Defendants wrongfully commingled assets of the REAL VEBA and SEWBP Trusts with other assets of unknown origin, any ambiguity resulting from this commingling must redound to the benefit of the wronged parties.

213

Because the Koresko Defendants have failed to apportion such profits or explain why funds were indeed commingled, all accounts under the name of the Koresko Defendants that contain commingled funds are subject to restitution and disgorgement. These include the remaining 6 accounts -- the 5154 Account, the 6018 Account, the 8384 Account, the 1146 Account, the RBTT Koresko Law Firm Account, and the 7801 Account.  The total sum of those transactions involving plan assets and the balance in these accounts is $4,862.340.57.  In Appendix A, these transactions are listed as transaction 32 through transaction 47 (the 5154 Account, the 6018 Account, the 8384 Account, and the 1146 Account), transaction 246 (the RBTT Koresko Law Firm Account), and transaction 257 (the 7801 Account).

Although these transactions amount to $39,839,477.04, the Court has already frozen all of relevant accounts except for the RBTT Account.[68]  The Court therefore has frozen over $19,987,362.16 for which the Koresko Defendants owe in restitution and disgorgement.  The Koresko Defendants are thus liable for $19,852,114.88.

---

[68] Through the power of attorney, the Court is attempting to transfer control over the RBTT Account to the Court.  If and when that occurs, the Koresko Defendants would no longer be liable for the balance of the account, unless it is determined that the account was drained by them.

3.   Prejudgment Interest

Generally, the "awarding of prejudgment interest under federal law is committed to the trial court's discretion, and given in response to considerations of fairness" and "denied when its exaction would be inequitable."  Ambromovage v. United Mine Workers of Am., 726 F.2d 972, 981-82 (3d Cir. 1984) (alterations in original) (internal quotation marks omitted). In ERISA cases, "[p]rejudgment interest exists to make [plan participants and beneficiaries] whole and to preclude defendants from garnering unjust enrichment."  Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 102 (3d Cir. 2012).  The overarching concern, therefore, is to prevent breaching fiduciaries from unjustly profiting from their breaches.  See, e.g., Fotta v. Trustees of United Mine Workers of Am., Health & Ret. Fund of 1974, 165 F.3d 209, 212 (3d Cir. 1998); Schake v. Colt Indus. Operating Corp. Severance Plan for Salaried Employees, 960 F.2d 1187, 1192 n.4 (3d Cir. 1992) (citing Stroh Container Co. v. Delphi Industries, Inc., 783 F.2d 743, 752 (8th Cir.), cert. denied, 476 U.S. 1141 (1986)).

At the same time, prejudgment interest has largely been conferred only when benefit payments were either denied or delayed.  See, e.g., Moore v. CapitalCare, Inc., 461 F.3d 1, 13 (D.C. Cir. 2006)("The presumption in favor of prejudgment interest has three recognized bases.  First, to permit the

215

fiduciary to retain the interest earned on wrongfully withheld benefits would amount to unjust enrichment -- a fiduciary would benefit from failing to pay ERISA benefits."); Ford v. Uniroyal Pension Plan, 154 F.3d 613, 618 (6th Cir. 1998) ("Awards of prejudgment interest pursuant to § 1132(a)(1)(B), however, are not punitive, but simply compensate a beneficiary for the lost interest value of money wrongly withheld from him or her."); Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1010 (3d Cir. 1992) ("We regard Schake as providing authority for the principle from which we may not depart that in the district court's discretion, prejudgment interest may be awarded for a denial of pension benefits."); Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1219 (8th Cir. 1981) ("We believe that these same considerations should be followed in an award of prejudgment interest with regard to an ERISA violation. The former executives have been denied their contractual severance benefits for a period of approximately four years before final judgment was rendered. ... Under these circumstances, an award of prejudgment interest is necessary in order that the plan participants obtain 'appropriate equitable relief.'").

　　　　Here, the Secretary seeks prejudgment interest to "further[] the remedial purposes of ERISA."  (Docket No. 941.) The Secretary argues that such prejudgment interest is necessary to "restore a plan to the position it would have been in, but

for the violations of ERISA." (Id.) In so contending, the Secretary cites various district court opinions, the majority of which are unpublished, as well as the Third Circuit's opinion in Fotta, 165 F.3d at 209.

The problem with the Secretary's argument, however, is that it fails to address Mr. Koresko's contention that the award of prejudgment interest hinges upon the denial or the delay of benefit payments. (Docket No. 984.) Even Fotta, which the Secretary cites approvingly, dealt with late payment of benefits, not with the improper transfer of plan assets. 165 F.3d at 212 ("The principles justifying prejudgment interest also justify an award of interest where benefits are delayed but paid without the beneficiary's having obtained a judgment. ... A late payment of benefits effectively deprives the beneficiary of the time value of his or her money whether or not the beneficiary secured the overdue benefits through a judgment as the result of ERISA litigation.") Although the Third Circuit in Iola, 700 F.3d at 102, approved the award of prejudgment interest to "disgorged commissions," the facts in Iola and the facts herein are substantially different. In Iola, the district court dealt with finite disgorgement: the commissions.

Here, the disgorgement entails the transfer of plan assets either from the Trusts or from one of the Koresko entities to an outside party. If, instead, the Secretary had

217

limited his request of prejudgment payment to "any provable amount of death benefits payment to beneficiaries pursuant to the plans that Koresko failed to make" (Docket No. 984), as Mr. Koresko suggested, the Court would be on firmer footing to award pre-judgment interest.

Further, the request of prejudgment interest based upon the rate that the Internal Revenue Service charges taxpayers who underpay their taxes is not, in fact, supported by "several courts" as the Secretary contends, at least not by the majority of courts who have dealt with this issue.  The concern is not whether "several courts" relied upon that rate but whether that rate is appropriate given the remedial motivations of ERISA of making a plan whole.  See Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan, 711 F.3d 675, 686 (6th Cir. 2013) ("An award that fails to make the plaintiff whole due to an inadequate compensation for her lost use of money frustrates the purpose of ERISA's remedial scheme.")  The Secretary has offered no evidence why prejudgment interest is necessary to accomplish that task or why this particular rate is appropriate.  For that reason, the Court cannot award prejudgment interest at this time.

An appropriate Order shall issue separately.