IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD C. HUGLER, ACTING | : | CIVIL ACTION |
| SECRETARY OF LABOR, UNITED | : | |
| STATES DEPARTMENT OF LABOR | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN J. KORESKO, V, et al. | : | NO.  09-988 |

**REPORT AND RECOMMENDATION
ON DISTRIBUTION PLAN PHASE ONE**

ELIZABETH T. HEY, U.S.M.J.                          February  17, 2017

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case began with the Department of Labor's ("DOL") issuance of

administrative subpoenas directed to John J. Koresko, V, ("Koresko") and others in

December of 2004, in connection with an investigation into alleged violations of the

Employee Retirement Income Security Act of 1974 ("ERISA").  On March 6, 2009, the

DOL filed a complaint against Koresko and others, alleging among other things

violations of their ERISA-imposed fiduciary duties with respect to the Regional

Employers Assurance Leagues Voluntary Employees' Beneficiary Association Trust

("REAL VEBA") and the Single Employer Welfare Benefit Plan Trust ("SEWBPT")

(together, "The Trusts").  Years of discovery, investigation, and litigation ensued,

culminating in a bench trial before the Honorable Mary McLaughlin in June 2014.

On February 6, 2015, Judge McLaughlin issued a comprehensive opinion finding

that Koresko and his related entities violated their fiduciary duties under ERISA.  Perez

v. Koresko, 86 F. Supp.3d 293 (E.D. Pa. 2015) ("Perez").  In her accompanying order, issued March 13, 2015, Judge McLaughlin permanently removed and enjoined Koresko and his entities from any position with respect to the Trusts, found them jointly and severally liable to the Trusts for over $18 million, and retained jurisdiction for purposes of overseeing and obtaining an equitable accounting of the assets of the Trusts.  Doc. 1149.[1]  The Third Circuit affirmed Judge McLaughlin's February 6, 2015 opinion and March 13, 2015 order.  Sec'y United States Dep't of Labor v. Koresko, 646 F. App'x 230 (3d Cir. 2016).

Judge McLaughlin thereafter appointed a forensic accounting firm to determine the total value of the distributable assets in the Trusts, determine the values of the individual employer member accounts, and develop alternative methodologies for the equitable distribution of the Trusts' remaining assets.  Doc. 1240.[2]  Marcum LLP

---

[1] The only other individual named as a defendant was Jeanne Bonney.  Judge McLaughlin found Ms. Bonney violated her fiduciary duties under ERISA and removed her as a fiduciary, but did not impose personal liability on her for restitution or disgorgement.  Perez, 86 F. Supp.3d at 391-93.

[2] In a series of Orders in the summer of 2013, see Docs. 392, 407, 436, 439,  Judge McLaughlin had frozen the Trusts' assets and enjoined Koresko and his related entities from "expending, transferring, encumbering, hypothecating, secreting or otherwise disposing of the cash value in [the Trusts' insurance] policies, whether by means of policy loans, withdrawals (partial or otherwise), cash surrender applications, or any other method of removing cash from the value of any life insurance policies owned by or for the benefit of the [Trusts] or its constituent employer-level Plans or arrangements."  Doc. 436 at 2-3.

("Marcum") is the court-appointed forensic accountant.[3]  Upon Judge McLaughlin's

retirement, the case was reassigned to the Honorable Wendy Beetlestone.  In September

2015, guided by Judge McLaughlin's Findings of Fact and Conclusions of Law

("FOF/COL") in her Perez opinion and subsequent orders (Docs. 1162, 1240, 1242),

Judge Beetlestone undertook oversight of the equitable distribution of the remaining

assets in the Trusts.  On August 22, 2016, the DOL filed a Motion for Equitable

Distribution of the Trusts' assets, requesting the Court to adopt the distribution

methodology proposed by Marcum ("the Unified Model").  Doc. 1384.  Judge

Beetlestone referred the Motion for Equitable Distribution to me for the purpose of

developing notice to the plans and a scheduling order.  Doc. 1389.[4]

   On September 12, 2016, I determined that the Court's consideration of the DOL's

Motion for Equitable Distribution would proceed in two stages and set forth a detailed

schedule and proposed initial Notice to the plans.  Doc. 1395.  During the first stage,

which this Report concerns, plan sponsors were provided notice, an explanation of the

---

[3]Smart Devine PC was initially appointed as the forensic accountant.  However, on December 1, 2015, Smart Devine was merged into Marcum, which was directed to perform the duties of Smart Devine.  Doc. 1272.

[4]Based on prior referrals, I am familiar with the underlying case and the phased-distribution process Judge McLaughlin envisioned in the orders appointing a trustee, a forensic accountant, and a trust administrator.  Judge McLaughlin first referred the case to me to conduct settlement negotiations on December 2, 2010.  Doc. 244.  In the ensuing years, my role evolved to include oversight of the work of the court-appointed Independent Fiduciary ("IF") as it inventoried the assets in the Trusts and took control of the Trusts' administration, Docs. 496, 532, 553, oversight of depositions, Doc. 602, and oversight of the professionals tasked with the dissolution of the Trusts and distribution of the assets.  Doc. 1261.

Unified Model, and a list of all the plans and their status as open or closed/terminated.[5]

Judge Beetletsone thereafter adopted the initial Notice to be provided to the plans.  Doc.

1409.

On October 17, 2016, the court mailed the Notice of Proposed Methodology for

Distribution of Trust Assets ("Notice"), which directed the plan sponsors to the court's

website to review Marcum's description of the Unified Model, and to a list of the 558

plans included in the Trusts and denoting their status as open or closed/terminated.[6]

Marcum's description provides a detailed history of its analysis of the transactions

associated with the plans and the Trusts, an explanation of why it is recommending the

---

[5]As explained in the description of the Unified Model, open plans may participate
in the distribution.  Plans designated as closed/terminated will not receive any
distribution.

[6]The Trusts are comprised of 558 plans, but the list attached to the Notice
identified 557 plans because Marcum mistakenly treated two plans, JGM and Graham-
Malone, Inc., as one plan.  The court mailed Notices to 553 plan sponsors and emailed
the Notice to one plan, James Barrie Publishing, because no physical address was
contained in the records.  Four closed/terminated plans, Leydecker PC, R M Sales Inc.,
Refrigerant Management, and a plan identified as Unknown, had no contact information.
Of the 553 mailed notices, the U.S. Postal Service forwarded 16 Notices to different
addresses, and the Clerk's Office kept record of the new addresses.  The Postal Service
returned 128 Notices to the court as "Unable to Forward Return to Sender."  Of these
returned Notices, just 14 were sent to plans designated as "open" by the forensic
accountant.  With the help of the DOL and Wagner Law Group, the court-appointed Trust
Administrator, the court obtained updated contact information or an email address for
each of the open plans for which the Notice had been returned except one, Central
Georgia Cardiology Management, P.C.  The court resent the Notice to those for which it
had obtained physical addresses and emailed the remainder, directing the plan sponsors to
the tab on the court's webpage which contains the Notice and other relevant information.
With respect to JGM and Graham-Malone, Inc., the Clerk's Office sent a Notice to
Graham-Malone, Inc., in the original mailing.  Upon learning of the mistake, the Clerk's
Office mailed a Notice to JGM and my office emailed the plan sponsor, directing him to
the Court's website.

Unified Model over other possible methodologies, and illustrations of how the Unified Model works under various hypothetical scenarios.  Both the description of the Unified Model and the plan list with designation as open or closed/terminated are appended to this Report.

On December 12, 2016, I held a hearing at which Marcum explained the Unified Model and both Marcum and the DOL responded to questions from plan sponsors, their counsel, and other interested parties.[7]  Objections to the Unified Model, to designation of a plan as open or closed/terminated, or to a plan's inclusion in the Trusts were required to be sent to the Clerk's Office and postmarked on or before January 3.  The court received six objections.[8]

---

[7]In the Notice, the plan sponsors were advised that any sponsor wishing to object to the Unified Model, designation of a plan as open or closed/terminated, or inclusion of a plan within the Trusts, must appear at the hearing.  The court arranged for plan sponsors or their representatives who were unable to be present to participate by telephone. Representatives of the following plans were present at the hearing or participated by telephone:  Kerry Investments, Elam Enterprises, Nautical Marine, W.S. Newell, Crandall Investments, Allamo Ventures, Brite Management, Cavaliere Professional, Ellertson Family, James M. LaRose, D.O. & Associates, Brigham City Arthritis Clinic, Wuest Estate Company, Ben-Lin Associates, Ltd., JES Realty, Flagship Management LLC, GP Construction Services, Inc., Cedar OB & GYN Associates, Mida, Inc., Gretchen Castellano, Anthem Medical Management, Inc., Pamela K. Erdman, M.D., Inc., Engineered Systems and Products, Inc., Resource Realizations, Inc., Howard Greils, M.D., Inc., Harvey A. Kalan, M.D., Inc., Wilshire Palisades Law Group, P.C., Powercom Electrical Services, Inc., Everything for Love, Inc., Olouakan Comluct, Inc., Mario Magcalas, M.D., P.A., Carson's Steak Warehouse and Saloon, Morgen & Oswood Construction, Charles Parsons & Associates, LGS Specialty Sales, LTD, David Spokane Orthodontic Associates, P.C., Tobey Karg Sales Agency, Inc., U.E. Systems, Inc., and M&E Zenni, Inc.  In addition, various insurance carriers were represented by Robert Develack.

[8]The Court also received correspondence from representatives of Ben-Lin Associates, Ltd., and Solloway Enterprises, Inc., seeking to join in an objection posed by

## II.   <u>THE UNIFIED MODEL</u>

Judge McLaughlin found that each of the plans "holds an undivided beneficial interest in each of the Trusts' underlying assets and each of these underlying Trust assets is a plan asset of each of the . . . plans." <u>Perez</u>, 86 F. Supp.3d at 378.  The equitable distribution of the Trusts' assets is complicated by Koresko's improper depletion of those assets as described in Judge McLaughlin's FOF/COL and by the variety of investment vehicles and insurance policies purchased for the plans.  Marcum's Unified Model attempts to take these complicating factors into account.

Marcum created a detailed description of the Unified Model which was made available on the court's website.  <u>See</u>

<u>http://www.paed.uscourts.gov/documents/koresko/Perez%20v.%20Koresko%20-%20Unified%20Model.pdf.</u>  In addition, the DOL focused on specific advantages of the Unified Model in its Memorandum in support of its Motion for Equitable Distribution. Doc. 1384-1 at 11-12.  I provide a brief synopsis of the Unified Model here.

The Unified Model considers a number of factors in determining the value of each plan's interest in the whole.  First, the Unified Model considers the PennMont Internal

---

other plans.  These items were postmarked more than two-weeks after the objection period expired, despite the fact that both plans received the Notice of Proposed Methodology, which advised all of the plan sponsors that any objection to the methodology had to be postmarked on or before January 3, 2017.  There was no representative from Solloway at the hearing, and as noted presence at the hearing was a prerequisite to filng any objection.  Benjamin O'Neill, the principal of Ben-Lin, attended the hearing on December 12, at which I again reminded everyone that objections had to be postmarked by January 3.  <u>N.T.</u> 12/12/16 at 115.  Therefore, the request of these plans to join in other objections is denied.

Balance ("PIB"), the internal accounting system behind the Trusts.  The PIB reflects the transactions that directly affect each plan's balance, with additions for a plan's payment to the Trusts and a deduction for the Trusts' payment of an insurance premium for a policy related to that plan.[9]  Marcum found that the PIB accurately accounted for all transactions associated with the plans, both normal and expected transactions such as premium payments and service fees, and improper transactions such as "loans" Koresko took on policies and legal fees he charged the plans.  Through this aspect of the Unified Model, Marcum was able to account for payments and charges to each plan's balance and to credit the plans for the misdeeds of Koresko.

The Unified Model also credits each plan for the value of the insurance products related to that plan.  This component recognizes that all insurance products are not created equal, e.g., term insurance with no accumulated value, whole life insurance with accumulated value, and a variety of other insurance products with differing investment features.  Thus, each plan receives credit for the value of the policies, including investments, related to its individual plan.  This is a critical feature of the Unified Model and distinguishes it from other possible distribution models which would ignore the expectation each plan had in the products it chose.

Once Marcum determines the sum of all of the liabilities of the Trusts (i.e., the total of amounts due each plan) and determines the value of the assets available for

_____

[9]Once Judge Beetlestone adopts a distribution model, the second phase of the distribution process will begin with each plan being provided an individual accounting of Marcum's calculation of its credits, debits, and policy values.

distribution, it will then determine the asset shortfall discount ("ASD"), which is the percentage by which the amounts due all the plans will be reduced for liquidation.

In its Memorandum in support of the Motion for Equitable Distribution, the DOL stresses that the distribution must be informed by ERISA.  "Though complex in design, ERISA maintains the basic goal of 'protecting employees' justified expectations of receiving the benefits their employers promise them."  Doc. 1384-1 at 16 (quoting Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743 (2004)).  The DOL argues:

> The basic premise in Marcum's approach is to fulfill the purpose of the Trusts in providing the plans with the value of its anticipated insurance coverage.  Marcum's approach also allows for the alternative of easily providing the plans with their insurance policies, minus any amount owed to the Trusts, if the plans determine such in kind distribution is the most beneficial alternative in terms of the plan's particular situation and the age and circumstances of the covered employee.

Doc. 1384-1 at 19.

## III.   OBJECTIONS

As noted, the court received six objections.  For the reasons set forth below, I will address three of the objections, and will defer ruling on the others pending further factual development.

### A.   Objections to a Plan's Designation as Open or Closed/Terminated - Flagship and Omni

Two plans, Flagship Management LLC ("Flagship"), and Omni Management and Consultants Unlimited, Inc. ("Omni"), have filed counseled objections to their designation as closed/terminated.  Flagship argues that, as a result of Koresko's actions

8

and misrepresentations, which included a purported unilateral amendment to the plan that was later deemed void, Flaghsip was "fraudulently induced" and "coerced . . . into terminating participation in the Koresko Arrangment without receiving either the insurance policies or the cash value associated with the policies."  Doc. 1438 at 4-6.[10] Omni argues that Koresko unilaterally terminated its plan because Omni refused to contribute additional funds based on the allegations in the DOL's complaint against Koresko and his related entities, leaving it without any portion of the significant investment it made.  Doc. 1439.[11]  I conclude that further fact development is necessary before addressing these two objections.

With respect to Flagship, the DOL concurs in the objection, responding that the evidence provided by Flagship evidences that "its participation in the trust was terminated in a manner inconsistent with its intention."  Doc. 1448 at 3.  Although Flagship has attached correspondence exchanged with Koresko in support of its position, Doc. 1438-1, it is unclear whether there is any additional evidence upon which Marcum relied in determining that Flagship was a closed/terminated plan.  The court should not address the objection without weighing both the information supporting Marcum's

---

[10]In the alternative to a finding that the plan was improperly terminated, Flagship requests discovery and an evidentiary hearing or segregation and return of its assets. Doc. 1438 at 11.

[11]Omni also objects to the distribution methodology because it excludes the closed/terminated plans from any distribution.  Doc. 1439 at 1.  However, if a plan was properly closed or terminated, there is no basis for it to participate in the distribution, and Omni offers no argument to challenge this reasoning.  Omni's only real challenge is to its characterization as closed/terminated in light of the circumstances surrounding its termination.

designation of the plan and the information on which the plan relies.  Therefore, rather than proceeding on the record now before the court, I will defer consideration of this objection to allow an exchange of documents relevant to the termination of the Flagship plan.[12]  Marcum shall provide the DOL with the documentation that informed its decision to conclude that Flagship was a closed/terminated plan.  The DOL shall then provide that documentation to counsel for Flagship and the court will entertain further briefing.

With respect to Omni, although Omni has not provided any documentation to support its argument that it was improperly terminated, a similar document exchange is called for.  Omni will be required to provide the DOL any documents it relies on, and Marcum will be directed to provide the DOL with the documentation that informed its decision to conclude that Omni was a closed/terminated plan.  The DOL shall provide the documentation to counsel for Omni and the court will entertain additional briefing.

### B.      Objection to a Plan's Inclusion in the Trusts - Wuest

Wuest Estate Company ("Wuest") filed a counseled objection to its inclusion in the Trusts.  Doc. 1440.[13]  This objection arises from the fact that some or all of the plans

---

[12]Flagship also contends that Mr. Koresko "removed a substantial portion of the cash value via the mass loan conversions that took place in July and August of 2009," and that "Flagship still does not know the true status of the cash value of its policies as of December 2010."  Doc. 1438 at 4-5.  These objections are appropriate for the second notice and objection phase of the distribution process if Flagship is determined to be an open plan, and must be asserted at the appropriate time.

[13]There is a related intervenor action pending in this court in which Sun Life deposited the proceeds of a Wuest-related insurance policy with the court.  Sun Life Assurance Co. of Canada v. Morton, Civ. No. 13-1088 (E.D. Pa.).  Ultimately, Judge

were seeking favorable tax treatment for their premium contributions, but were disappointed in their expectations.[14]  According to Wuest, the Internal Revenue Service ("IRS") disallowed its  deductions for contributions to the plan, and after a settlement with the IRS, plan participants paid income taxes and interest.  Id. at 1-2.  Wuest also represents that Koresko later refused plan participants' request to terminate the plan and to distribute the insurance policies to the plan.  Id. at 2.  Wuest argues that based on these events the plan should be excluded from the distribution process and the policies returned to plan participants.  Id.  The DOL argues that Wuest is not entitled to take the policies free and clear of liabilities and risk associated with participation in the Trusts, and that Wuest's request is unfair to other plans that also suffered from Koresko's conduct.  Doc. 1451.[15]

---

McLaughlin ordered that the proceeds of the policy be transferred to the court-appointed trustee of the Trusts.  Civ. No. 13-1088, Doc. 63.  Recently, upon learning that no other litigation is pending regarding this policy, the court authorized the payment of one-half of the calculated death benefit.  Wuest continues to have two active policies in the Trusts.

[14]Koresko marketed the Trusts as a vehicle for small business owners to obtain tax deductions for the contributions made to the Trusts to purchase life insurance.  See Doc. 1437 at 56 (pamphlet authored by Koresko explaining tax benefits of participation in the VEBA); Koresko v. United States, 123 F. Supp.3d 654, 673-75 (E.D. Pa. 2015) (Stengel, J.) (general description of REAL VEBA as a tax-driven venture intended to be a ten-or-more-employer plan ("TOME")); id. at 674 ("The REAL VEBA was intentionally structured to favor owner/employers in a 'Top Hat' tax advantaged arrangement . . . [and] [e]mployers and highly compensated employees using REAL VEBA documents did so for an immediate deduction and with tax purposes in mind.") (quoting Koresko's proposed findings of fact and answer in Perez);  id. at 683 ("Mr. Koresko promoted the REAL VEBA as a TOME").

[15]The DOL originally misconstrued the Wuest objection, believing that Wuest complained about an impermissible termination of the plan.  Doc. 1448 at 3.  However,

The IRS's determination is not dispositive of whether Wuest was part of the Trusts.[16]  Judge McLaughlin's opinion, however, is dispositive of this issue, as she found that the plans identified in her opinion were part of the Trusts.

> Here, employers signed adoption agreements on behalf of all of the plans listed in [Findings of Fact] Section C [including Wuest].  This means that those plans adopted the REAL VEBA or SEWBP Master Plan and chose among the benefits offered in those Plans.

Perez, 86 F. Supp. 3d at 372; see also id. at 316 (participants in Trusts established employee benefit plan by signing adoption agreement).  Moreover, Judge McLaughlin found that each plan "holds an undivided beneficial interest in each of the Trusts' underlying assets."  Id. at 378.  Therefore, Judge McLaughlin has already found that Wuest is part of the Trusts and that the other plans in the Trusts hold an interest in the value of the Wuest plan and any insurance policies relating to the Wuest plan; just as the Wuest plan has an interest in the other assets of the Trusts.  How each plan was treated for tax purposes has no relevance to whether the plans were subject to ERISA and part of the Trusts.[17]

---

the DOL filed a supplemental response, addressing Wuest's objection that the plan should not be considered part of the Trusts.  See Doc. 1451.

[16]In fact, Judge Stengel's opinion explains why none of the plans in the Trusts could receive the tax advantages offered to a TOME.  Koresko v. United States, 123 F. Supp.3d at 683-84; see also N.T. 12/12/16 at 94 (discussion of IRS settlements with individuals involved in the Trusts).

[17]The Unified Model does not account for tax events, whether past or future, in the calculation of the Trusts' liability to the plans.  Although there was discussion at the December 12, 2016 hearing of various tax issues, including different settlements plans have made with the IRS and potential tax implications of a distribution from the Trusts,

To the extent Wuest's objection can be read to assert a rescission request based on a mistake of law, see Doc. 1451 at 2, the court should reject the objection.  Rescission of a contract is an equitable remedy available under ERISA.  See generally McBride v. Hartford Life & Accident Co., Civ. No. 05-6172, 2007 WL 5185293, at *17 (E.D. Pa. Jan. 29, 2007) (allowing insurance company to rescind ERISA policy based on applicant's material misrepresentations); see also Griggs v. E.I. DuPont de Nemours & Co., 385 F.3d 440, 441 (4th Cir. 2004) (in ERISA action for negligent misrepresentation, "[w]e conclude that, in general, rescission is a remedy traditionally available in equity and that rescission is therefore a proper remedy under ERISA").  As the DOL notes, rescission might be the proper relief if Wuest could simply dissolve its plan without impacting any other plans.  Doc. 1451 at 3.  However, in this case, the plans were all in a similar situation.  "[T]he problem with a simple rescission to release Wuest from inclusion in an equitable distribution model would ignore the relevant fact that Koresko induced many plans like Wuest to participate in the trusts based on misrepresentations about the nature and effect of the trusts."  Id. at 2.  Central to Judge McLaughlin's determination that each of the plans holds an undivided beneficial interest in the Trusts' assets is the notion that any reduction in the amount available for distribution impacts all plans.  Removal of the Wuest plan affects Wuest's neighbors, and vice versa.  Wuest's suggestion that its remaining life insurance policies should be directly distributed to it on account of a mistake suffered not only by it but by other plans as well, but without

---

N.T. 12/12/16 at 93-95, no plan has raised an objection to the Unified Model on the ground that it does not account for tax events.

concern for the impact on the other plans, runs contrary to Judge McLaughlin's opinion and the equitable considerations which govern rescission.

### C.   Objection to a Plan's Inclusion in the Trusts – Newell

The sponsor of the W.S. Newell Employee Welfare Benefit Plan ("the Newell Plan") has filed a counseled objection to the inclusion of the Newell Plan in the Trusts, arguing that it is a separate and distinct trust.  Doc. 1441.  The Newell Plan relies on the actions of the Independent Fiduciary ("IF") with respect to an annuity payment,[18] the transcript of a conference call, and Judge McLaughlin's FOF/COL, to argue that the Newell Plan is a separate trust and its assets should not be included in the distribution plan.  Doc. 1441 at 4-5.  The Newell Plan also objects to the Unified Model, arguing that it fails to identify and segregate funds belonging to third parties such as the Newell Plan or to account for and reimburse funds paid by third parties for the benefit of the Trusts. Id. at 7-8.

The DOL maintains that the Newell Plan's argument "fails both legally and factually."  Doc. 1448 at 6.  Factually, the DOL relies on the documents demonstrating that Penn Public Trust, the Koresko entity that was the trustee of the Trusts, was also the trustee of the Newell Plan and the record owner of funds held in trust for the Newell Plan. Id. at 6-7.  Legally, the DOL argues that trust law and equitable principles call for keeping the Newell Plan in the Trusts for distribution.  Id. at 7-9.  In response to the Newell Plan's complaint that it has been denied the opportunity to litigate this issue

---

[18]Wagner Law Group, which currently serves as Trust Administrator, was appointed to act as the IF during the period prior to Judge McLaughlin's initiation of the distribution process.

before now, the DOL argues that the Newells waited five years into the pendency of the
Perez case before asserting that the Newell Plan was separate.  Id. at 9-10.

A certain degree of confusion arises from the fact that there were a number of
different plans connected to different Newell family members and entities.  Review of the
documents cited by the Newell Plan adds to the confusion.  In a letter to Judge
McLaughlin in November 2014, the IF sought guidance on the handling of an annuity
payment funded by an annuity policy on the life of Sadie Newell ("the Sadie Newell
annuity"), received in October 2014, payable to W.S. Newell WPBT.  Doc. 1062 at 1.  In
the letter, the IF noted that there were various indications that the Newell Plan was a
separate trust, but other details were inconsistent with it being separate.  Id. at 2.  For
example, the IF noted that some of the Newell policies name the SEWBPT as
beneficiary,[19] the Newell Plan used the tax identification number of Penn Public Trust,
and the Trusts paid premiums on policies attached to the Newell Plan.[20]

In the ensuing telephone conference with Judge McLaughlin, little light was shed
on the Newell Plan's status.[21]  The IF stated that it was not sure of the validity or

---

[19]It is unclear to the court whether the policies cited by the IF in the November
2014 letter are attributable to the specific plan asserting an objection or another plan
related to the Newell family.

[20]It appears that the premiums to which the IF was referring predated a later
agreement the IF reached with the Newell Plan's attorneys that the Sadie Newell annuity
payment would be used to make policy premium payments.  See Doc. 1062 at 2 n.1, 4.

[21]As Judge McLaughlin stated many times, the court's goal at that point in time
was to maintain the status quo with respect to the plans and policies in the Trusts.  See,
e.g., Doc. 496 (appointing IF to handle day-to-day operation of the Trusts); N.T. 11/13/14
(Doc. 1088 ) at 32 (DOL reiterating the court's directive to maintain status quo).

existence of a separate Newell Trust.  N.T. 11/13/14 (Doc. 1088) at 5.  At that time, the

DOL took the position that it was up to the insurance company to determine the rightful

recipient of the Sadie Newell annuity payment, rather than using Trust money to pay the

IF to investigate the issue, and that all of the accounts that were frozen and in the IF's

control had Trust assets in them.  Id. at 6, 9.  Judge McLaughlin authorized the return of

the annuity check to the insurance company with a letter advising that the IF was not the

trustee for the trust to whom the check was made out.  Id. at 23.

Judge McLaughlin's opinion places the Newell Plan squarely within the Trusts,

but then refers to additional information that muddies the water.  In section C of her FOF,

which is the portion of her opinion identifying all plans that were part of the Trusts and

their different characteristics, Judge McLaughlin included the W.S. Newell, Inc., Welfare

Benefit Plan.  Perez, 86 F. Supp.3d at 324, 333 (¶ 50(398)).  In that same section she

found that the evidence indicated that the Newell Plan was an active plan at the time of

the decision.  Id. at 336, 338 (¶ 25(63)).  Later in the opinion, Judge McLaughlin stated

that all of the plans listed in Section C of the FOF had signed adoption agreements and

had adopted the REAL VEBA, and she included all the plans on the list as covered plans

for purposes of beneficial ownership in the Trusts.  Id. at 373, 378.

However, later in the opinion, Judge McLaughlin cited Koresko's January 7, 2014

deposition in support of her statement that "[t]he Newell trust was not a part of the REAL

VEBA Trust but was 'separate and distinct.'"  See Perez, 86 F. Supp.3d at 355 (¶ 152).

This statement is in a section of the FOF documenting certain transfers out of the Trusts,

and Judge McLaughlin cited a transfer of $1.9 million from the Trusts to purchase an

annuity titled to the W.S. Newell Welfare Benefit Plan and a transfer of $1,974,017.04 from a bank account belonging to the Trusts to another account relating to the W.S. Newell Trust.  Id.  Judge McLaughlin included these transfers in the amounts improperly diverted from the Trusts for purposes of calculating the judgment against Koresko and the related entities.  Id. at 393; see also Doc. 1134-1 at 1 lines 11 & 18 (spreadsheet appended to Judge McLaughlin's opinion).  Treating these sums as inappropriately transferred out of the Trusts, as opposed to transactions within the plans and accounts associated with the Trusts, could support the conclusion that the Newell Plan is separate and apart from the REAL VEBA and SEWBPT.

The DOL argues that, even if found to be separate, the Newell Plan cannot extricate itself completely from the Trusts due to the comingling of funds and the use of Trust assets to support some of the Newell-associated insurance policies.  Doc. 1448 at 8. During the above-referenced telephone conference on November 13, 2014, recognizing the complexity in combing through the transactions, the DOL suggested that the "determination [regarding the Newell Plan's inclusion in the Trusts] can only be made after ascertaining the facts as to where the monies . . . came from that initially paid for these policies, whether there was consideration given in return for the policies leaving the [Trusts], all of these things that would happen during an accounting . . . ."  N.T. 11/13/14 (Doc. 1088) at 7.  Judge McLaughlin documented comingling of funds extensively in her FOF/COL, in which she conducted an extensive transactional history of the movement of funds from account to account through the banking maze that Koresko created.  Perez, 86 F. Supp.3d at 338-71.  With respect to the Newell Plan, Judge McLaughlin traced monies

expended on behalf of the Newell Plan to Trust assets, establishing a significant comingling of funds.[22]

The record now before the court is insufficient to make a determination whether the Newell Plan is separate from the Trusts or, if separate, to what extent Trust and Newell Plan assets should be extricated from one another to account for commingling or the use of one's assets to benefit the other.  Therefore, the court will entertain additional briefing on these issues after an exchange of information.  Marcum shall provide to the DOL any documentation relevant to the Newell Plan being part of the Trusts and, if separate, any monies that should be returned to the Trusts, and the DOL shall produce that documentation to the Newell Plan.  Similarly, the Newell Plan shall submit to the DOL any documentation evidencing its existence as separate and apart from the Trusts, and any funds or assets it believes wrongfully reside in the Trusts or were paid for the benefit of the Trusts.

### D.   <u>Challenge to Calculation of Death Benefits – Various Plans</u>

A group of over twenty plans ("the Death Benefit objectors") have filed counseled objections challenging the calculation of the death benefit to be paid by the Trusts.  Doc.

---

[22]For example, Judge McLaughlin traced monies flowing from the Castellano Death Benefit account ("7994 account"), <u>Perez</u>, 86 F. Supp.3d at 344, to a Koresko IOLTA account ("5455 account"), <u>id.</u> at 346, which was then used to purchase an annuity titled to the W.S. Newell Welfare Benefit Plan and another account ("1302 account") that Koresko characterized as relating to the W.S. Newell Trust.  <u>Id.</u> at 355.  Likewise, Judge McLaughlin found that an IOLTA account that Mr. Koresko characterized as containing amounts owed to the Newell Trust ("1146 account") contained significant Trust assets that had been transferred by Koresko.  <u>Id.</u> at 361.

1437.[23]  By way of brief background, under the adoption agreements established by

Koresko and entered into by the plans, calculation of death benefits was based on a

formula linked to an individual's salary rather than the face amount of the policy at issue.

See Solis v. Koresko, 884 F. Supp.2d 261, 272 (E.D. Pa. 2012) ("Each Adoption

Agreement . . . defined the death benefit as calculated based on a set multiple of the

participating employee's salary."); see also N.T. 7/8/13 (Doc. 429) at 116-17 (Mr.

Koresko's explanation at the TRO hearing of the calculation of a death benefit).  The

Unified Model assumes that any death benefit paid prior to final resolution of the Trusts

will be the lesser of:  "1) the death benefit as determined by the [Wagner Law Group] as

called for by the Adoption Agreement; or 2) the face amount of the associated insurance

policy after any applicable reductions for loans or partial surrenders . . . and excluding

any interest payments."[24]  Unified Model at 10.[25]

---

[23]The plans represented in this objection are:  Flagship Management, LLC, GP Construction Services, Inc., Mida, Inc., Anthem Medical Management, Inc., Pamela K. Erdman, M.D., Inc., Engineered Systems and Products, Inc., Resource Realizations, Inc., Howard Greils, M.D., Inc., Harvey A. Kalan, M.D., Inc., Powercom Electrical Services, Inc., Olouakan Comluct, Inc., Mario Magcalas, M.D., P.A., Carson's Steak Warehouse and Saloon, Inc., Morgen & Oswood Construction, Inc., Charles Parsons & Associates, LGS Specialty Sales, LTD, David C. Spokane Orthodontic Associates, P.C., Tobey Karg Sales Agency Inc., U.E. Systems, Inc., and M&E Zenni, Inc.

[24]The Unified Model does not penalize any of the plans singly, including those that receive death benefits, for the inappropriate loans Koresko took out on the policies.

[25]Judge McLaughlin approved the use of the Adoption Agreement calculation when the Wagner Law Group was acting as the IF, and also directed that the IF pay 50% of death benefits to preserve assets during the forensic accounting process.  See Docs. 807, 1146.  I have followed both practices in overseeing Wagner Law Group's current role as Trust Administrator.  With respect to the 50% payment of death benefits, the Unified Model takes into account the remaining 50% due.

The Death Benefit objectors urge the court to ignore the plan documents in the calculation of death benefits and rely on the face value of the insurance policy, relying on plan participants' expectation that beneficiaries would be entitled to the face amount of the policies, Koresko's history of dealing (and misdealing),[26] and ambiguity in the adoption agreements.  Doc. 1437.  The DOL concurs, noting that the terms of the adoption agreements were "inconsistent with other agreements or intentions understood between the parties."  Doc. 1448 at 2.

I conclude that the objection need not be ruled on at this time.  The objection is to the calculation of death claims, not the distribution methodology.  The Trusts have continued to exist after coming under the court's control, making it necessary to pay death claims as deaths have triggered policy payments to the Trusts.  However, none of the objecting plans has a death claim pending, rendering this objection moot.[27]

---

[26]The objectors cite to the litigation involving a plan named Castellano as an example of Koresko's misconduct in refusing to pay a death claim and in support of their position that the plan documents created by Koresko should not be used to limit death benefits.  Doc. 1437 at 4-5 (citing Reg'l Emp'rs' Assurance Leagues Voluntary Emp'rs' Ben'y Ass'n Trust v. Castellano, Civ. No. 03-6903 (E.D. Pa.)).  Neither Judge McLaughlin in granting benefits to Mrs. Castellano, nor Judge Stengel in his opinion finding Koresko liable for tax penalties in connection with the plans, ruled on the validity of the death benefit formula in the adoption agreements.  See Castellano, Civ. No. 03-6903, 2015 WL 5025446 (E.D. Pa. Aug. 25, 2015); Koresko v. United States, 123 F. Supp.3d 654 (E.D. Pa. 2015).

[27]The court inquired of the Trust Administrator whether any of the Death Benefit objectors has a pending death claim, and was advised that none of these plans have filed a death claim.  However, the Trust Administrator also advised the court that the insureds named in a policy previously related to the Flagship plan have died.  If the court determines that Flagship was properly terminated, there will be no basis to address this objection.  If the court determines that Flagship is an open plan, Flagship may reassert

**E.    Challenge to Methodology – Various Plans**

This brings me to the only objection that challenges the distribution methodology underlying the Unified Model.  Allamo Ventures, Inc., Brigham City Arthritis Clinic P.C., Brite Management, Inc., Cavaliere Professional, P.C., Crandall Investments, Inc., Ellertson Family, Inc., and James M. LaRose, D.O. & Associates ("the Allamo objectors") filed a counseled objection asserting alleged flaws in the Unified Model.  Doc. 1442.  I conclude that the objection should be rejected.

First, the Allamo objectors argue that the "Unified Model incorrectly attempts to determine and allocate a pro-rated share of the overall cash losses to participants by mixing current policy cash values and future policy death proceeds."  Doc. 1442 at 3.  I agree with the DOL, Doc. 1448 at 4, that this objection reflects a misunderstanding of this aspect of the Unified Model.  <u>Future</u> policy death proceeds play no role in the calculation.  The only time that death benefits enter the calculation is if a death benefit has been paid to the Trusts.[28]

In a related argument, the Allamo objectors complain that the Model varies the distribution result depending on the date of death of an insured.  Doc. 1442 at 3.  The Model does distinguish between deaths that occurred prior to and after Judge

---

this objection.  Should any of the other objecting plans have a death claim arise prior to final resolution of the Trusts, such plan may re-raise the objection at that time.

[28]The objectors refer to the ninth example in Marcum's hypotheticals to illustrate this objection.  Doc. 1442 at 3.  In that example, Marcum posited a scenario in which a plan experienced a death of an insured.  Thus, the hypothetical involves a death resulting in current payment of policy proceeds, and it does not anticipate payment for "future policy death proceeds" as the objectors argue.

McLaughlin's entry of the temporary restraining order ("TRO") on July 9, 2013, which was effectively the date the court took control of the Trusts from Koresko.  Doc. 407. The Unified Model assumes that insurance benefits for deaths that occurred prior to the TRO will be paid at 100% of the determined death benefit (using the lesser of the policy amount or the adoption agreement and plan documents, as mentioned above), without a reduction for the ASD.  This assumption recognizes that many deaths occurred and were fully paid in the years before this process began.  In contrast, payment of death benefits for deaths that occurred after the TRO was entered will be subject to the ASD.  Although this may seem arbitrary, dissolution of the Trusts in light of an expected shortfall of assets places a priority on preservation of assets.  Entry of the TRO seems a logical place to begin that preservation process.  Under the Unified Model, plans that received payment of death proceeds before the TRO are not treated more favorably than plans where death occurred prior to the TRO but payment happened to be made later.  By applying the ASD to all deaths after the TRO, the Model balances the expectations of the plans with the need to preserve limited Trust assets for distribution to all plans.

The Allamo objectors also argue that "[t]he Unified Model attempts to determine and allocate a pro-rated share of the overall loss to participants by adjusting liability for loss according to a pro-rated amount of each policy's current cash values."  Doc. 1442 at 3.  The result is that "policies with greater cash value . . . absorb a greater portion of the asset shortfall."  Doc. 1442 at 7.  The DOL believes this argument again misinterprets the Unified Model.  Doc. 1448 at 4.

22

Although the objection is not completely clear, the implication of the Allamo objectors' argument is that the distribution should be based on per capita rather than pro rata shares.  Read this way, the objectors' proposal and the Unified Model stand in stark contrast to each other.  Allamo suggests calculating the loss to the Trusts and then dividing that per capita, with each plan bearing the identical loss to obtain the assets related to its plan regardless of the value of the plan or the policies it holds.  The Unified Model instead calculates the available assets and divides those assets pro rata, or proportionately, by applying the ASD to the amounts due to each plan.  Consistent with Judge McLaughlin's orders setting the distribution process in motion, and in light of the equities at stake, a proportional division is preferable to a per capita division.  See Doc. 1240 (requiring Marcum to conduct a sub-accounting to determine each plan's interest in the Trusts).

The Allamo objectors note that in one of its bulletins the "DOL has discussed the options and alternatives for allocation of costs in individual account plans."  Doc. 1442 at 7 n.6 (citing DOL Field Assistance Bulletin 2003-03).  The referenced Bulletin does not apply to the distribution question at issue.  It issues guidance generally on the allocation of ERISA plan expenses that are both proper and reasonable.  The losses in this case go far beyond the proper and reasonable expenses attendant to the maintenance of an ERISA plan, and the issue is not normal maintenance of an ERISA plan but its dissolution due to fiduciary breaches.  Here, the court has found that Koresko and his entities are liable for over $18 million that was misappropriated from the Trusts, in addition to legal and professional fees authorized to be paid from the Trusts.

In any event, the Field Assistance Bulletin recognizes both pro rata and per capita assessment of plan expenses. It notes that in most cases a pro rata method of cost allocation would appear to be an equitable method of allocation, and acknowledges that a per capita allocation "may also provide a reasonable method of allocating certain fixed administrative expenses." Field Assistance Bulletin 2003-03 at 2-3.[29] Thus, there is nothing inherently wrong with adopting a pro rata expense calculation, and the history and posture of this case favor pro rata.

The core of the Allamo objectors' complaint is their view that the Unified Model punishes those plans with greater cash values. See Doc. 1442 at 7 ("the effect of [the Unified Model's adjustment based on cash values] is to cause policies with greater cash value to absorb a greater portion of the asset shortfall"). Although not intended as a punishment, the statement is mathematically correct because the ASD is applied to the value attributed to each plan, which, as noted above, is a combination of the plan's transactions and policy values. Because the ASD applies at the same percentage to all plan values, greater-value plans lose more in absolute numbers. This is neither "punishing" nor inequitable. Koresko marketed the VEBA as a tax shelter, a way to purchase life insurance that allowed the business owner to deduct the policy premiums from his or her taxes. See supra at 11 n.14. Thus, a person who contributed more to the

---

[29]The Bulletin also suggests that the cost allocation determination should begin with the plan documents. Field Assistance Bulletin 2003-03 at 2. Here, the Adoption Agreements that the court has reviewed are silent on the issue.

plan  expected to receive a greater tax benefit.[30]  Likewise, it is equitable for all plans to share proportionately in the loss.

The Trusts are made up of mostly small businesses, whose yearly contributions averaged $100,000 with some providing as little as $25,000 and others as much as $500,000.  N.T. 9/9/09 (Doc. 132) at 73.  Jeanne Bonney, an attorney in the Koresko Law Firm who was familiar with the Trusts, stated that the plan participants were "not high rollers."  Id. at 74.  One of the equitable considerations in the Unified Model is to protect all of the plan participants, including the smaller investors.  As the DOL notes in response, "[t]he basic problem with [Allamo's] approach is that a distribution of losses on a per-capita basis gives no consideration to the ability of plans to absorb such losses.  The larger accounts would be 'winners' and the smaller accounts the 'losers,' which cannot stand under equity."  Doc. 1448 at 5.  In essence, Allamo's proposal would have a disparate impact on the smaller investors.  Although a per capita attribution of the loss across the plans appears neutral on its face, in application, many smaller plans would be eliminated from the distribution, benefitting the larger plans.

Diminution or elimination of value for smaller plans would have another negative result.  Many plans have expressed the desire to receive "their" insurance policies, and the Unified Model assumes that plans will be given the opportunity to do so.  This is a critical element of the Unified Model because many of the insureds are elderly or otherwise uninsurable, and the loss of the insurance through the Trusts will render them

---

[30]The IRS ultimately found that the deductions were not valid and in many cases audited the taxpayers and denied the deduction.  N.T. 12/12/16 at 93-94.

without the ability to obtain life insurance.  To obtain their policies, plans will have to pay the Trusts the cash values of the policies by cash payment and/or by using the residual value in the plan.  Allamo's proposal ignores the economic reality that a per capita distribution would render some of the plan participants unable to buy back their policies.  Doc. 1442 at 4-5.  As the DOL suggests, such a result "cannot stand under equity."  Doc. 1448 at 5.

## IV.    <u>CONCLUSION</u>

I have addressed three objections and recommend that each be denied.  First, Wuest's objection to its inclusion in the Unified Model of Equitable Distribution, Doc. 1440, should be rejected.  The IRS's determination that the Wuest principals were not entitled to a tax deduction does not result in a conclusion that Wuest is not a part of the Trusts.  Second, the death benefit objection should be denied.  Doc. 1437.  The challenge brought by this group focuses on the calculation of death benefits, which is moot because none of the objecting plans has a claim for death benefits pending.  The denial of this objection should be without prejudice.  Should Flagship be determined to be an open plan, it may reassert this objection and should one of the other objecting plans submit a death benefit claim during the pendency of the dissolution process, it may also reassert this claim.  Third, the objection brought by Allamo and other plans challenging the distribution methodology, Doc. 1441, should be rejected as inequitable in light of the facts and history of the case.  In light of these conclusions, the court should now adopt the Unified Model.

The other three objections require further development.  The objections brought by Flagship and Omni, Docs. 1438 & 1439, challenging their characterization as closed/terminated require additional discovery to determine the accuracy of the characterization.  By separate order, the plans and DOL will exchange relevant documents and engage in further briefing.  The objection brought by the Newell Plan to its inclusion in the Trusts also requires additional discovery and briefing, addressed by separate order.

Therefore, I make the following:

**R E C O M M E N D A T I O N**

AND NOW this 17th day of February, 2017, upon consideration of the Department of Labor's Motion for Equitable Distribution, Doc. 1384, the Unified Model of Distribution, the Objections filed by various plan sponsors, Docs. 1437-1442, the Responses by the Department of Labor, Docs. 1448 & 1451, and for the reasons stated in the attached Report, IT IS RESPECTFULLY RECOMMENDED that  the objections filed by Wuest and a group of plans including Allamo, Docs. 1440 & 1442, be rejected, the death benefit objection by various plans, Doc. 1437, be rejected as moot at this point, the court grant the Department of Labor's Motion for Equitable Distribution, Doc. 1384, to the extent it calls for adoption of the Unified Model, and adopt the Unified Model of Distribution.  Marcum should proceed with the second phase of the distribution and prepare to mail the individual plan accountings to the plan sponsors, consistent with the previously entered schedule.

By separate orders, the undersigned will oversee discovery and entertain additional briefing on the objections filed by Flagship, Omni, and Newell.  Docs. 1438, 1439, 1441.  These plans' objections focus on their characterization as open or closed/terminated or their inclusion in the Trusts.  Delaying ruling on these objections will not interfere with the second phase of the distribution process.

BY THE COURT

/s/ Elizabeth T. Hey

_____

ELIZABETH T. HEY, U.S.M.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD C. HUGLER, ACTING        :           CIVIL ACTION
SECRETARY OF LABOR, UNITED     :
STATES DEPARTMENT OF LABOR    :
                                     :
           v.                 :
                                     :
JOHN J. KORESKO, V, et al.        :          NO.  09-988

## **O R D E R**

AND NOW, this                     day of                                    2017, upon

careful and independent consideration of the Department of Labor's Motion for Equitable

Distribution (Doc. 1384), the Unified Model of Distribution, the Objections filed by

various plan sponsors (Docs. 1437-42), the Responses by the Department of Labor (Docs.

1448 & 1451), and after review of the Report and Recommendation of United States

Magistrate Judge Elizabeth T. Hey, IT IS ORDERED that:

    1.  The Report and Recommendation is APPROVED AND ADOPTED.

    2.  The Objections by Wuest and the Allamo objectors (Docs. 1440 & 1442) are

OVERRULED.

    3.  The Objection challenging the death benefit calculation (Doc. 1437) is

DISMISSED AS MOOT without prejudice.

    4.  The Motion for Equitable Distribution is GRANTED to the extent it calls for

the adoption of the Unified Model.

    5.  The Unified Model of Distribution is APPROVED AND ADOPTED.

6.  Marcum shall proceed to prepare the individual plan accountings to be sent to the plans under the schedule previously adopted.

BY THE COURT:

_____

WENDY BEETLESTONE, J.